**ORAL ARGUMENT NOT YET SCHEDULED**

Nos. 24-1363 (lead), 24-1364, 25-1028, 25-1034

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

PUBLIC SAFETY SPECTRUM ALLIANCE AND PUBLIC
SAFETY BROADBAND TECHNOLOGY ASSOCIATION,

Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,

Respondents.

On Petitions For Review Of Orders
Of The Federal Communications Commission

**PETITIONERS PUBLIC SAFETY SPECTRUM ALLIANCE AND
PUBLIC SAFETY BROADBAND TECHNOLOGY ASSOCIATION'S
OPPOSITION TO MOTIONS FOR STAY PENDING APPEAL**

Andrew J. Pincus
Carmen N. Longoria-Green
Wajdi C. Mallat
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
apincus@mayerbrown.com

*Counsel for Petitioners Public Safety Spectrum Alliance & Public Safety
Broadband Technology Association*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

BACKGROUND ...................................................................................3

    A.    Prior Commission Proceedings ...................................................3

    B.    The Eighth Report And Order........................................................5

    C.    Legal Challenges To The Order.....................................................7

ARGUMENT .......................................................................................7

I.      MOVANTS WILL NOT SUCCEED ON THE MERITS.............................8

    A.    The Order Is Neither Arbitrary Nor Capricious. ..................................8

          1.    The Commission Adequately Considered Movants' Claimed Reliance Interests. ......................................................9

          2.    The Order Does Not Arbitrarily Or Capriciously Cancel Geographic Licenses. ................................................13

          3.    The Order Is Not Contradictory.............................................14

          4.    NSA/CSA's Remaining Policy Arguments Are Meritless. ......14

    B.    The Order Was Adequately Noticed. ...............................................15

II.    MOVANTS WILL NOT SUFFER IRREPARABLE HARM. ....................18

III.   THE PUBLIC INTEREST WEIGHS AGAINST A STAY.........................21

CONCLUSION ...................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ALLTEL Corp. v. FCC*,
  838 F.2d 551 (D.C. Cir. 1988).............................................................12

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
  937 F.3d 559 (D.C. Cir. 2019).............................................................12

*AT&T Servs., Inc. v. FCC*,
  21 F.4th 841 (D.C. Cir. 2021)...............................................................3

*Brennan v. Dickson*,
  45 F.4th 48 (D.C. Cir. 2022)................................................................16

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006).............................................................19

*City of Waukesha v. EPA*,
  320 F.3d 228 (D.C. Cir. 2003).............................................................17

*Clean Air Council v. Pruitt*,
  862 F.3d 1 (D.C. Cir. 2017).................................................................17

*CSX Transp., Inc. v. STB*,
  584 F.3d 1076 (D.C. Cir. 2009)...........................................................16

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)............................................................................15

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005) ...............................................................20

*Fund for Animals v. Frizzell*,
  530 F.2d 982 (D.C. Cir. 1975).............................................................21

*Great Lakes Commc'n Corp. v. FCC*,
  3 F.4th 470 (D.C. Cir. 2021)................................................................16

*Huntsman Petrochemical LLC v. EPA*,
  114 F.4th 727 (D.C. Cir. 2024)..............................................................9

*ICORE, Inc. v. FCC,*
  985 F.2d 1075 (D.C. Cir. 1993) ........................................................12

*Idaho Conservation League v. Wheeler,*
  930 F.3d 494 (D.C. Cir. 2019) ..........................................................16

*Intelligent Transp. Soc'y of Am. v. FCC,*
  45 F.4th 406 (D.C. Cir. 2022) ...........................................................12

*KalshiEX LLC v. CFTC,*
  119 F.4th 58 (D.C. Cir. 2024) ...........................................................19

*MediNatura, Inc. v. FDA,*
  998 F.3d 931 (D.C. Cir. 2021) ..........................................................12

*Mobile Relay Assocs. v. FCC,*
  457 F.3d 1 (D.C. Cir. 2006) ..............................................................10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .............................................................................9

*Mozilla Corp. v. FCC,*
  940 F.3d 1 (D.C. Cir. 2019) ..............................................................10

*Nat'l Lifeline Ass'n v. FCC,*
  2018 WL 4154794 (D.C. Cir. Aug. 10, 2018) ..................................20

*Nken v. Holder,*
  556 U.S. 418 (2009) ......................................................................7, 21

