# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

PUBLIC SAFETY SPECTRUM ALLIANCE and PUBLIC BROADBAND
TECHNOLOGY ASSOCIATION,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents.*

On Petitions for Review of an Order of
the Federal Communications Commission

# RESPONDENT FEDERAL COMMUNICATIONS COMMISSION'S
# OPPOSITION TO MOTIONS FOR STAY PENDING JUDICIAL
# REVIEW

## INTRODUCTION

In October 2024, the Federal Communications Commission issued
its eighth rulemaking order in a decades-long proceeding regulating the
"4.9 GHz band" of radiofrequency spectrum. *See In re Amendment of Part
90 of the Commission's Rules*, FCC 24-114, 2024 WL 4581402, ¶ 1 (rel.

Oct. 22, 2024) (*Eighth Order*). The proceeding's goal is to unleash the full potential of this band to support public safety. *See id.*

Unlike other spectrum bands in which the Commission grants licensees exclusive rights to use certain frequencies in specific locations, the 4.9 GHz band is shared. *Id.* ¶¶ 3–4. This means that multiple licensees may operate in or near the same geographic areas. *Id.* ¶ 4. At the same time, 4.9 GHz licensees are not limited to a specific frequency range; they may use any or all of the 50 megahertz that comprises the band. *Id.* ¶ 3. Because the geographic range of 4.9 GHz licenses often overlaps, the licensees' ability to use all channels in the band creates potential radio interference issues. Potential interference, in turn, discourages providers from offering new service because—given the band's few documentation requirements—they cannot tell whether other providers will interfere with their service. As a result, some of the 4.9 GHz band goes unused—a problem the FCC has long recognized and worked to address. *See In re Amendment of Part 90 of the Commission's Rules*, 36 FCC Rcd 1958, 1959 ¶ 1 (2020) (*Sixth Order*).

But the Commission determined that it could not foster greater use of the band without a comprehensive understanding of where current licensees operate and the technical parameters (such as specific

frequencies, power levels, and antenna heights) of the facilities they have deployed. Different types of equipment use different frequencies and thus have different interference thresholds. With a better sense of what equipment licensees are using, the agency could find usage patterns that, in turn, could help the agency use the band more efficiently. The Commission thus decided to collect this spectrum-usage information—including specifics on transmitters and other equipment—from the licensees.

Such data would be little help, though, if it were constantly in flux. To mitigate that risk, the Commission "froze" the band: it barred current licensees from expanding their operations—whether geographically or by deploying equipment that uses additional frequency channels—without the agency's permission. In doing so, the Commission committed to protecting current licensees and clarified that their existing operations would be unaffected.

Several parties, including the National Sheriffs' Association and California State Sheriffs' Association (collectively, Sheriffs' Associations), and the San Francisco Bay Area Rapid Transit District (BART), petitioned for review of the *Eighth Order* in this Court. Now, both the Sheriffs' Associations and BART (collectively, Movants) seek a stay

pending this Court's review. Their attempt to show arbitrary-and-capricious agency action—their only theory here—is nothing more than a policy disagreement: they take issue with the Commission's decision to stabilize the spectrum band while it moves to a new licensing scheme. A disagreement about how the Commission should weigh competing interests, however, does not mean that the agency's decision was arbitrary and capricious. That is especially so when the Commission concluded that the Movants' preferred approach would undermine its data collection and ultimate transition to a new regulatory framework for optimizing the 4.9 GHz band.

The Movants thus have not shown a likelihood of success on the merits. And even if they had, they still would not be entitled to a stay because their speculative theory of irreparable harm relies on a so-called "absolute right," *e.g.*, BART Mot. 14, that they never had: expanding their operations. The public interest also weighs against a stay, and the Court should deny the motions.

# BACKGROUND

## A. The 4.9 GHz Band And The Commission's Traditional Approach To Licensing In The Band

In 2002, based in part on the communications problems that public safety agencies experienced during the terrorist attacks of September 11, 2001, the FCC allocated the 4940–4990 MHz band of radiofrequency spectrum exclusively for public safety use. *Eighth Order* ¶ 6. The Commission accordingly limited operations in the 4.9 GHz band "to those in support of public safety operations," with only "public safety entities or those operating in support of public safety" able to obtain licenses. *Id.*

In some other spectrum bands, the Commission gives licensees exclusive access to frequencies within a geographic area and allows them to use that spectrum flexibly for various purposes. The 4.9 GHz band is different for several reasons.

*First*, the 4.9 GHz band is expressly set aside for public safety use. *Second*, licensees do not have exclusive rights to use the band. *Id.* ¶¶ 3, 6. Rather, the 4.9 GHz band "is shared amongst eligible licensees." *Id.* ¶ 3. The 4.9 GHz license holders have historically had authority to operate in the band anywhere within their authorized areas. *Id.* A licensee's authorized area, in turn, has generally corresponded to "the

geographic area encompassing the legal jurisdiction of the licensee," such as a state or a county. *Id.* These "licenses often overlap," meaning multiple licensees may operate in the same area. *Id.* ¶ 5.

