[ORAL ARGUMENT NOT YET SCHEDULED]

Nos. 24-1363 (lead), 24-1364, 25-1028, 25-1034

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

PUBLIC SAFETY SPECTRUM ALLIANCE AND PUBLIC
SAFETY BROADBAND TECHNOLOGY ASSOCIATION,

*Petitioners,*

*v.*

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

*Respondents.*

*On Petitions for Review of Orders
of the Federal Communications Commission*

Petitioner San Francisco Bay Area Rapid Transit District's Reply in
Support of Stay Pending Appeal

Phyllis A. Whitten
SAN FRANCISCO BAY AREA RAPID
  TRANSIT DISTRICT
2150 Webster St, 10th Floor
Oakland, CA 94612
(510) 464-5000
pwhitte@bart.gov

Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Ste. 300
Washington, DC 20001
(202) 868-6915
hhunt@deutschhunt.com

*Counsel for San Francisco Bay Area Rapid Transit District*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ........................................................................................................1

ARGUMENT ................................................................................................................1

I.    By Cancelling Geographic Licenses, The Order Substantially Altered Incumbent Licensees' Rights. ...........................................................................1

II.    BART Is Likely To Succeed In Showing That None Of The Commission's Justifications Pass Muster. ................................................................................4

    A.  The Commission Admits It Cancelled Licenses Without a "Clear Picture" of Spectrum Usage. ....................................................................4

    B.  The Spectrum-Stabilization Rationale Does Not Justify Cancelling Licenses. .................................................................................................6

    C.  A One-Sentence Generic Reference to Reliance Is Insufficient. ...............6

III.    The Mere Possibility Of Waiver Does Not Negate BART's Irreparable Harm. ................................................................................................................9

IV.    The Public Interest Favors A Stay. ..................................................................10

CONCLUSION ...........................................................................................................12

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*CTIA - Wireless Ass'n v. FCC,* 530 F.3d 984 (D.C. Cir. 2008) ................................... 3

*Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309 (D.C. Cir. 1992) ........... 5

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) .................................... 2, 8

*ICORE, Inc. v. FCC,* 985 F.2d 1075 (D.C. Cir. 1993) ................................................ 8

*Mozilla Corp. v. FCC,* 940 F.3d 1 (D.C. Cir. 2019) ................................................... 7

*Safe Extensions, Inc. v. FAA,* 509 F.3d 593 (D.C. Cir. 2007) ................................... 5

*U.S. Telecom Ass'n v. FCC,* 359 F.3d 554 (D.C. Cir. 2004) ...................................... 8


**Regulations**

47 C.F.R. § 90.1207(e)(1) .......................................................................................... 2

89 Fed. Reg. 97559 (Dec. 9, 2024) ............................................................................ 3


**Other Authorities**

*Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Seventh Report and Order and Ninth Further Notice of Proposed Rulemaking, 38 FCC Rcd 704 (2023) .................................................................................................... 3

File No. 0011366120, FCC Universal Licensing Sys. (Dec. 13, 2024) .................... 4

Roberson & Assocs. LLC, *Utilization Analysis of 4.9 GHz Spectrum* (Jan. 2024) ... 5

**INTRODUCTION**

Let's be clear: the Commission did not merely "stabilize the [4.9 GHz] band while it moves to a new licensing scheme." FCC Opp'n 4. It *already* has moved to a new licensing scheme by cancelling—not freezing—geographic licenses as of June 9, 2025. It did so while admittedly lacking a "comprehensive understanding" of spectrum usage (FCC Opp'n 2), with barely one sentence addressing licensees' reliance interests. BART is likely to succeed in showing this action is arbitrary; the deference claimed by the Commission does not extend to actions that fail to address a significant part of the problem (reliance) and lack any foundation. The Commission does not dispute that BART will suffer concrete harm, theorizing only that BART could seek a waiver. But the speculative possibility of case-by-case waivers can neither substitute for reasoned decision-making nor remedy BART's harm. The public interest in maximizing use of the band is served, not hindered, by a stay. BART has met the requirements for a stay.

**ARGUMENT**

**I.   By Cancelling Geographic Licenses, The Order Substantially Altered Incumbent Licensees' Rights.**

In the Order, the Commission acknowledged that cancelling geographic licenses would mark a change: before, licensees could use any channel without Commission approval; now, they can't. *In the Matter of Amendment of Part 90 of the Commission's Rules,* WP Docket No. 07-100, FCC 24-114, ¶58 (released Oct.

22, 2024) ("Order"). Before, licensees could move base stations and most fixed sites within their geographic areas without Commission approval; now, they can't. Order ¶¶56, 58. This change—which is permanent, not a temporary "freeze"—is a major departure in band licensing. The Commission sometimes recognizes as much (Opp'n 35), noting that geographic licensees could "modify and expand their footprints in the band … without involving the Commission," and now they can't without a stay.

