**Nos. 24-1363 (lead), 24-1364, 25-1028, 25-1034**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

PUBLIC SAFETY SPECTRUM ALLIANCE AND PUBLIC SAFETY BROADBAND
TECHNOLOGY ASSOCIATION,
*Petitioners*,
v.
FEDERAL COMMUNICATIONS COMMISSION AND UNITED STATES OF AMERICA,
*Respondents*,

COALITION FOR EMERGENCY RESPONSE AND CRITICAL INFRASTRUCTURE AND SAN
FRANCISCO BAY AREA RAPID TRANSIT,
*Intervenors*.

---

On Petitions for Review of a Final Order of the Federal
Communications Commission

---

### OPENING BRIEF OF COALITION FOR EMERGENCY RESPONSE AND
### CRITICAL INFRASTRUCTURE, NATIONAL SHERIFFS'
### ASSOCIATION, CALIFORNIA STATE SHERIFFS' ASSOCIATION, AND
### SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT

---

James M. Smith
LAW OFFICE OF JAMES M. SMITH
4069 27th Road North
Arlington, VA 22207
(703) 855-4183
jamesmsmith8980@gmail.com

*Counsel for National Sheriffs'
Association and California State
Sheriffs' Association*

Jessica Ring Amunson
Arjun R. Ramamurti
Joshua J.W. Armstrong
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
jamunson@jenner.com

*Counsel for Coalition for Emergency
Response and Critical Infrastructure*

*Additional Counsel Listed on Inside Cover*

Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 300
Washington, DC 20001
(202) 868-6915
hhunt@deutschhunt.com

Phyllis A. Whitten
SAN FRANCISCO BAY AREA RAPID
   TRANSIT DISTRICT
2150 Webster St, 10th Floor
Oakland, CA 94612
(510) 464-5000
pwhitte@bart.gov

*Counsel for San Francisco Bay Area
Rapid Transit District*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioners Coalition for Emergency Response and Critical Infrastructure ("CERCI"), National Sheriffs' Association ("NSA"), California State Sheriffs' Association ("CSSA"), and San Francisco Bay Area Rapid Transit District ("BART") file the following Certificate as to Parties, Rulings, and Related Cases:

## A. Parties, Intervenors, and *Amici*

Four related cases have been consolidated: Nos. 24-1363, 24-1364, 25-1028, and 25-1034. Petitioners in 24-1363 are the Public Safety Spectrum Alliance ("PSSA") and the Public Safety Broadband Technology Association ("PSBTA"). Petitioner in No. 24-1364 is CERCI. Petitioners in No. 25-1028 are NSA and CSSA. Petitioner in No. 25-1034 is BART. Respondents in all cases are the Federal Communications Commission and the United States. The National Fraternal Order of Police has intervened in Nos. 14-1364, 25-1028, and 25-1034. PSSA and PSBTA have intervened in support of Respondents in No. 24-1364. CERCI and BART have intervened in support of Respondents in No. 24-1363. There are no *amici curiae* involved in this matter to date.

## B. Rulings Under Review

All petitions seek review of the Commission's Eighth Report and Order, captioned *In re Amendment of Part 90 of the Commission's Rules*, 39 FCC Rcd 12032

(2024) (JA\_\_), a summary of which was published in the Federal Register on November 20, 2024 at 89 Fed. Reg. 91578.

The petitions in Nos. 25-1028 and 25-1034 also seek review of the related public notice captioned *The Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Establish Deadline for 4.9 GHz Public Safety Licensees to Provide Granular Licensing Data*, Public Notice, WP Docket No. 07-100, DA 24-1137 (rel. Dec. 9, 2024) (JA\_\_), which was published in the Federal Register on December 9, 2024 at 89 Fed. Reg. 97559. The petition in No. 25-1028 includes the related public notice captioned *Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Further Modify Temporary Filing Freeze on the Acceptance and Processing of Certain Part 90 Applications for the 4940-4990 MHz Band*, Public Notice, WP Docket No. 07-100, DA 24-1136 (rel. Nov. 15, 2024) (JA\_\_).

## C. Related Cases

There are no related cases other than the four cases identified above that have already been consolidated by order of the Court.

/s/ *Jessica Ring Amunson*
Jessica Ring Amunson

# RULE 26.1 DISCLOSURE STATEMENTS

Under Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioners Coalition for Emergency Response and Critical Infrastructure ("CERCI"), National Sheriffs' Association ("NSA"), California State Sheriffs' Association ("CSSA"), and San Francisco Bay Area Rapid Transit District ("BART") file the following disclosure statements:

**CERCI** is a trade association of public safety and critical infrastructure organizations and telecommunications companies headquartered in Washington, D.C. Its purpose is to protect local control of the 4.9 GHz Band. CERCI is an unincorporated entity whose members have no ownership interest in it; CERCI has no parent company, and no publicly traded company has a 10% or greater ownership interest in CERCI. As a trade association, CERCI is exempt from disclosure of members that have issued shares or debt securities to the public under D.C. Circuit Rule 26.1(b).

**NSA** is a nonprofit professional association dedicated to serving the Offices of Sheriff and their affiliates through law enforcement education and training, and through the provision of general law enforcement informational resources. NSA does not have publicly traded stock, and no entity having publicly traded stock owns 10% or more of NSA. As a nonprofit professional association, NSA does not issue shares or debt securities to the public under Circuit Rule 26.1(b).

**CSSA** is a nonprofit professional organization that represents each of the fifty-eight (58) elected California Sheriffs. CSSA does not have publicly traded stock, and no entity having publicly traded stock owns 10% or more of CSSA. As a nonprofit professional organization, CSSA does not issue shares or debt securities to the public under Circuit Rule 26.1(b).

**BART** is a rapid transit district established by the California Public Utilities Code. BART is a governmental entity in the State of California and thus not a publicly traded company and no entity has a 10% or greater ownership interest in BART. As a rapid transit district, BART does not issue shares or debt securities to the public under Circuit Rule 26.1(b).

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

RULE 26.1 DISCLOSURE STATEMENTS ......................................... iii

TABLE OF AUTHORITIES .................................................. vii

GLOSSARY.................................................................. xiii

INTRODUCTION ...........................................................1

JURISDICTIONAL STATEMENT ....................................5

STATEMENT OF THE ISSUES..........................................6

STATUTES AND REGULATIONS.....................................6

STATEMENT OF THE CASE...............................................6

I.       Legal and Factual Background ......................................6

         A.       The Commission's Licensing Authority. .............6

         B.       FirstNet.................................................................8

         C.       The 4.9 GHz Band.............................................13

         D.       The Order ...........................................................15

II.      Procedural History ........................................................18

SUMMARY OF ARGUMENT ...........................................20

STANDING ........................................................................22

STANDARD OF REVIEW .................................................23

ARGUMENT .......................................................................24

I.       THE ORDER EXCEEDS THE COMMISSION'S AUTHORITY. .............24

         A.       The Commission Lacks Authority to Award Spectrum to Federal Entities and Cannot Do Indirectly What It Lacks Authority to Do Directly. ...................24

B.   The Commission Cannot Authorize FirstNet to Operate Beyond the Spectrum Specifically Dedicated by Congress.................28

C.   In Any Case, the Commission's Workaround Is Also Contrary to Law........................................................................................32

1.   The Commission Lacks Authority Under Section 309(j)(2) to Issue a Nationwide Overlay License to the Band Manager for the 4.9 GHz Band. ......................................33

2.   Section 2.103(b) of the Commission's Rules Does Not Authorize the Commission's Contemplated Sharing Agreement. ..............................................................................35

II.  THE ORDER IS ARBITRARY AND CAPRICIOUS IN NUMEROUS RESPECTS. ..........................................................38

A.   The Commission Created "Unassigned" Spectrum for FirstNet by Cancelling Geographic Licenses Without Considering Significant Reliance Interests..............................................38

B.   The Commission's Cancel First, Justify Later Approach Is Arbitrary and Capricious. ....................................................42

C.   The Order Is Internally Inconsistent and Contradictory. ....................44

CONCLUSION ..............................................................................................49

# TABLE OF AUTHORITIES[*]

**CASES**

*ANR Storage Co. v. FERC*, 904 F.3d 1020 (D.C. Cir. 2018) ..................................44

*Cape Cod Hospital v. Sebelius*, 630 F.3d 203 (D.C. Cir. 2011)..............................39

*Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020)................................................................38

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)....................................38

*Environmental Defense Fund v. United States EPA*, 124 F.4th 1 (D.C. Cir. 2024) ......................................................................................23

*Epic Systems Corp. v. Lewis*, 584 U.S. 497 (2018) .................................................23

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)........................................23

*FEC v. Cruz*, 596 U.S. 289 (2022)..........................................................................28

*Halverson v. Slater*, 129 F.3d 180 (D.C. Cir. 1997)................................................25

*Humane Society of United States v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017) .......................................................................................................25

*International Dark-Sky Ass'n v. FCC*, 106 F.4th 1206 (D.C. Cir. 2024) ....................................................................................................22, 27

*Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 574 F.3d 748 (D.C. Cir. 2009)............................................................42

*Louisiana Public Service Commission v. FCC*, 476 U.S. 355 (1986)....................28

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ...............................32

*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)..........................23

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*Music Choice v. Copyright Royalty Board*, 970 F.3d 418 (D.C. Cir. 2020) ................................................................41

*\*Nasdaq Stock Market LLC v. SEC*, 38 F.4th 1126 (D.C. Cir. 2022) ....................25

*National Environmental Development Assn's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014)................................................36

*New Jersey Television Corp. v. FCC*, 393 F.3d 219 (D.C. Cir. 2004) ....................7

*Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002) ................................25

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ................................................35

*Sorenson Communications Inc. v. FCC*, 755 F.3d 702 (D.C. Cir. 2014) ................................................................43

*U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004)................................42

*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014)................................30

*\*West Virginia v. EPA*, 597 U.S. 697 (2022) ................................ 30-31

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001)........................... 27-28

STATUTES

5 U.S.C. § 706(2)(A)................................................................23

28 U.S.C. § 2342(1) ................................................................5

28 U.S.C. § 2344 ................................................................22

47 U.S.C. § 153(40) ................................................................7

47 U.S.C. § 153(42) ................................................................7

47 U.S.C. § 301 ................................................................6, 24

47 U.S.C. § 303 ................................................................7, 24

47 U.S.C. § 305(a) ................................................................7, 24

47 U.S.C. § 309(j)(1) ................................................................7

47 U.S.C. § 309(j)(2) ..................................................................3, 32, 33

47 U.S.C. § 309(j)(2)(A) ..............................................................3, 8, 33

47 U.S.C. § 309(j)(2)(A)(ii) ..............................................................3, 34

47 U.S.C. § 309(j)(11) ..........................................................................35

47 U.S.C. § 310(a) ................................................................................24

47 U.S.C. § 337(f)(1) ...........................................................................33

47 U.S.C. § 402(a) ..................................................................................5

47 U.S.C. § 902(b)(2)(A) ...................................................................7, 24

47 U.S.C. § 1401(1) ..............................................................................11

47 U.S.C. § 1401(2) .........................................................................11, 28

47 U.S.C. § 1401(14) .....................................................................9, 11, 28

47 U.S.C. § 1402 ...................................................................................28

47 U.S.C. § 1411(a) .........................................................................10, 26

47 U.S.C. § 1421 ...............................................................................3, 29

47 U.S.C. § 1421(a) ......................................................9, 10, 11, 26, 28

47 U.S.C. § 1421(b) ..............................................................................26

47 U.S.C. § 1421(b)(1) ..........................................................................10

47 U.S.C. § 1421(b)(2) ..........................................................................10

47 U.S.C. § 1421(c) ...............................................................................10

47 U.S.C. § 1422(a) ...............................................................................11

47 U.S.C. § 1422(b) .........................................................................11, 32

47 U.S.C. § 1424 .............................................................................12, 30

47 U.S.C. § 1424(a) ................................................................................9

47 U.S.C. § 1424(g)(2)......................................................................30

47 U.S.C. § 1426 ..........................................................10, 12, 26, 30

47 U.S.C. § 1426(b) .......................................................................29

47 U.S.C. § 1426(b)(1)...........................................................3, 11, 29

47 U.S.C. § 1426(b)(1)(B) .............................................................12

47 U.S.C. § 1426(b)(1)(B)(ii) ........................................................11

47 U.S.C. § 1426(d) .........................................................................9

47 U.S.C. § 1426(f)....................................................................12, 29

47 U.S.C. § 1427 ........................................................................12, 30

47 U.S.C. § 1428 ........................................................................12, 30

47 U.S.C. § 1429 ............................................................................30

47 U.S.C. § 1430 ............................................................................12

47 U.S.C. § 1433 ....................................................................10, 26, 27

47 U.S.C. § 1457(b)(3)....................................................................12

Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112-96, § 6201(a), 126 Stat. 156, 206 .................................9

**LEGISLATIVE MATERIALS**

158 Cong. Rec. S889 (Feb. 17, 2012) (Statement of Sen. Leahy) ............................8

**ADMINISTRATIVE RULINGS**

*In re Amendment of Part 90 of the Commission's Rules*, 36 FCC Rcd 15032 (2021)....................................................15, 43

*In re Amendment of Part 90 of the Commission's Rules*, 38 FCC Rcd 704 (2023)....................................................................15

*In re First Responder Network Authority*, 38 FCC Rcd 4989 (PSHSB 2023) ..........................................................................10

