---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

PUBLIC SAFETY SPECTRUM ALLIANCE AND PUBLIC SAFETY BROADBAND
TECHNOLOGY ASSOCIATION,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED STATES OF AMERICA,

*Respondents*,

COALITION FOR EMERGENCY RESPONSE AND CRITICAL INFRASTRUCTURE AND SAN
FRANCISCO BAY AREA RAPID TRANSIT,

*Intervenors*.

---

On Petitions for Review of a Final Order of the Federal
Communications Commission

---

**BRIEF OF INTERVENOR-RESPONDENTS COALITION FOR
EMERGENCY RESPONSE AND CRITICAL INFRASTRUCTURE AND
SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT**

---

Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 300
Washington, DC 20001
(202) 868-6915
hhunt@deutschhunt.com

Phyllis A. Whitten
SAN FRANCISCO BAY AREA RAPID
  TRANSIT DISTRICT
2150 Webster St, 10th Floor
Oakland, CA 94612
(510) 464-5000
pwhitte@bart.gov

*Counsel for San Francisco Bay Area
Rapid Transit District*

Jessica Ring Amunson
Arjun R. Ramamurti
Joshua J.W. Armstrong
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
jamunson@jenner.com

*Counsel for Coalition for Emergency
Response and Critical Infrastructure*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Intervenor-Respondents Coalition for Emergency Response and Critical Infrastructure ("CERCI") and San Francisco Bay Area Rapid Transit District ("BART") file the following Certificate as to Parties, Rulings, and Related Cases:

## A.     Parties, Intervenors, and *Amici*

Four related cases have been consolidated: Nos. 24-1363, 24-1364, 25-1028, and 25-1034.   Petitioners in 24-1363 are the Public Safety Spectrum Alliance ("PSSA") and the Public Safety Broadband Technology Association ("PSBTA"). Petitioner in No. 24-1364 is CERCI.  Petitioners in No. 25-1028 are NSA and CSSA. Petitioner in No. 25-1034 is BART.   Respondents in all cases are the Federal Communications Commission and the United States.  The National Fraternal Order of Police has intervened in Nos. 14-1364, 25-1028, and 25-1034.  PSSA and PSBTA have intervened in support of Respondents in No. 24-1364.  CERCI and BART have intervened in support of Respondents in No. 24-1363.  There are no *amici curiae* involved in this matter to date.

## B.     Rulings Under Review

All petitions seek review of the Commission's Eighth Report and Order, captioned *In re Amendment of Part 90 of the Commission's Rules*, 39 FCC Rcd 12032

(2024) (JA__), a summary of which was published in the Federal Register on November 20, 2024 at 89 Fed. Reg. 91578.

The petitions in Nos. 25-1028 and 25-1034 also seek review of the related public notice captioned *The Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Establish Deadline for 4.9 GHz Public Safety Licensees to Provide Granular Licensing Data*, Public Notice, 39 FCC Rcd 13108 (2024) (JA__), which was published in the Federal Register on December 9, 2024 at 89 Fed. Reg. 97559. The petition in No. 25-1028 includes the related public notice captioned *Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Further Modify Temporary Filing Freeze on the Acceptance and Processing of Certain Part 90 Applications for the 4940-4990 MHz Band*, Public Notice, 39 FCC Rcd 12317 (2024) (JA__).

## C.    Related Cases

There are no related cases other than the four cases identified above that have already been consolidated by order of the Court.

/s/ *Jessica Ring Amunson*
Jessica Ring Amunson

# RULE 26.1 DISCLOSURE STATEMENTS

Under Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioners Coalition for Emergency Response and Critical Infrastructure ("CERCI") and San Francisco Bay Area Rapid Transit District ("BART") file the following disclosure statements:

**CERCI** is a trade association of public safety and critical infrastructure organizations and telecommunications companies headquartered in Washington, D.C. Its purpose is to protect local control of the 4.9 GHz Band. CERCI is an unincorporated entity whose members have no ownership interest in it; CERCI has no parent company, and no publicly traded company has a 10% or greater ownership interest in CERCI. As a trade association, CERCI is exempt from disclosure of members that have issued shares or debt securities to the public under D.C. Circuit Rule 26.1(b).

