**ORAL ARGUMENT NOT YET SCHEDULED**

Nos. 24-1363 (lead), 24-1364, 25-1028, 25-1034

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

PUBLIC SAFETY SPECTRUM ALLIANCE AND PUBLIC
SAFETY BROADBAND TECHNOLOGY ASSOCIATION,

Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,

Respondents.

On Petitions For Review Of An Order
Of The Federal Communications Commission

**PAGE PROOF BRIEF OF INTERVENORS PUBLIC SAFETY SPECTRUM
ALLIANCE; PUBLIC SAFETY BROADBAND TECHNOLOGY
ASSOCIATION; AND THE NATIONAL FRATERNAL ORDER OF
POLICE**

Joshua S. Turner
Sara M. Baxenberg
Wiley Rein LLP
2050 M Street N.W.
Washington, DC 20036
(202) 719-7000
jturner@wiley.law

*Counsel for Intervenor the
National Fraternal Order of Police*

Andrew J. Pincus
Carmen N. Longoria-Green
Wajdi C. Mallat
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
apincus@mayerbrown.com

*Counsel for Intervenors Public Safety
Spectrum Alliance & Public Safety
Broadband Technology Association*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Petitioners Public Safety Spectrum Alliance and Public Safety Broadband Technology Association certify as follows:

### I.    Parties and *Amici*

#### A.    Parties, Intervenors, and *Amici* who Appeared in the District Court

There were no proceedings in the district court, so there were no parties in the district court.

#### B.    Parties to this Case

The following are the parties before this Court in these consolidated cases.

In No. 24-1363, Petitioners are the Public Safety Spectrum Alliance (PSSA) and Public Safety Broadband Technology Association (PSBTA), the Respondents are the Federal Communications Commission (FCC) and the United States, and the intervenors are the Coalition for Emergency Response and Critical Infrastructure (CERCI) and the San Francisco Bay Area Rapid Transit District (BART).

In No. 24-1364, Petitioner is CERCI, Respondents are the FCC and the United States, and intervenors are PSSA, PSBTA, BART, and the National Fraternal Order of Police (FOP).

In No. 25-1028, Petitioners are the National Sheriffs' Association and the California State Sheriffs' Association, Respondents are the FCC and the United States, and intervenors are PSSA, PSBTA, CERCI, BART, and FOP.

i

In No. 25-1034, Petitioner is BART, Respondents are the FCC and the United States, and intervenors are PSSA, PSBTA, CERCI, and FOP.

*Amici Curiae*: There are no *amici curiae* as of the time of this filing.

## II.    Rulings Under Review

Petitioners seek review of a final order of the Federal Communication Commission, captioned Improving Public Safety Communications in the 4.9 GHz band, 89 Fed. Reg. 91578 (Nov. 20, 2024) (the Order).

## III.    Related Cases

The Order has not been previously before this or any other court. The Court has consolidated four petitions for review of the FCC's order. CERCI filed a petition for review of the Order, Pet. for Review, *Coalition for Emergency Response and Critical Infrastructure v. FCC*, No. 24-1364 (D.C. Cir. Nov. 27, 2024), Doc. No. 2087294, and the Court consolidated CERCI's petition for review with PSSA's petition on December 4, 2024, Order, *Public Safety Spectrum Alliance v. FCC*, No. 24-1363 (D.C. Cir. Dec. 4, 2024), Doc. No. 2087934. NSA and CSSA filed a petition for review of the Order on January 17, 2025. *See* Pet. for Review, *National Sheriffs' Association v. FCC*, No. 25-1028 (D.C. Cir. Jan. 17, 2025), Doc. No. 2095068. BART filed a petition for review of the Order the same day. *See* Pet. for Review, *San Francisco Bay Area Rapid Transit District v. FCC*, No. 25-1034 (D.C. Cir. Jan. 17, 2025), Doc. No. 2095119. The Court consolidated these actions with PSSA's

and CERCI's petitions for review on January 21, 2025. *See* Order, *Public Safety Spectrum Alliance v. FCC*, No. 24-1363 (D.C. Cir. Jan. 21, 2025), Doc. No. 2095073; Order, *Public Safety Spectrum Alliance v. FCC*, No. 24-1363 (D.C. Cir. Jan. 21, 2025), Doc. No. 2095228.

<table>
<tr><td>/s/ Joshua S. Turner<br>Joshua S. Turner<br>Wiley Rein LLP<br>2050 M Street N.W.<br>Washington, DC 20036<br>(202) 719-7000<br>jturner@wiley.law</td><td>/s/ Andrew J. Pincus<br>Andrew J. Pincus<br>MAYER BROWN LLP<br>1999 K Street, N.W.<br>Washington, DC 20006<br>(202) 263-3000<br>apincus@mayerbrown.com</td></tr>
<tr><td>*Counsel for Intervenor the National Fraternal Order of Police*</td><td>*Counsel for Intervenors Public Safety Spectrum Alliance & Public Safety Broadband Technology Association*</td></tr>
</table>

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Public Safety Spectrum Alliance (PSSA) states that it is an alliance of the nation's leading public safety officials and organizations that aims to ensure that first responders nationwide are able to use the most technologically advanced communications capabilities that address the difficult, life-threatening challenges they face as first responders. PSSA is an initiative of the Public Safety Broadband Technology Association (PSBTA). PSSA and PSBTA advocate for their members and operate as trade associations within the meaning of Circuit Rule 26.1(b). PSBTA is operated by Public Safety 360, LLC. Public Safety 360, LLC has no parent corporation, and no publicly held corporation has a 10% or greater ownership interest in Public Safety 360, LLC.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the National Fraternal Order of Police (FOP) states that it is the oldest and largest national law enforcement organization in the United States representing more than 377,000 officers and deputies in every region of the country from large urban law enforcement agencies to small departments in rural communities, and everywhere in between. The FOP advocates for its members and operates as a trade association

within the meaning of Circuit Rule 26.1(b). The FOP has no parent company, and

no publicly held corporation has a 10% or greater ownership interest in the FOP.