*Southwestern Bell Tel. Co. v. FCC,*
  168 F.3d 1344 (D.C. Cir. 1999) ..........................................................8

*Telesat Canada v. FCC,*
  999 F.3d 707 (D.C. Cir. 2021) ..........................................................16

*Virginia Petroleum Jobbers Ass'n v. FPC,*
  259 F.2d 921 (D.C. Cir. 1958) ............................................................7

*Virginian R. Co. v. United States,*
  272 U.S. 658 (1926) ............................................................................7

*Western Union Int'l, Inc. v. FCC*,
    804 F.2d 1280 (D.C. Cir. 1986) .............................................................8

*Window Covering Mfrs. Ass'n v. CPSC*,
    82 F.4th 1273 (D.C. Cir. 2023) ...........................................................17

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ...........................................................19

*WorldCom, Inc. v. FCC*,
    238 F.3d 449 (D.C. Cir. 2001) .............................................................8

**Statutes**

5 U.S.C. § 553(b)(3) ................................................................................16

5 U.S.C. § 706 .........................................................................................17

47 U.S.C. § 154(*i*) .....................................................................................3

47 U.S.C. § 301 .......................................................................................10

47 U.S.C. § 303(r) ......................................................................................3

47 U.S.C. § 1401 *et seq.* ............................................................................3

**Other Authorities**

*Amendment of Part 90 of the Commission's Rules*,
    WP Docket No. 07-100, Eighth Report and Order, FCC 24-114
    (rel. Oct. 22, 2024) ..............................................1-8, 10-16, 18-22

*Amendment of Part 90 of the Commission's Rules*,
    WP Docket No. 07-100, Seventh Report and Order and Ninth
    Further Notice of Proposed Rulemaking,
    38 FCC Rcd 704 (2023) ...................................... 4-6, 13, 17, 20

Roberson & Assocs. LLC, *Utilization Analysis*
    *of 4.9 GHz Spectrum* (Jan. 2024) ....................................... 3, 11, 13-14

**INTRODUCTION**

These cases involve the most recent in a series of orders issued by the Federal Communication Commission in its decade-long effort to achieve increased utilization of the 4940-4990 MHz spectrum band (4.9 GHz band) for public safety purposes. That band is chronically underutilized: one analysis in the administrative record found it ***more than 90% unused***. For that reason, the Commission issued its most recent order to make advanced services available for public safety communications, increase the band's utilization, and reduce equipment costs.

In *Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Eighth Report and Order, FCC 24-114 (rel. Oct. 22, 2024) (Order)—the order at issue here—the Commission built upon its prior orders to (1) require licensees to submit information that will enable the Commission to obtain a granular understanding of the current utilization of the 4.9 GHz band; and (2) enhance the use of the band for public safety's benefit by assigning a nationwide license to a Band Manager. The Commission's decision reflects a compromise. It is an effort "to ensure that [the] 4.9GHz band spectrum is more fully utilized in the near term, while at the same time protecting existing incumbent licensee usage." Order ¶ 22.

The Bay Area Rapid Transit District (BART) and the National Sheriffs Association and the California Sheriffs Association (NSA/CSA) (collectively Movants) seek a stay of the Order, but they cannot satisfy any of the requirements

1

for such relief. Movants principally assert that the Order is arbitrary and capricious because it reclassifies their geographic licenses—licenses that correspond to the physical boundaries of their respective jurisdictions, and do not reflect their actual use of the 4.9 GHz band—to licenses based on their actual usage of the band. But the Commission's reasoned determination, after considering the effect on incumbent licensees, is not arbitrary or capricious. Moreover, incumbent licensees like BART and members of NSA/CSA had ample notice that the Commission was considering such a change to the 4.9 GHz band framework.

Even if Movants' arguments were meritorious, and they are not, Movants are not entitled to a stay because they will not suffer irreparable harm. Movants advance two purported injuries: (1) that they or their members may wish to expand operations in the future and would not be able to do so; and (2) that it will be costly for them to collect data concerning their existing operations. Neither constitutes irreparable harm. On the first, the Commission's express statement that licensees may seek waivers to expand beyond their current use of the band renders any possible injury entirely reparable. Movants' failure to seek waivers renders their claims of injury entirely speculative. And Movants' argument about expending resources to provide data fails because the requirement stems from a prior Commission order, is legally permissible, and will not impose anywhere near the substantial financial cost needed to qualify as irreparable harm.