*Third*, given the overlap, the licensees must—and do—coordinate to avoid radio interference. *See id.* Coordination in the 4.9 GHz band is unique because, "unlike other public safety bands that only authorize operations on specific frequencies . . . , [current] 4.9 GHz band licenses authorize operation on any channel over the entire 50 megahertz of the band" within the authorized area. *Id.* ¶ 3.

*Finally*, the 4.9 GHz band is different because the Commission restricts what equipment may operate in the band. That equipment can include (1) base stations that communicate with mobile units but do not themselves move (such as would be installed in the headquarters of a campus security organization); (2) mobile units that do move (like walkie-talkies or firefighter bodycams that send video back to a firetruck); and (3) temporary fixed equipment (such as base stations temporarily

deployed as part of a network that first responders use during a search-and-rescue mission in a remote area). *See id.* ¶ 4.[1]

## B. To Unleash The Band's Potential By Putting More Spectrum To Use, The Commission Moves Away From Its Historical Approach

Since the designation of the 4.9 GHz band for public safety in 2002, the Commission has continued to reexamine, revise, and adapt the rules governing the band in response to changing conditions, band use, and technological innovation. *Eighth Order* ¶ 6. In particular, the agency has sought to "increase the use of the band with the goal of maximizing the spectrum's potential." *Id.*[2]

---

[1] *See also* Coalition for Emergency Response and Critical Infrastructure, *4.9 GHz Use Cases*, *available at* https://responsecoalition.com/wp-content/uploads/2024/02/CERCI-4.9-Use-Cases.pdf (last visited Feb. 27, 2025) (describing additional use cases).

[2] The Commission has long recognized that the 4.9 GHz band is underused. For instance, in 2018 the Commission observed that, "[a]lthough nearly 90,000 public safety entities are eligible . . . to obtain licenses in the band, there were only 2,442 licenses in use in 2012 and only 3,174 licenses in use . . . in 2018." *In re Amendment of Part 90 of the Commission's Rules*, FCC 18-33, 2018 WL 1452723, at *1 ¶ 1 (2018) (*Sixth Further Notice*). As of 2024, there were only 3,676 licenses issued in the band. *Eighth Order* ¶ 5.

Stakeholders have identified various reasons for the widely acknowledged underutilization of the band. One issue is that, because the geographic licensing system lacks documentation, a potential new licensee cannot tell if new services would interfere with others. *See Sixth Further Notice* ¶ 2.

In deciding how to manage a spectrum band, the Commission necessarily confronts complex technical and policy questions. *E.g.*, *Intelligent Transp. Soc'y v. FCC*, 45 F.4th 406, 411 (D.C. Cir. 2022). This already-challenging task has been further complicated for the 4.9 GHz band. This is, in part, because rather than relying on a single, formalized process for managing the band, licensees share the band and informally coordinate operations among themselves. *See Eighth Order* ¶ 4 & n.13. As a result, the Commission has lacked a clear picture of existing operations in the band, including what types of networks and devices are using what frequencies.

The Commission has thus taken steps to get a clearer picture of operations in the band. Recent orders have pursued two goals: (1) generating an inventory of existing spectrum use (which will show what frequencies are being used where), while (2) implementing a

licensing framework that will address the band's long-recognized underutilization.

### 1. 2020 Temporary Freeze On New 4.9 GHz Applications: An Effort To Stabilize The Band

In September 2020, while considering "comment on proposals to stimulate expanded use of and investment in the . . . band" in response to the *Sixth Further Notice* in the 4.9 GHz proceeding, the FCC announced a temporary freeze on applications in the 4.9 GHz band. *Eighth Order* ¶ 7. The purpose of the freeze was "to stabilize the band while the Commission consider[ed] changes to its rules" to maximize the band's potential. *Id.* This meant that the agency would not accept applications for new licenses in the 4.9 GHz band.

### 2. 2021 *Reconsideration Order* And *Eighth Further Notice*: The Commission Explores A Nationwide Approach To Licensing And A Database To Generate A Spectrum Inventory

In October 2021, the Commission reconsidered the total freeze and determined that, while the next stage of its rulemaking proceeding unfolded, it would lift the freeze "as it applie[d] to incumbents wishing to modify their existing licenses or license new permanent fixed sites." *In re Amendment of Part 90 of the Commission's Rules*, 36 FCC Rcd 15032, 15041 ¶ 25 (2021) (*Reconsideration Order* or *Eighth Further Notice*).

At the same time, the Commission began contemplating whether it could meet its goal of fostering greater and more efficient band use through models that advanced a single "nationwide framework for coordinating access." *Eighth Further Notice* ¶ 27. To that end, the agency "sought comment on important technical and policy questions concerning how to maximize the use of the band to support public safety, leverage technological advancements (such as 5G), foster a robust equipment market, and address nonpublic safety use of the band on a nationwide basis." *Eighth Order* ¶ 8. Additionally, the FCC sought comment "on establishing a database that would contain consistent and reliable information about what spectrum is available and where and how it is being used." *Eighth Further Notice* ¶ 27. A critical piece of that database would be details about what equipment the licensees were using. *Id.* ¶¶ 32–33.