Yet it tries to downplay the policy shift, insisting (Opp'n 17) that new site-based licenses "replace" the cancelled geographic ones. But its careful argument that "*certain* operations … retain their geographic character," Opp'n 22 (emphasis added), gives up the point. Purely mobile systems (without any base station) or temporary fixed sites can still be licensed under a geographic area. 47 C.F.R. § 90.1207(e)(1)(vi). But there's no dispute that *other* existing and future operations are different now. First, all licenses (including mobile-only) will be limited to identified channels. Order ¶58; 47 C.F.R. § 90.1207(e)(1)(iv). Second, base stations can no longer be moved or added. Order ¶¶56, 58; 47 C.F.R. § 90.1207(e)(1)(i). This change substantially impairs BART's communications-based train control project, which depends upon the ability to adjust or add base stations to communicate with mobile equipment on moving trains along 130-plus miles of track. This is a major policy shift, *Encino Motorcars, LLC v. Navarro,* 579 U.S. 211, 222 (2016), so the

Commission cannot avoid its obligation to supply a reasoned explanation by asserting it changed nothing.

The Commission also attempts to shift responsibility onto the Seventh Order (Opp'n 31), echoed by PSSA (Opp'n 20-21), suggesting that BART sat on its rights and delay undercuts its irreparable harm. Wrong. First, as BART explained, Mot. 6, and no one disputes, the data collection was contingent upon Office of Management and Budget approval of the information collection request. Seventh Report and Order, 38 FCC Rcd 704, 718 n.94 (2023). The Bureaus did not publish that approval until December 9, 2024. 89 Fed. Reg. 97559 (Dec. 9, 2024). Under Circuit law, any objection to the data collection was not ripe until that notice. *CTIA - Wireless Ass'n v. FCC*, 530 F.3d 984, 987 (D.C. Cir. 2008).

Second, and again undisputed, the Commission did not decide to cancel all geographic licenses until the Order here. *Compare* Seventh Report and Order, 38 FCC Rcd at 742 ¶117 (licensees retained rights to make "future deployments" with coordination), *with* Order ¶58 (directing geographic-license cancellation); *see also* FCC Opp'n 12 (recognizing that Seventh Order "preserv[ed] incumbents' traditional flexibility").

BART did not delay. It repeatedly raised concerns during the comment period. Mot. 6-7. It filed a petition for review about a month after the Public Notice making the data collection—and thus the newly-announced license cancellation—effective.

3

*See* Pet. for Rev., No. 25-1034 (Jan. 17, 2025). It petitioned the Commission for a stay eleven days later, more than four months before the license cancellation date—hardly waiting until the last minute. More than one month later, the Commission has not acted.

BART also is preparing a waiver application, thereby pursuing every avenue for restoring geographic license rights. But the possibility of waiver does not save the rule from arbitrariness and is highly unlikely to provide full, timely relief. *See* Sections II.C, III, *infra*. The New York City Transit Authority applied for a waiver in December 2024. File No. 0011366120, FCC Universal Licensing Sys. (Dec. 13, 2024). Nearly three months later, the Commission has not acted. This record does not support the Commission's suggestion that all BART needed to do was ask for waiver earlier, and the Commission would have resolved the harm that the changed rules inflict upon BART.

II. **BART Is Likely To Succeed In Showing That None Of The Commission's Justifications Pass Muster.**

   A. **The Commission Admits It Cancelled Licenses Without a "Clear Picture" of Spectrum Usage.**

The Commission acknowledges that it does not have a "comprehensive understanding" of how the 4.9 GHz band is being used. Opp'n 2; *see also* Opp'n 8 ("lack[s] a clear picture"), 27 ("not yet knowing the spectrum usage details"). These candid statements only strengthen BART's claim that the Order "rest[ed] upon a

4

factual premise … unsupported by substantial evidence." *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992) (Thomas, J.).

At most, the Commission asserts a single data point in support of its theory that the band is "underutilized" (Opp'n 26)—the number of licensees is less than the number of eligible entities (Opp'n 7 n.2). Yet the purportedly small number of licensees reveals nothing meaningful about usage, given that some licensees are state agencies that can cover and coordinate statewide public safety needs. Order ¶5. For its part, PSSA repeatedly cites a purported "90% unused" statistic (Opp'n 1, 3, 13-14) that comes from a comment that (1) was never mentioned in the Order and (2) is most notable for what it could not estimate: "geographic coverage," "number/type of users or endpoints," and "real utilization." Roberson & Assocs. LLC, *Utilization Analysis of 4.9 GHz Spectrum* 1 (Jan. 2024), https://tinyurl.com/kyha3epr.