*In re Implementation of Sections 309(j) and 337 of the Communications Act of 1934 as amended*, 15 FCC Rcd 22709 (2000) ....................................8, 34

**OTHER AUTHORITIES**

47 C.F.R. § 1.925 ...............................................................................39

47 C.F.R. § 2.103 .................................................................................8

47 C.F.R. § 2.103(b) ...............................................................4, 32, 36

47 C.F.R. § 2.103(b)(1) .....................................................................36

47 C.F.R. § 2.103(b)(2)...............................................8, 21, 36, 37

47 C.F.R. § 2.103(b)(3) .....................................................................36

47 C.F.R. § 2.103(b)(4) .....................................................................36

47 C.F.R. § 90.523 .............................................................................33

47 C.F.R. § 90.1207(e)(1)(vi) ...........................................................39

47 C.F.R. § 90.1217 ...........................................................................16

47 C.F.R. § 90.1217(d) ...............................................................37, 45

Congressional Research Service, *The First Responder Network (FirstNet) and Next-Generation Communications for Public Safety:* (Apr. 27, 2018), https://www.congress.gov/crs-product/R45179 ........................9

Department of Commerce, OIG-25-004-A, *Nationwide Public Safety Broadband Network Was Not Always Available to First Responders During the Catastrophic 2023 Maui Wildfires* (Dec. 5, 2024), https://www.oig.doc.gov/wp-content/OIGPublications/OIG-25-004-A_Final_Report.pdf ....................................................................13

Department of Commerce, OIG-24-030-M, *February 2024 FirstNet Authority's NPSBN Outage Raised a Significant Risk to the Readiness of First Responders Across the Country* (July 18, 2024), https://www.oig.doc.gov/wp-content/OIGPublications/OIG-24-030-M-SECURED.pdf....................................................................13

Department of Commerce, OIG-24-026-A, *FirstNet Authority's Lack of NPSBN Contract Oversight for Coverage Puts at Risk First Responders' Ability to Serve the Public Effectively* (June 5, 2024), https://www.oig.doc.gov/wp-content/OIGPublications/OIG-24-026-A-REDACTED.pdf ...................................................................13

FirstNet Authority, *Fiscal Year 2023 Annual Report to Congress* (Feb. 2024), https://www.firstnet.gov/sites/default/files/FirstNet Authority_AnnualReport_FY2023.pdf.............................................45

Memorandum of Understanding Between the FCC and the NTIA (Aug. 1, 2022), https://www.ntia.gov/sites/default/files/publications/ntia-fcc-spectrum_mou-8.2022.pdf.............................................................7

*The 9/11 Commission Report* (2004) ......................................................8

*The Development of Technical Standards*, 63 Fed. Reg. 58645 (Nov. 2, 1998) ......................................................................................... 36-37

# GLOSSARY

| | |
|---|---|
| **BART** | San Francisco Bay Area Rapid Transit District |
| **CERCI** | Coalition for Emergency Response and Critical Infrastructure |
| **CSSA** | California State Sheriffs' Association |
| **FCC or Commission** | Federal Communications Commission |
| **FirstNet** | First Responder Network Authority |
| **NPSBN** | National Public Safety Broadband Network |
| **NSA** | National Sheriffs' Association |
| **NTIA** | National Telecommunications and Information Administration |
| **OMB** | Office of Management and Budget |
| **OIG** | Department of Commerce's Office of Inspector General |
| **PSBTA** | Public Safety Broadband Technology Association |
| **PSSA** | Public Safety Spectrum Alliance |

**INTRODUCTION**

This case concerns the Federal Communications Commission's ("Commission") authority to allocate and regulate spectrum: the radio frequencies over which wireless signals travel. Spectrum is grouped into bands depending on wavelength, and those bands are then allocated for different uses. The Commission regulates non-federal use of spectrum, while the National Telecommunications and Information Administration ("NTIA") manages federal use.

In 2012, in response to communications systems failures on 9/11 and the recommendations of the 9/11 Commission, Congress created a new federal entity within NTIA called the First Responder Network Authority ("FirstNet"). By law, Congress dedicated portions of the 700 MHz spectrum band for FirstNet to build and operate a new "Nationwide Public Safety Broadband Network" ("NPSBN"). Congress provided detailed specifications and funding for FirstNet to receive and operate those portions of the 700 MHz band, and Congress instructed the Commission to reallocate that spectrum to FirstNet and to grant FirstNet a license for the use of those designated frequencies.

In the order under review, captioned Eighth Report and Order, *In re Amendment of Part 90 of the Commission's Rules*, 39 FCC Rcd 12032 (2024) ("Order") (JA__), without any further congressional enactments, the Commission authorized FirstNet to vastly expand its reach and take over "unassigned" portions

of an entirely different band of spectrum—the 4.9 GHz band—which for decades had been dedicated for use by incumbent state and local public safety entities like the sheriffs and transit authority that are petitioners here. Moreover, the Commission effectively created additional "unassigned" spectrum within the 4.9 GHz band by cancelling incumbents' existing broad geographic licenses and requiring those incumbents to apply for new and narrower site-based licenses. The changed designation results in an enormous windfall for AT&T—FirstNet's commercial partner—and in destabilizing losses for incumbents that have relied on the ability to modify and expand public-safety communications systems over time within geographic license areas.

The Order is patently contrary to law and is arbitrary and capricious in several respects:

*First*, the Order is contrary to law because under the Communications Act, the Commission cannot directly grant spectrum use to federal entities like FirstNet absent the type of express authorization Congress provided for the 700 MHz band. The Order seeks to obscure its unlawful award by adopting a two-step workaround: first, the Commission grants a nationwide overlay license to the 4.9 GHz band to a "Band Manager," and second, it authorizes the Band Manager to "share" that spectrum with FirstNet. But the Commission cannot manufacture statutory authority by doing indirectly what it lacks authority to do directly.

In addition, the Commission lacks authority to vastly expand FirstNet's responsibilities. In the Spectrum Act, Congress directed the Commission to grant FirstNet a "single" license to a portion of a precisely specified 700 MHz public-safety band. 47 U.S.C. §§ 1421, 1426(b)(1). The text, structure, context, and history of the Spectrum Act all confirm that Congress intended FirstNet to be confined to the 700 MHz band. And Congress comprehensively provided for FirstNet's powers, structure, funding, and oversight, with no mention of FirstNet gaining access to other valuable and competitively significant spectrum bands.

Moreover, each step of the Order's workaround is independently contrary to law. The Commission cannot grant an unspecified Band Manager a nationwide overlay license based on the "public safety radio services" exemption to the general rule requiring a competitive auction for the valuable 4.9 GHz band. 47 U.S.C. § 309(j)(2). The Band Manager itself provides no "public safety radio services," and FirstNet does not qualify because the exemption is limited to non-federal entities. *Id.* § 309(j)(2)(A). Furthermore, the exemption requires that the services "are not made commercially available to the public," *id.* § 309(j)(2)(A)(ii), but FirstNet's spectrum *is* commercially available to the public on a secondary basis through its contract with AT&T. Thus, the Order does not merely reorganize public safety use of the band from local to federal control—which is unlawful and arbitrary enough

3

on its own—but in fact makes the band less available to local public safety entities and more available for commercial use.

As for the contemplated sharing agreement between the Band Manager and FirstNet, the only basis the Commission cites is 47 C.F.R. § 2.103(b), but that regulation requires consent from incumbent state and local entities to share use of the band with a federal entity. Sham consent from a Band Manager that uses its nationwide overlay license to override the interests and objections of thousands of state and local public-safety incumbents does not suffice.

*Second*, the Order is arbitrary and capricious. The Order fails to adequately address incumbents' reliance interests in geographic licenses. The Order's cancellation of those licenses and replacement with site-based licenses eliminates flexibility and severely interferes with ongoing and planned local investments to expand coverage and address public safety needs. In addition, the Order adopts an irrational "cancel first, justify later" approach whereby incumbents' geographic licenses are cancelled before the Commission even examines the data it is collecting to understand how those licenses are used. And it does so to vastly expand the amount of "unassigned" spectrum to "share" with FirstNet (and thereby AT&T).

Finally, the Order arbitrarily characterizes certain aspects of its workaround as tentative to minimize its legal infirmities, but the result is internally contradictory and blind to important aspects of the problem. It makes no sense to tout FirstNet's

4

supposed public-safety benefits when the Commission is not even able or willing to determine that it is legally permissible for FirstNet to use the spectrum "shared" by the Band Manager. The Commission also ignored FirstNet's uncertain future given a statutory sunset provision, FirstNet's need (or lack thereof) for additional spectrum, FirstNet's history of poor management, and the impact that FirstNet's commercial relationship with AT&T will have on future use in the band.

For each of these reasons, the Court should grant the petitions for review and vacate the Order.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a). The Commission issued its final Order pursuant to its regulatory jurisdiction under the Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.* The petitions in Nos. 25-1028 and 25-1034 also seek review of the related public notice captioned *The Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Establish Deadline for 4.9 GHz Public Safety Licensees to Provide Granular Licensing Data*, Public Notice, WP Docket No. 07-100, DA 24-1137 (rel. Dec. 9, 2024) (JA__) ("December Notice"). The petition in No. 25-1028 includes the related public notice captioned *Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Further Modify Temporary Filing Freeze on the Acceptance and Processing of Certain Part 90 Applications for the*

*4940-4990 MHz Band*, Public Notice, WP Docket No. 07-100, DA 24-1136 (rel. Nov. 15, 2024) (JA__). Petitioners timely filed their petitions for review on November 27, 2024 (CERCI), and January 17, 2025 (BART and NSA/CSSA).

## STATEMENT OF THE ISSUES

1.      Whether the Commission acted contrary to the Spectrum Act, the Communications Act, and the Commission's own rules by authorizing a federal entity, FirstNet, to operate on a band of spectrum other than the 700 MHz band in which Congress specifically authorized FirstNet to operate.

2.      Whether the Commission acted arbitrarily and capriciously or otherwise not in accordance with law by issuing an internally contradictory Order that fails to fully account for the Order's impact on incumbent users.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are contained in an addendum to this brief.

## STATEMENT OF THE CASE

### I.      Legal and Factual Background

### A.      The Commission's Licensing Authority.

By law, the Commission authorizes non-federal spectrum use and the NTIA authorizes federal spectrum use. Sections 301 and 303 of the Communications Act grant the Commission general licensing authority "over all the channels of radio transmission," 47 U.S.C. § 301, and set forth the Commission's powers and duties,

*id.* § 303, but Section 305(a) specifies that "[r]adio stations belonging to and operated by the United States shall *not* be subject to the provisions of [S]ections 301 and 303," *id.* § 305(a). Instead, "[a]ll such Government stations shall use such frequencies as shall be assigned to each or to each class by the President." *Id.* Congress then vested NTIA with the President's authority "to assign frequencies to radio stations or classes of radio stations belonging to and operated by the United States." *Id.* § 902(b)(2)(A).[1] Summarizing this arrangement, a Memorandum of Understanding between these two agencies states that the "FCC is an independent agency that is the exclusive regulator of non-Federal spectrum use," while "NTIA is the sole agency responsible for authorizing Federal spectrum use."[2]

Congress has generally authorized the Commission to license non-federal spectrum use through a "system of competitive bidding." *Id.* § 309(j)(1). However, Congress created certain "[e]xemptions" to this competitive bidding requirement. *See N.J. Television Corp. v. FCC*, 393 F.3d 219, 222 (D.C. Cir. 2004). Thus, Section 309(j)(2) exempts initial licenses "for public safety radio services, including private internal radio services used by State and local governments and non-government entities and including emergency road services provided by not-for-profit

---

[1] These provisions apply to broadband. *See* 47 U.S.C. § 153(40), (42).

[2] Memorandum of Understanding Between the FCC and the NTIA at 2 (Aug. 1, 2022), https://www.ntia.gov/sites/default/files/publications/ntia-fcc-spectrum_mou -8.2022.pdf.

organizations," that are (1) "used to protect the safety of life, health, or property; and" are (2) "not made commercially available to the public." 47 U.S.C. § 309(j)(2)(A).[3]

By longstanding regulation, the Commission has provided for "Federal use of non-Federal frequencies" with respect to certain bands, including the 4.9 GHz band, 47 C.F.R. § 2.103, but only when the "Federal entity obtains the approval of the non-Federal (State/local government) licensee(s) or applicant(s) involved," *id.* § 2.103(b)(2).

## B.    FirstNet

Following the recommendations of the 9/11 Commission, Congress created a new federal entity in 2012 called FirstNet to address the communications failures that had occurred among first responders in large buildings in dense urban areas.[4] Choosing a low frequency band well-suited to address these types of

---

[3] *See generally In re Implementation of Sections 309(j) and 337 of the Communications Act of 1934 as amended*, 15 FCC Rcd 22709 (2000) ("Section 309(j) Order").