**BART** is a rapid transit district established by the California Public Utilities Code. BART is a governmental entity in the State of California and thus not a publicly traded company and no entity has a 10% or greater ownership interest in BART. As a rapid transit district, BART does not issue shares or debt securities to the public under Circuit Rule 26.1(b).

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............i

RULE 26.1 DISCLOSURE STATEMENTS ....................................................iii

TABLE OF AUTHORITIES.........................................................................v

GLOSSARY ...............................................................................................vii

INTRODUCTION ........................................................................................1

STATEMENT OF THE ISSUES ..................................................................3

STATUTES AND REGULATIONS .............................................................3

BACKGROUND..........................................................................................3

    A.    PSSA Mischaracterizes Incumbents' Usage in the 4.9 GHz Band. ....................................................................................4

    B.    PSSA Mischaracterizes FirstNet's Statutory Authority.....................7

SUMMARY OF ARGUMENT ....................................................................9

ARGUMENT..............................................................................................11

I.    PSSA LACKS STANDING. ............................................................11

II.    PSSA HAS NO BASIS TO CHALLEGE THE COMMISSION'S CONVERSION OF GEOGRAPHIC LICENSES INTO SITE-BASED LICENSES........................................................................12

III.    THE COMMISSION REASONABLY DECLINED TO REQUIRE INCUMBENT LICENSEES TO IMMEDIATELY SURRENDER UNUSED SPECTRUM. ....................................................................15

CONCLUSION ..........................................................................................20

# TABLE OF AUTHORITIES[*]

**CASES**

*International Dark-Sky Ass'n v. FCC*, 106 F.4th 1206 (D.C. Cir. 2024)..............................................................................11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).......................................11

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)......................16

*Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932 (D.C. Cir. 2017)................................................................... 17-18

*Transportation Division of the International Association of Sheet Metal, Air, Rail & Transportation Workers v. Federal Railroad Administration*, 10 F.4th 869 (D.C. Cir. 2021).......................................9, 10

*Viasat, Inc. v. FCC*, 47 F.4th 769 (D.C. Cir. 2022)..........................................11

**STATUTES**

47 U.S.C. § 1401(21) ...................................................................................7

47 U.S.C. § 1422(b) ....................................................................................7

47 U.S.C. § 1426(a)(1) ................................................................................8

47 U.S.C. § 1426(a)(6) ................................................................................8

47 U.S.C. § 1426(b)(1) ................................................................................8

47 U.S.C. § 1426(b)(4)(D) ...........................................................................8

47 U.S.C. § 1426(c)(4) ................................................................................7

**OTHER AUTHORITIES**

47 C.F.R. 90.1207(e)(1)(i) ..........................................................................13

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

47 C.F.R. 90.1207(e)(1)(vi)................................................................................ 13

# GLOSSARY

| | |
|---|---|
| **BART** | San Francisco Bay Area Rapid Transit District |
| **CERCI** | Coalition for Emergency Response and Critical Infrastructure |
| **FCC or Commission** | Federal Communications Commission |
| **FirstNet** | First Responder Network Authority |
| **NPSBN** | National Public Safety Broadband Network |
| **NSA** | National Sheriffs' Association |
| **PSBTA** | Public Safety Broadband Technology Association |
| **PSSA** | Public Safety Spectrum Alliance |

## INTRODUCTION

Without establishing standing to do so, the Public Safety Spectrum Alliance ("PSSA") and Public Safety Broadband Technology Association ("PSBTA"; collectively, "PSSA") challenge two minor aspects of an order of the Federal Communications Commission ("FCC" or the "Commission") that otherwise adopted essentially everything PSSA requested in the rulemaking process. *See In re Amendment of Part 90 of the Commission's Rules*, Eighth Report and Order, 39 FCC Rcd 12032 (2024) (JA___) ("Order"). As the Coalition for Emergency Response and Critical Infrastructure ("CERCI") and San Francisco Bay Area Rapid Transit District ("BART") (joined by the Sheriffs' Associations) explained in their opening brief, the Order expressly adopted PSSA's two-step workaround to gift "unassigned" spectrum from the 4.9 GHz public-safety band to the First Responder Network Authority ("FirstNet") and, ultimately almost certainly, to FirstNet's commercial partner, AT&T.