<table>
<tr><td>

/s/ Joshua S. Turner<br>
Joshua S. Turner<br>
Wiley Rein LLP<br>
2050 M Street N.W.<br>
Washington, DC 20036<br>
(202) 719-7000<br>
jturner@wiley.law

*Counsel for Intervenor the*<br>
*National Fraternal Order of Police*

</td><td>

/s/ Andrew J. Pincus<br>
Andrew J. Pincus<br>
MAYER BROWN LLP<br>
1999 K Street, N.W.<br>
Washington, DC 20006<br>
(202) 263-3000<br>
apincus@mayerbrown.com

*Counsel for Intervenors Public Safety*<br>
*Spectrum Alliance & Public Safety*<br>
*Broadband Technology Association*

</td></tr>
</table>

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT....................................iv

TABLE OF CONTENTS.........................................................................................vi

GLOSSARY...........................................................................................................x

INTRODUCTION ..................................................................................................1

STATEMENT OF THE CASE..............................................................................2

SUMMARY OF THE ARGUMENT ....................................................................3

ARGUMENT ..........................................................................................................5

I.     THE ORDER IS FULLY SUPPORTED BY THE COMMISSION'S
       BROAD STATUTORY AUTHORITY. .......................................................5

       A.     The Communications Act And The Spectrum Act Authorize
              The Order's Framework. ....................................................................5

       B.     Nothing In The Governing Statutes Prohibits The
              Commission's Determinations. ...........................................................7

II.    ALTHOUGH THE ORDER SHOULD HAVE GONE FURTHER, IT
       WAS NOT ARBITRARY OR CAPRICIOUS IN THE MANNER
       CERCI ALLEGES.........................................................................................14

       A      The FCC Reasonably Determined That The 4.9 GHz Band
              Framework Needed Change To Remedy Historic
              Underutilization....................................................................................15

       B.     The Agency Thoroughly Considered Incumbents' Reliance
              Interests...............................................................................................18

       C.     CERCI's Claim That The Commission Canceled Incumbent
              Licenses Is Erroneous.......................................................................19

       D.     CERCI's Other Arbitrary And Capricious Arguments Are
              Meritless. .............................................................................................20

CONCLUSION......................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Aiken County*,
  725 F.3d 255 (D.C. Cir. 2013)..............................................................................21

*AT&T Servs., Inc. v. FCC*,
  21 F.4th 841 (D.C. Cir. 2021)...............................................................................5

*Bendix Aviation Corp. v. FCC*,
  272 F.2d 533 (D.C. Cir. 1959)..............................................................................8

*Blue Water Navy Vietnam Veterans Ass'n v. McDonald*,
  830 F.3d 570 (D.C. Cir. 2016)............................................................................11

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962).............................................................................................17

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021).............................................................................................14

*Intelligent Transp. Soc'y v. FCC*,
  45 F.4th 406 (D.C. Cir. 2022)...............................................................................6

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024).............................................................................................14

*MediNatura, Inc. v. FDA*,
  998 F.3d 931 (D.C. Cir. 2021)............................................................................18

*Mobile Relay Assocs. v. FCC*,
  457 F.3d 1 (D.C. Cir. 2006)...........................................................................6, 13

*Puerto Rico Mar. Shipping Auth. v. ICC*,
  645 F.2d 1102 (D.C. Cir. 1981).............................................................................9

*Save Jobs USA v. United States Dep't of Homeland Sec.*,
  111 F.4th 76 (D.C. Cir. 2024).............................................................................12

*Teledesic LLC v. FCC*,
  275 F.3d 75 (D.C. Cir. 2001)........................................................................6, 14

*Telocator Network of Am. v. FCC*,
    691 F.2d 525 (D.C. Cir. 1982) ............................................................... 14

**Statutes**

47 U.S.C. § 305(a) ...................................................................................... 7

47 U.S.C. § 309(j)(2) .......................................................................... 3, 9, 10

47 U.S.C. § 309(j)(2)(A) .............................................................................. 9

47 U.S.C. § 902(b)(2) .................................................................................. 7

47 U.S.C. § 1401(21) ................................................................................ 11

47 U.S.C. § 1421(a) .................................................................................. 11

47 U.S.C. § 1422 ...................................................................................... 11

47 U.S.C. § 1422(b) .............................................................................. 5, 11

47 U.S.C. § 1426(a)(1) .............................................................................. 11

47 U.S.C. § 1426(a)(6) .............................................................................. 11

47 U.S.C. § 1426(b)(1) .......................................................................... 5, 11

47 U.S.C. § 1426(b)(4)(D) ..................................................................... 5, 11

47 U.S.C. § 1426(c)(4) .......................................................................... 5, 11

47 U.S.C. § 1433 .................................................................................. 6, 11

**Regulations**

47 C.F.R. § 2.103(b) .............................................................................. 7, 13

47 C.F.R. § 2.103(b)(1) .............................................................................. 13

47 C.F.R. § 2.103(b)(2) .............................................................................. 13

47 C.F.R. § 2.103(b)(3) ................................................................................ 7

Frequency Allocations and Radio Treaty Matters,
    25 Fed. Reg. 13976 (1960) ...................................................................... 8

viii

*In re Amend. of Part 90 of the Commission's Rules*, Sixth Further
    Notice of Proposed Rulemaking,
    33 FCC Rcd. 3261, 2018 WL 1452723 (2018) ......................................14, 15, 16