Finally, the public interest weighs heavily against a stay. The 4.9 GHz spectrum is grossly underutilized, limiting public safety entities' ability to take advantage of the superior propagation characteristics of this spectrum and to deploy advanced life-saving communications technologies. A stay would halt the process of making the 4.9 GHz band a focal point for advanced public-safety communications, thereby harming first responders and the general public.

For all of these reasons, the Court should deny the Motions.

## BACKGROUND

The Commission has statutory authority to regulate the use of electromagnetic spectrum. *See* 47 U.S.C. § 154(*i*); *id.* § 303(r); *id.* §§ 1401-1473. The Communications Act of 1934 provides the Commission with substantial discretion to determine what entities are eligible to use a particular band, as well as how licensees can utilize spectrum. *See AT&T Servs., Inc. v. FCC*, 21 F.4th 841, 844 (D.C. Cir. 2021).

### A.    Prior Commission Proceedings

In 2002, the Commission designated the 4.9 GHz band for public safety use. Order ¶ 6. Since then, the 4.9 GHz band has remained chronically underutilized: a recent analysis in the administrative record found that between 92% and 95% of the spectrum was unused. *See* Roberson & Assocs. LLC, *Utilization Analysis of 4.9 GHz Spectrum* 3-4 (Jan. 2024), https://www.fcc.gov/ecfs/document/10201148616775/1

(Roberson Report). The Commission has undertaken multiple efforts to increase the band's utilization. *See* Order ¶ 6 & nn.22-25.

In 2020, the Commission issued a freeze on applications for the 4.9 GHz band so that it could better study how to improve utilization of the band. Order ¶ 7. In 2021, the Commission sought public input on "how to maximize the use of the band to support public safety, leverage technological advancements (such as 5G), foster a robust equipment market, and address non-public safety use of the band on a nationwide basis." *Id.* ¶ 8 (citing prior order). And the Commission "sought comment on implementation of a single, nationwide framework." *Id.*

Then, in January 2023, the Commission issued its Seventh Report and Order establishing a "comprehensive and coordinated nationwide approach to managing the 4.9 GHz band." Order ¶ 10; *see also Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Seventh Report and Order and Ninth Further Notice of Proposed Rulemaking, 38 FCC Rcd 704 (2023) (Seventh Report and Order). It adopted a nationwide Band Manager framework under which the Band Manager would "be selected based on its expertise and connections to the public safety community." Order ¶ 10. The Band Manager would be responsible "for coordinating all operations in the band." *Id.* The Commission sought comment on how to implement the nationwide Band Manager framework and how to choose the Band Manager. *Id.* ¶ 15.

The Commission concurrently adopted "new licensing rules" under which "public safety licensees may be issued site-based licenses for all operations which currently are authorized under their geographic area licenses." Seventh Report and Order ¶ 117. The Commission also required "incumbent licensees . . . to obtain a license for base stations (currently authorized under the geographic license scheme) on a site-by-site basis." *Id.* ¶ 34.

Consistent with this change in structure, the Seventh Report and Order authorized "the collection [from licensees] of granular data on public safety operations in the 4.9 GHz band." Order ¶ 11. As the Commission explained, "this data combined with a formal coordination structure performed by the Band Manager will improve interference mitigation efforts, bolster public safety confidence in the band, and play a crucial role in the Band Manager's ability to find opportunities for increasing access into the band." *Id.* Movants did not seek administrative or judicial relief from the Seventh Report and Order.

### B.    The Eighth Report And Order

In October 2024, the Commission issued the Eighth Report and Order. The Order builds upon the Commission's efforts in the Seventh Report and Order to enhance the use of the band for the benefit of public safety through the assignment of a nationwide overlay license to a Band Manager. Order ¶¶ 21-37, 42-43. The Commission found that this approach would "increase overall utilization of the band,

enhance public safety coordination, and allow incorporation of the latest commercially available technologies into the band." *Id.* ¶ 35.