The Commission likewise asked whether it should require incumbent licensees "to license base stations ([then] authorized under the geographic license scheme) on a site-by-site basis." *Id.* ¶ 32.

### 3. 2023 *Seventh Order* And *Ninth Further Notice*: The Commission Adopts A Nationwide Band Manager Framework And Specifies What Information Incumbents Must Provide

In January 2023, the Commission issued another order and further notice of proposed rulemaking. *In re Amendment of Part 90 of the Commission's Rules*, 38 FCC Rcd 704 (2023) (*Seventh Order* or *Ninth Further Notice*). Here, the Commission "established a comprehensive and coordinated nationwide approach to managing the 4.9 GHz band." *Eighth Order* ¶ 10. It decided to "center[]" its new framework around a "Band Manager" concept. *Seventh Order* ¶ 20. The Band Manager would be responsible for "frequency coordination . . . for public safety applicants seeking to license new or modify existing facilities in the band." *Id.* ¶ 24. The Band Manager framework would also "incentiviz[e] the use of the latest commercially available technologies" and "facilitat[e] secondary non-public safety use" of the band, *id.* ¶ 23, through a leasing model under which public safety licensees would be protected from interference, *see id.* ¶¶ 24, 47.

To "help the Band Manager perform its duties and enable non-public safety use of excess capacity in the band without causing interference," *id.* ¶ 33, the Commission adopted a proposal from the

*Eighth Further Notice* to "collect[] more granular data on" public safety operations in the band, *id.* ¶ 30.

The Commission clearly delineated what information incumbents would be required to provide, codifying in its rules the data (including relevant technical network parameters) it needed to receive. *See id.* ¶ 34 (requirements codified in 47 C.F.R. § 90.1207(e)). To address commenters' concerns that collecting this data required significant effort, the Commission determined that "incumbent licensees [would] have at least one year from publication of [the 2023 *Seventh Order*] to provide the required data in [the FCC's Universal Licensing System]." *Id.* ¶ 35.

The Commission concluded that it would require incumbents to obtain new licenses and file this data on a site-by-site basis. *Id.* ¶ 34. The Commission chose this approach because it offered more clarity about the actual use of the equipment in the 4.9 GHz band, while preserving incumbents' traditional flexibility. *Id.* Better knowing the specifics of use, the Commission explained, would "improve interference protection and give public safety licensees more confidence in the band without adding a significant burden on licensees or applicants." *Id.* ¶ 33.

In the *Ninth Further Notice* issued alongside the *Seventh Order*, the Commission sought "comment on a wide range of questions related to the

implementation of [the] new Band Manager model, including the best policies as to new licensing in the band." *Ninth Further Notice* ¶ 70. In particular, the Commission referenced a proposal that the "Band Manager should evaluate 'potential integration' of the 4.9 GHz band 'with the Nationwide Public Safety Broadband Network' and sought broad comment on exploring ways in which the band might be used in conjunction with broadband networks used by public safety." *Eighth Order* ¶ 28 (quoting *Ninth Further Notice* ¶¶ 87–88). One piece of the new-licensing puzzle was what the Commission should do with incumbents' old licenses under service code "PA" after they were issued new licenses with new service codes. *See Ninth Further Notice* ¶ 118.

### 4. Order On Review: The Commission Adopts A Nationwide Overlay License And Protects Incumbents' Existing Operations

After reviewing the record in response to the *Ninth Further Notice*, the FCC concluded in the *Eighth Order* "that the best mechanism for putting unassigned spectrum to use as quickly and efficiently as possible" is through a nationwide overlay license. *Eighth Order* ¶ 21. This license will be assigned to a Band Manager, once the process set forth in the *Seventh Order* to select and confirm a Band Manager is completed. *Eighth Order* ¶ 21. The Band Manager will then be "authorized to enter

into a [spectrum] sharing agreement with the First Responder Network Authority (FirstNet)"—a congressionally created agency that oversees public safety broadband—to allow FirstNet to operate in "unassigned" portions of the band. *Id.* ¶ 1; *see id.* ¶¶ 13, 59.[3]

The Commission also examined whether to lift the freeze (in effect since 2020, and modified in 2021) on applications for new licenses. *Id.* ¶ 53. It declined to do so, concluding that "issuing licenses to new entrants before the Commission has collected granular data from incumbent licensees would further complicate the spectrum environment." *Id.* The Commission reached the same conclusion—based on the same spectrum-stability concerns—for incumbent licensees: it deemed it "necessary" to freeze new license applications from, and license modifications by, incumbent licensees to keep the data accurate. *See id.* ¶ 54.