Dodging the lack of evidence, the Commission now says (Opp'n 26) it doesn't matter whether licenses are intensively used. This litigating position cannot be squared with the Order's design to "ensure[]" the band "is efficiently and intensely utilized." Order ¶1. Even PSSA agrees (Opp'n 10-11, 13) that the Order was premised on a finding "that geographic licenses contributed to the underutilization of the … band." Yet the Order cites no evidence of this underutilization and the Commission acknowledges (Opp'n 8) that it "lack[s] a clear picture." That is arbitrary. *See Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007) (An

5

"agency's decision ... must be supported by substantial evidence—otherwise it would be arbitrary and capricious."). As for the Commission's other theory—that the licenses could be cancelled because they are "redundant" (Opp'n 27)—it is flat wrong. *See* Section I, *supra*.

### B. The Spectrum-Stabilization Rationale Does Not Justify Cancelling Licenses.

Unable to defend license cancellation based on non-use of the spectrum, the Commission attempts to justify it by the purported need "to stabilize the spectrum landscape to accurately assess spectrum usage." Opp'n 23. For starters, the Order recites that rationale only for the regulatory freeze. Order ¶54. In addition, that keep-the-status-quo rationale cannot justify changing the status quo. A temporary freeze on using geographic licenses to add or change frequencies or sites would have avoided "a moving target" (FCC Opp'n 21) during data analysis. That is not what the Commission did. Instead, it permanently rescinded geographic license rights *before* considering the data.

### C. A One-Sentence Generic Reference to Reliance Is Insufficient.

Because the keep-the-status-quo rationale is facially inapt to justify permanent license cancellation, it also fails as a reason to cast aside licensees' reliance interests, *contra* Opp'n 23-24. The Commission's back-up argument—that licensees never had an "unfettered 'right to expand'" (Opp'n 24)—fares no better.

The Commission itself cited comments describing the "right to expand" and related "serious reliance interests" in deferring consideration of PSSA's proposal to require the sharing of unused spectrum with FirstNet, Order ¶¶57, 59—while ignoring those same reliance interests when cancelling geographic licenses. So it cannot now deny the "right to expand." Its attempt to backpedal fails anyway. The Commission says (Opp'n 24-25) "coordinat[ing] with the Commission" is the same as coordinating among licensees. Not so. Although licensees coordinated to avoid interference, this did not "fetter" their rights; formal coordination was not required and no other licensee had the veto power over expansion or modification that the Commission now holds. *See* Order ¶4. In addition, though the Commission ignored it, BART had *completed* this coordination for its communications-based train control project, Mot. 13; BART Comments at 1-2—so the project was, indeed, "certain" despite the "band's non-exclusive, shared nature" (Opp'n 24 n.7). [1]

The Commission nonetheless eliminated BART's right to complete that already coordinated project without a whisper about the millions of dollars and years

---

[1] PSSA strikes a similar theme by claiming (Opp'n 10) that regulatory uncertainty lessened BART's reliance interests. But it acknowledges (*id.*) that a licensee can "reasonabl[y] rel[y] on the scope of a license as issued." And the case it cites, *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019), is inapposite. There, the Court held it was unreasonable to rely on a policy change that persisted for only two years before it was reversed. *Id.* at 64. Here, geographic licensing underpinned the 4.9 GHz band for more than 20 years before the Commission's abrupt shift.

7

of planning invested in equipment, contracts, and testing—for BART or other licensees with major public safety projects. *See* Mot. 7 (describing comments from BART and others). One sentence casting this substantial investment as a mere "hope" for expansion, Order ¶54, falls far short of grappling with how geographic licenses "engendered serious reliance interests that must be taken into account." *Encino Motorcars*, 579 U.S. at 222.

The Commission asserts (Opp'n 21) that it can address any reliance interests with a waiver; PSSA agrees (Opp'n 11-12). But although a waiver might save a "rational" but "impermissibly broad" rule, the "mere existence of a safety valve does not cure an *irrational* rule." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 571 (D.C. Cir. 2004) (emphasis added). In other words, a waiver process may "shore[] up" reasoned decision-making, but it cannot substitute for it. *ICORE, Inc. v. FCC*, 985 F.2d 1075, 1080 (D.C. Cir. 1993). Neither Opposition points to any case where a court released an agency from pre-decisional consideration of reliance because the agency could consider reliance in *post hoc* one-off waiver proceedings.[2]

---

[2] The failure to consider reliance interests is not mitigated by the Commission's decision to defer "assign[ing] all unused spectrum to FirstNet." FCC Opp'n 25. True, assigning the spectrum to someone else will make things worse. Mot. 12. But licensees' reliance interests are plenty impaired by the fact that "the spectrum they previously had" (FCC Opp'n 25)—and planned to use for significant, investment-backed public safety projects—is now unavailable to them absent the Commission's approval, which they cannot even *request* without going through a cumbersome waiver process, Order ¶54.