[4] *See* 158 Cong. Rec. S889 (Feb. 17, 2012) (Statement of Sen. Leahy) (noting the Act was inspired by "a key recommendation of the 9/11 Commission"); *The 9/11 Commission Report* at 397 (2004) ("Congress should support pending legislation which provides for the expedited and increased assignment of radio spectrum for public safety purposes."); *see also id.* at 280 (noting past issues where "[r]escue efforts by the Fire Department of New York . . . were hampered by the inability of its radios to function in buildings as large as the Twin Towers").

communications failures,[5] Congress instructed the Commission to "reallocate and grant a license to" FirstNet "for the use of the 700 MHz D block spectrum and existing public safety broadband spectrum" to build the NPSBN. Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112-96, § 6201(a), 126 Stat. 156, 206 ("Spectrum Act").[6]

Three features of the Spectrum Act are particularly relevant here. First, Congress made clear that FirstNet is a federal entity. Congress created FirstNet as an "independent authority within the NTIA." 47 U.S.C. § 1424(a). And Congress expressly exempted "[a]ny action taken or decisions made by [FirstNet]" from the Paperwork Reduction Act, the Administrative Procedure Act, and the Regulatory Flexibility Act—all of which would be unnecessary if FirstNet were not a federal entity. *Id.* § 1426(d). As a result, given the division of authority between the

---

[5] *See, e.g.*, Cong. Res. Serv., *The First Responder Network (FirstNet) and Next-Generation Communications for Public Safety*, at 2 n.9 (Apr. 27, 2018), https://www.congress.gov/crs-product/R45179 (noting that the band's "propagation characteristics allow the 700 MHz signals to penetrate buildings and walls easily and to cover large geographic areas with less infrastructure").

[6] So that there could be no confusion as to where FirstNet was to operate, the statute further specified that "[t]he term 'existing public safety broadband spectrum' means the portion of the electromagnetic spectrum between the frequencies—(A) from 763 megahertz to 768 megahertz; (B) from 793 megahertz to 798 megahertz; (C) from 768 megahertz to 769 megahertz; and (D) from 798 megahertz to 799 megahertz." 47 U.S.C. § 1401(14).

Commission and NTIA, the Commission lacks any authority to license or assign spectrum to FirstNet absent express congressional authorization.

Second, Congress prescribed a very limited role for the Commission with respect to FirstNet. Congress permitted the Commission to reallocate a portion of the 700 MHz band and grant a single license in that band to FirstNet. 47 U.S.C. § 1421(a). Congress then gave the Commission authority to ensure the smooth transfer of a portion of the 700 MHz band to FirstNet, including reiterating that the Commission "shall reallocate the 700 MHz D block spectrum for use by public safety entities," *id.* § 1411(a), and "shall take all actions necessary to facilitate the transition of the existing public safety broadband spectrum to [FirstNet]," *id.* § 1421(c). And though Congress authorized the Commission to renew FirstNet's license in the 700 MHz band, *id.* § 1421(b)(2), Congress itself fixed the precise terms of FirstNet's initial license to 10 years, *id.* § 1421(b)(1).[7] Otherwise, Congress stated only that the "Commission may provide technical assistance to [FirstNet] and may take any action necessary to assist [FirstNet] in effectuating its duties and responsibilities under this subchapter." *Id.* § 1433. And Congress specifically enumerated those "[p]owers, duties, and responsibilities." *Id.* § 1426.

---

[7] The Commission granted FirstNet's renewal application in 2023. *See In re First Responder Network Authority*, 38 FCC Rcd 4989 (PSHSB 2023).

Third, Congress made clear that FirstNet was to be a limited-purpose entity confined to use of a discrete portion of the 700 MHz band, and subject to ongoing congressional oversight. The Spectrum Act is rife with provisions that limit FirstNet to operate only within the 700 MHz band. Thus, the Spectrum Act states that FirstNet "shall hold the *single* public safety wireless license granted under section 1421," *id.* § 1426(b)(1), with Section 1421 in turn granting FirstNet "*a* license ... for the use of the 700 MHz D block spectrum and existing public safety broadband spectrum," *id.* § 1421(a). Congress further defined both "700 MHz D block spectrum" and "existing public safety broadband spectrum" with precise reference to specific frequencies within the 700 MHz band. *See id.* § 1401(1), (2), (14). Congress further confirmed that it intended FirstNet to operate only within the 700 MHz band by requiring FirstNet to ensure that any equipment deployed on its network be "capable of being used by any public safety entity and by multiple vendors across all public safety broadband networks operating *in the 700 MHz band*." *Id.* § 1426(b)(2)(B)(ii) (emphasis added).

Congress also delineated FirstNet's role in great detail. Congress tasked FirstNet with establishing a "nationwide, interoperable public safety broadband network" (the NPSBN) based on a "single, national network architecture that evolves with technological advancements." *Id.* § 1422(a)-(b). But Congress provided that the entire FirstNet entity would automatically "terminate" after 15

years unless Congress expressly reauthorized it. *Id.* § 1426(f). And Congress otherwise specified nearly every aspect of FirstNet's operations, including: (1) FirstNet's specific powers, duties, and responsibilities in deploying and operating the NPSBN, *id.* § 1426; (2) FirstNet's governing structure, including the composition, appointment, qualifications, and tenure of its Board, the frequency of the Board's meetings, and the Board's compensation, *id.* § 1424; (3) FirstNet's funding and finances, including a specified sum of $7 billion for FirstNet's "[b]uildout" of the NPSBN, § 1457(b)(3), an ongoing funding source via fees, *id.* § 1428, and a cap on FirstNet's administrative expenses, *id.* § 1427; and (4) FirstNet's extensive oversight, including an annual audit, *id.* § 1429, and an annual report to Congress, *id.* § 1430.

Congress specified that FirstNet could issue a request for proposals "for the purposes of building, operating, and maintaining" the NPSBN. *Id.* § 1426(b)(1)(B). In 2017, FirstNet agreed to a 25-year contract with AT&T, under which AT&T must build, operate, maintain, and upgrade the NPSBN. Crucially, though the details of FirstNet's contract with AT&T are nonpublic, it is undisputed that the contract permits AT&T to use FirstNet's spectrum for AT&T's commercial customers on a "secondary, interruptible basis" when FirstNet is not using it. AT&T June 20, 2024 Ex Parte Letter, at 13 (JA__); Order ¶ 35 n.154 (JA__).

FirstNet has been plagued by poor management, as detailed in nearly twenty reports from the Department of Commerce's Office of Inspector General ("OIG") and the Government Accountability Office. Among many other issues, these reports found that "FirstNet Authority must improve its oversight of AT&T to ensure the NPSBN meets its intended purpose as a reliable communication network for first responders during emergencies" after FirstNet failed to provide effective support to first responders during a major natural disaster and then allowed AT&T to "alter" data related to its response;[8] failed to plan for network outages or to communicate effectively with first responders when outages occurred;[9] and failed to implement adequate measures for oversight of AT&T.[10]

## C.     The 4.9 GHz Band

In 2002, the Commission designated the 4.9 GHz band for state and local public safety use. *See, e.g.*, Order ¶ 6 (JA__). Between 2002 and the Order,

---

[8] *See* Dep't of Com., OIG-25-004-A, *Nationwide Public Safety Broadband Network Was Not Always Available to First Responders During the Catastrophic 2023 Maui Wildfires*, at 1, 16 (Dec. 5, 2024), https://www.oig.doc.gov/wp-content/OIG Publications/OIG-25-004-A_Final_Report.pdf.

[9] *See generally* Dep't of Com., OIG-24-030-M, *February 2024 FirstNet Authority's NPSBN Outage Raised a Significant Risk to the Readiness of First Responders Across the Country* (July 18, 2024), https://www.oig.doc.gov/wp-content/OIG Publications/OIG-24-030-M-SECURED.pdf.

[10] *See generally* Dep't of Com., OIG-24-026-A, *FirstNet Authority's Lack of NPSBN Contract Oversight for Coverage Puts at Risk First Responders' Ability to Serve the Public Effectively* (June 5, 2024), https://www.oig.doc.gov/wp-content/OIG Publications/OIG-24-026-A-REDACTED.pdf.

licensees in the 4.9 GHz band generally held geographic licenses, meaning their licenses "authorize[d] operation on any channel over the entire … band and [were] generally issued for the geographic area encompassing the legal jurisdiction of the licensee." *Id.* ¶ 3 (JA\_\_). So, for example, a county sheriff would have a license that covered the entire county. Licensees within the band thus had "blanket authority" to operate base stations, mobile units, and temporary fixed stations anywhere within their geographic areas, on any 4.9 GHz band frequency. *Id.* Geographic licenses enable timely coverage changes needed to keep the public and emergency personnel safe. Such licenses differ from more typical site-specific licenses that "authorize operations [only] on specific frequencies and in clearly delineated geographic areas." *Id.* For this reason, among others, the Commission has recognized that the "licensing and regulatory regime for the 4.9 GHz band is significantly different from other public safety bands." *Id.* ¶ 2 (JA\_\_).[11]

In September 2020, the Commission imposed a "freeze" on applications for new or modified licenses in the 4.9 GHz band. *Id.* ¶ 7 (JA\_\_). This freeze did not stop incumbents from adding or moving base stations given that they held geographic licenses. The Commission then lifted this freeze "as it applie[d] to incumbents wishing to modify their existing licenses or license new permanent fixed

---

[11] With overlapping geographic licenses, no licensee in the 4.9 GHz band holds a "right to exclusive, or interference free, access to the band"; rather, licensees generally coordinated the "use of shared frequencies." Order ¶¶ 3-4 (JA\_\_).

sites." *In re Amendment of Part 90 of the Commission's Rules*, 36 FCC Rcd 15032, 15041 ¶ 25 (2021) ("2021 Reconsideration Order").

In January 2023, the Commission issued its Seventh Report and Order and Ninth Further Notice. *In re Amendment of Part 90 of the Commission's Rules*, 38 FCC Rcd 704 (2023) ("Seventh Order"). The Seventh Order adopted a "Band Manager" framework for the 4.9 GHz band, according to which a Band Manager would be selected and tasked with a purely advisory "frequency coordination" role designed to "promote efficient and robust use of the band and prevent harmful interference." *Id.* ¶ 24. The Seventh Order also directed incumbent licensees to submit "more granular technical data" on their existing uses of the band, *id.* ¶¶ 33-34, but it made those data collection requirements contingent on subsequent regulatory approval, *id.* ¶ 35 n.94. Otherwise, the Seventh Order generally preserved incumbents' geographic licenses while noting that "public safety licensees may be issued site-based licenses" for existing uses while still maintaining their geographic-license authority to engage in "future deployments." *Id.* ¶ 117.

### D.    The Order

In October 2024, the Commission issued the Order. In a stark departure from the advisory/coordination role previously contemplated for the Band Manager, the Order first "assigns a nationwide overlay license to the Band Manager ... pursuant to the public safety radio services exception in [S]ection 309(j)[(2)]." Order ¶ 21

(JA__).  This overlay license means the Band Manager "will obtain the rights to a nationwide geographic area license across the entire 50 megahertz of the band that is 'overlaid' on top of the existing incumbent licenses and includes areas where spectrum is unassigned."  *Id.* ¶ 23 (JA__).  The Order then makes clear that the Band Manager will function as a pass-through for FirstNet: "Rather than directly operating in the band, the Band Manager, once selected, will be authorized to enter into a sharing agreement with FirstNet to enable use of unassigned portions of the 4.9 GHz band as part of FirstNet's NPSBN."  *Id.* ¶ 20 (JA__); *see also, e.g.*, *id.* ¶¶ 21, 24 (JA__, __) (similar).  Indeed, the new regulations state that "[m]anaging a sharing agreement with [FirstNet]" is one of the Band Manager's "primary responsibilities." 47 C.F.R. § 90.1217.

Though the Order declares that FirstNet's use will be done "in a manner that protects incumbent operations," Order ¶ 20 (JA__), the Order in fact radically modifies the licensing regime for incumbents.  The Order requires incumbents to apply for new licenses that cover only (1) their existing "fixed" operations or (2) their existing "base/mobile, mobile-only or temporary fixed" operations, at specified frequencies and, for all but mobile-only or temporary fixed operations, precise locations (not entire geographic areas).  *Id.* ¶¶ 56-59 (JA__-__).  Incumbents must specify their existing operations by submitting the "granular technical data" the Seventh Order directed them to compile.  *Id.* ¶ 58 (JA__).  The Order then directs

that incumbents' current geographic licenses "will be cancelled once the incumbents ... are" granted their new site-based licenses. *Id.*

The upshot of "requir[ing] incumbent licensees to surrender spectrum that they are not using," *id.* ¶ 18 (JA__), is to push more spectrum into the "unassigned" category by largely eliminating geographic-area licenses and curtailing the flexibility once conveyed by geographic licenses to expand without federal approval. The Order also reestablishes the freeze parameters from before the 2021 Reconsideration Order by prohibiting incumbents from expanding, adding to, or modifying their existing licenses absent further permission from the Commission. *Id.* ¶ 54 (JA__). In practical terms, the Order therefore requires incumbents to seek Commission approval via a waiver request to authorize license modifications for previously unreviewed actions such as changing channels or adding or moving base stations within geographic areas.

In December 2024, the Commission issued a public notice setting a June 9, 2025 deadline for incumbent licensees to submit the granular data on their existing uses and request new licenses. *See* December Notice at 1-2 (JA__-__). The December Notice further provided that the Commission "will automatically cancel any remaining" geographic licenses, potentially immediately "after June 9, 2025, without the need for further action." *Id.* at 3 (JA__).

## II. Procedural History

As the Order acknowledges, its two-step Band-Manager-to-FirstNet workaround reflects a "PSSA proposal" set forth and "further clarified" in ex parte letters filed after the comment period closed. Order ¶¶ 17-18 (JA__-__); *see* PSSA April 23, 2024 Ex Parte Letter (JA__); PSSA May 24, 2024 Ex Parte Letter (JA__). During the comment period, PSSA and FirstNet had argued the Commission should grant FirstNet a license to the 4.9 GHz spectrum directly. *See, e.g.*, FirstNet Comments (Apr. 13, 2023) (JA__); PSSA April 23, 2024 Letter (JA__). In April 2024, however, CERCI submitted an extensive legal analysis demonstrating that the Commission lacked statutory authority to grant FirstNet a nationwide license to the 4.9 GHz band. CERCI April 15, 2024 Ex Parte Letter, Attachment at 1-12 (JA__-__).