As CERCI, BART, and the Sheriffs' Associations explained, the Order exceeds the Commission's and FirstNet's statutory authority. It is also arbitrary and capricious because it fails to account for incumbents' reliance interests and the resulting consequences for public safety; fails to adequately consider data regarding incumbent usage that the Order requires be collected; and fails to address serious concerns about FirstNet. Yet despite these serious infirmities, the Order is not

arbitrary and capricious for the two reasons that PSSA asserts. In both cases, PSSA argues that the Commission should have taken even more extreme action than it did, but the Commission adequately explained why it declined to go as far as PSSA wanted.

First, PSSA incorrectly argues that the Commission failed to address its proposal to replace incumbents' geographic licenses with site-based licenses. But the Commission *did* largely direct the replacement of incumbents' prior geographic licenses with site-based licenses. And to the extent the Order did not direct geographic-license replacement for some subset of cases—a subset that PSSA nowhere specifies—the need for this limited retention of geographic licenses is readily apparent and adequately explained.

Second, PSSA incorrectly argues that the Commission should have required incumbent licensees to immediately surrender all unused spectrum. But the Commission explained that it chose to defer consideration of surrender until it reviewed the data incumbents submit about their usage. PSSA itself repeatedly recognizes that this data would "of course" bear on the agency's determination of how best to proceed, and further acknowledges that an agency need not regulate everything all at once. Those concessions alone suffice to rebut PSSA's second argument.

More fundamentally, PSSA lacks standing to raise these issues because it has not established anything beyond a generalized interest in the 4.9 GHz band. Though PSSA claims to be interested in public safety, both of its proposals actually *undermine* public safety by seeking to immediately disrupt incumbent operations and planned expansions within the 4.9 GHz band, even beyond the unwarranted disruption already created by the Order at PSSA's urging. Despite the Order's other flaws, the Order correctly declined to proceed in such an irrational manner. PSSA's petition for review should be dismissed for lack of standing or otherwise denied.

## STATEMENT OF THE ISSUES

Whether PSSA has standing and, if so, whether the Order adequately addressed PSSA's proposals to convert geographic-based licenses into site-based licenses and to require incumbent licensees to surrender unused spectrum.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are contained in the addendum to the Commission's brief.

## BACKGROUND

Though PSSA purportedly petitions for review of the Order, the vast majority of PSSA's brief is spent advocating for the Commission's approach. Unfortunately, PSSA's justification mischaracterizes several aspects of (1) incumbents' usage of

the 4.9 GHz band prior to the Order; and (2) FirstNet's statutory authority, past performance, and exclusive commercial relationship with AT&T.

## A. PSSA Mischaracterizes Incumbents' Usage in the 4.9 GHz Band.

PSSA defends the Order as necessary to address chronic underutilization in the 4.9 GHz band. But the Commission made no such findings in the Order itself, nor would such findings be supported by the record.

*First*, despite PSSA's claims, the Order made no findings about current utilization in the band, nor would the FCC have had the data to do so: that is the entire point of the Order's mandated data collection. PSSA references two paragraphs from the "Background" section summarizing the "Current 4.9 GHz Band Rules" and the "Current State of the 4.9 GHz Band." PSSA Br. 12, 30 (citing Order ¶¶ 3, 5 (JA__)). But those paragraphs simply describe how the pre-Order geographic licensing regime operated. *See, e.g.*, Order ¶ 3 (JA__) (explaining that current licenses "authorize operation on any [band] channel" and are generally issued for a geographic area). The word "underutilized" appears nowhere in these paragraphs, and is mentioned only twice in the *entire* Order—in both cases summarizing (or quoting) comments rather than stating a Commission finding. *See* Order ¶ 22 n.90 (JA__); *id.* ¶ 29 (JA__). And though the Order notes the number of current licensees, *id.* ¶ 5 (JA__)—a fact that in itself is not probative given that a single license could

reflect intensive usage across a large area—it contains no analysis of how much of the band is or should be in use.

PSSA otherwise resorts to reports submitted by self-interested commenters to support its narrative that the 4.9 GHz band is chronically underutilized. *See, e.g.*, PSSA Br. 1, 11, 30. But the Order itself did not meaningfully rely on those sources, and in any event, those sources provide little support for the notion that the 4.9 GHz band is underutilized. For example, the four-page Roberson Report—on which PSSA relies but the Commission did not mention—acknowledges it *cannot* estimate fundamental issues like "geographic coverage," "number/type of users or endpoints," and "real utilization." Roberson Report at 1 (JA__).