*In re Amend. of Part 90 of the Commission's Rules*, Sixth Report and
    Order and Seventh Further Notice of Proposed Rulemaking
    36 FCC Rcd. 1958 (2020)...................................................................................16

*In re Amend. of Part 90 of the Commission's Rules*, Order on
    Reconsideration and Eighth Further Notice of Proposed
    Rulemaking,
    36 FCC Rcd. 15032 (2021)...........................................................................15, 16

*In re Amend. of Part 90 of the Commission's Rules*, WP Docket No.
    07-100, Seventh Report and Order and Ninth Further Notice of
    Proposed Rulemaking,
    38 FCC Rcd. 704 (2023)................................................................................15, 16

*In re Amend. of Part 90 of the Commission's Rules*,
    WP Docket No. 07-100, Eighth Report and Order, FCC 24-114
    (rel. Oct. 22, 2024)...................................................................1-2, 6-7, 11, 13-21

*Dev. of Operational, Tech. & Spectrum Requirements*,
    15 FCC Rcd. 16844 (2000)...................................................................................7

*Public Safety and Homeland Security Bureau and Wireless
    Telecommunications Bureau Announce Temporary Filing Freeze
    on the Acceptance and Processing of Certain Part 90 Applications
    for the 4940-4990 MHz Band*, Public Notice,
    35 FCC Rcd. 9522 (2020)...................................................................................19

**Other Authorities**

NTIA, *4940-4990 MHz* (Dec. 1, 2015).......................................................................8

# GLOSSARY

| | |
|---|---|
| 4.9 GHz Band | 4940-4990 MHz spectrum band |
| APA | Administrative Procedure Act |
| BART | San Francisco Bay Area Rapid Transit District |
| CSSA | California State Sheriffs' Association |
| CERCI | Coalition for Emergency Response and Critical Infrastructure |
| FirstNet | First Responder Network Authority |
| FOP | National Fraternal Order of Police |
| FCC | Federal Communications Commission |
| NSA | National Sheriffs' Association |
| NTIA | National Telecommunications and Information Administration |
| PSBTA | Public Safety Broadband Technology Association |
| PSSA | Public Safety Spectrum Alliance |

## INTRODUCTION

The Eighth Report and Order (Order) takes long-needed steps to increase usage of the grossly-underutilized 4940-4990 MHz spectrum (4.9 GHz) band and make this spectrum more broadly available to first responders like the members of Public Safety Spectrum Alliance (PSSA) and the Fraternal Order of Police (FOP). Nevertheless, in an effort to maintain the status quo (and deny access to PSSA's and FOP's members), the Coalition for Emergency Response and Critical Infrastructure (CERCI),[1] the National Sheriffs' Association (NSA), the California State Sheriffs' Association (CSSA), and the San Francisco Bay Area Rapid Transit District (BART) claim the Order exceeds the Federal Communications Commission's (FCC or Commission) and First Responder Network Authority's (FirstNet) statutory authority, violates the major questions doctrine, violates limits on FirstNet's statutory authority and the Commission's own regulations, and is arbitrary and capricious. CERCI is wrong in all respects.

The Order authorizes the assignment of a nationwide overlay license to the 4.9 GHz Band Manager, allows for a sharing agreement with FirstNet, and reissues incumbent licenses consistent with those licensees' usage. These actions fit comfortably within the Commission's broad statutory authority to regulate spectrum

---

[1] For clarity, this brief collectively refers to these petitioners as CERCI.

and to protect public safety, do not violate limits on FirstNet's authority, are consistent with FCC regulations, and do not raise a major question.

The Order also is neither arbitrary nor capricious for the reasons CERCI identifies. The Order is the culmination of the Commission's lengthy, record-based evaluation of the 4.9 GHz band's gross underutilization, and appropriately considers all reliance interests.

The Court therefore should deny the CERCI parties' petitions.

## STATEMENT OF THE CASE

The Communications Act broadly tasks the Commission with managing radio spectrum in the United States, including the 4.9 GHz band, which is designated for public safety use. PSSA Br. 5-10.[2] For several reasons, including a lack of coordination, unavailability of technology and devices, and public safety entities' geographic licenses, that band has been historically underutilized, and the Commission has long sought to improve its usage. *Id.* at 11-17.

The Order takes important actions to remedy these problems by building on a series of orders that took incremental steps toward a new paradigm for the band. Under the Order, the Commission will issue a nationwide overlay license to the Band Manager established by a prior FCC order and authorize the Band Manager to enter

---

[2] "PSSA Br." refers to the opening brief of the Public Safety Spectrum Alliance and the Public Safety Broadband Technology Association.