Also building upon its work from the Seventh Report and Order, the Commission modified the 4.9 GHz band licensing regime. Order ¶¶ 56-59. The Commission explained that the collection of granular data regarding licensees' use of the band would be used to replace geographic licenses with usage-based licenses. *Id.* ¶ 58. Accordingly, the Commission gave "incumbent licensees 6 months to make the appropriate filings" concerning their use of the 4.9 GHz band. *Id.* ¶ 56. Once that data was collected, "incumbent licensees' current . . . licenses will be cancelled once the incumbents apply for and are" granted new licenses. *Id.* ¶ 58. The new regime "does not modify or alter incumbents' rights to operate their existing networks." *Id.*

To ensure an effective transition, the Commission also addressed the pre-existing freeze on licenses for the 4.9 GHz band that persisted through the Seventh Report and Order. It determined that the freeze on new licensees should continue, Order ¶ 53, and concluded that it would also freeze expansions of existing licenses, *id.* ¶ 54. But the Commission "remind[ed] applicants and current licensees facing special circumstances that they make seek a waiver of the freeze pursuant to section 1.925 of the Commission's rules." *Id.*

### C. Legal Challenges To The Order

The Commission published the Order in the Federal Register on November 20, 2024. On November 26, PSSA petitioned this Court for review of several discrete aspects of the Order, while supporting its principal provisions. On January 17, NSA/CSA and BART filed two separate petitions for review. Both Movants petitioned the Commission for a stay, and PSSA opposed those petitions. The Commission has not yet acted on either request for a stay.

### ARGUMENT

In determining whether to grant a stay pending review, the Court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation marks omitted).

Importantly, "[a] stay is an 'intrusion into the ordinary processes of administration and judicial review.'" *Nken*, 556 U.S. at 427 (quoting *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam)). Thus, a stay "is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Id.* (quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672 (1926)).

The Court should deny the Motions. Movants have not shown that they are likely to succeed on the merits. Nor have Movants shown that they will suffer irreparable harm absent a stay. Finally, the public interest and balance of equities weigh heavily against a stay.

## I.     MOVANTS WILL NOT SUCCEED ON THE MERITS.

### A.     The Order Is Neither Arbitrary Nor Capricious.

Movants first assert (BART Mot. 11-15, NSA/CSA Mot. 9-14) that the Order is arbitrary and capricious because, in their view, it adversely affects reliance interests. Second, BART (Mot. 16-18) contends that the Order is arbitrary and capricious because it purportedly cancels incumbents' geographic licenses before analyzing the data regarding spectrum use. Third, NSA/CSA (Mot. 14-16) assert that the Order is self-contradictory. Finally, Movants raise a litany of policy disagreements with the Commission's conclusions. None of these arguments is meritorious.

Arbitrary-and-capricious review "is a 'deferential standard' that 'presume[s] the validity of agency action.'" *WorldCom, Inc. v. FCC*, 238 F.3d 449, 457 (D.C. Cir. 2001) (quoting *Southwestern Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1352 (D.C. Cir. 1999)). It is not a court's "role to second guess the FCC's policy judgment, so long as it comports with established standards of administrative practice." *Id.* at 458; *Western Union Int'l, Inc. v. FCC*, 804 F.2d 1280, 1292 (D.C. Cir. 1986) ("The FCC's

judgment about the best regulatory tools to employ in a particular situation is . . . entitled to considerable deference from the generalist judiciary.").

Therefore, agency action is arbitrary and capricious only if "the agency 'entirely failed to consider an important aspect of the problem' or 'offered an explanation for its decision that runs counter to the evidence before the agency,'" or if the agency "fails to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Huntsman Petrochemical LLC v. EPA*, 114 F.4th 727, 735 (D.C. Cir. 2024) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Because the agency carefully considered and rejected each of the arguments raised by Movants, there is no basis for an arbitrary-and-capricious claim.

### 1. The Commission Adequately Considered Movants' Claimed Reliance Interests.

Both Movants argue that the Commission's decision to shift from a geographic licensing regime to one based on licensees' actual use of the 4.9 GHz band harms what they assert are reliance interests in the geographic licensing regime—and that the Commission did not adequately consider that some incumbent licensees may wish to expand their operations beyond their existing site-specific footprint. Movants are incorrect.

As an initial matter, Movants have not established a cognizable reliance interest in maintaining their original geographic licenses. "The Commission grants a licensee the right 'to the use of' the spectrum . . . 'but not the ownership thereof.'" *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 12 (D.C. Cir. 2006) (quoting 47 U.S.C. § 301). Therefore, the Commission generally "has the unilateral authority" to alter and even revoke spectrum licenses. *Id.* And while it is possible for a licensee to demonstrate reasonable reliance on the scope of a license as issued, here, because the Commission has for years worked to alter the rules of the 4.9 GHz band, "[a]ny reliance" in the unfettered licensing status quo was not "reasonable," let alone cognizable. *Mozilla Corp. v. FCC*, 940 F.3d 1, 64 (D.C. Cir. 2019).