The Commission acknowledged that applying the freeze to incumbent licensees was a change—reestablishing the freeze parameters from before the 2021 *Reconsideration Order*—that would implicate the

---

[3] "Unassigned" spectrum means spectrum not currently licensed to any incumbent public safety entity. *See id.* ¶ 23 n.94. It thus differs from spectrum that is licensed to a public safety entity but is currently "unused" in any operative network.

incumbents' reliance interests. *See id.* But the Commission concluded that the need for a clear spectrum picture outweighed these competing reliance interests. *See id.*

The Commission explained that incumbents' reliance interests would be protected in two different ways. Some adjustments of incumbents' systems (e.g., adding new mobile units or relocating existing ones) would be permissible under the new licenses. *Id.* ¶ 58 ("We remind incumbents that this decision to cancel the former licenses once the new licenses have been created does not modify or alter incumbents' rights to operate their existing networks."). And incumbents facing special circumstances not covered by the scope of their license could seek a waiver. *Id.* ¶ 54.

When the Commission adopted the *Eighth Order*, its bureaus had not yet announced a deadline for parties to submit granular data to the Commission as required under the *Seventh Order*. The Commission thus directed its subordinate bureaus to issue a public notice giving "incumbent licensees 6 months to make the appropriate filings in [the agency's] Universal Licensing System." *Id.* ¶ 56.

The Commission specified the format for submitting the required data. Incumbent licensees must use one of two new service codes, and the

codes depend on the licensees' existing operations. One code is the "PB" service; incumbent licensees will use this code to create new licenses for their existing "base/mobile, mobile-only or temporary fixed" operations—operations that are dynamic and allow the licensee to move or relocate some or all components of the radio system. *Id.* ¶ 58.[4] The other code is the "PF" code, which incumbent licensees will use to create new licenses for their existing "fixed" operations—static operations in which stationary base stations communicate only with other stationary base stations for point-to-point (or point-to-multipoint) operations. *Id.*[5]

The Commission explained that the new licenses that incumbents will generate when submitting their data will not "modify or alter incumbents' rights to operate their existing networks" in any way. *Id.* Indeed, the regulations adopted in the *Seventh Order* expressly state that

---

[4] For example, such operations would include (1) a base station at a fixed location on a college campus that exchanges data with mobile units in vehicles used to patrol the campus (base/mobile), (2) transmitters on a firefighter's protective gear that send video to a firetruck stationed outside a burning building (mobile-only), and (3) a temporary base station near the scene of a search-and-rescue mission that transmits data to base stations or mobile units to assist communications among first responders (temporary fixed).

[5] As an example, the PF code will apply to operations in which base stations deployed across a city transmit video back to the city's 911 center.

existing operations involving movement—that is, mobile and temporary fixed operations—will be authorized to operate in the same way. *See* 47 C.F.R. § 90.1207(e)(1)(vi) (effective Mar. 30, 2023). Facilities that do not involve movement—that is, base stations in a base/mobile or point-to-point network—will be licensed as "site-based," consistent with the regulations adopted in the *Seventh Order*. *See id.*; *Seventh Order* ¶ 34.

The new licenses created through the data-submission process, in turn, will replace the old licenses. Indeed, there is no need—and could create confusion—for incumbent licensees to maintain two sets of differently coded but otherwise duplicative licenses. The Commission thus concluded that "once the incumbents apply for and are authorized under the newly created . . . codes," their "current . . . licenses will be cancelled." *Eighth Order* ¶ 58.

Because the new licenses will simply replace the old ones, the Commission saw no need to wait for the data to come in before canceling the old licenses. *Cf. id.* ¶ 41 n.178 ("[T]he results of the data collection are not required for us to authorize the overlay licensing process and sharing agreement framework described herein."). The data collection will, however, "help the Band Manager identify specific frequency usage across all deployments in the band." *Id.* ¶ 59. Indeed, it will identify key

technical characteristics of the networks and equipment being used. *See Seventh Order* ¶ 34. The Commission thus deferred deciding how to address unused spectrum until after the data is analyzed. *See Eighth Order* ¶ 59.

### 5. December 2024 Public Notice

On December 9, 2024, pursuant to the *Eighth Order* (at ¶ 56), the FCC issued a public notice setting June 9, 2025, as the deadline for incumbent licensees to submit the granular data required under the *Seventh Order*, and to create new "PB" and "PF" licenses corresponding to that data in the Universal Licensing System. *Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Establish Deadline for 4.9 GHz Public Safety Licensees to Provide Granular Licensing Data*, DA 24-1137, 2024 WL 5052941, at *1 (Pub. Safety and Wireless Burs. 2024). Upon "transitioning all operations on [existing] licenses to new PB and PF licenses," the agency announced, "licensee[s] should cancel" their former licenses. *Id.* at *2. Anticipating that licensees might not always do so, however, the agency further provided that, if a licensee does not cancel its existing licenses on or before June 9, the Commission will do so "after" that date "without the need for further action" from licensees. *Id.*

## C. The Petitions For Review And Motions For Stay

Days after the *Eighth Order* was published in the Federal Register, *see* 89 Fed. Reg. 91,578, two of the four petitioners in these consolidated cases—the Public Safety Spectrum Alliance and the Coalition for Emergency Response and Critical Infrastructure—petitioned this Court for review. BART and the Sheriffs' Associations filed their petitions for review almost two months later, on the last day to do so. *See* 28 U.S.C. § 2344. The Sheriffs' Associations petitioned the FCC for a stay of the *Eighth Order* the next day. BART followed suit a week later. With their agency petitions still pending, BART and the Sheriffs' Associations now seek a stay from this Court.