## III. The Mere Possibility Of Waiver Does Not Negate BART's Irreparable Harm.

The Commission does not dispute that BART will suffer a "concrete" harm absent a stay—being "left 'with a partly completed … communications-based train control system' that it will not be able to 'complete' without substantial 're-work.'" FCC Opp'n 32 (quoting Mot. 20).

Its only answer (joined by PSSA) is to lean hard on the possibility of a waiver. *See* FCC Opp'n 32-33; PSSA Opp'n 19. The Commission ignores that the Order did not make "clear that it will entertain waiver petitions" (Opp'n 32) for geographic license cancellations; it invited waiver petitions only for lifting the regulatory freeze, Order ¶54. PSSA recognizes the limits of the Commission's invitation, theorizing that BART could apply for a waiver so that it could ask for a license modification. PSSA Opp'n 19. The waiver PSSA envisions would fall short of remedying BART's harm. Having to apply for a waiver and a license modification every time a base station needs to be adjusted or added would not give BART the certainty that was conveyed by its geographic license and is needed to move forward with its billion-dollar communications-based train control project. Broader waivers are available under the rules, Mot. 21, but (1) that is true for nearly every FCC action and (2) the Order gives no assurance the Commission is open to considering them.

The upshot is that only a stay can avoid a more costly, less efficient project and delayed passenger safety and reliability improvements. *See* Mot. 19-20. Beyond

9

that, the Commission's slow processing of at least one similar waiver request suggests that a timely waiver is not so certain a remedy. *See* p. 4, *supra*.

As for compliance costs, both the Commission and PSSA primarily complain of delay. FCC Opp'n 31, 34; PSSA Opp'n 20-21. But as described above, the data collection mandate was contingent on Office of Management and Budget approval and therefore not effective until December 2024, p. 3, *supra.* It was entirely reasonable to postpone this costly endeavor until the mandate was certain. Because the costs are unrecoverable, moreover, they need not be business-destroying to constitute irreparable harm, *contra* FCC Opp'n 33. The record shows that they are substantial. What BART estimated would take a year to 18 months (FCC Opp'n 34) must be escalated into a few months—necessarily driving up costs, because additional personnel must be added or diverted from crucial functions.

Neither the Commission nor PSSA suggests that these compliance costs are reparable, and neither suggests any way of remedying the harm to BART's communications-based train control project besides speculating about waivers. A stay is essential to forestall this irreparable harm.

## IV. The Public Interest Favors A Stay.

The simple fact is that incumbent licensees with planned deployments are best positioned to use the 4.9 GHz band to serve local public safety needs, and neither the (not-yet-selected) band manager nor FirstNet can do so. Mot. 22-23. The

Commission and PSSA do not dispute this; they just ignore it. Simply repeating the goal of the order—to maximize use of the band (PSSA Opp'n 21)—falls short of showing that a stay would impede that goal, especially given that the band manager has yet to be selected. The Commission insists (Opp'n 35) that "progress … will be stalled" if incumbent licensees "expand their footprints in the band" pending judicial review. But the theory that the Commission needs to know incumbent licensees' usage does not explain why they need to *stop* such usage, much less why an incumbent expanding its footprint is contrary to the public interest, but "progress" toward the new scheme—a band manager and FirstNet using the band—is good for the public. Either way, the band is being used. Only incumbent licensees are positioned to do so now, if the Order is stayed. A stay thus favors the public interest in "optimizing access to a scarce and valuable public resource." FCC Opp'n 35.

## CONCLUSION

The Court should stay the Order pending review.

                                             Respectfully submitted,

                                            /s/Hyland Hunt

| | |
|---|---|
| Phyllis A. Whitten | Hyland Hunt |
| SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT | Ruthanne M. Deutsch |
| | DEUTSCH HUNT PLLC |
| 2150 Webster St, 10th Floor | 300 New Jersey Ave. NW, Ste. 300 |
| Oakland, CA 94612 | Washington, DC 20001 |
| (510) 464-5000 | (202) 868-6915 |
| pwhitte@bart.gov | hhunt@deutschhunt.com |

*Counsel for San Francisco Bay Area Rapid Transit District*

March 7, 2025

# CERTIFICATE OF COMPLIANCE

This reply is in 14-point Times New Roman proportional font and contains 2,593 words as counted by Microsoft Word, excluding the items that may be excluded. The reply thus complies with the type-face, style, and volume limitations set forth in Rule 27(d) and 32(a)(5)–(6) of the Federal Rules of Appellate Procedure.

/s/Hyland Hunt<br>
Hyland Hunt

March 7, 2025

**CERTIFICATE OF SERVICE**

    I hereby certify that, on March 7, 2025, I served the foregoing reply upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.

                                            /s/Hyland Hunt
                                            Hyland Hunt