Thereafter, PSSA argued "[i]n the alternative" that the Commission could assign "one, nationwide overlay license to a single Band Manager" and then require the "overlay licensee [to] engage in a sharing agreement with [FirstNet] pursuant to Section 2.103," which PSSA proposed to amend so as to authorize such sharing without approval from incumbent licensees. PSSA April 23, 2024 Ex Parte Letter, at 2-3 & Attachment A (JA__). CERCI responded to explain that PSSA proposed the Commission do indirectly what Congress had forbidden the Commission to do directly, and that PSSA's alternative proposal still impermissibly expanded

FirstNet's role beyond the 700 MHz band. CERCI May 10, 2024 Ex Parte Letter, Attachment at 2-4, 8-9 (JA__-__, JA__-__). CERCI also explained that "PSSA's proposal would disrupt the serious reliance interests of existing state and local 4.9 GHz public-safety licensees." *Id.* at 4 (JA__). A further exchange ensued on these issues. *See* PSSA May 24, 2024 Ex Parte Letter (JA__-__); CERCI June 6, 2024 Ex Parte Letter at 1-4 (JA__-__).

In November 2024, the Commission largely adopted the PSSA proposal. Both PSSA (along with PSBTA) and CERCI petitioned for review. In January 2025, BART, as well as the NSA and CSSA, also petitioned for review. BART and NSA/CSSA also moved to stay the Order pending appeal. BART holds a 4.9 GHz geographic license and has depended on its flexibility to carry out various public safety efforts, including implementation of a communications-based train control system throughout the five-county BART service territory. BART Comments (Mar. 30, 2023) (JA__). For its part, NSA represents over 3,000 sheriffs' offices, many of which are incumbent licensees within the 4.9 GHz band. *See* Add. E, NSA/CSSA Motion to Stay Order Pending Appeal (listing these offices) (Feb. 18, 2025), Doc. 2101193 (JA__). CSSA similarly represents California's 58 elected sheriffs. BART and NSA/CSSA argued that the Commission should not be permitted to proceed with its post-June 9, 2025 cancellation of geographic-based licenses until this case was heard. On March 19, 2025, this Court denied the stay motions.

# SUMMARY OF ARGUMENT

The Order unlawfully authorizes FirstNet to use unassigned portions of the 4.9 GHz band and is arbitrary and capricious in numerous respects.

I.A.    The Order is contrary to law.   Under the Communications Act, the Commission generally lacks statutory authority to assign spectrum to federal entities.  Nothing in the Spectrum Act expressly alters that prohibition with respect to the 4.9 GHz band, and the Commission cannot circumvent this statutory bar by proceeding indirectly.

I.B.  The Commission also lacks statutory authority to expand FirstNet's role beyond what Congress specified in the Spectrum Act.  Congress repeatedly made clear that FirstNet would receive only a single license to the 700 MHz band and would otherwise operate under Congress' close supervision.  The Commission's attempt to aggrandize FirstNet beyond what Congress authorized is contrary to law and violates the major questions doctrine.

I.C. The Commission independently lacks authority to implement either step of its workaround.  The exemption to competitive bidding in Section 309(j)(2) does not authorize the Commission to grant a nationwide overlay license to the Band Manager.  And though the Order purports to be agnostic as to whether Section 2.103(b) of the Commission's rules authorizes the sharing agreement with FirstNet, the plain text of that regulation makes clear that the Band Manager cannot enter into

any such agreement because it is not a "[N]on-Federal (State/local government) licensee(s)" and cannot provide genuine consent in place of state and local entities. 47 C.F.R. § 2.103(b)(2).

II.A. The Order is also arbitrary and capricious. The Order fails to adequately protect incumbents' reliance interests in geographic licenses. The Order commands the conversion of flexible geographic licenses to narrow site-based licenses, ignoring that incumbent licensees (like BART) have made substantial investments in public safety communications systems premised on expanding coverage with their longstanding geographic licenses.

B. The Order's "cancel now, justify later" approach is arbitrary and capricious. It is not rational decisionmaking to cancel incumbents' geographic licenses *en masse* without even examining data on existing uses or considering less harmful alternatives.

C. Finally, the Order is internally contradictory. The Order centrally relies on the public safety benefits that FirstNet would confer without establishing that FirstNet is legally permitted to access the 4.9 GHz band nor showing that granting such access was reasonable in light of serious concerns about FirstNet's future, its lack of demonstrated need for additional spectrum, its history of poor management, and its commercial relationship with AT&T.

## STANDING

The Order and December Notice injure BART by cancelling BART's geographic license, thereby stripping BART of previously licensed frequencies essential to implementing a planned expansion of communication-based train control services. *See* Decl. of Htee Hmun, ¶¶ 3-4, Add. D to BART's Motion to Stay Order Pending Appeal (Feb. 18, 2025), Doc. 2101163 (JA__). An order from this Court vacating the Commission's cancellation would redress BART's injury.

NSA, CSSA, and CERCI all have associational standing. *See Int'l Dark-Sky Ass'n v. FCC*, 106 F.4th 1206, 1217-18 (D.C. Cir. 2024). Their individual members (or, in CERCI's case, the individual members of their member organizations) hold 4.9 GHz geographic licenses. The Order and December Notice effectively prevent those members from expanding critical communications infrastructure. Protecting those licenses is "germane" to NSA and CSSA's purpose of advancing the interests of sheriffs across the country, and to CERCI's purpose of maximizing the benefits of the 4.9 GHz band by serving locally identified public-safety needs. Individual participation by those members is not necessary because "[n]either the legal claims nor the relief sought involve individualized grievances." *Id.* at 1218. All petitioners also participated actively in the underlying proceeding and are parties aggrieved within the meaning of 28 U.S.C. § 2344.

## STANDARD OF REVIEW

Under the Administrative Procedure Act, the Court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In "determining whether an agency's interpretation of its governing statute is contrary to law, [the Court] must exercise [its] 'independent judgment' and 'apply[] all relevant interpretive tools' to reach 'the best reading of the statute.'" *Env't Def. Fund v. U.S. EPA*, 124 F.4th 1, 11 (D.C. Cir. 2024) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-95, 400 (2024)). The "reconciliation of distinct statutory regimes is a matter for the courts, not agencies," and "courts must exercise independent interpretive judgment" to "preserve the balance Congress struck in its statutes." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 520 (2018) (internal quotation marks omitted).

Agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). In particular, an agency must offer a "satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

## ARGUMENT

## I.   THE ORDER EXCEEDS THE COMMISSION'S AUTHORITY.

### A.   The Commission Lacks Authority to Award Spectrum to Federal Entities and Cannot Do Indirectly What It Lacks Authority to Do Directly.

It is undisputed that the Commission cannot directly assign FirstNet a license to use the 4.9 GHz band because FirstNet is a federal entity. *See generally* 47 U.S.C. §§ 301, 303, 305(a), 902(b)(2)(A).  The Order concedes that FirstNet is a federal entity, *see, e.g.*, Order ¶¶ 13, 27 (JA__, __), and PSSA and FirstNet quickly pivoted from their initial proposal before the agency that FirstNet should directly receive a nationwide license after CERCI demonstrated the legal obstacles to that proposal. The central question is whether the Commission can achieve the same practical result by channeling FirstNet's access through a pass-through Band Manager and a spectrum sharing arrangement.

It cannot.  As an initial matter, the Commission's position is an untenable reading of the Communications Act.  Taken to its logical conclusion, the idea that licensing restrictions have no bearing on indirect assignments would allow the Commission, for example, to circumvent the statutory prohibition on granting licenses to "any foreign government or the representative thereof," 47 U.S.C. § 310(a), by relying on a Band Manager to share its license with such entities.  The Court should not countenance the Commission's attempt to end-run the limits of its

statutory authority in this matter. *Cf. Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91-92, 94 (2002) (invalidating agency action that "worked an end run around important [statutory] limitations" and thus "contravene[d] Congress' will" and "subvert[ed] the careful balance" of the statute); *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 603 (D.C. Cir. 2017) (same).

Moreover, the Commission's use of a pass-through cannot overcome the specific limits on the Commission's authority over FirstNet set forth in the Spectrum Act. Though the Commission relies on broader authority under the Communications Act to justify the Order, the proper touchstone for determining whether the Commission has authority to dramatically expand FirstNet's role is the statute that specifically addresses the Commission's authority over FirstNet. *See, e.g.*, *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1136-37 (D.C. Cir. 2022) (applying the *expressio unius* canon to conclude that an agency may not rely on a broader delegation of authority where a more specific provision controls); *Halverson v. Slater*, 129 F.3d 180, 185-86 (D.C. Cir. 1997) (same). Application of the *expressio unius* canon is especially appropriate where "the context shows that the draftsmen's mention of one thing, like a grant of authority, does really necessarily, or at least reasonably, imply the preclusion of alternatives." *Nasdaq*, 38 F.4th at 1137 (quotation marks omitted).

That is the case here. The Spectrum Act is a narrow carve-out to the default rule that the Commission lacks authority to license spectrum for federal use. And the Spectrum Act itself provides the Commission with extremely limited authority over FirstNet, commanding that the Commission "*shall* reallocate the 700 MHz D block spectrum ... *in accordance with the provisions of this chapter*" and "*shall* reallocate and grant a license to [FirstNet] for use of the 700 MHz D block spectrum and existing public safety broadband spectrum." 47 U.S.C. §§ 1411(a), 1421(a). Otherwise, Congress only authorized the Commission to renew FirstNet's license in the 700 MHz band and to provide ongoing "technical" and other assistance in furtherance of FirstNet's specified duties. 47 U.S.C. §§ 1421(a), (b), 1426, 1433. Congress nowhere authorized the Commission to expand FirstNet's single license to include other spectrum bands.[12] Indeed, the Order itself makes clear that the Commission is operating without any sound basis for authority because it simply promises—apparently as a matter of grace—to apply the Spectrum Act's "regulatory framework" to FirstNet as part of its sharing agreement conferring access to the 4.9 GHz band. *See, e.g.*, Order ¶ 31 n.132 (JA__). Because the Spectrum Act does not authorize the Commission to grant FirstNet access to the 4.9 GHz band, and the Commission otherwise lacks such authority, the Order is contrary to law.

---

[12] Nor would that conclusion be consistent with Congress' purpose to facilitate first responders' communication in large buildings and dense areas, as the 700 MHz band is tailored to do.

The Commission's primary answer is that it "need not address stakeholders' concerns as they specifically pertain to FirstNet's statutory authority to hold a nationwide overlay license, as we are not directly assigning a nationwide license to FirstNet." Order ¶ 30 (JA__). But that is unresponsive: the Commission still has not shown that its workaround has any grounding in the Spectrum Act's limited grant of authority to the Commission over FirstNet. At minimum, the Commission's refusal to consider whether it is permitted to achieve, through indirect means, the same result as a plainly forbidden nationwide overlay license to FirstNet ignores an "important aspect[] of the problem" and is arbitrary and capricious. *Int'l Dark-Sky Ass'n*, 106 F.4th at 1213.

The Commission also appears to claim authority from Section 1433, which provides the Commission with discretion to "assist" FirstNet. Order ¶ 31 n.131 (JA__) (citing 47 U.S.C. § 1433). But this provision primarily refers to "technical assistance," and insofar as it authorizes the Commission to "take any action necessary to assist" FirstNet, that authorization is cabined by the qualifier "in effectuating [FirstNet's] *duties and responsibilities*." 47 U.S.C. § 1433. Those "[p]owers, duties, and responsibilities" are specifically enumerated in § 1426, and the Commission has not identified how its mere ability to "assist" with respect to any of those duties—none of which independently authorize FirstNet to expand into the 4.9 GHz band—can underpin the Commission's Order. *Cf. Whitman v. Am.*

*Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions.").

### B. The Commission Cannot Authorize FirstNet to Operate Beyond the Spectrum Specifically Dedicated by Congress.

The Commission's Order is also contrary to law because it violates Congress' clear restrictions on *FirstNet*'s room to maneuver. FirstNet, like the Commission, "literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also FEC v. Cruz*, 596 U.S. 289, 301 (2022). Here, Congress repeatedly made clear that FirstNet could not operate outside of the 700 MHz band.

Most significantly, Congress precisely identified the spectrum FirstNet was to receive for building the NPSBN. That spectrum was "700 MHz D block spectrum and existing public safety broadband spectrum." 47 U.S.C. § 1421(a). To avoid any doubt, Congress then further defined each of those terms by reference to the specific frequencies within the 700 MHz band it intended to confer on FirstNet. *See id.* § 1401(2), (14). Furthermore, Congress enacted a "[r]ule of construction" to make clear that "[e]ach range of frequencies described in this chapter shall be construed to be inclusive of the upper and lower frequencies in the range." *Id.* § 1402. Congress could not possibly have intended FirstNet to operate in a band unmentioned anywhere in the Spectrum Act given these detailed specifications.