*Second*, even if future analysis from the Order's mandated data collection demonstrates underutilization of the 4.9 GHz band, the Order still does not support PSSA's contention that non-exclusive geographic licenses or lack of coordination are the causes. *Cf.* PSSA Br. 12. If anything, the portions of the Order on which PSSA relies actually rebut PSSA's premise. The Order explains that the Commission "established this flexible [geographic-licensing] structure based on public safety agencies' unique history of coordination with one another in the use of shared frequencies." Order ¶ 4 (JA__). And the Order quotes prior findings that "many public safety agencies already have procedures or protocols in place with nearby jurisdictions to govern frequency sharing during situations requiring joint

operations," and that "the nature of public safety operations in general will . . . facilitate this sharing requirement." *Id.* ¶ 4 n.14 (JA__). By contrast, PSSA nowhere identifies where the Commission concluded that any underutilization is due to the use of geographic licenses.

*Third*, again contrary to PSSA's assertion, the Commission did not find that "[v]irtually all usage of the 4.9 GHz band is site-based." PSSA Br. 3. On the contrary, the Commission repeatedly admitted that it did not know whether, where, or how spectrum is used or unused—which is why it directed data collection. *See* Order ¶¶ 41, 59 (JA__, __). Here again, PSSA simply points to studies on which the Commission did not rely. PSSA Br. 13, 35 (citing APCO Report).

*Fourth*, PSSA incorrectly argues that incumbent geographic licensees in the 4.9 GHz band "rarely" use the band throughout the entirety of their jurisdictions, use "only a small portion of the territory," lack the technology needed to make use of the whole band, and "generally use only a specific frequency." *See id.* at 12-13, 30 (citing APCO Report; Order ¶¶ 3, 5 (JA__)). But these propositions are nowhere supported. And even if true, that fact would be irrelevant given the public-safety imperatives served by geographic licenses. As the Sheriffs' Associations explained, access to the entire band and geographic area is crucial in the context of emergency response and quickly expanding coverage for effective communication, even if

geographic licensees are not using the entire band everywhere all the time. *See* Sheriffs' Stay Mot. 9-10, Doc. 2101193 (Feb. 18, 2025).

**B.    PSSA Mischaracterizes FirstNet's Statutory Authority.**

PSSA's depiction of FirstNet misstates the scope of FirstNet's statutory authority, the Commission's statutory authority relative to FirstNet, and FirstNet's performance since its creation. PSSA Br. 8-10. Most significantly, PSSA ignores that FirstNet is a creature of statute and cannot act beyond what Congress has authorized in limiting FirstNet's activities to the 700 MHz band.

None of the statutory provisions to which PSSA refers justifies FirstNet's expansive role with respect to the 4.9 GHz band. PSSA asserts that FirstNet's role in the creation of a "nationwide, interoperable public safety broadband network" can encompass other spectrum bands, but that is stated nowhere in the statute. *Cf.* 47 U.S.C. §§ 1401(21), 1422(b). PSSA also refers to 47 U.S.C. § 1426(c)(4), but that authority is limited to "ensuring that [FirstNet] updates and revises any policies … to take into account new and evolving technologies." It does not provide a broad delegation of authority to expand into entirely new bands of spectrum. And though PSSA attempts to characterize the 700 MHz band as an "initial grant of spectrum," PSSA Br. 9, the statute is to the contrary: it speaks *only* of a single license (and renewal) with respect to that particular 700 MHz band and nowhere discusses, much less authorizes, any additional grants of spectrum.