2

into a sharing agreement with FirstNet. This will allow FirstNet, under the Band Manager's supervision, to support the nationwide public safety broadband network. PSSA Br. 18-21. Finally, the Order directs incumbent licensees to submit data detailing their existing 4.9 GHz operations to protect "incumbents' rights to operate their existing networks." *Id.* at 21-22 (quoting Order ¶ 58).

## SUMMARY OF THE ARGUMENT

I.    The Commission has broad power under the Communications Act and the Spectrum Act to allocate spectrum and to assist FirstNet in building and developing the nationwide public safety broadband network. That statutory authority fully supports the Commission's actions in the Order.

CERCI's challenges are meritless. First, the Band Manager framework does not violate the Communications Act by issuing a license to a federal entity. No federal entity will receive a license, and allowing federal entities to share spectrum is not the same as issuing them a license. Indeed, the Commission has long done so without controversy.

Second, the Commission properly exempted the Band Manager framework from the competitive bidding requirements under Section 309(j)(2). Because the Commission will only issue a license to the Band Manager to facilitate public safety services, the requirement to assign the spectrum through competitive bidding is not applicable.

3

Third, the Spectrum Act does not bar FirstNet from using spectrum outside the 700 MHz band. To the contrary, the Spectrum Act directs the Commission to help FirstNet continue to develop and evolve the nationwide public safety broadband network. And the Spectrum Act's initial grant to FirstNet of spectrum in the 700 MHz band does not limit FirstNet to that band.

Fourth, the Order does not violate the major questions doctrine. Congress's *initial* grant of spectrum to FirstNet does not mean that only Congress may approve any subsequent use of spectrum by FirstNet. Nor is the 4.9 GHz band's potential market value a basis for invoking the doctrine; otherwise, virtually all spectrum-related decisions would be "major questions."

Fifth, the Order is consistent with the Commission's regulations. Those regulations contemplate that federal entities will obtain consent from affected licensees when sharing spectrum. But there is no sharing with incumbent 4.9 GHz band licensees: the Order allows the Band Manager to share only *unused* spectrum with FirstNet.

II.    Although the Order should have gone further to fully effectuate the 4.9 GHz policies it adopted, PSSA Br. 29-39, the Order is not, as CERCI alleges, arbitrary or capricious for failure to adequately address incumbents' reliance interests or to justify the steps it did take. The Commission has long recognized that the 4.9 GHz band is underutilized and reasonably concluded that the Band Manager

4

framework would improve the band's usage. The Commission acknowledged incumbent users of the band and created a framework to protect them. Indeed, the nationwide overlay license permits operation only on *unused* spectrum—and thus by definition it does not impact incumbent operations.

**ARGUMENT**

## I.    THE ORDER IS FULLY SUPPORTED BY THE COMMISSION'S BROAD STATUTORY AUTHORITY.

### A.    The Communications Act And The Spectrum Act Authorize The Order's Framework.

The Communications Act grants the Commission wide-ranging powers to "generally encourage the larger and more effective use of" spectrum. *AT&T Servs., Inc. v. FCC*, 21 F.4th 841, 844 (D.C. Cir. 2021) (quoting 47 U.S.C. § 303(g)). That power allows the Commission to allocate spectrum and issue licenses. PSSA Br. 5-6 & 29-30.

Congress also gave the Commission authority to help FirstNet build a nationwide public safety broadband network that enables first responders to use interoperable, cutting-edge communications technologies. FirstNet's responsibilities under the statute include "tak[ing] all actions necessary to ensure the building, deployment, and operation of the nationwide public safety broadband network," 47 U.S.C. § 1426(b)(1), that is "based on a single, national network architecture that evolves with technological advancements," *id.* § 1422(b), and to "ensur[ing] the maintenance, operation, and improvement of the nationwide public

5

safety broadband network," including by "tak[ing] into account new and evolving technologies," *id.* § 1426(c)(4). In turn, the Commission is empowered to "take any action necessary to assist [FirstNet] in effectuating its duties and responsibilities" and "provide technical assistance to" FirstNet to fulfill its mission. *Id.* § 1433; *see* PSSA Br. 7.

Courts are highly deferential to the FCC's exercise of its spectrum management authority. The Commission "must predict the effect and growth rate of technological newcomers on the spectrum, while striking a balance between protecting valuable existing uses and making room for these sweeping new technologies." *Teledesic LLC v. FCC*, 275 F.3d 75, 84 (D.C. Cir. 2001). "That is a difficult, highly technical task." *Intelligent Transp. Soc'y v. FCC*, 45 F.4th 406, 411 (D.C. Cir. 2022). Accordingly, "if the Commission 'is fostering innovative methods of exploiting the spectrum,' it 'functions as a policymaker' and is 'accorded the greatest deference by a reviewing court.'" *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 8 (D.C. Cir. 2006) (quoting *Teledesic LLC*, 275 F.3d at 84).

The Order fits comfortably within the Commission's broad authority to regulate spectrum. Issuing a nationwide overlay license to the Band Manager and allowing the Band Manager to enter into a sharing agreement with FirstNet will "enable broader access into the band," "enable greater public safety use," and "free

up new opportunities for expanded use in the band in the near term." Order ¶ 20.

These are the precise objectives that Congress assigned to the Commission.

### B.     Nothing In The Governing Statutes Prohibits The Commission's Determinations.

Despite this broad express authority, CERCI asserts the Order violates several

statutory provisions. Each of its arguments is wrong.