Moreover, the Commission did consider licensees' interests. The Commission expressly recognized that "[t]here are 3,676 licenses currently issued in the band," Order ¶ 5, and it was "cognizant that some incumbent licensees . . . may have invested in systems that they hoped to use to modify or expand current operations," *id.* ¶ 54. And the Commission acknowledged comments warning that altering the licensing rules could "disrupt the serious reliance interests of existing state and local 4.9 GHz public-safety licensees." *Id.* ¶ 57 (quoting CERCI May 10, 2024, *Ex Parte* at 4).

But the Commission determined that these interests were insufficient to justify maintaining the status quo. It found that geographic licenses contributed to the

underutilization of the 4.9 GHz band, and therefore shifted to a usage-based licensing regime in order to enhance utilization of the spectrum. As the Commission explained, the shift from blanket geographic licensing to usage-based licensing was necessary to "improve interference mitigation efforts and bolster public safety confidence in the band." Order ¶ 58 (quotation marks omitted). Moreover, the shift would "help the Band Manager identify specific frequency usage across all deployments in the band, and thus potentially unused channels within areas covered by certain geographic licenses." *Id.* ¶ 59 (footnote omitted). And given the extensive record evidence and commentary that the "4.9 GHz band is very much underutilized nationwide," *id.* ¶ 29 (quoting Fraternal Order of Police Feb. 13, 2024, *Ex Parte* at 1-3); *see also* Roberson Report 4, it made sense for the Commission to continue its efforts to find ways to improve utilization of the band, which reasonably included stopping licensees from warehousing spectrum that they do not use.

In any event, the Commission sought to allay any remaining concerns by explaining that licensees could obtain waivers to expand their existing operations where necessary. As Movants concede, the Order makes clear that "applicants and current licensees facing special circumstances . . . may seek a waiver of the freeze." Order ¶ 54. And the Order states that the Public Safety and Homeland Security Bureau and the Wireless Telecommunications Bureau would "retain jurisdiction to manage and implement the freeze." *Id.* ¶ 55. In other words, the Commission

ensured that any incumbent licensees have recourse should they demonstrate a need to expand their existing operations.[1]

Put simply, the Order on its face demonstrates that Movants are wrong that "[t]he Commission gave zero consideration to" incumbent licensees' interests. BART Mot. 13. The Commission "assess[ed] whether there were reliance interests, determine[d] whether they were significant, and weigh[ed] . . . such interests against competing policy concerns." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 940-41 (D.C. Cir. 2021) (quotation marks omitted). Because the Commission was cognizant of reliance interests and explained its choice, "[n]o further explanation was required." *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 578 (D.C. Cir. 2019); *see also Intelligent Transp. Soc'y of Am. v. FCC*, 45 F.4th 406, 414-15 (D.C. Cir. 2022) (FCC reasonably explained its decision to reallocate portion of a spectrum band, despite reliance-interest objection).

---

[1] BART's invocation (Mot. 15) of *ALLTEL Corp. v. FCC*, 838 F.2d 551 (D.C. Cir. 1988), is unavailing. As this Court has recognized, even "a rule with a rational basis, yet otherwise impermissibly broad, 'can be saved by the "safety valve" of waiver or exemption procedures.'" *ICORE, Inc. v. FCC*, 985 F.2d 1075, 1080 (D.C. Cir. 1993) (quoting *ALLTEL*, 838 F.2d at 561). The Order here plainly has a rational basis, and it is not impermissibly broad, so the exemption process simply serves as an additional concession to incumbent licensees.

### 2. The Order Does Not Arbitrarily Or Capriciously Cancel Geographic Licenses.

BART (Mot. 16-18) argues that the Order is arbitrary and capricious because it cancels all geographic licenses.