## ARGUMENT

To obtain the extraordinary remedy of a stay pending review, the Movants must show that (1) they are likely to prevail on the merits, (2) they will suffer irreparable harm without a stay, (3) a stay will not harm others, and (4) a stay will serve the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The last two factors "merge" where, as here, "the Government is the opposing party." *Id.* at 435. To prevail, the Movants must make "a clear showing" that they are entitled to such an "extraordinary remedy." *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 22

(2008). Their policy disagreements and undeveloped, speculative theories of imminent harm fall well short of what is required.

## I.  THE MOVANTS ARE NOT LIKELY TO PREVAIL ON THE MERITS

As this Court has often recognized, "fostering innovative methods of exploiting the spectrum" is a "difficult, highly technical task," dependent on policy judgments that warrant the Court's "greatest deference." *Intelligent Transp. Soc'y*, 45 F.4th at 411. The Commission's actions in the *Eighth Order* reflect reasonable judgments—informed by technical expertise, after weighing competing interests—that easily survive deferential review under the Administrative Procedure Act.

### A.  The Movants' Policy Disagreements Do Not Amount To Arbitrary And Capricious Agency Action

**1.** BART argues that the Commission failed to consider incumbent licensees' significant reliance interests. *See generally* BART Mot. 11–16. That contention is belied by the plain terms of the agency's decision. *See Eighth Order* ¶ 54 (noting that "some incumbent licensees, in reliance on the existing state of the freeze prior to [the *Eighth Order*], may have invested in systems that they hoped to use to modify or expand current operations"). Rather, the Commission considered these interests and weighed them against the need for "a stable spectrum landscape" for the

upcoming inventory of "current . . . operations in the band." *Id.* It concluded that the need for stability in the band won out. *Id.* BART may disagree, but that does not make the Commission's decision arbitrary and capricious. *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 380 (D.C. Cir. 2013) (rejecting arguments that "amount[] to nothing more than another policy disagreement" with the agency). After all, the Commission's data-collection efforts are useful only if they are a snapshot of frequency use and equipment, not a moving target.

Beyond that, as the Commission expressly observed, "licensees facing special circumstances" may "seek a waiver of the freeze." *Eighth Order* ¶ 54. BART argues that the possibility of waiver "cannot save an irrational rule." Mot. 15 (citing *ALLTEL Corp. v. FCC*, 838 F.2d 551, 561 (D.C. Cir. 1988)). But as we have explained, the freeze itself was reasonably calculated to facilitate the upcoming spectrum inventory. The waiver option will allow the Commission to use its technical expertise to consider the facts—including reliance interests—of any given situation.[6]

---

[6] BART speculates (at 15–16) that "most, if not all, incumbent licensees" have invested in projects that they hoped to use to modify or expand their operations. Yet BART offers no support for this claim, which also overlooks that the new licensing scheme affects different operations in different ways.

Stepping back, the Movants' central claim—that their operations are frozen in place, *see* Sheriffs' Associations Mot. 9–11; BART Mot. 12—exhibits a fundamental misunderstanding: that the new licensing regime will affect all operations the same way. That is wrong. Rather, as we explained above, under the Commission's new license codes, certain operations that incumbent licensees were previously authorized to operate on a "geographic," not a site-specific, basis will retain their geographic character. *See supra* 17.

For example, a fire department that relies on mobile-to-mobile facilities for communications at the scene of a fire may still operate in all of the same places and on all of the same frequencies, under the *Eighth Order*, as it could before. If a fire department needs to relocate a temporary base station to respond to a wildfire, *see* Sheriffs' Associations Mot. 13, it may do so, just as it could have under its previous license.

The Movants offer no clarity on the nature of their equipment, and they shed no light on how their operations will function under the new licensing regime. They instead speculate that all of their operations will be treated like static operations. As we explain below, the Movants cannot rely on mere speculation to show harm. Nor can they rely on speculation to show that the *Eighth Order* is arbitrary and capricious.

This one-size-fits-all approach is fatal, because the Movants must clearly prove their entitlement to a stay. Here, they have not shown that all of their operations will necessarily lose the ability to operate throughout an authorized geographic area.

**2.** In any event, the Movants' disagreement with the Commission's decision to stabilize the spectrum landscape is, at bottom, a policy disagreement. *E.g.*, BART Mot. 12; Sheriffs' Associations Mot. 9–10. As we explained above, the Commission concluded that it needed to stabilize the spectrum landscape to accurately assess spectrum usage. *See Eighth Order* ¶¶ 1, 54. Freezing expansions, including through new licenses, was therefore necessary. *See id.* Without a freeze, the Commission could not get a complete and accurate picture of licensees' current use of the band— where it is being used, with what devices, and on which frequencies; without that data, in turn, it would not be possible to close gaps between users to increase usage of the band. *See id.* ¶¶ 41, 59; *see also id.* ¶ 11; *Seventh Order* ¶¶ 16–17, 20, 30–35. The Movants' disagreement with this policy decision is insufficient to render the agency's action arbitrary and capricious. *See Inv. Co. Inst.*, 720 F.3d at 380.