The statutory text is replete with additional indicators that Congress intended

FirstNet to operate only within the 700 MHz band. For example, Congress directed that FirstNet would "hold *the single* public safety wireless license granted under section 1421," which in turn references only "a" license to the 700 MHz band. 47 U.S.C. §§ 1426(b)(1), 1421. Congress also itself specified the terms of FirstNet's initial license in the 700 MHz band, making clear Congress was creating a one-off, special license for FirstNet and did not intend to grant FirstNet access to new spectrum bands in the future. *Id.* § 1421. Similarly, Section 1426(b) provides that FirstNet, in carrying out its statutory duties, must require that network equipment be "capable of being used by any public safety entity … *operating in the 700 MHz band*." *Id.* § 1426(b). If Congress had really left open the possibility that FirstNet could expand the network's spectrum authorizations, it would have required the equipment to be functional on additional frequencies, not just the 700 MHz band.[13]

FirstNet's lack of authorization to use the 4.9 GHz band can also be gleaned from the broader statutory context. Congress did not create FirstNet to be a major agency with a broad mission to expand. Quite the opposite: Congress expressly provided that the *entire agency* would be "[t]erminat[ed] of authority" in 2027 barring express congressional reauthorization. *Id.* § 1426(f). And Congress

---

[13] Similarly, if Congress intended FirstNet eventually to hold another license, it would have required rural coverage consistent with all FirstNet licenses, not just the "*license granted under section 1421 of this title*." 47 U.S.C. § 1426(b).

otherwise precisely detailed FirstNet's powers, structure, funding, and oversight. *See id.* §§ 1424, 1426, 1427, 1428, 1429, 1430. None of FirstNet's enumerated powers remotely authorizes FirstNet to operate outside of the 700 MHz band. *Id.* § 1426. This glaring omission is striking, particularly where Congress took the trouble to spell out details as minute as the FirstNet Board members' allowable per diem. *Id.* § 1424(g)(2).

Further, the history and purpose of the Spectrum Act confirm that Congress did not intend FirstNet to operate outside the 700 MHz band. That Congress—in response to the specific issues raised by the 9/11 Commission—simultaneously created FirstNet and directed the Commission to give it a particular band of spectrum in a single piece of legislation shows Congress created FirstNet as a federal entity *for the purpose of* creating the NPSBN using the 700 MHz license, and that license alone.

The Commission's action also violates the major questions doctrine. Reallocating a band of spectrum worth billions of dollars for use by FirstNet is a question of "vast 'economic and political significance.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)). And there is no question as to whether "Congress would likely have intended [this decision] for itself." *West Virginia v. EPA*, 597

U.S. 697, 730 (2022). Congress previously *did* make such a decision for itself when it enacted the Spectrum Act.

In fact, the Order represents a decision of even greater economic and political significance than Congress' previous action. The 4.9 GHz band at issue involves more bandwidth than Congress dealt with in the Spectrum Act, and it is estimated to be worth approximately $15 billion—again more than the Spectrum Act's 700 MHz band. *See* CERCI April 15, 2024 Ex Parte Letter, Attachment at 12-13 & n.25 (JA__). The Order simultaneously seeks to strip more than 3,500 state, local, and non-governmental licensees of their incumbent geographic licenses, reorient the 4.9 GHz band to federal control, and—by virtue of FirstNet's AT&T contract—make the band available for commercial use. *See* CERCI April 15, 2024 Ex Parte Letter, Attachment at 13 (JA__). Congress nowhere clearly authorized this seismic shift.

In response, the Commission cites PSSA's suggestion that "while the Spectrum Act directed the Commission to issue a license for the 700 MHz band to FirstNet, nothing in the statutory language limits the operation of FirstNet's NPSBN to that band." Order ¶ 30 (JA__). This proposition gets things exactly backwards: FirstNet is a creature of statute and cannot act beyond what Congress has permitted. And it is also wrong, for all the reasons just explained. *See supra* 28-30. The Commission also cites AT&T's view that Congress' "expectation" was that FirstNet's "NPSBN would keep pace with technological advancements." Order ¶ 30

(JA\_\_). But AT&T's self-serving assessment of Congress' "expectation" cannot override the text, structure, context, and history of the statute. *Cf.* AT&T June 20, 2024 Ex Parte Letter at 7 (JA\_\_).

The Commission also relies on FirstNet's own understanding of its authority under the Spectrum Act. Order ¶ 31 (JA\_\_). But FirstNet is not owed any deference with respect to its interpretation. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). In any case, the sole textual basis the Commission gleans from FirstNet's submission, *see* Order ¶ 31 (JA\_\_), simply states that the NPSBN will "evolv[e] with technological advancements" related to "network architecture"—*i.e.*, the hardware and software used to transmit broadcast signals. 47 U.S.C. § 1422(b). It provides no authority for FirstNet to expand to other *spectrum* beyond the 700 MHz band. Indeed, if this provision actually authorized FirstNet to keep pace with "technological advancements" by expanding to other bands, it would confer limitless authority on FirstNet—a contingent agency set to expire in less than two years—to take over virtually all public safety spectrum.

### C. In Any Case, the Commission's Workaround Is Also Contrary to Law.

Even if the Court concludes that the Spectrum Act does not pose an insuperable barrier, each part of the Order's workaround is independently contrary to law under 47 U.S.C. § 309(j)(2) and 47 C.F.R. § 2.103(b).

### 1. The Commission Lacks Authority Under Section 309(j)(2) to Issue a Nationwide Overlay License to the Band Manager for the 4.9 GHz Band.

The Commission lacks authority to undertake the first step of its indirect assignment to FirstNet: granting a nationwide overlay license to the Band Manager without a competitive process under the exemption for "public safety radio services." 47 U.S.C. § 309(j)(2). As relevant here, this exemption is available for "public safety radio services, including private radio internal radio services used by State and local governments and non-government entities and including emergency road services provided by not-for-profit organizations," that (1) "are used to protect the safety of life, health, or property; and" (2) "are not made commercially available to the public." *Id.* § 309(j)(2)(A).

The Band Manager itself will not be providing any "public safety radio services," so the Commission must rely on FirstNet's use of the band to qualify for the exemption. But FirstNet is a federal entity, so its spectrum use cannot satisfy Section 309(j)(2)(A)'s requirement of being "used by State and local governments and non-government entities," as well as certain nongovernmental "not-for-profit organizations." 47 U.S.C. § 309(j)(2)(A). Consistent with this reading, Congress and the Commission have elsewhere understood the term "public safety services" to encompass only State, local, and nonprofit entities. *See, e.g.*, *id.* § 337(f)(1); 47 C.F.R. § 90.523. Even more glaringly, granting spectrum for FirstNet services does

33

not meet the exemption's requirement that the services for which the license is granted "are not made commercially available to the public." 47 U.S.C. § 309(j)(2)(A)(ii). As noted, FirstNet contractually permits AT&T to use all of FirstNet's spectrum on a secondary, interruptible basis for AT&T's commercial subscribers—a fact with which the Order does not meaningfully grapple.

Ironically, the Commission attempts to sidestep these issues by relying on the current use of the band by incumbents, claiming that because a "majority of users licensed in the 4.9 GHz band are qualified to obtain auction-exempt spectrum, assigning a nationwide overlay license to the Band Manager is also exempt from auction." Order ¶¶ 25, 26 (JA__-__). But assessing auction-exempt status based on *current* use only makes sense when the licensing eligibility requirements defining the service remain constant.[14] And the Commission provides no support for its assertion that the "primary use of the band ... will not change by assigning an overlay license to the Band Manager and authorizing it to enter into a sharing agreement with FirstNet." Order ¶ 26 (JA__). Indeed, it is uncontested that FirstNet will allow AT&T to use unassigned portions of the band on a secondary, interruptible basis for AT&T's commercial subscribers. At minimum, it is arbitrary and capricious for the Commission to rely on this provision without explaining how FirstNet's and

---

[14] *See* Section 309(j) Order ¶ 66 (explaining use of eligibility criteria in relevant band to define "services" for purposes of statutory exemption).

34

AT&T's use will not become *the* dominant use of the 4.9 GHz band.

The Commission therefore retreats to the argument that "even if the issuance of an overlay license could be seen as a new service, … this service still meets the requirements of section 309(j)(2)(A)" because of FirstNet's public-safety use. Order ¶ 26 (JA__). But as explained, FirstNet is not a State, local, or nonprofit public-safety entity and its spectrum is available for commercial use. It therefore does not qualify for the statutory exemption. Moreover, the Commission cannot here rely on the certainty of FirstNet's public-safety use when elsewhere it claims that it would be "premature" to make certain determinations "given the Band Manager and FirstNet have yet to enter into a sharing agreement" at all. Order ¶ 37 (JA__). The Commission's reliance on what FirstNet may do in the future only exposes the Band Manager as a mere pass-through.[15]

2. **Section 2.103(b) of the Commission's Rules Does Not Authorize the Commission's Contemplated Sharing Agreement.**

As to the second step of the Commission's workaround, the Commission's envisioned reliance on Section 2.103(b) for the "sharing" arrangement between the Band Manager and FirstNet is not consistent with law. *See* Order ¶ 36 (JA__). "It

_____

[15] The Commission's auction authority under Section 309(j) has largely lapsed, *see* 47 U.S.C. § 309(j)(11), but the Commission's stated rationale for departing from auction procedures is that an exemption applies. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94-95 (1943).

is axiomatic ... that an agency is bound by its own regulations." *Nat'l Envtl. Dev. Assn's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (citations omitted). Here, Section 2.103(b) provides that "Federal stations may be authorized to use channels in the" 4.9 GHz band "with non-Federal entities if the Commission finds such use necessary" where four conditions are met. 47 C.F.R. § 2.103(b)(1)-(4). The Commission's contemplated sharing agreement between the Band Manager and FirstNet cannot be squared with this provision.[16]

Section 2.103(b) envisions genuine sharing between federal and non-federal entities that the Band Manager cannot provide. The regulation requires the federal entity to "obtain the *approval* of the non-Federal (State/local government) licensee(s)," refers to "*shared* or joint-use system[s]," and reiterates that these "shared or joint-use systems are the subject of *mutual agreement* between the Federal and non-Federal entities." *Id.* (emphasis added). Thus, as the Commission summarized when promulgating this regulation, "if a state or local governmental licensee *desires* for a Federal public safety entity to receive access to some or all of its licensed frequencies, the licensee can *join in the request.*" *The Development of*

---

[16] Even PSSA appears to have recognized this limitation, advocating (unsuccessfully) for the Commission to amend Section 2.103(b) to add a new section expressly allowing FirstNet to use the 4.9 GHz band without consent from incumbent users. *See* PSSA April 23, 2024 Ex Parte, at 3-4 (JA__).

*Technical Standards*, 63 Fed. Reg. 58645, 58647 ¶ 10 (Nov. 2, 1998) (emphasis added).

The Order subverts any such genuine agreement between state and local licensees and FirstNet by relying on the Band Manager's overlay license to provide sham consent in place of the thousands of incumbent state and local public safety licensees. Indeed, the Band Manager *itself* is compelled to consent to this arrangement, as managing the "sharing agreement" is one of the Band Manager's "primary responsibilities." 47 C.F.R. § 90.1217(d).

Section 2.103(b) is also clear that it applies only to agreements between "Federal" and "non-Federal (State/local government) licensee(s)." *Id.* § 2.103(b)(2). The Band Manager is not a state or local government licensee, and so it is not a proper entity to give the consent the regulation requires. Thus, even if the Commission has authority to *allow* state and local public safety licensees to *share* spectrum with federal entities, it does not follow that Section 2.103(b) provides the Commission with authority to *force* incumbent licensees to share spectrum with FirstNet through a sham Band Manager.

## II. THE ORDER IS ARBITRARY AND CAPRICIOUS IN NUMEROUS RESPECTS.

### A. The Commission Created "Unassigned" Spectrum for FirstNet by Cancelling Geographic Licenses Without Considering Significant Reliance Interests.

When it awarded the Band Manager a nationwide overlay license for "unassigned" spectrum for the purpose of "sharing" that spectrum with FirstNet, the Commission defined "unassigned" spectrum by excluding "licensed geographic areas and frequencies held by an incumbent licensee." Order ¶ 23 n.94 (JA__). But the Commission simultaneously jettisoned its decades-long licensing approach, virtually eliminating geographic licensing. The result is that incumbents' licenses are narrowed to existing coverage only, their right to network expansions and modifications has been eliminated, and more spectrum is made available for "sharing" with FirstNet (and thus, with AT&T for its commercial subscribers).

When an agency changes course so drastically, it must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Rational decisionmaking requires an agency "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (citations omitted). In doing so, the agency must "respond to

relevant and significant public comments." *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 211 (D.C. Cir. 2011) (quotation marks omitted).  The Order meets none of these requirements.

The Order profoundly changed the 4.9 GHz licensing regime by replacing geographic licenses with site-based ones.  Before, licensees could use any channel in the 4.9 GHz band without Commission approval; after cancellation, they cannot.  Order ¶ 58 (JA__).  Before, licensees could add or move base stations and most fixed sites within their geographic areas without Commission approval; after cancellation, they cannot.  *Id.* ¶¶ 56, 58 (JA__, __).[17]  On top of this elimination of geographic license rights, the Order imposed an indefinite "freeze" on even *asking* for license modifications, absent a theoretical waiver.  *Id.* ¶¶ 54, 58 (JA__, __).  And the Commission grants waiver requests only under extraordinary circumstances, at its discretion.  *See* 47 C.F.R. § 1.925.