7

The same goes for the remaining provisions PSSA cites. *See* PSSA Br. 8. The authority to "take all actions necessary to ensure the building, deployment, and operation of the nationwide public safety broadband network," 47 U.S.C. § 1426(b)(1), does not encompass acting beyond the band of spectrum that Congress directed be allocated and licensed to FirstNet. Similarly, the authority "[t]o exercise, through the actions of its Board, all powers *specifically granted by the provisions of this subchapter*, and such incidental powers as shall be necessary," *id.* § 1426(a)(1), makes clear on its face that it cannot provide a standalone basis for expanding beyond the 700 MHz band absent some *other* specific grant of authority. So, too, for Section 1426(a)(6) (authorizing actions "necessary, appropriate, or advisable *to accomplish the purposes of this chapter*") and Section 1426(b)(4)(D) (authorizing "such other actions as may be necessary *to accomplish the purposes set forth in this subsection*"). Those cabined sources of authority hardly constitute what PSSA construes as "broad statutory authority" to generally "mak[e] available to first responders an up-to-date network so that they may utilize state-of-the-art communications tools." PSSA Br. 8. Ultimately, PSSA confirms that the only rationale for allowing FirstNet to expand in the way permitted by the Order is not grounded in the statutory text but rather Congress' purported "goal" in enacting the Spectrum Act. *Id.* at 20. That unbounded rationale could justify FirstNet expanding

to all state and local public safety spectrum, despite the statute's clear focus on the 700 MHz band.

Nor is PSSA correct that FirstNet has "successfully advanced its mission to establish a nationwide interoperable public safety broadband network." PSSA Br. 9; *see also id.* at 31 (similar). Rather, a steady stream of government reports confirms that FirstNet has been plagued by poor management. *See* CERCI/BART/Sheriffs Opening Br. 13, 47-49. That FirstNet's 700 MHz license was renewed does not erase those serious concerns—particularly in relation to FirstNet's commercial partner, AT&T. *Cf.* PSSA Br. 9-10 (citing *In re First Responder Network Auth. Nationwide Pub. Safety Broadband Network Renewal of Sp-700 MHz Pub. Safety Broadband Nationwide License Radio Serv.*, Order, 38 FCC Rcd 4989 (PSHSB 2023) ("Renewal Order")). In that Renewal Order, the Bureau itself "requested that FirstNet provide additional information about its processes and policies to hold AT&T accountable for meeting its contractual obligations." *Id.* ¶ 20.

## SUMMARY OF ARGUMENT

As an initial matter, PSSA lacks standing because it has only a generalized interest in the 4.9 GHz band. On the merits, PSSA offers two unpersuasive arguments that the Commission acted arbitrarily by "failing to adopt PSSA's proposals to take more expeditious action to reclaim unused spectrum." PSSA Br.

32.   As PSSA itself recognizes, an agency "is under no obligation to 'regulate a particular area all at once.'" PSSA Br. 37 (quoting *Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R. Admin.*, 10 F.4th 869, 876 (D.C. Cir. 2021)).   Indeed, "under the 'pragmatic' one-step-at-a-time doctrine, 'agencies have great discretion to treat a problem partially' and 'regulat[e] in a piecemeal fashion.'" *Transp. Div.*, 10 F.4th at 875 (citation omitted).   Both of PSSA's arguments run afoul of this cornerstone of administrative law.

First, PSSA argues that the Commission failed to address PSSA's proposal to immediately convert all existing geographic licenses into site-based licenses.   PSSA Br. 34-36.   But that is effectively what the Commission did, and the Commission cannot be faulted for not explaining why it did not do something that it in fact did. To the extent the 4.9 GHz band's new licensing scheme permits incumbents to retain geographic licenses—absent a waiver—that permission applies only for temporary fixed or purely mobile public-safety uses.

Second, PSSA argues the Commission should have required incumbents to immediately surrender all unused spectrum rather than "defer[ring] any consideration" of that issue.   *Id.* at 37 (quoting Order ¶ 59 (JA__)).   But the Commission acknowledged this proposal.   And given that the Order already adopted a "cancel first, justify later" approach, it was not arbitrary and capricious for the Commission to stop short of requiring the immediate surrender of all unused

spectrum before the Commission reviews the data incumbents were required to submit regarding their usage. To the contrary, *accepting* PSSA's proposal to make an even more drastic alteration to the status quo before any incumbent use data is reviewed (and any Band Manager is even selected) would have been *a fortiori* unreasonable.

## ARGUMENT

## I.    PSSA LACKS STANDING.

PSSA lacks associational standing to bring its two challenges. "To establish associational standing, an organization must show that '(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Int'l Dark-Sky Ass'n v. FCC*, 106 F.4th 1206, 1217 (D.C. Cir. 2024) (citations omitted). Yet PSSA's brief states only that its members "include public safety officials and organizations that are subject to the Order," PSSA Br. 27, and nowhere states how they are "subject" to the Order, nor what concrete and particularized injury they suffer due to the Order. *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Because the Court is "left with no basis to determine whether the requisite elements of standing have been met," *Viasat, Inc. v. FCC*, 47 F.4th 769, 782 (D.C. Cir. 2022), PSSA's petition should be dismissed.