*First*, CERCI incorrectly asserts that the Commission in effect issued a license

to FirstNet. Br. 24. And it invokes Section 305's bar on the Commission assignment

of licenses to federal entities. 47 U.S.C. § 305(a).

But, as CERCI elsewhere concedes (Br. 15-16), the Order does not issue a

license directly to FirstNet; the license will be issued to the Band Manager. Order

¶ 21. In turn, that Band Manager is authorized to "allow FirstNet to operate in

unassigned portions of the band" pursuant to a sharing agreement under 47 C.F.R.

§ 2.103(b). *Id.* ¶ 36. Ultimately, the National Telecommunications and Information

Administration (NTIA) will approve—and superintend—any federal use of the

spectrum by FirstNet. *See* 47 C.F.R. § 2.103(b)(3) (requiring "agree[ment] . . . by

. . . NTIA" for "Federal stations" to be "authorized to use" the 4.9 GHz band); 47

U.S.C. § 902(b)(2); *cf. Dev. of Operational, Tech. & Spectrum Requirements*, 15

FCC Rcd. 16844, ¶ 46 (2000).

The Commission is well within its statutory authority to allow a federal entity

to *use* spectrum; that action is not equivalent to granting that entity a license. This

Court has long recognized that the Commission may take action that makes non-federal spectrum available to federal entities. *See, e.g.*, *Bendix Aviation Corp. v. FCC*, 272 F.2d 533, 535 (D.C. Cir. 1959) (affirming Commission order under which "[m]any bands of frequencies were reassigned, some to be reserved exclusively for Government use . . . and others on a shared basis").

Indeed, the Commission's rules have for more than half a century authorized the agency to make non-federal spectrum available for federal use. Frequency Allocations and Radio Treaty Matters, 25 Fed. Reg. 13976, 13976 (1960) (codifying rule for "Government stations . . . to use non-Government frequencies" and recognizing that this 1960 rule "state[d] long-established Commission policies"). And the Commission for decades has made certain spectrum bands, *including the 4.9 GHz band itself*, available for use by federal entities. *See, e.g.*, NTIA, *4940-4990 MHz*, at 5 (Dec. 1, 2015), https://perma.cc/RC6B-VWA8 (noting "use of this band by Federal agencies" including the military and NASA).[3]

That is exactly what the Order does: it facilitates *access* to non-federal spectrum via a sharing agreement. Authorizing a sharing arrangement with the non-federal Band Manager, to which an overlay license is assigned, does not constitute assigning spectrum to federal users under Section 305. Nor does it amount to the

---

[3] CERCI cannot reconcile this practice with its contention that any federal use of spectrum amounts to a license.

FCC arrogating authority to control federal uses; instead, it represents reasonable coordination between the Commission and NTIA, using their respective authorities to solve underutilization of the 4.9 GHz band and address first responders' communications needs essential to promoting public safety and protecting national security.[4]

*Second*, CERCI misreads 47 U.S.C. § 309(j)(2) in arguing that the overlay license had to be competitively bid. That provision exempts from competitive bidding "licenses . . . for public safety radio services, including private internal radio services used by State and local governments and non-government entities" as long as they "are used to protect the safety of life, health, or property" and "are not made commercially available to the public." According to CERCI, the exemption applies only to "State and local governments and non-government entities" and prohibits the Band Manager framework because there may be some tertiary commercial use. Br. 33-35. CERCI is wrong.

The Section 309(j)(2) exemption applies to licenses for "public safety radio services, *including*" the named entities. 47 U.S.C. § 309(j)(2)(A) (emphasis added). "It is hornbook law that the use of the word 'including' indicates that the specified list of carriers that follows is illustrative, not exclusive." *Puerto Rico Mar. Shipping*

---

[4] For the same reason, CERCI's invocation (Br. 24) of the ban on licensing to foreign governments is a red herring—the Order does not issue a license to FirstNet. *See also* FCC Br. 68-69.

*Auth. v. ICC*, 645 F.2d 1102, 1112 & n.12 (D.C. Cir. 1981). And because the license issued to the Band Manager *is* for the provision of "public safety radio services," use of the band by a federal entity for "public safety radio services" fully complies with the statute.[5]

CERCI likewise is wrong that the Order violates the exemption's proviso that licenses may not be "made commercially available to the public." That restriction applies to the issuance of "licenses." As already explained, the Commission has not issued a license to FirstNet, much less to any commercial services provider. The overlay license is assigned to the Band Manager, which in turn may enter into a sharing agreement with FirstNet, which has contracted with AT&T to construct and operate the nationwide public safety broadband network. AT&T is even further removed from the license than FirstNet and can only use excess network capacity on a secondary, interruptible basis if permitted by FirstNet. Because such tertiary use does not constitute the issuance of a license by the Commission, the Order does not violate Section 309(j)(2).

*Third*, CERCI argues that the Order violates the Spectrum Act, because, according to CERCI, that statute bars FirstNet from operating outside the 700 MHz band. Br. 30-32. CERCI is wrong.

---

[5] And again, the Commission's long history of authorizing federal use of the 4.9 GHz band, *see supra* p. 8, further demonstrates the flaw in CERCI's argument.