As an initial matter, the Commission did not cancel existing licenses wholesale. Rather, it required incumbent licensees to complete the data collection obligations imposed on them in the Seventh Report and Order by June 9, 2025. Order ¶ 56. Geographic licenses do not instantly disappear on that date. Rather, once that data is collected, "incumbent licensees' current . . . licenses will be cancelled once the incumbents apply for and are" given new licenses. *Id.* ¶ 58. Thus, the Commission "remind[ed] incumbents that this decision to cancel the former licenses *once the new licenses have been created* does not modify or alter incumbents' rights to operate their existing networks." *Id.* (emphasis added).

Further, the record amply supports replacing the existing geographic licenses with new, usage-based licenses that will allow the 4.9 GHz band to be used more efficiently. Numerous commenters, including the Fraternal Order of Police, presented evidence that the "4.9 GHz band is very much underutilized nationwide." Fraternal Order of Police Feb. 13, 2024, *Ex Parte* at 1-3; *see also* Order ¶ 22 n.90 (collecting comments). Indeed, Roberson and Associates, a technology and management consulting company, submitted a report studying utilization of the 4.9 GHz band, finding that between 92% to 95% of the spectrum was unused and

therefore agreeing "with the FCC's position that the 4.9GHz band is underutilized by public safety." Roberson Report 3-4. As the FCC reasonably concluded, "the best mechanism for putting unassigned spectrum to use as quickly and efficiently as possible is to assign a nationwide overlay license to the Band Manager," Order ¶ 21, and doing so requires the contemplated license reclassifications.

### 3. The Order Is Not Contradictory.

NSA/CSA argue (Mot. 14-16) that the Order is arbitrary and capricious because it is purportedly contradictory in that it concludes that existing licensees will not be harmed.

There is no inconsistency. NSA/CSA do not dispute that incumbents retain their "rights to operate their existing networks." Order ¶ 58. And nothing in the Order prohibits incumbent licensees from expanding their operations in the future as long as they satisfy certain requirements. Even during the temporary freeze, any licensee is entitled to "seek a waiver of the freeze." Order ¶ 54. The Commission's determination that existing licensees will not be harmed is thus entirely logical and consistent and therefore is not arbitrary or capricious.

### 4. NSA/CSA's Remaining Policy Arguments Are Meritless.

Finally, NSA/CSA throw (Mot. 16-18) the proverbial kitchen sink at the Order, raising a host of meritless policy disagreements with the Commission's determination.

Putting aside the baselessness of these assertions, these kinds of policy disputes have no relevance to arbitrary-and-capricious review. Under this standard, "a court may not substitute its own policy judgment"—much less a challenger's policy judgment—"for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Rather, the question is whether the Order is "reasonable and reasonably explained." *Id.* Even if the Commission reached the wrong policy (it did not) or acted in a way to harm NSA/CSA (it did not), that is entirely irrelevant under arbitrary-and-capricious review. NSA/CSA do not—and cannot—claim that the Commission failed to consider and explain the relevant issues.

At bottom, these challenges to the Order amount to nothing more than a disagreement with the Commission's policy determinations, which were reached after years of notice to the public of the Commission's proposed direction, and after carefully considering a multitude of comments that helped shape the Commission's final determination. The fact that the Commission's unanimous, bi-partisan decision to maximize public safety's use of the 4.9 GHz band is not NSA/CSA's desired outcome is insufficient to support an arbitrary-and-capricious challenge.

### B. The Order Was Adequately Noticed.

NSA/CSA alone argue that they had no notice that the Commission was considering switching existing licenses from geographic licenses to licenses based

on licensees' existing operations. NSA/CSA are wrong as a matter of both law and fact.

Under the Administrative Procedure Act's (APA) notice requirement, an agency rule must be a logical outgrowth of the agency's notice of proposed rulemaking. *Idaho Conservation League v. Wheeler*, 930 F.3d 494, 508 (D.C. Cir. 2019); 5 U.S.C. § 553(b)(3). A change in a final order "qualifies as a logical outgrowth if interested parties should have anticipated that the change" to a proposed order "was possible, and thus reasonably should have filed their comments on the subject." *CSX Transp., Inc. v. STB*, 584 F.3d 1076, 1079-80 (D.C. Cir. 2009) (quotation marks omitted). The "version adopted as final" therefore need not be "identical to the last notice of proposed rulemaking; after all, the very premise of agencies' duty to solicit, consider, and respond appropriately to comments is that rules evolve from conception to completion." *Brennan v. Dickson*, 45 F.4th 48, 69 (D.C. Cir. 2022). All that is needed to satisfy the logical-outgrowth rule is that the final order is "foreshadowed by the NPRM." *Great Lakes Commc'n Corp. v. FCC*, 3 F.4th 470, 478 (D.C. Cir. 2021). The question is whether "'a reasonable member of the regulated class . . . [could] anticipate' the general aspects of the" Order. *Telesat Canada v. FCC*, 999 F.3d 707, 713 (D.C. Cir. 2021) (citation omitted).