The Commission also expressly considered incumbent licensees' reliance interests and provided a "reasoned explanation," *Encino*

*Motorcars, LLC v. Navarro*, 584 U.S. 79, 84 (2018): the Commission "continue[s] to believe that issuing licenses to new entrants before the Commission has collected granular data from incumbent licensees would further complicate the spectrum environment and undermine the Band Manager's flexibility to provide for efficient use of this spectrum." *Eighth Order* ¶ 53. The Movants' arbitrary-and-capricious claim founders on that explanation.

Their claim is even weaker when examined in context: incumbent licensees in the 4.9 GHz band never had the unfettered "right to expand" operations that the Movants now claim. *E.g.*, BART Mot. 14. "The 4.9 GHz band is shared amongst eligible licensees," and "no licensee has a right to exclusive, or interference free, access to the band." *Eighth Order* ¶ 3.[7] As such, incumbent licensees have always had to coordinate with each other to expand their operations in areas where licenses overlap. *See id.* The Movants offer no compelling reason why incumbent licensees

---

[7] BART's argument (at 14) that it relied on "certain (not hoped for) expansions already within the scope of [its] absolute right to make changes within [its] geographic areas" is at odds with the band's non-exclusive, shared nature. *See Bell Atl. Tel. Cos. v. FCC*, 79 F.3d 1195, 1207 (D.C. Cir. 1996) (concluding that an agency rule "d[id] not upset petitioners' reliance interests" where there was considerable uncertainty in the legal landscape surrounding the rule).

cannot now similarly coordinate with the Commission (including by seeking a waiver of the freeze, while it remains in place, *see* BART Mot. 12) to expand their existing operations if necessary.

The Movants complain that, "even if the Commission . . . permits" incumbent licensees to make "modification request[s]," the spectrum they previously had "may no longer be available" because the Band Manager "can share 'unused' spectrum with FirstNet without considering any planned uses" by the licensees. BART Mot. 12; *see* Sheriffs' Association Mot. 11–12 ("[R]elinquishing control of the entire 4.9 GHz band to FirstNet and blocking future state and local public safety applicants is arbitrary and harmful."). This speculation assumes that the Commission will immediately assign all unused spectrum to FirstNet. But that runs counter to what the Commission determined in the *Eighth Order*. Instead, the Commission deferred consideration of proposals for "incumbent licensees to surrender to the Band Manager or share with FirstNet any unused spectrum" currently licensed to them. *Eighth Order* ¶ 59. It likewise explained that one of the Band Manager's "important responsibilities in conjunction with its overlay licensee role [will be to] ensure that FirstNet's operations on these frequencies do not interfere with incumbent operations." *Id.* ¶ 24.

The upshot of the Movants' position is to require the Commission to shoot at a moving target of fluctuating spectrum use. But that would undermine the purpose of the data collection, which is meant to locate current operations and ultimately promote the most efficient use of the entire 4.9 GHz band. *See id.* ¶¶ 1, 54.

**3.** The Movants also take issue with the Commission's decision to cancel the old licenses after they are converted to the new PB/PF licenses. *See* BART Mot. 16–18; Sheriffs' Association Mot. 14–15. BART makes various arguments (at 16–18) as to why this aspect of the *Eighth Order* is arbitrary and capricious. They all share a common premise: that the Commission cancelled licenses indiscriminately, including those that are "already 'efficiently and intensely' using the spectrum," even after the Commission "repeatedly acknowledged that it does not yet know whether or where 4.9 GHz spectrum is 'underused.'" Mot. 16.

This misunderstands the issue. To begin with, there is no doubt as to "whether" the 4.9 GHz band is underutilized; the Commission has known for years that it is. *See supra* 7 & n.2. In any event, the Commission is not canceling licenses because they are underused. Rather, it is canceling licenses because the old ones will be unnecessary after the new ones are issued. *See Eighth Order* ¶ 58. And that is true

despite the Commission's not yet knowing the spectrum usage details. The data collection will provide those details, but the Commission's decision to cancel a redundant license does not turn on the details of the data collected.

## B. The Sheriffs' Associations' Individual Arguments Fail

The Sheriffs' Associations raise several arguments that BART does not. None is likely to prevail.

**1.** The Associations first argue that the Commission's decision to "block public safety licensing was not the subject of adequate notice." Mot. 6–9. The crux of this argument is that "giving FirstNet *sole* access to a nationwide license," without allowing incumbent licensees to continue seeking "their own new and modified licenses" in the 4.9 GHz band, "was never clearly proposed by the FCC in any Notice of Proposed Rulemaking." *Id.* at 6.