Public safety users relied on the flexibility of geographic licenses to make substantial investments of time and scarce public dollars.  For example, Petitioner BART heavily relied on its rights to make and adjust deployments within its licensed geographic area when it invested substantial time and money in testing and selecting 4.9 GHz-compatible equipment, designing the system, securing funding, and

---

[17] The only operations that can still be licensed on a geographic basis are purely mobile systems (without any base station) and temporary fixed sites (lasting less than one year). 47 C.F.R. § 90.1207(e)(1)(vi).

awarding the design/build contract for a billion-dollar-plus communications-based train control project to be installed over a span of years. BART Comments at 1-3 (Mar. 30, 2023) (JA__). Other public safety agencies made similar large investments to meet a variety of public safety needs. *See* CERCI Feb. 6, 2024 Ex Parte Letter, at 3-4 (JA__).

The Commission gave zero consideration to these substantial investments and related reliance interests. At most, the Commission acknowledged that some licensees may have relied "on the existing state of the freeze"—*i.e.*, the ability, before the Order, for incumbents to request license modifications—to "invest[] in systems that they hoped to use to modify or expand current operations." Order ¶ 54 (JA__). That single sentence speaks only to licensees' loss of the ability to ask for license modifications absent waiver. To be sure, this loss is an independent, significant, and equally arbitrary impairment of licensees' rights. *See id*. But the cancellation of geographic licenses impairs distinct and more fundamental reliance interests—the investments engendered by licensees' (pre-Order) *right* to expand their systems within geographic areas *without* Commission approval.

The Commission's only other response was to "remind" incumbents that the cancellation did not alter their "rights to operate their existing networks." *Id.* ¶ 58 (JA__). That existing-operations "answer" is no answer at all to how the Order

impairs incumbent licensees' planned, investment-backed expansions and modifications, with the corresponding sunk costs.

The Order's willful blindness to planned expansions and modifications is especially arbitrary given the unacknowledged risk that geographic areas lost through the conversion to site-based licenses (unless able to be re-licensed) will be deemed "unassigned." These swathes of previously assigned (and planned-for use) spectrum will then be shifted to FirstNet by way of the Band Manager and, by extension, to secondary commercial use by AT&T subscribers. In the face of significant comments on the issue, the Commission's failure to address these reliance interests is arbitrary. *See Music Choice v. Copyright Royalty Bd.*, 970 F.3d 418, 429 (D.C. Cir. 2020) (holding agency action invalid for "fail[ing] to respond to … reliance interests arising from the previous audit standard" when "specifically raised on the record").

The Commission's only justification for disregarding licensees' reliance interests was that "stable spectrum landscape reflecting the current state of operations … will better facilitate [data] analysis." Order ¶ 54 (JA__). But the Order does not maintain the status quo pending data analysis. Rather, it *alters* the status quo by converting or cancelling all geographic licenses and authorizing the Band Manager-FirstNet sharing agreement.

Nor is the Order saved by inviting "current licensees facing special circumstances" to "seek a waiver." *Id.* Although a waiver might save a "rational" but "impermissibly broad" rule, the "mere existence of a safety valve does not cure an *irrational* rule." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 571 (D.C. Cir. 2004) (emphasis added). An agency cannot ignore reliance interests ex ante by promising to consider reliance in one-off waiver proceedings after the fact. And the Commission nowhere explains why investment in new systems in reliance on geographic license rights is a "special circumstance" appropriate for a waiver rather than a factor common to most incumbent licensees.

## B. The Commission's Cancel First, Justify Later Approach Is Arbitrary and Capricious.

The Commission's arbitrary blindness to reliance interests is compounded by its failure to establish any reasoned foundation for cancelling all geographic licenses—yet maintaining, contradictorily, that the Order fosters "protection of incumbent licensees." Order ¶ 24 (JA__). "[R]ational decisionmaking … requires more than an absence of contrary evidence; it requires substantial evidence to support a decision." *Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 574 F.3d 748, 767 (D.C. Cir. 2009). No such evidence exists here.

The Order stated its overarching goal was to ensure the 4.9 GHz band is "efficiently and intensely utilized in support of public safety missions." Order ¶ 1 (JA__). Yet the result is to make more spectrum available for commercial use. Plus,

the Commission made no determination that public safety licensees were not already "efficiently and intensely" using the spectrum. Instead, the Commission repeatedly acknowledged it does not yet know whether or where 4.9 GHz spectrum is "unused"; that is the point of the data collection. *Id.* ¶¶ 41, 59 (JA__, __).

Before such data collection and analysis occurs, no evidence supports the conclusion that widespread underutilization of the band justifies cancellation of *all* geographic licenses. *See* 2021 Reconsideration Order ¶ 87 (acknowledging that "public safety usage of the band is greater in urban areas than rural ones"). The Commission offhandedly cited a few comments asserting underutilization, *see* Order ¶¶ 22 n.90, 29 (JA__, __), but such comments themselves "offered no evidence." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014). Nor did the Commission adequately consider less harmful alternatives, such as allowing continued 4.9 GHz licensing by state and local public safety entities while also allowing the leasing of 4.9 GHz spectrum by others where there is an identified need and funding to add 4.9 GHz in a particular location.

The Commission baldly asserted that "the results of the data collection are not required … to authorize the [national] overlay licensing process and sharing agreement" with FirstNet. Order ¶ 41 n.178 (JA__). That is an *ipse dixit*, not an explanation. The Commission insists that because the Band Manager's overlay license extends only to "unassigned" spectrum, the Band Manager will "ensure the

protection of incumbent operations" and has no "authority … to modify or alter the existing license rights of incumbents." *Id.* ¶ 24 n.100 (JA__). But this platitude ignores that more "unassigned" spectrum is itself a creation of the Order. *See id.* ¶ 23 & n.94 (JA__). And by doing so before collecting or analyzing usage data (much less any data on planned deployments), the Commission has itself impaired incumbent operations. This is arbitrary.

## C. The Order Is Internally Inconsistent and Contradictory.

Finally, in its attempt to sidestep any questions regarding the Commission's legal authority, the Order inconsistently frames certain outcomes or legal conclusions as tentative or undecided, while elsewhere taking those matters as given. As a result, the Order is "internally inconsistent" and fails to provide a reasonable explanation for its decision. *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).

It is not rational decisionmaking to set up a two-step process in which a yet-to-be selected Band Manager is awarded a nationwide overlay license for the sole and express purpose of awarding FirstNet access to the 4.9 GHz band without ensuring that FirstNet is legally able to access the band under the Commission's own rules. *See, e.g.*, Order ¶ 37 (JA__) (stating simply that the Commission "*anticipate[s]* that section 2.103(b) would enable" such access). Similarly, the fact that the Order specifies one of the Band Manager's "primary responsibilities" is

"[m]anaging a sharing agreement with [FirstNet]," 47 C.F.R. § 90.1217(d), while concluding it is "unnecessary to resolve ... at this time" any questions as to how the Band Manager will be selected, Order ¶ 52 (JA__), makes clear that the Band Manager is just a pass-through entity to facilitate the Commission doing indirectly what it cannot do directly.

In addition, the Commission essentially ignores numerous practical concerns regarding an expansion of FirstNet's responsibilities. For example, FirstNet is set to expire in 2027 unless Congress reauthorizes it. CERCI warned that it "would be unwise to attempt to transform [FirstNet's] responsibilities beyond the [Spectrum] Act's scope less than three years before the entire entity is set to terminate." CERCI April 15, 2024 Ex Parte Letter, Attachment at 10 (JA__). And FirstNet itself has recognized that the termination provision "create[s] a risk for continued network operations and [would] result in a loss of service for public safety users."[18] Yet other than quoting this termination provision in a footnote, Order ¶ 14 n.59 (JA__), the Commission nowhere addresses this obstacle.

Similarly, the Commission has not adequately explained why FirstNet *needs* any additional public-safety spectrum. As CERCI explained, at present "only a fraction of the capacity of [FirstNet's] assigned spectrum is actually used for public

---

[18] FirstNet Authority, *Fiscal Year 2023 Annual Report to Congress*, at 39 (Feb. 2024) (capitalization omitted), https://www.firstnet.gov/sites/default/files/First NetAuthority_AnnualReport_FY2023.pdf.

safety; AT&T uses the rest to serve its commercial subscribers." CERCI July 10, 2024 Ex Parte Letter, at 3 (JA__); *see also* AT&T June 20, 2024 Ex Parte Letter at 13-14 (JA__) (conceding this point). Even if FirstNet did need such spectrum, the Commission did not explain how and when FirstNet would secure funding for the buildout of the NPSBN in the 4.9 GHz band. That is in obvious contrast to Congress' provision of $7 billion for funding the buildout of the NPSBN by FirstNet in the 700 MHz band. Moreover, the Commission identified no evidence that FirstNet can even provide all of the services that incumbent licensees were planning pursuant to their geographic licenses, such as the services BART needs for communications-based train control.

In the face of these concerns, the Commission simply declares that it "disagree[s] with commenters suggesting that such a showing [evidencing a need for additional spectrum] is needed as there are multiple public interest benefits that will flow from FirstNet's future access," including "furtherance of FirstNet's statutory mission." Order ¶ 34 (JA__). But that is a non-sequitur: FirstNet's "statutory mission" has nothing to do with the 4.9 GHz band, and the other "public interest benefits" are entirely unsupported beyond vague statements of intent from FirstNet and its allies as to what FirstNet might do in the future. *Id.* ¶ 34 nn.150-51 (JA__). None of those putative potential benefits can show a need for additional spectrum

right now.  Crediting such speculative benefits over the very real and immediate costs to incumbents is arbitrary and capricious.

Even assuming FirstNet needed additional spectrum, the Commission also largely ignored longstanding and serious questions regarding FirstNet's poor management.  *See, e.g.*, CERCI July 10, 2024 Ex Parte Letter, at 12-13 (JA__-__). OIG reports show that FirstNet lacks effective oversight, especially related to its contract with AT&T; that it has failed to comply with various federal contract management and related requirements; and that it has made network reinvestment decisions without proper justification and in a manner that demonstrates strong influence from its contractor, AT&T.  *See supra* 13.  In 2024 alone, OIG issued six reports that detailed network outages, inadequate network coverage, and contract oversight problems that, collectively, risked putting the FirstNet program out of compliance with its statutory obligations.

The Commission acknowledged only a small subset of these issues and irrationally concluded that NTIA's response to a single draft OIG report was "sufficient" to provide adequate reassurance as to FirstNet's suitability for its envisioned task.  *See* Order ¶ 34 n.145 (JA__).  By ignoring whether FirstNet could be relied upon to deliver on the benefits it promised, the Commission failed to consider an important aspect of the problem.

Nor, finally, did the Commission explain how it advances public safety for AT&T to gain access to 4.9 GHz for commercial use of network capacity on FirstNet's NPSBN. *Cf.* Order ¶ 35 n.154 (JA__). The Commission relies on the formalistic point that AT&T itself is not receiving any "license, lease, or other spectrum use" because of the Order's use of a Band Manager, but that distinction is irrelevant, particularly where AT&T does not dispute that it will have "secondary, interruptible use rights" to the 4.9 GHz band once it is integrated into FirstNet's NPSBN (which AT&T maintains and operates). *See id.* Otherwise, the Commission naively accepts AT&T's unsupported assertion that the "primary benefit" of the Order will be upgrades to the NPSBN rather than a commercial windfall to AT&T, *id.*, even though AT&T does not dispute that only a "fraction" of the NPSBN's current 700 MHz spectrum goes to public safety, with the vast majority in commercial use by AT&T subscribers, *see* CERCI July 10, 2024 Ex Parte Letter, at 3 (JA__); AT&T June 20, 2024 Ex Parte Letter at 13-14 (JA__).

The Commission provides no further reasoning on this issue. The Commission ignores that AT&T will be able to use the 4.9 GHz band valued at approximately $15 billion to serve commercial subscribers while its competitors that also provide services to public safety entities must pay for their spectrum. And the Commission says nothing to address how the Order will substantially harm and distort competition in the commercial wireless marketplace where spectrum access

is premised on auctions and secondary market transactions. The Commission unreasonably sacrificed public safety to commercial gain without adequate explanation.

## CONCLUSION

For the foregoing reasons, the Court should grant the petitions for review of CERCI, BART, and NSA/CSSA and vacate the Order under review.


Dated: June 3, 2025

Respectfully submitted,

/s/ *James M. Smith*
James M. Smith
Law Office of James M. Smith
4069 27th Road North
Arlington, VA 22207
(703) 855-4183
jamesmsmith8980@gmail.com

*Counsel for National Sheriffs'*
*Association and California State Sheriffs'*
*Association*

/s/ *Jessica Ring Amunson*
Jessica Ring Amunson
Arjun R. Ramamurti
Joshua J.W. Armstrong
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
jamunson@jenner.com

*Counsel for Coalition for*
*Emergency Response and Critical*
*Infrastructure*

/s/ *Hyland Hunt*
Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite
300 Washington, DC 20001
(202) 868-6915
hhunt@deutschhunt.com

Phyllis A. Whitten
SAN FRANCISCO BAY AREA RAPID
    TRANSIT DISTRICT
2150 Webster St, 10th Floor
Oakland, CA 94612
(510) 464-5000
pwhitte@bart.gov

*Counsel for San Francisco Bay
Area Rapid Transit District*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the word limit approved by this Court in its Order of May 6, 2025, because this brief contains 10,997 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14 point Times New Roman font for the main text and 14 point Times New Roman font for footnotes.