## II. PSSA HAS NO BASIS TO CHALLENGE THE COMMISSION'S CONVERSION OF GEOGRAPHIC LICENSES INTO SITE-BASED LICENSES.

On the merits, PSSA's primary argument is that the Commission "violated the basic tenet of administrative law requiring an agency to respond to significant comments" by "*sub silentio* declin[ing] to adopt PSSA's proposal that the agency convert all incumbent, geographic licenses into site-based licenses." PSSA Br. 34; *see also id.* at 3, 26 (similar). But the Commission certainly responded given that the Order gave PSSA nearly everything it sought.

Indeed, PSSA fails to explain how exactly the Commission fell short relative to PSSA's extreme proposal, leaving CERCI/BART and this Court to guess at the answer. Though PSSA contends that it was important to cancel *all* geographic licenses because (it claims) 90% of the band usage is fixed-location usage (*e.g.*, PSSA Br. 13, 35), the Commission largely *did* cancel all geographic licenses (except for temporary fixed and purely mobile uses). Every incumbent license holder in the band was required to apply for a new license by July 9, 2025 (originally June 9, 2025). The Order specified that once those applications were submitted, "incumbent licensees' current PA [*i.e.*, geographic] licenses will be cancelled" and then new licenses would be issued under "newly created [PB and PF] radio service codes." Order ¶ 58 (JA__).

These newly created radio service codes do not allow geographic areas to be licensed except for "mobile" and "temporary fixed" uses. 47 C.F.R. § 90.1207(e)(1)(vi); *see also id.* § 90.1207(e)(1)(i) (specifying that "[c]oordinates" must be supplied for base stations). Thus, the Commission did essentially exactly what PSSA wanted, as PSSA acknowledged. *See* PSSA October 22, 2024 *Ex Parte* at 1 (JA___) (stating PSSA "commends the [FCC]" and is "eternally grateful" for the new rules). As the December Public Notice states, because the "new PB and PF licenses will authorize incumbent licensee operations going forward," the "Bureaus will automatically cancel any remaining PA [*i.e.*, geographic] licenses." December Public Notice at 1, 3 (JA___). In short, the Commission adequately responded to PSSA's "proposal" because it largely *adopted* PSSA's proposal.

To the extent PSSA is complaining that the Order should have required purely mobile or temporary fixed usages *also* to be converted to site-based licenses, the Commission adequately explained its approach. *See* FCC Br. 94-95. For example, the Order cited a comment explaining that some law enforcement uses are not well-suited to site-based licenses (such as vehicular local area networks). *See* Order ¶ 56 n.232 (JA___). And it would be impractical, if not impossible, to require fixed licensing of mobile systems, which by their nature constantly move. Moreover, temporary fixed sites meet an obvious need for public safety agencies to build out temporary networks in an emergency area (say tornado or hurricane response),

which they could not do with site-based licensing. *See* Sheriffs' Stay Mot. 9-10. In any case, given PSSA's own insistence that the lion's share of the band's usage already *is* site-based, PSSA never explains why the continued existence of narrow categories of geographic licenses for ephemeral deployments hinders usage of the band.

PSSA also insists that "overlapping geographic licenses" are a problem because of the lack of "any mechanism for coordination," PSSA Br. 35, thus compelling the Commission to cancel them all (which it very nearly did). But this ignores that the Order empowers the Band Manager to undertake precisely the coordination PSSA claims is lacking. And PSSA ignores the Order's recognition that incumbent users of the 4.9 GHz band historically have developed their own coordination mechanisms. Order ¶ 4 (JA__).

Finally, PSSA's suggestion that the Commission's "failure to grapple with this issue" could undermine public safety is absurd. PSSA Br. 26. The opposite is true. PSSA claims that its proposals would protect existing incumbent usage (*e.g.*, PSSA Br. 29), but by seeking to cancel the last narrow forms of geographic licensing, PSSA would effectively eliminate any existing incumbent usage that is purely mobile (such as a walkie-talkies or bodycams) or temporary fixed (such as base stations that first responders temporarily deploy as part of search-and-rescue missions). *See* FCC Br. 30 n.2. Such uses are impractical, if not impossible, to

license on a site-based basis, so site-based-only licensing would effectively mean no public-safety-entity licensing for those uses at all. FirstNet/AT&T, on the other hand, will likely gain access to that spectrum. The upshot is that PSSA's proposal would make FirstNet/AT&T the *sole* user of any spectrum that cannot be licensed as site-based.