CERCI points to the Spectrum Act provision stating that the Commission "shall reallocate" 700 MHz spectrum to FirstNet, 47 U.S.C. § 1421(a), asserting that this language bars both the Commission from making available to FirstNet any spectrum outside that band and FirstNet from operating outside the band. But the statute contains no such restriction: CERCI's argument depends on reading "only" into the statute. This Court has explained that it will "not read the word 'only' into the statute 'when Congress has left it out.'" *Blue Water Navy Vietnam Veterans Ass'n v. McDonald*, 830 F.3d 570, 575 (D.C. Cir. 2016) (quoting *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993)).

Moreover, CERCI's reading is inconsistent with other provisions of the Spectrum Act. In directing FirstNet to establish a "nationwide, interoperable public safety broadband network," 47 U.S.C. § 1422, Congress could have limited that network to the 700 MHz band. It did not. Instead, Congress required this network to be "based on a single, national network architecture *that evolves with technological advancements*." *Id.* §§ 1401(21), 1422(b) (emphasis added); *see also id.* §§ 1426(a)(1), (a)(6), (b)(1), (b)(4)(D), (c)(4). As the FCC reiterated in the Order, such advancements often require additional spectrum resources and, here, will enable public safety use of 5G. *See* Order ¶ 20. And, again, Congress directed the Commission to "take any action necessary to assist [FirstNet]" in its mission to operate the nationwide public safety broadband network. 47 U.S.C. § 1433.

11

*Fourth*, CERCI's invocation of the major questions doctrine (Br. 30-32) fails. "The major questions doctrine holds that courts 'expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.'" *Save Jobs USA v. United States Dep't of Homeland Sec.*, 111 F.4th 76, 80 (D.C. Cir. 2024), *petition for cert. filed*, No. 24-923 (U.S. Feb. 26, 2025) (quoting *West Virginia v. EPA*, 597 U.S. 697, 716 (2022)). Here, CERCI claims there is a "major question" because Congress provided FirstNet an initial spectrum grant, and any additional spectrum access therefore must also require statutory authorization. That makes no sense. Nothing in that grant of spectrum limits the Commission's broad authority to manage spectrum or limits FirstNet's use of other spectrum consistent with its Spectrum Act responsibilities.

CERCI also rests its invocation of the major question doctrine on the claim that the Order involves issues of "great economic and political significance." Br. 31. That, too, is incorrect. To reach its calculation of economic significance, CERCI assumes that the band would be cleared of all public safety licensees and auctioned for commercial use. But the band is restricted to public safety entities. Moreover, CERCI's theory of "economic" significance would disable the FCC from making a broad range of spectrum-related decisions, because the vast majority of the spectrum it oversees has great value. Congress, however, expressly empowered the Commission to make those decisions. *See supra* pp. 5-6.

12

As a fallback, CERCI contends that the Order is politically significant because it purportedly "seeks to strip more than 3,500 . . . licensees of their incumbent geographic licenses" and reallocate this spectrum to FirstNet. Br. 31. But the Order does not strip incumbent licensees of their right to operate, nor does it reallocate the spectrum to FirstNet. Order ¶ 58. And, as discussed in detail below (*infra* pp. 18-19), the Commission protected incumbents' operations from harmful interference, including by making clear that FirstNet's use of the band must cease if it interferes with incumbent licensees' operations. That accords with the FCC's broad authority to manage spectrum licenses even after they are issued. *Mobile Relay Assocs.*, 457 F.3d at 12.

*Fifth*, CERCI asserts that the Order's Band Manager framework cannot be reconciled with Section 2.103(b). Br. 35-37 (citing 47 C.F.R. § 2.103(b)). But CERCI's argument rests on a mistaken understanding of the Order and that rule.

Section 2.103(b) requires licensees' approval only when there is a "licensee[] or applicant[] involved" for "shared or joint-use system[s]." 47 C.F.R. § 2.103(b)(1)-(2). But the Band Manager may only share "unassigned" spectrum with FirstNet, Order ¶¶ 24, 27, so no licensees will be "involved."

Nor is CERCI correct, Br. 37, that the Band Manager cannot negotiate a sharing agreement with FirstNet—and instead that each non-federal entity must separately negotiate its own sharing agreement with FirstNet. Nothing in the

13

Communications Act or the Commission's regulations requires that inefficient procedure.

Finally, CERCI wrongly concludes that the Band Manager has no choice but to enter into a sharing agreement with FirstNet. The Order repeatedly clarifies that the Band Manager is "authorized to enter into a sharing agreement with" FirstNet. Nothing in that language *requires* entry into such an agreement. Order ¶ 1; *id.* ¶¶ 20-21, 23, 27.

## II. ALTHOUGH THE ORDER SHOULD HAVE GONE FURTHER, IT WAS NOT ARBITRARY OR CAPRICIOUS IN THE MANNER CERCI ALLEGES.

Where—as here—the agency acts within its statutory authority, the reviewing court's inquiry is limited to whether the action is arbitrary and capricious under the Administrative Procedure Act. *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 395 (2024). This analysis demands caution and deference, as "a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Where the policy decision involves matters of FCC spectrum management, like this case, it is accorded "the greatest deference by a reviewing court." *Telocator Network of Am. v. FCC*, 691 F.2d 525, 538 (D.C. Cir. 1982); *accord, e.g.*, *Teledesic LLC*, 275 F.3d at 84.