Here, the answer is unequivocally yes. The Order was clearly foreshadowed by the Ninth Further Notice. And in fact, several actions completed in the Order

*were instituted* in the Seventh Report and Order that preceded it. *First*, the Seventh Report and Order stated that the Commission would "require incumbent licensees . . . to obtain a license for base stations (currently authorized under the geographic license scheme) on a site-by-site basis," *id.* ¶ 34, and accordingly sought comment on whether to "allow[] all incumbent licensees to retain their geographic-area licenses after they have been issued site-based licenses," *id.* ¶ 118. The Commission therefore made clear to the public that it was considering modifying the licensing regime in a way that could affect current and new licensees.

*Second*, to succeed on a logical outgrowth challenge, the challenging party must show "prejudice from an agency procedural violation" such as an inability to comment on certain proposals. *City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003) (citing 5 U.S.C. § 706). Not only is there no prejudice here, but NSA/CSA's own comments show that they *actually had the notice* they now claim was lacking. Thus, NSA/CSA's arguments are independently foreclosed because they "took advantage of th[e] opportunity [to comment] by extensively critiquing the" model adopted by the Order, *Window Covering Mfrs. Ass'n v. CPSC*, 82 F.4th 1273, 1286 (D.C. Cir. 2023), and therefore plainly "anticipated the final rule," *Clean Air Council v. Pruitt*, 862 F.3d 1, 12 (D.C. Cir. 2017).

On May 14, 2024, the NSA/CSA filed an *ex parte* notice in which they "opposed PSSA's plan for the FCC to issue a nationwide 4.9 GHz overlay license,

and through a sharing arrangement, assign rights to FirstNet." *Ex Parte* Letter of National Sheriffs' Association, WP Docket No. 07-100, at 1 (May 14, 2024). They complained that this approach would "strip local public safety licensees' rights to expand their systems." And that was not all. On June 28, 2024, the NSA/CSA complained that the "proposal would in fact freeze current uses" of the 4.9 GHz band and "force state and local public-safety licensees to hand over currently unused spectrum to" FirstNet. *Ex Parte* Letter of National Sheriffs' Association, WP Docket No. 07-100, at 5 (filed June 28, 2024). On September 23, 2024, the NSA/CSA bemoaned "a plan to transfer the 4.9 GHZ spectrum band to FirstNet Authority," claiming that they "oppos[ed]" the plan "many times in previous filings." *Ex Parte* Letter of National Sheriffs' Association, California State Sheriffs' Association, et al., WP Docket No. 07-100, at 1 (filed Sept. 23, 2024). Indeed, dozens of stakeholders filed submissions supporting and opposing the plan ultimately adopted in the Order. *See* Order ¶¶ 29-30 & nn.119-28 (detailing filings).

## II.   MOVANTS WILL NOT SUFFER IRREPARABLE HARM.

Movants also fail to establish that they will suffer any harm absent a stay, let alone *irreparable* harm. Their claimed irreparable injuries boil down to the supposed inability to expand existing operations and the cost of preparing the data needed to maintain their licenses. Neither is an irreparable injury stemming from the Order.

To show irreparable injury, Petitioners must meet "a high standard."

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

The "moving party must show '[t]he injury complained of is of such *imminence* that

there is a "clear and present" need for equitable relief to prevent irreparable harm.'"

*Id.* (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)

(alteration in original)). And "the injury must be beyond remediation." *Id.* Failure to

show irreparable harm is an independent basis to deny a stay. *See, e.g.*, *KalshiEX*

*LLC v. CFTC*, 119 F.4th 58, 63-64 (D.C. Cir. 2024).