The Commission's decision with respect to FirstNet was a "logical outgrowth" of the *Ninth Further Notice. See Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 548 (D.C. Cir. 2006) ("An agency's final rule need only be a 'logical outgrowth' of its notice."). There, the Commission referenced an earlier proposal for "the nationwide Band Manager [to] evaluate potential integration of the 4.9 GHz band with the Nationwide Public

Safety Network." *Ninth Further Notice* ¶ 87 (internal quotation marks omitted). The Commission expressly noted, after citing that proposal, that "the Band Manager should explore opportunities to lease spectrum . . . to operators of broadband networks used by public safety in other frequency bands." *Id.* In addition, the Commission sought "further comment on whether the Band Manager should be able to engage with any broadband network providers (public safety and/or commercial) to pursue opportunities for integrating operations in the 4.9 GHz band with broadband networks used by public safety in other spectrum bands." *Id.* ¶ 88.

The Sheriffs' Associations assert (at 8) that this language did not foreshadow giving FirstNet "exclusive . . . control of the band and . . . prohibit[ing] . . . further public safety licensing." Not so. Especially given the question whether to engage with "any" broadband network providers—which could, on its face, mean "any one" provider—a reasonable party "should have anticipated" that the Commission might ultimately authorize the Band Manager to engage with a specific entity,

such as FirstNet. *Covad Commc'ns Co.*, 450 F.3d at 548 (internal quotation marks omitted).[8]

Regardless, the Associations' own filings show that they knew the Commission was considering the FirstNet model: they urged the Commission not to adopt it. *See, e.g.*, 6/3/2024 Ex Parte Letter (attached hereto as Ex. A) ("giving the band to . . . FirstNet," which "has an exclusive contract with a single network provider, AT&T," "would eliminate choices for public safety"). This shows that any notice deficiency was harmless. *See Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1284 (D.C. Cir. 2023) ("Notice-and-comment violations are subject to 'the rule of prejudicial error.'" (quoting 5 U.S.C. § 706)). And the Associations notably make no attempt to show prejudice. *See id.*

**2.** The Sheriffs' Associations charge that the *Eighth Order* is based "in part on helping AT&T," which may use FirstNet's excess network capacity, "better position itself vis-à-vis its competitors," and that the Commission undercut national security efforts by reducing AT&T's

---

[8] The Sheriffs' Associations also mischaracterize the *Eighth Order*. The Commission did not give FirstNet "exclusive" control of the band. *See supra* 13–15.

incentive to bid in the upcoming "AWS-3" auction. Mot. 16–18. But the Associations identify nothing to suggest that the Commission was interested in helping AT&T. The Commission considered all comments regarding FirstNet and its "network partner AT&T," including those of AT&T's competitors. *Eighth Order* ¶ 35 & n.154. That was all that the Commission was required to do. The Sheriffs' Associations' conjecture about the Commission's desire to help AT&T finds no support in the record. *See Wisc. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) ("[b]are allegations of" harm are insufficient). And their bare assertions run counter to the "presumption of regularity [that] supports the official acts of public officers." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 918 F.3d 151, 157 (D.C. Cir. 2019).[9]

## II. THE MOVANTS HAVE NOT SHOWN IRREPARABLE HARM

The Movants' inability to prevail on the merits should doom their stay petitions. *See Citizens for Resp. and Ethics in Washington v. Fed. Election Comm'n*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (inability to

---

[9] The Sheriffs' Associations' undeveloped concerns about the AWS-3 auction are even more attenuated. They rest on legislation—the Fiscal Year 2025 National Defense Authorization Act—that had not yet been enacted when the Commission adopted the *Eighth Order*.

prevail on the merits alone is "an arguably fatal flaw"). But they also have not demonstrated irreparable harm.

**A.** As an initial matter, the Movants' failure to challenge the *Seventh Order*—in which the FCC announced, more than two years ago, that it would undertake the data collection they now complain will cause them "irreparable . . . financial cost," BART Mot. 19; *see* Sheriffs' Associations Mot. 20—undercuts their claims of urgency and irreparable harm. *See Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.*, 240 F. Supp. 3d 206, 233 (D.D.C. 2016) ("Plaintiffs' delay is at least a factor that 'undermines [their] showing of irreparable injury'" (quoting *Biovail Corp. v. U.S. Food & Drug Admin.*, 448 F. Supp. 2d 154, 165 (D.D.C. 2006))); *see also Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (delay indicates a lack of irreparable harm).

**B.** Both BART and the Sheriffs' Associations contend that they (or their members) will suffer irreparable harm from having to convert previously held geographic-area licenses into the new PB and PF licenses. *See* Sheriffs' Association Mot. 21; BART Mot. 20 ("geographic license cancellation will irreparably harm BART"). But as we have explained, *see supra* 17–18, this conversion, and the subsequent

cancellation, of old licenses will not affect the scope of incumbent licensees' existing operations.

Even as to future operations, neither Movant has demonstrated irreparable harm.

The Sheriffs' Associations (at 20) raise abstract claims that "public safety entities" will be harmed by their "inability . . . to modify and/or expand existing 4.9 GHz systems." But the Associations make no attempt to identify—let alone to substantiate—any specific needs or plans of Association members that will be impeded under the *Eighth Order*.