/s/ *Jessica Ring Amunson*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2025, I caused to be electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Jessica Ring Amunson*

**STATUTORY ADDENDUM**

## INDEX

47 U.S.C. § 305.............................................................................S.A.1

47 U.S.C. § 309.............................................................................S.A.1

47 U.S.C. § 902.............................................................................S.A.2

47 U.S.C. § 1401...........................................................................S.A.3

47 U.S.C. § 1411...........................................................................S.A.3

47 U.S.C. § 1421...........................................................................S.A.3

47 U.S.C. § 1422...........................................................................S.A.4

47 U.S.C. § 1424...........................................................................S.A.5

47 U.S.C. § 1426...........................................................................S.A.9

47 U.S.C. § 1427.........................................................................S.A.15

47 U.S.C. § 1428.........................................................................S.A.15

47 U.S.C. § 1429.........................................................................S.A.17

47 U.S.C. § 1430.........................................................................S.A.18

47 U.S.C. § 1431.........................................................................S.A.19

47 U.S.C. § 1433.........................................................................S.A.19

47 C.F.R. § 2.103.........................................................................S.A.19

**47 U.S.C. § 305**

§ 305. Government owned stations

(a) Frequencies; compliance with regulations; stations on vessels

Radio stations belonging to and operated by the United States shall not be subject to the provisions of sections 301 and 303 of this title. All such Government stations shall use such frequencies as shall be assigned to each or to each class by the President. […]

****

**47 U.S.C. § 309**

§ 309. Application for license

(a) Considerations in granting application

Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 of this title applies, whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.

****

(j) Use of competitive bidding

    (1) General authority

    If, consistent with the obligations described in paragraph (6)(E), mutually exclusive applications are accepted for any initial license or construction permit, then, except as provided in paragraph (2), the Commission shall grant the license or permit to a qualified applicant through a system of competitive bidding that meets the requirements of this subsection.

    (2) Exemptions

    The competitive bidding authority granted by this subsection shall not apply to licenses or construction permits issued by the Commission--

        (A) for public safety radio services, including private internal radio services used by State and local governments and non-government entities and including emergency road services provided by not-for-profit organizations, that--

(i) are used to protect the safety of life, health, or property; and

(ii) are not made commercially available to the public;

(B) for initial licenses or construction permits for digital television service given to existing terrestrial broadcast licensees to replace their analog television service licenses; or

(C) for stations described in section 397(6) of this title.

****

(11) Termination

The authority of the Commission to grant a license or permit under this subsection shall expire March 9, 2023, except that, with respect to the electromagnetic spectrum identified under section 1004(a) of the Spectrum Pipeline Act of 2015, such authority shall expire on September 30, 2025, and with respect to the electromagnetic spectrum identified under section 90008(b)(2)(A)(ii) of the Infrastructure Investment and Jobs Act, such authority shall expire on the date that is 7 years after November 15, 2021.

****


**47 U.S.C. § 902**

§ 902. Establishment; assigned functions

****

(b) Assigned functions

****

(2) Communications and information functions

Subject to section 904(d) of this title, the functions to be assigned by the Secretary under paragraph (1) include (but are not limited to) the following functions transferred to the Secretary by Reorganization Plan Number 1 of 1977 and Executive Order 12046:

(A) The authority delegated by the President to the Secretary to assign frequencies to radio stations or classes of radio stations belonging to and operated by the United States, including the authority to amend, modify, or revoke such assignments, but not including the authority to make final disposition of appeals from frequency assignments.

****

**47 U.S.C. § 1401**

§ 1401. Definitions

In this chapter:

(1) 700 MHz band

The term "700 MHz band" means the portion of the electromagnetic spectrum between the frequencies from 698 megahertz to 806 megahertz.

(2) 700 MHz D block spectrum

The term "700 MHz D block spectrum" means the portion of the electromagnetic spectrum between the frequencies from 758 megahertz to 763 megahertz and between the frequencies from 788 megahertz to 793 megahertz.

****

(14) Existing public safety broadband spectrum

The term "existing public safety broadband spectrum" means the portion of the electromagnetic spectrum between the frequencies--

    (A) from 763 megahertz to 768 megahertz;

    (B) from 793 megahertz to 798 megahertz;

    (C) from 768 megahertz to 769 megahertz; and

    (D) from 798 megahertz to 799 megahertz.

****

**47 U.S.C. § 1411**

§ 1411. Reallocation of D block to public safety

(a) In general

The Commission shall reallocate the 700 MHz D block spectrum for use by public safety entities in accordance with the provisions of this chapter.

(b) Omitted

****

**47 U.S.C. § 1421**

§ 1421. Single public safety wireless network licensee

(a) Reallocation and grant of license

Notwithstanding any other provision of law, and subject to the provisions of this chapter, the Commission shall reallocate and grant a license to the First Responder Network Authority for the use of the 700 MHz D block spectrum and existing public safety broadband spectrum.

(b) Term of license

(1) Initial license

The license granted under subsection (a) shall be for an initial term of 10 years from the date of the initial issuance of the license.

(2) Renewal of license

Prior to expiration of the term of the initial license granted under subsection (a) or the expiration of any subsequent renewal of such license, the First Responder Network Authority shall submit to the Commission an application for the renewal of such license. Such renewal application shall demonstrate that, during the preceding license term, the First Responder Network Authority has met the duties and obligations set forth under this chapter. A renewal license granted under this paragraph shall be for a term of not to exceed 10 years.

(c) Facilitation of transition

The Commission shall take all actions necessary to facilitate the transition of the existing public safety broadband spectrum to the First Responder Network Authority.

**47 U.S.C. § 1422**

§ 1422. Public safety broadband network

(a) Establishment

The First Responder Network Authority shall ensure the establishment of a nationwide, interoperable public safety broadband network.

(b) Network components

The nationwide public safety broadband network shall be based on a single, national network architecture that evolves with technological advancements and initially consists of--

(1) a core network that--

(A) consists of national and regional data centers, and other elements and functions that may be distributed geographically, all of which shall be based on commercial standards; and

(B) provides the connectivity between--

    (i) the radio access network; and

    (ii) the public Internet or the public switched network, or both; and

(2) a radio access network that--

(A) consists of all cell site equipment, antennas, and backhaul equipment, based on commercial standards, that are required to enable wireless communications with devices using the public safety broadband spectrum; and

(B) shall be developed, constructed, managed, maintained, and operated taking into account the plans developed in the State, local, and tribal planning and implementation grant program under section 1442(a) of this title.

## 47 U.S.C. § 1424

§ 1424. Establishment of the First Responder Network Authority

(a) Establishment

There is established as an independent authority within the NTIA the "First Responder Network Authority" or "FirstNet".

(b) Board

(1) In general

The First Responder Network Authority shall be headed by a Board, which shall consist of--

(A) the Secretary of Homeland Security;

(B) the Attorney General of the United States;

(C) the Director of the Office of Management and Budget; and

(D) 12 individuals appointed by the Secretary of Commerce in accordance with paragraph (2).

(2) Appointments

(A) In general

In making appointments under paragraph (1)(D), the Secretary of Commerce shall--

(i) appoint not fewer than 3 individuals to represent the collective interests of the States, localities, tribes, and territories;

(ii) seek to ensure geographic and regional representation of the United States in such appointments;

(iii) seek to ensure rural and urban representation in such appointments; and

(iv) appoint not fewer than 3 individuals who have served as public safety professionals.

(B) Required qualifications

(i) In general

Each member appointed under paragraph (1)(D) should meet not less than 1 of the following criteria:

(I) Public safety experience

Knowledge and experience in the use of Federal, State, local, or tribal public safety or emergency response.

(II) Technical expertise

Technical expertise and fluency regarding broadband communications, including public safety communications.

(III) Network expertise

Expertise in building, deploying, and operating commercial telecommunications networks.

(IV) Financial expertise

Expertise in financing and funding telecommunications networks.

(ii) Expertise to be represented

In making appointments under paragraph (1)(D), the Secretary of Commerce shall appoint--

(I) not fewer than 1 individual who satisfies the requirement under subclause (II) of clause (i);

(II) not fewer than 1 individual who satisfies the requirement under subclause (III) of clause (i); and

(III) not fewer than 1 individual who satisfies the requirement under subclause (IV) of clause (i).

(C) Citizenship

No individual other than a citizen of the United States may serve as a member of the Board.

(c) Terms of appointment

(1) Initial appointment deadline

Members of the Board shall be appointed not later than 180 days after February 22, 2012.

(2) Terms

(A) Length

(i) In general

Each member of the Board described in subparagraphs (A) through (C) of subsection (b)(1) shall serve as a member of the Board for the life of the First Responder Network Authority.

(ii) Appointed individuals

The term of office of each individual appointed to be a member of the Board under subsection (b)(1)(D) shall be 3 years. No member described in this clause may serve more than 2 consecutive full 3-year terms.

(B) Expiration of term

Any member whose term has expired may serve until such member's successor has taken office, or until the end of the calendar year in which such member's term has expired, whichever is earlier.

(C) Appointment to fill vacancy

Any member appointed to fill a vacancy occurring prior to the expiration of the term for which that member's predecessor was appointed shall be appointed for the remainder of the predecessor's term.

(D) Staggered terms

With respect to the initial members of the Board appointed under subsection (b)(1)(D)--

(i) 4 members shall serve for a term of 3 years;

(ii) 4 members shall serve for a term of 2 years; and

(iii) 4 members shall serve for a term of 1 year.

(3) Vacancies

A vacancy in the membership of the Board shall not affect the Board's powers, and shall be filled in the same manner as the original member was appointed.

(d) Chair

(1) Selection

The Secretary of Commerce shall select, from among the members of the Board appointed under subsection (b)(1)(D), an individual to serve for a 2-year term as Chair of the Board.

(2) Consecutive terms

An individual may not serve for more than 2 consecutive terms as Chair of the Board.

(e) Meetings

(1) Frequency

The Board shall meet--

(A) at the call of the Chair; and

(B) not less frequently than once each quarter.

(2) Transparency

Meetings of the Board, including any committee of the Board, shall be open to the public. The Board may, by majority vote, close any such meeting only for the time necessary to preserve the confidentiality of commercial or financial information that is privileged or confidential, to discuss personnel matters, or to discuss legal matters affecting the First Responder Network Authority, including pending or potential litigation.

(f) Quorum

Eight members of the Board shall constitute a quorum, including at least 6 of the members appointed under subsection (b)(1)(D).

(g) Compensation

(1) In general

The members of the Board appointed under subsection (b)(1)(D) shall be compensated at the daily rate of basic pay for level IV of the Executive Schedule for each day during which such members are engaged in performing a function of the Board.

(2) Prohibition on compensation

A member of the Board appointed under subparagraphs (A) through (C) of subsection (b)(1) shall serve without additional pay, and shall not otherwise benefit, directly or indirectly, as a result of their service to the First Responder Network Authority, but shall be allowed a per diem allowance for travel expenses, at rates authorized for an employee of an agency under subchapter I of chapter 57 of Title 5, while away from the home or regular place of business of the member in the performance of the duties of the First Responder Network Authority.

## 47 U.S.C. § 1426

§ 1426. Powers, duties, and responsibilities of the First Responder Network Authority

(a) General powers

The First Responder Network Authority shall have the authority to do the following:

(1) To exercise, through the actions of its Board, all powers specifically granted by the provisions of this subchapter, and such incidental powers as shall be necessary.

(2) To hold such hearings, sit and act at such times and places, take such testimony, and receive such evidence as the First Responder Network Authority considers necessary to carry out its responsibilities and duties.

(3) To obtain grants and funds from and make contracts with individuals, private companies, organizations, institutions, and Federal, State, regional, and local agencies.

(4) To accept, hold, administer, and utilize gifts, donations, and bequests of property, both real and personal, for the purposes of aiding or facilitating the work of the First Responder Network Authority.

(5) To spend funds under paragraph (3) in a manner authorized by the Board, but only for purposes that will advance or enhance public safety communications consistent with this chapter.

(6) To take such other actions as the First Responder Network Authority (through the Board) may from time to time determine necessary, appropriate, or advisable to accomplish the purposes of this chapter.

(b) Duty and responsibility to deploy and operate a nationwide public safety broadband network

(1) In general

The First Responder Network Authority shall hold the single public safety wireless license granted under section 1421 of this title and take all actions necessary to ensure the building, deployment, and operation of the nationwide public safety broadband network, in consultation with Federal, State, tribal, and local public safety entities, the Director of NIST, the Commission, and the public safety advisory committee established in section 1425(a) of this title, including by, at a minimum--

(A) ensuring nationwide standards for use and access of the network;

(B) issuing open, transparent, and competitive requests for proposals to private sector entities for the purposes of building, operating, and maintaining the network that use, without materially changing, the minimum technical requirements developed under section 1423 of this title;

(C) encouraging that such requests leverage, to the maximum extent economically desirable, existing commercial wireless infrastructure to speed deployment of the network; and

(D) managing and overseeing the implementation and execution of contracts or agreements with non-Federal entities to build, operate, and maintain the network.

(2) Requirements

In carrying out the duties and responsibilities of this subsection, including issuing requests for proposals, the First Responder Network Authority shall--

(A) ensure the safety, security, and resiliency of the network, including requirements for protecting and monitoring the network to protect against cyberattack;

(B) promote competition in the equipment market, including devices for public safety communications, by requiring that equipment for use on the network be--

(i) built to open, non-proprietary, commercially available standards;

(ii) capable of being used by any public safety entity and by multiple vendors across all public safety broadband networks operating in the 700 MHz band; and

(iii) backward-compatible with existing commercial networks to the extent that such capabilities are necessary and technically and economically reasonable;

(C) promote integration of the network with public safety answering points or their equivalent; and

(D) address special considerations for areas or regions with unique homeland security or national security needs.