Taking spectrum away from state and local public safety entities and then making that spectrum available through FirstNet for commercial use by AT&T would only *undermine* public safety. And PSSA's suggestion that the Order will delay the "speed and efficiency with which [FirstNet's] access can take place," PSSA Br. 36, is entirely unsupported given that numerous steps must occur before any sharing agreement with FirstNet is implemented. It could be years before FirstNet completes the planning and secures the funding and equipment needed to recreate the capability that incumbent licensees already have in a given area. And FirstNet would not be any under any timetable for deployment, as it was in the case of implementing the 700 MHz system it was actually authorized to build.

## III. THE COMMISSION REASONABLY DECLINED TO REQUIRE INCUMBENT LICENSEES TO IMMEDIATELY SURRENDER UNUSED SPECTRUM.

PSSA also incorrectly argues that it was arbitrary and capricious for the Commission to "defer[] consideration of PSSA's recommendation that it compel

licensees to surrender unused spectrum." PSSA Br. 3; *see id.* at 27, 36-37 (similar). But the Commission's explanation was entirely reasonable. *See* FCC Br. 96-97.

There is no dispute that the Commission acknowledged and addressed PSSA's recommendation, Order ¶ 57 (JA__), as well as AT&T's similar proposal "requir[ing] licensees to share any 4.9 GHz spectrum that is not in use with FirstNet," *id.* The Order explained that "[c]ommenters were generally divided on this issue," noting CERCI's responsive argument that "PSSA's proposal would 'strip today's 4.9 GHz public safety licensees' right to expand their systems'" and would "'disrupt the serious reliance interests of existing state and local 4.9 GHz public-safety licensees.'" *Id.* (quoting CERCI May 10, 2024 *Ex Parte* at 2, 4). Given these acknowledged, conflicting viewpoints, it was not arbitrary and capricious for the Commission to "defer any consideration of" PSSA's and AT&T's immediate-surrender proposals. Order ¶ 59 (JA__).

In any case, the Commission fully "articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Commission explained that it could not assess whether PSSA's and AT&T's proposals were a good idea until it had undertaken the data collection and evaluation effort set forth in the Order. According to PSSA, the Commission's deferral is "starkly inconsistent with the rationale underlying the Order." PSSA Br. 38. But that claim grossly overstates what the Commission said.

PSSA claims that the Commission "acknowledged that [PSSA's] proposal *would* *'potentially ... increase overall spectrum efficiency in the band.'*" PSSA Br. 37 (quoting Order ¶ 59 (JA__)) (emphasis added). Just so: "potentially." The Order tentatively observed that PSSA's and AT&T's proposals "*could* potentially make more spectrum available to FirstNet and increase overall spectrum efficiency," but found that no such conclusion could be reached "until after the Commission has completed its collection and analysis of granular technical data on incumbent licensed public safety operations in the band." Order ¶ 59 (JA__). PSSA rests its argument on an incorrect premise of certainty, but the Commission did not act arbitrarily in declining to leap to PSSA's preferred but unsubstantiated conclusion.

In fact, as CERCI/BART/Sheriffs have explained, the Commission should have taken that more measured, data-driven approach *before altering the licensing status quo at all*. But taking that choice as given for present purposes, it was hardly unreasonable for the Commission to defer requiring the surrender of unused spectrum "until after the Commission has completed its collection and analysis of granular technical data on incumbent licensed public safety operations in the band." Order ¶ 59 (JA__). PSSA itself recognizes that "[o]f course, the Commission cannot determine *which* spectrum is underutilized and should be surrendered without collecting this data." PSSA Br. 27; *see id.* at 38 (materially the same). It is not arbitrary and capricious to decline to regulate in one area to the maximum extent

possible in the fastest way possible, especially where the agency needs more information. *See Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 939 (D.C. Cir. 2017) (upholding FCC's choice "to move cautiously and gather more comprehensive information before deciding"). It would have been arbitrary and capricious for the Commission to require licensees to surrender their spectrum *without* first collecting and analyzing the necessary data—just as it was arbitrary to cancel their existing geographic licenses without that data, *See* CERCI/BART/Sheriffs Opening Br. 42-44.