The Order easily satisfies this standard. Leading up to the Order, the FCC conducted a lengthy proceeding to examine underuse of the 4.9 GHz band. *See*

14

*generally in re Amend. of Part 90 of the Commission's Rules*, Sixth Further Notice of Proposed Rulemaking, 33 FCC Rcd. 3261, 2018 WL 1452723 (2018) (2018 Sixth FNPRM). The FCC gathered a voluminous record to evaluate proposals to maximize use of the band and best effectuate the Band Manager framework. *See in re Amend. of Part 90 of the Commission's Rules*, Order on Reconsideration and Eighth Further Notice of Proposed Rulemaking, 36 FCC Rcd. 15032, ¶ 4 (2021) (2021 Eighth FNPRM); *see also in re Amend. of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Seventh Report and Order and Ninth Further Notice of Proposed Rulemaking, 38 FCC Rcd. 704, ¶¶ 73-90 (2023) (2023 Seventh Report and Order).

The Order on review alone involved 57 comments and 148 *ex partes*. Order, ¶ 12. Only after considering this substantial input from a broad range of stakeholders did the FCC make its final policy determination, which—as detailed below—is well-founded in the evidence.

### A    The FCC Reasonably Determined That The 4.9 GHz Band Framework Needed Change To Remedy Historic Underutilization.

As the Commission explains, the 4.9 GHz band has been chronically underutilized for decades. *See* FCC Br. 18-20, 25, 78. Although approximately 90,000 entities were "eligible . . . to obtain licenses in the band," 2018 Sixth FNPRM ¶ 1, there are fewer than 4,000 licenses currently issued, Order ¶ 5. The FCC accordingly sought to collect granular data to determine whether all of these licenses were actually in use, and if so, to what extent. *Id.* ¶¶ 57-58.

15

There were two primary reasons for that chronic underutilization. *First*, thousands of users with non-exclusive rights previously had to voluntarily coordinate use—resulting in "increase[d] costs" and "inefficiencies." FCC Br. 29; *see also in re Amend. of Part 90 of the Commission's Rules*, Sixth Report and Order and Seventh Further Notice of Proposed Rulemaking, 36 FCC Rcd. 1958, ¶ 5 (2020); 2018 Sixth FNPRM ¶ 2. *Second*, reports from the public safety community demonstrated that first responders had a more limited vendor ecosystem and higher costs of deployment because "the public safety user community remains small relative to the greater consumer marketplace." 2018 Sixth FNPRM ¶ 2. And these problems were mutually reinforcing. The regional nature of the individual, non-exclusive licenses and incompatible system designs limited available economies of scale and vendor interest and meant that individual licensees had to bear the full cost of deployment. *See, e.g.*, 2021 Eighth FNPRM ¶ 27.

To address these issues, the Commission sought to "ensure that public safety continues to have priority in the band while opening up the band to additional uses that will facilitate increased usage." 2018 Sixth FNPRM ¶ 3. Accordingly, in 2023, the Commission adopted rules to centralize management in "a nationwide Band Manager" and thereby "help leverage new technologies, lower equipment costs, attract new users, facilitate effective frequency coordination and interference protection, and promote interoperability." Seventh Report and Order ¶¶ 17, 20.

In the Order, the Commission built on this framework. It concluded that the Band Manager should be granted a nationwide overlay license and allowed to enter into a sharing agreement with FirstNet. This framework, the Commission found, would "free up new opportunities for expanded use in the band in the near term." *See* Order ¶ 20.

The central coordination, overlay license, and sharing agreement address many of the fundamental problems that led to the band's underutilization. The Band Manager structure provides the previously absent spectrum coordination function, reducing costs and inefficiencies. Order ¶¶ 19-20. The nationwide overlay license promotes the use of spectrum that is otherwise unused and provides economies of scale for equipment that were not available under the prior rules. *Id.* ¶ 26.

And the sharing agreement framework leverages the existing network constructed by FirstNet, further encouraging adoption and aiding deployment. *See* Order ¶ 22 & n.90; *see also id.* ¶ 23 & n.95.

Of course, the Order should also have taken the next logical step and replaced incumbent geographic licenses with site-based licenses and compelled incumbent licensees to surrender unused spectrum. PSSA Br. 29-39. However, the decisions that the Order did make clearly reflect a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

17

**B.    The Agency Thoroughly Considered Incumbents' Reliance Interests.**

CERCI incorrectly alleges that the Commission gave "zero consideration" to incumbents' substantial investments and reliance interests. Br. 40. The Commission "assess[ed] whether there were reliance interests, determine[d] whether they were significant, and weigh[ed] . . . such interests against competing policy concerns." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 940-41 (D.C. Cir. 2021) (quotation marks omitted). Throughout the years-long proceeding, the agency closely considered incumbent licensees' interests in and use of the 4.9 GHz band, recognized that incumbent users of the band required protection, and took steps to ensure that protection. Order ¶ 41.