Movants' supposed inability to expand their operations falls far short of this

showing. For one, the Order simply does not prevent Movants from expanding their

operations. After the temporary freeze is lifted, Movants can simply apply for a

license modification as needed—a routine procedure for the agency that is

unaffected by the Order. Even during the freeze, Movants can apply for a waiver if

they have an immediate need to modify their operations. Order ¶¶ 54-55. For these

reasons, the harm that Movants assert is far from "beyond remediation" and thus is

not an irreparable injury. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.[2]

Perhaps recognizing the entirely reparable nature of their asserted harm,

Movants (BART Mot. 19, NSA/CSA Mot. 19-20) also focus on the expense of

---

[2] BART speculates (Mot. 21) that the waiver process is inadequate because BART
and its passengers may have to wait "while any waivers are considered." BART has
not availed itself of the waiver system even though it could pursue that option today,
so its concern is wholly speculative and belied by its own inaction.

complying with the Commission's data-collection requirement. But the Seventh Report and Order imposed the data collection obligation, so Movants are challenging the wrong order, and are too late. Seventh Report and Order ¶¶ 30-35. Any expenses related to that data collection and reporting are not traceable to the challenged Order. Moreover, the Commission regularly expects licensees to present data regarding their use of spectrum in order to ensure that it is being appropriately utilized.

In any event, Movants do not actually challenge the legality of the data collection. To the contrary, BART argues that the Commission must collect the data before it alters incumbents' licenses. As explained, that contention is incorrect. But it also shows that this irreparable-harm argument is illusory because even BART agrees that data collection is a necessary step.

Even if Movants were correct, the purported financial injury underlying Movants' argument is insufficient to meet the irreparable-harm standard. This Court has held, in the context of challenges to federal agency action, that monetary harm must be "substantial" to justify an injunction. *See, e.g.*, *Nat'l Lifeline Ass'n v. FCC*, 2018 WL 4154794, at *1 (D.C. Cir. Aug. 10, 2018); *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) ("ordinary compliance costs are typically insufficient to constitute irreparable harm"). Nothing in Movants' submission even suggests any financial injury will be substantial enough to be irreparable.

Finally, Movants' delay undermines their claims of irreparable injury. As this

Court has recognized, "delay . . . in seeking" an injunction undermines a showing of irreparable injury. *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975). Here, the Commission published the Order in the Federal Register on November 20, 2024. Movants waited until nearly the end of the review window before filing their petitions for review on January 17—and then another month to move for a stay. Thus, Movants' own conduct belies their claim of imminent irreparable harm.

## III.    THE PUBLIC INTEREST WEIGHS AGAINST A STAY.

Finally, the balance of equities and public interest both weigh heavily against a stay. When the government is the opposing party, the "harm to the opposing party and . . . the public interest. . . . merge." *Nken*, 556 U.S. at 435.

The Commission issued the Order to ensure that the 4.9 GHz band was "efficiently and intensely utilized in support of public safety missions nationwide." Order ¶ 1. Faced with a record demonstrating "that the 4.9 GHz band is very much underutilized nationwide," the Commission concluded that its decision "is the best approach to ensure that [the] 4.9 GHz band spectrum is more fully utilized in the near term, while at the same time protecting existing incumbent licensee usage." *Id.* ¶¶ 22, 29 (quotation marks omitted). This decision was amply supported in the record. *Id.* ¶¶ 21-24 & nn.99-101.

The Order therefore is an important step towards increasing utilization of the spectrum by public safety entities, and to providing them with access to advanced

communications technologies as well as reducing equipment costs. Staying the Order will delay these important goals. The public interest thus weighs heavily against a stay.

## CONCLUSION

The motions for a stay should be denied.

Respectfully submitted,

/s/ Andrew J. Pincus

Andrew J. Pincus
Carmen N. Longoria-Green
Wajdi C. Mallat
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
apincus@mayerbrown.com

*Counsel for Petitioners Public Safety Spectrum Alliance & Public Safety Broadband Technology Association*

Dated: February 28, 2025

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4,980 words.

This motion complies with the typeface requirements of Rule 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point type.

<div style="margin-left:50%">

*/s/ Andrew J. Pincus*
Andrew J. Pincus
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

*Counsel for Petitioners Public Safety Spectrum Alliance & Public Safety Broadband Technology Association*

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2025, I filed the foregoing with the Clerk

of the Court for the United States Court of Appeals for the District of Columbia

Circuit by using the CM/ECF system, which will serve all counsel of record.

/s/ Andrew J. Pincus
Andrew J. Pincus
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

*Counsel for Petitioners Public Safety Spectrum Alliance & Public Safety Broadband Technology Association*