BART does attempt (at 18–20) to make a concrete showing of harm. But BART still fails to show, as it must, that its claimed injuries are "imminen[t]." *E.g.*, *Wisc. Gas. Co.*, 758 F.2d at 674. BART contends that, without a stay, it will be left "with a partly completed, non-operational 4.9 GHz-based communications-based train control system" that it will not be able to "complete" without substantial "re-work," or that it might even have to "scratch." Mot. 19. But the Commission has made clear that it will entertain waiver petitions in "special circumstances." *Eighth Order* ¶ 54; *see* 47 C.F.R. §§ 1.3, 1.925. Although BART contends (at 21) that it should not have to wait for the Commission to consider a waiver request, it does not explain why "passengers will suffer irremediable delays while

. . . waivers are considered," *id.*, particularly when it elsewhere concedes that its "communications-based train control system" will take years to build out in the ordinary course, *id.* at 19. BART, to date, has not asked for a waiver.

**C.** Both Movants assert that the costs of complying with the Commission's *Eighth Order* constitute irreparable harm. *See* BART Mot. 19; Sheriffs' Associations Mot. 20.

Even assuming these costs are properly attributable to the *Eighth Order*, this Court has held that "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Wisc. Gas Co.*, 758 F.2d at 674; *cf. Nat'l Lifeline Ass'n v. FCC*, No. 18-1026, 2018 WL 4154794, at *1 (D.C. Cir. Aug. 10, 2018) (per curiam) (granting a stay where "substantial, unrecoverable losses in revenue . . . may indeed threaten the future existence of [petitioners'] businesses"). And although "economic loss that threatens the survival of the movant's business can amount to irreparable harm," *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (citing *Wisc. Gas Co.*, 758 F.2d at 674), neither BART nor the Sheriffs' Associations claim that the possible costs of compliance threaten their very survival. Indeed, they do not quantify or attempt to

substantiate their compliance costs at all, as is their burden. *See, e.g.*, *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 67–68 (D.D.C. 2020) ("considerable burden" of proving injury not satisfied where plaintiffs delayed in seeking a stay and did not show compliance costs that were "substantial relative to [their] budgets").

Given the history of this proceeding, BART's complaint (at 19) that it will "need to hire or shift personnel from other duties to file as many as 188 site-specific licenses over a period of just a few months" rings hollow. BART knew of the granular data collection for over two years. Indeed, in the comments that resulted in the *Seventh Order*, BART itself estimated that it needed from "one year to eighteen months to submit" information "from the hundreds of fixed sites in its 131.4 mile network." *Seventh Order* ¶ 32. The fact that BART delayed its implementation of the data collection until the last few months is a problem of BART's own creation and thus cannot constitute irreparable harm. *See Barton v. District of Columbia*, 131 F. Supp. 2d 236, 247 (D.D.C. 2001) (collecting cases for the proposition that "[a] preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted").

## III. THE PUBLIC INTEREST WEIGHS AGAINST A STAY

In arguing that the public interest favors a stay, the Movants insist that a stay would "foster[] robust use of the 4.9 GHz band" by "maximizing efficient deployment of the spectrum while the need for future changes is adequately analyzed." BART Mot. 22; *see* Sheriffs' Associations Mot. 23 ("Incumbent licenses would continue to be valid and active . . . , and the FCC would gain a more reasonable timetable in which to compile granular license data."). That entirely overlooks the problem that the Commission's 4.9 GHz proceeding is striving to solve. It has been well and widely understood for decades that the 4.9 GHz band is underutilized. Deployment in the band cannot be "adequately analyzed"—and the Commission cannot "foster[] robust use of the" spectrum—without an accurate picture of where, with what equipment, and on what frequencies incumbent licensees are now operating. If, pending judicial review of the *Eighth Order*, incumbent licensees may modify and expand their footprints in the band through informal coordination with one another, without involving the Commission, progress toward optimizing access to a scarce and valuable public resource will be stalled. This foreseeable consequence weighs heavily against a stay.

# CONCLUSION

The motions for a stay pending review should be denied.[10]


Dated:  February 28, 2025

Respectfully submitted,


/s/ *Igor Helman*

D. Adam Candeub
  *General Counsel*

Bradley Craigmyle
  *Deputy General Counsel*

Sarah E. Citrin
  *Deputy Associate General Counsel*

Igor Helman
  *Counsel*

FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal
  Communications Commission*

---

[10] BART's alternative request (at 2) to expedite review should likewise be denied. This Court "grants expedited consideration very rarely." D.C. Circuit Handbook of Practice and Internal Procedures 34 (2021). For the reasons already explained above, expedited review is not warranted here.

# CERTIFICATE OF COMPLIANCE

### Certificate of Compliance With Type-Volume Limitation,
### Typeface Requirements and Type Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1):

    ☒ this document contains <u>7,111</u> words, *or*

    ☐ this document uses a monospaced typeface and contains ____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒ this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word for Office 365</u> in <u>14-point Century Schoolbook</u>, *or*

    ☐ this document has been prepared in a monospaced spaced typeface using _____ with _____.


/s/ *Igor Helman*
Igor Helman
*Counsel for Respondent*
*Federal Communications Commission*