(3) Rural coverage

In carrying out the duties and responsibilities of this subsection, including issuing requests for proposals, the nationwide, interoperable public safety broadband network, consistent with the license granted under section 1421 of this title, shall require deployment phases with substantial rural coverage milestones as part of each phase of the construction and deployment of the network. To the maximum extent economically desirable, such proposals shall include partnerships with existing commercial mobile providers to utilize cost-effective opportunities to speed deployment in rural areas.

(4) Execution of authority

In carrying out the duties and responsibilities of this subsection, the First Responder Network Authority may--

(A) obtain grants from and make contracts with individuals, private companies, and Federal, State, regional, and local agencies;

(B) hire or accept voluntary services of consultants, experts, advisory boards, and panels to aid the First Responder Network Authority in carrying out such duties and responsibilities;

(C) receive payment for use of--

(i) network capacity licensed to the First Responder Network Authority; and

(ii) network infrastructure constructed, owned, or operated by the First Responder Network Authority; and

(D) take such other actions as may be necessary to accomplish the purposes set forth in this subsection.

(c) Other specific duties and responsibilities

(1) Establishment of network policies

In carrying out the requirements under subsection (b), the First Responder Network Authority shall develop--

(A) requests for proposals with appropriate--

(i) timetables for construction, including by taking into consideration the time needed to build out to rural areas and the advantages offered through partnerships with existing commercial providers under paragraph (3);

(ii) coverage areas, including coverage in rural and nonurban areas;

(iii) service levels;

(iv) performance criteria; and

(v) other similar matters for the construction and deployment of such network;

(B) the technical and operational requirements of the network;

(C) practices, procedures, and standards for the management and operation of such network;

(D) terms of service for the use of such network, including billing practices; and

(E) ongoing compliance review and monitoring of the--

(i) management and operation of such network;

(ii) practices and procedures of the entities operating on and the personnel using such network; and

(iii) necessary training needs of network operators and users.

(2) State and local planning

(A) Required consultation

In developing requests for proposals and otherwise carrying out its responsibilities under this chapter, the First Responder Network Authority shall consult with regional, State, tribal, and local jurisdictions regarding the distribution and expenditure of any amounts required to carry out the policies established under paragraph (1), including with regard to the--

(i) construction of a core network and any radio access network build out;

(ii) placement of towers;

(iii) coverage areas of the network, whether at the regional, State, tribal, or local level;

(iv) adequacy of hardening, security, reliability, and resiliency requirements;

(v) assignment of priority to local users;

(vi) assignment of priority and selection of entities seeking access to or use of the nationwide public safety interoperable broadband network established under subsection (b); and

(vii) training needs of local users.

(B) Method of consultation

The consultation required under subparagraph (A) shall occur between the First Responder Network Authority and the single officer or governmental body designated under section 1442(d) of this title.

(3) Leveraging existing infrastructure

In carrying out the requirement under subsection (b), the First Responder Network Authority shall enter into agreements to utilize, to the maximum extent economically desirable, existing--

(A) commercial or other communications infrastructure; and

(B) Federal, State, tribal, or local infrastructure.

(4) Maintenance and upgrades

The First Responder Network Authority shall ensure the maintenance, operation, and improvement of the nationwide public safety broadband network, including by ensuring that the First Responder Network Authority updates and revises any policies established under paragraph (1) to take into account new and evolving technologies.

(5) Roaming agreements

The First Responder Network Authority shall negotiate and enter into, as it determines appropriate, roaming agreements with commercial network providers to allow the nationwide public safety broadband network to roam onto commercial networks and gain prioritization of public safety communications over such networks in times of an emergency.

(6) Network infrastructure and device criteria

The Director of NIST, in consultation with the First Responder Network Authority and the Commission, shall ensure the development of a list of certified devices and components meeting appropriate protocols and standards for public safety entities and commercial vendors to adhere to, if such entities or vendors seek to have access to, use of, or compatibility with the nationwide public safety broadband network.

(7) Representation before standard setting entities

The First Responder Network Authority, in consultation with the Director of NIST, the Commission, and the public safety advisory committee established under section 1425(a) of this title, shall represent the interests of public safety users of the nationwide public safety broadband network before any proceeding, negotiation, or other matter in which a standards organization, standards body, standards development organization, or any other recognized standards-setting entity addresses the development of standards relating to interoperability.

(8) Prohibition on negotiation with foreign governments

The First Responder Network Authority shall not have the authority to negotiate or enter into any agreements with a foreign government on behalf of the United States.

(d) Exemption from certain laws

Any action taken or decisions made by the First Responder Network Authority shall be exempt from the requirements of--

(1) section 3506 of Title 44 (commonly referred to as the Paperwork Reduction Act);

(2) chapter 5 of Title 5 (commonly referred to as the Administrative Procedures Act); and

(3) chapter 6 of Title 5 (commonly referred to as the Regulatory Flexibility Act).

(e) Network Construction Fund

(1) Establishment

There is established in the Treasury of the United States a fund to be known as the "Network Construction Fund".

(2) Use of Fund

Amounts deposited into the Network Construction Fund shall be used by the--

(A) First Responder Network Authority to carry out this section, except for administrative expenses; and

(B) NTIA to make grants to States under section 1442(e)(3)(C)(iii)(I) of this title.

(f) Termination of authority

The authority of the First Responder Network Authority shall terminate on the date that is 15 years after February 22, 2012.

(g) GAO report

Not later than 10 years after February 22, 2012, the Comptroller General of the United States shall submit to Congress a report on what action Congress should take regarding the 15-year sunset of authority under subsection (f).

## 47 U.S.C. § 1427

§ 1427. Initial funding for the First Responder Network Authority

(a) Borrowing authority

Prior to the deposit of proceeds into the Public Safety Trust Fund from the incentive auctions to be carried out under section 309(j)(8)(G) of this title or the auction of spectrum pursuant to section 1451 of this title, the NTIA may borrow from the Treasury such sums as may be necessary, but not to exceed $2,000,000,000, to implement this subchapter. The NTIA shall reimburse the Treasury, without interest, from funds deposited into the Public Safety Trust Fund.

(b) Prohibition

(1) In general

Administrative expenses of the First Responder Network Authority may not exceed $100,000,000 during the 10-year period beginning on February 22, 2012.

(2) Definition

For purposes of this subsection, the term "administrative expenses" does not include the costs incurred by the First Responder Network Authority for oversight and audits to protect against waste, fraud, and abuse.

## 47 U.S.C. § 1428

§ 1428. Permanent self-funding; duty to assess and collect fees for network use

(a) In general

Notwithstanding section 337 of this title, the First Responder Network Authority is authorized to assess and collect the following fees:

(1) Network user fee

A user or subscription fee from each entity, including any public safety entity or secondary user, that seeks access to or use of the nationwide public safety broadband network.

(2) Lease fees related to network capacity

(A) In general

A fee from any entity that seeks to enter into a covered leasing agreement.

(B) Covered leasing agreement

For purposes of subparagraph (A), a "covered leasing agreement" means a written agreement resulting from a public-private arrangement to construct, manage, and operate the nationwide public safety broadband network between the First Responder Network Authority and secondary user to permit--

(i) access to network capacity on a secondary basis for non-public safety services; and

(ii) the spectrum allocated to such entity to be used for commercial transmissions along the dark fiber of the long-haul network of such entity.

(3) Lease fees related to network equipment and infrastructure

A fee from any entity that seeks access to or use of any equipment or infrastructure, including antennas or towers, constructed or otherwise owned by the First Responder Network Authority resulting from a public-private arrangement to construct, manage, and operate the nationwide public safety broadband network.

(b) Establishment of fee amounts; permanent self-funding

The total amount of the fees assessed for each fiscal year pursuant to this section shall be sufficient, and shall not exceed the amount necessary, to recoup the total expenses of the First Responder Network Authority in carrying out its duties and responsibilities described under this subchapter for the fiscal year involved.

(c) Annual approval

The NTIA shall review the fees assessed under this section on an annual basis, and such fees may only be assessed if approved by the NTIA.

(d) Required reinvestment of funds

The First Responder Network Authority shall reinvest amounts received from the assessment of fees under this section in the nationwide public safety interoperable broadband network by using such funds only for constructing, maintaining, operating, or improving the network.

**47 U.S.C. § 1429**

§ 1429. Audit and report

(a) Audit

(1) In general

The Secretary of Commerce shall enter into a contract with an independent auditor to conduct an audit, on an annual basis, of the First Responder Network Authority in accordance with general accounting principles and procedures applicable to commercial corporate transactions. Each audit conducted under this paragraph shall be made available to the appropriate committees of Congress.

(2) Location

Any audit conducted under paragraph (1) shall be conducted at the place or places where accounts of the First Responder Network Authority are normally kept.

(3) Access to First Responder Network Authority books and documents

(A) In general

For purposes of an audit conducted under paragraph (1), the representatives of the independent auditor shall--

(i) have access to all books, accounts, records, reports, files, and all other papers, things, or property belonging to or in use by the First Responder Network Authority that pertain to the financial transactions of the First Responder Network Authority and are necessary to facilitate the audit; and

(ii) be afforded full facilities for verifying transactions with the balances or securities held by depositories, fiscal agents, and custodians.

(B) Requirement

All books, accounts, records, reports, files, papers, and property of the First Responder Network Authority shall remain in the possession and custody of the First Responder Network Authority.

(b) Report

(1) In general

The independent auditor selected to conduct an audit under this section shall submit a report of each audit conducted under subsection (a) to--

(A) the appropriate committees of Congress;

(B) the President; and

(C) the First Responder Network Authority.

(2) Contents

Each report submitted under paragraph (1) shall contain--

(A) such comments and information as the independent auditor determines necessary to inform Congress of the financial operations and condition of the First Responder Network Authority;

(B) any recommendations of the independent auditor relating to the financial operations and condition of the First Responder Network Authority; and

(C) a description of any program, expenditure, or other financial transaction or undertaking of the First Responder Network Authority that was observed during the course of the audit, which, in the opinion of the independent auditor, has been carried on or made without the authority of law.

## 47 U.S.C. § 1430

§ 1430. Annual report to Congress

(a) In general

Not later than 1 year after February 22, 2012, and each year thereafter, the First Responder Network Authority shall submit an annual report covering the preceding fiscal year to the appropriate committees of Congress.

(b) Required content

The report required under subsection (a) shall include--

(1) a comprehensive and detailed report of the operations, activities, financial condition, and accomplishments of the First Responder Network Authority under this section; and

(2) such recommendations or proposals for legislative or administrative action as the First Responder Network Authority deems appropriate.

(c) Availability to testify

The members of the Board and employees of the First Responder Network Authority shall be available to testify before the appropriate committees of the Congress with respect to--

(1) the report required under subsection (a);

(2) the report of any audit conducted under section 1429 of this title; or

(3) any other matter which such committees may determine appropriate.

## 47 U.S.C. § 1431

§ 1431. Public safety roaming and priority access

The Commission may adopt rules, if necessary in the public interest, to improve the ability of public safety networks to roam onto commercial networks and to gain priority access to commercial networks in an emergency if--

(1) the public safety entity equipment is technically compatible with the commercial network;

(2) the commercial network is reasonably compensated; and

(3) such access does not preempt or otherwise terminate or degrade all existing voice conversations or data sessions.


## 47 U.S.C. § 1433

§ 1433. Provision of technical assistance

The Commission may provide technical assistance to the First Responder Network Authority and may take any action necessary to assist the First Responder Network Authority in effectuating its duties and responsibilities under this subchapter.


## 47 C.F.R. § 2.103

§ 2.103 Federal use of non–Federal frequencies.

(a) Federal stations may be authorized to use non–Federal frequencies in the bands above 25 MHz (except the 758–775 MHz and 788–805 MHz public safety bands) if the Commission finds that such use is necessary for coordination of Federal and non–Federal activities: Provided, however, that:

(1) Federal operation on non–Federal frequencies shall conform with the conditions agreed upon by the Commission and NTIA (the more important of which are contained in paragraphs (a)(2), (a)(3) and (a)(4) of this section);

(2) Such operations shall be in accordance with Commission rules governing the service to which the frequencies involved are allocated;

(3) Such operations shall not cause harmful interference to non–Federal stations and, should harmful interference result, that the interfering Federal operation shall immediately terminate; and

(4) Federal operation has been certified as necessary by the non–Federal licensees involved and this certification has been furnished, in writing, to the Federal agency with which communication is required.

(b) Federal stations may be authorized to use channels in the 769–775 MHz, 799–805 MHz and 4940–4990 MHz public safety bands with non–Federal entities if the Commission finds such use necessary; where:

(1) The stations are used for interoperability or part of a Federal/non–Federal shared or joint-use system;

(2) The Federal entity obtains the approval of the non–Federal (State/local government) licensee(s) or applicant(s) involved;

(3) Federal operation is in accordance with the Commission's Rules governing operation of this band and conforms with any conditions agreed upon by the Commission and NTIA; and

(4) Interoperability, shared or joint-use systems are the subject of a mutual agreement between the Federal and non–Federal entities. This section does not preclude other arrangements or agreements as permitted under part 90 of the rules. See 47 CFR 90.179 and 90.421 of this chapter.

(c) Federal stations may be authorized by the First Responder Network Authority to use channels in the 758–769 MHz and 788–799 MHz public safety bands.