PSSA also dramatically overstates the practical significance of the Commission's deferred consideration. The full text of PSSA's proposal was: "Finally, the Commission should require incumbent licensees to surrender spectrum they are not using." PSSA Apr. 23, 2024 Ex Parte at 4 (JA__). Notably, PSSA never said "immediately," nor did it propose what it now appears to envision: an automatic procedural mechanism to require surrender of unused spectrum the second it is identified. Accepting PSSA's proposal verbatim, then, would not necessarily amount to anything more than a decision *in principle* that unused spectrum should be surrendered at a later date.

More broadly, PSSA's argument loses much of its force when considered in context. PSSA is objecting to incumbent licensees not being forced to immediately surrender all unused spectrum in an Order that already greatly expands *unassigned*

spectrum available for sharing with FirstNet by cancelling virtually all geographic licenses.[1]  If the goal is truly to *share* the spectrum to increase public safety utilization (rather than to merely seize the spectrum for use by FirstNet/AT&T), then there is no need for it to be immediately "surrendered" to the Band Manager.  *Cf.* PSSA Br. 15 (recognizing that the "Band Manager would be responsible 'for coordinating all operations in the band.'" (citing Order ¶ 10) (JA__)); *id.* at 20-21 (similar).  Nor does PSSA explain the urgency for the immediate surrender when no Band Manager has yet been selected and no sharing agreement has yet been entered into with FirstNet.

Finally, PSSA incorrectly states that the failure to require immediate surrender "harm[s] public safety."  PSSA Br. 27.  Immediate surrender of unused spectrum would interfere with state and local public safety agency incumbents' existing plans, including plans for expansion, as well as their capacity to respond to emergencies as needed.  That can hardly be said to advance public safety.  As CERCI explained, public safety licensees "need assured access to the 4.9 GHz band to support mission-critical needs," but "PSSA's proposal … would allow [FirstNet's] sole-source

---

[1] The Commission now asserts in its brief that the only "unassigned" spectrum subject to sharing with FirstNet is spectrum that was unassigned as of the date of the Order, covering just a few states and territories. FCC Br. 57.  However, the Commission's Order appears to authorize the Band Manager to share the spectrum from cancelled licenses with FirstNet going forward, Order ¶ 24 (JA__), which would necessarily include the geographic licenses cancelled by direction of the Order, *id.* ¶ 58 (JA__).

commercial vendor" to gain access to the band "for commercial use instead." CERCI May 10, 2024 Ex Parte at 2 (JA___). Thus, "PSSA cannot claim to serve existing licensees' interests *by taking away their rights to grow their capabilities by serving more public-safety users, covering more areas, and/or increasing capacity.*" *Id.* The Commission wisely declined PSSA's invitation to further undermine public safety by requiring the immediate surrender of unused spectrum.

## CONCLUSION

For the foregoing reasons, the Court should dismiss or deny PSSA's petition for review.

Dated:  August 21, 2025

Respectfully submitted,

/s/ *Hyland Hunt*
Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 300
Washington, DC 20001
(202) 868-6915
hhunt@deutschhunt.com

Phyllis A. Whitten
SAN FRANCISCO BAY AREA RAPID
   TRANSIT DISTRICT
2150 Webster St, 10th Floor
Oakland, CA 94612
(510) 464-5000
pwhitte@bart.gov

*Counsel for San Francisco Bay Area
Rapid Transit District*

/s/ *Jessica Ring Amunson*
Jessica Ring Amunson
Arjun R. Ramamurti
Joshua J.W. Armstrong
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
jamunson@jenner.com

*Counsel for Coalition for
Emergency Response and Critical
Infrastructure*

# CERTIFICATE OF COMPLIANCE

This brief complies with the word limit approved by this Court in its Order of May 6, 2025, because this brief contains 4,413 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14 point Times New Roman font for the main text and 14 point Times New Roman font for footnotes.

Dated:  August 21, 2025                    /s/ *Jessica Ring Amunson*

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Jessica Ring Amunson*