The Commission specifically considered incumbents' planned expansions and modifications. It acknowledged that some incumbents "may have invested in systems that they hoped to use to modify or expand current operations." Order ¶ 54. But the record did not suggest that these purported expansion plans were sufficient to address the fundamental underutilization that has plagued the band since its inception, or that they outweighed the need to repurpose the unused portions of the band. The Commission therefore reasonably concluded that it was necessary to "freez[e] expansions, additions to, or modification of other technical parameters to incumbent licensees" to ensure a "stable spectrum environment" that would allow the collection and evaluation of the granular data necessary to protect incumbent

18

operations and increase utilization of the band through the Band Manager framework. *Id.*

CERCI holds up the FCC's promise to consider reliance in "one-off" waiver proceedings as evidence of the Commission's alleged failure to adequately consider reliance interests. Br. 42. But the FCC's framework shows the opposite. *Any* 4.9 GHz licensee may seek a waiver from the freeze where special circumstances require. *See Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Announce Temporary Filing Freeze on the Acceptance and Processing of Certain Part 90 Applications for the 4940-4990 MHz Band*, Public Notice, 35 FCC Rcd. 9522 (2020). To date, the Commission has granted nearly 500 4.9 GHz licensee waiver requests, demonstrating that the waiver process protects reliance interests.

### C. CERCI's Claim That The Commission Canceled Incumbent Licenses Is Erroneous.

CERCI also misstates the nature of the Commission's actions with respect to incumbent licenses. Contrary to CERCI's claim, Br. 43, the Order did not cancel all geographic licenses with potentially unused channels. Instead, the Commission is in the process of *reissuing* new licenses based on current operations. Order ¶ 59. This ensures that the FCC's Universal Licensing System "does not contain duplicative or inaccurate licenses," which "improve[s] interference mitigation efforts and public safety confidence in the band." Order ¶ 58.

19

As CERCI acknowledges, the Order does not "modify or alter incumbents' rights to operate their existing networks." Order ¶ 58; *see also* CERCI Br. 40. To date, the Commission has reissued over 2,500 licenses with new radio service codes to incumbent 4.9 GHz public safety licensees; and over 3,000 applications involving prospective licenses remain pending in the Universal Licensing System. Thus, CERCI's allegations about canceling licenses are both inaccurate and premature— the Commission is engaged in an ongoing reissuance of licenses based on the data submitted to ensure that the spectrum is put to actual use.

While such continuing reissuance allows the Commission to determine the scope of incumbent operations, the Order did not actually decide whether to require incumbent licensees to surrender or share any unused spectrum. Instead, the Commission deferred any such determinations until after it has gathered reliable data on existing operations. Order ¶ 59. As PSSA explained, the evidence suggests that the Commission *should have* immediately required incumbents to surrender unused spectrum. PSSA Br. 34-39. But the Commission decided not to take that step, and the FCC cannot be held to have acted arbitrarily and capriciously for a decision it has not yet made.

### D.    CERCI's Other Arbitrary And Capricious Arguments Are Meritless.

CERCI offers a final, scattershot attempt to string together several baseless arguments that the "Order is internally consistent and fails to provide a reasonable

20

explanation." Br. 44-49. Instead, the Order provides a reasonable explanation for its adoption of the new 4.9 GHz framework.

*First*, CERCI claims that the Commission failed to "ensur[e] that FirstNet is legally able to access the band" and that the Band Manager "is just a pass-through entity to facilitate the Commission doing indirectly what it cannot do directly." Br. 45. These are merely restatements of CERCI's statutory authority arguments, which are meritless. *See supra* pp. 7-13.

*Second*, CERCI asserts that the FCC failed to heed "practical concerns" about FirstNet's authorization and performance. Br. 45. To this end, CERCI makes the speculative claim that FirstNet may not be able to fulfill its statutory mission to evolve the network. *Id.* But speculation about what Congress *may* do cannot invalidate agency action. *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013). "Congress speaks through the laws it enacts"—as such, an agency must rely on those laws, and not "political guesswork" about what a future Congress might do. *Id*. Here, the FCC did just that, rationally assessing the compatibility between FirstNet's existing mandate and the rules the Commission sought to adopt. Order ¶ 35.

At bottom, CERCI argues that the Commission should have kept the prior regulatory structure for the 4.9 GHz band in place, despite decades of underutilization and robust evidence that the band would continue to languish without significant changes. Accepting CERCI's arguments to maintain the status

21

quo would leave vast amounts of the band unused to the detriment of public safety—

the central concern the FCC set out to solve. Identifying and thoroughly exploring

solutions to a problem and then taking no action to fix it would be the most arbitrary

result of all.

## CONCLUSION

The Court should deny the CERCI parties' petitions for review.

Joshua S. Turner
Sara M. Baxenberg
WILEY REIN LLP
2050 M Street N.W.
Washington, DC 20036
(202) 719-7000
jturner@wiley.law

*/s/ Andrew J. Pincus*
Andrew J. Pincus
Carmen N. Longoria-Green
Wajdi C. Mallat
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
apincus@mayerbrown.com

*Counsel for Intervenor the*
*National Fraternal Order of Police*

*Counsel for Intervenors Public Safety*
*Spectrum Alliance & Public Safety*
*Broadband Technology Association*

Dated: August 21, 2025

22

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in the Court's Order, *see* Order, *Public Safety Spectrum Alliance v. FCC*, No. 24-1363 (D.C. Cir. May 6, 2025), Doc. No. 2114559, because it contains 4,721 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f).

This motion complies with the typeface requirements of Rule 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point type.

*/s/ Andrew J. Pincus*
Andrew J. Pincus
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

*Counsel for Intervenors Public Safety Spectrum Alliance & Public Safety Broadband Technology Association*

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2025, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system, which will serve all counsel of record.

*/s/ Andrew J. Pincus*
Andrew J. Pincus
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

*Counsel for Intervenors Public Safety Spectrum Alliance & Public Safety Broadband Technology Association*