**Nos. 24-1363 (lead), 24-1364, 25-1028, 25-1034**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

PUBLIC SAFETY SPECTRUM ALLIANCE AND PUBLIC SAFETY BROADBAND
TECHNOLOGY ASSOCIATION,
*Petitioners*,
v.
FEDERAL COMMUNICATIONS COMMISSION AND UNITED STATES OF AMERICA,
*Respondents*,

COALITION FOR EMERGENCY RESPONSE AND CRITICAL INFRASTRUCTURE AND SAN
FRANCISCO BAY AREA RAPID TRANSIT,
*Intervenors.*

On Petitions for Review of a Final Order of the Federal
Communications Commission

## REPLY BRIEF OF COALITION FOR EMERGENCY RESPONSE AND CRITICAL INFRASTRUCTURE, NATIONAL SHERIFFS' ASSOCIATION, CALIFORNIA STATE SHERIFFS' ASSOCIATION, AND SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT

James M. Smith
LAW OFFICE OF JAMES M. SMITH
4069 27th Road North
Arlington, VA 22207
(703) 855-4183
jamesmsmith8980@gmail.com

*Counsel for National Sheriffs'
Association and California State
Sheriffs' Association*

Jessica Ring Amunson
Arjun R. Ramamurti
Joshua J.W. Armstrong
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com

*Counsel for Coalition for Emergency
Response and Critical Infrastructure*

*Additional Counsel Listed on Inside Cover*

Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 300
Washington, DC 20001
(202) 868-6915
hhunt@deutschhunt.com

Phyllis A. Whitten
SAN FRANCISCO BAY AREA RAPID
  TRANSIT DISTRICT
2150 Webster St, 10th Floor
Oakland, CA 94612
(510) 464-5000
pwhitte@bart.gov

*Counsel for San Francisco Bay Area
Rapid Transit District*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ ii

GLOSSARY .............................................................................. v

INTRODUCTION ......................................................................... 1

ARGUMENT ............................................................................. 2

I.     CERCI PETITIONERS HAVE STANDING TO CHALLENGE THE OVERLAY LICENSE AND SPECTRUM SHARING AGREEMENT ........................................................................ 2

II.    THE ORDER EXCEEDS THE COMMISSION'S AUTHORITY. ............... 5

     A.     The Commission Cannot Authorize FirstNet to Operate Beyond the Spectrum Specifically Dedicated by Congress. ................ 5

         1.     There Is No Statutory Authority for the Commission's Authorization of FirstNet. ........................................... 6

         2.     The Commission's Resort to Non-Textual Arguments Fails. ................................................................ 9

     B.     The Commission's Workaround Is Also Contrary to Law. ............... 13

         1.     The "Public Safety" Exemption in Section 309(j) Does Not Apply. ............................................................. 13

         2.     Section 2.103(b) Does Not Authorize the Commission's Contemplated Sharing Agreement. ........................................ 16

III.    THE ORDER IS ARBITRARY AND CAPRICIOUS ................................. 18

     A.     The Commission Failed to Consider Incumbents' Significant Reliance Interests. ............................................. 18

     B.     The Commission's Cancel First, Justify Later Approach Is Arbitrary and Capricious. ..................................... 21

     C.     The Order Is Internally Inconsistent and Contradictory. .................... 21

CONCLUSION ........................................................................... 24

# TABLE OF AUTHORITIES[*]

## CASES

*American Library Ass'n v. FCC*, 401 F.3d 489 (D.C. Cir. 2005) ............................5

*Chickasaw Nation v. United States*, 534 U.S. 84 (2001).........................................17

*Entergy Arkansas, LLC v. FERC*, 134 F.4th 576 (D.C. Cir. 2025) .........................5

*Ethyl Corp. v. EPA*, 51 F.3d 1053 (D.C. Cir. 1995)................................................10

*\*Fischer v. United States*, 603 U.S. 480 (2024) ........................................................8

*Halverson v. Slater*, 129 F.3d 180 (D.C. Cir. 1997)...............................................10

*\*Hanser v. McDonough*, 56 F.4th 967 (Fed. Cir. 2022)..........................................17

*Louisiana Public Service Commission v. FCC*, 476 U.S. 374 (1986)......................6

*\*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024)...............................14

*M2Z Networks, Inc. v. FCC*, 558 F.3d 554 (D.C. Cir. 2009) ..................................17

*\*Nasdaq Stock Market LLC v. SEC*, 38 F.4th 1126 (D.C. Cir. 2022)..............10, 11

*National Railroad Passenger Corp. v. National Ass'n of Railroad
  Passengers*, 414 U.S. 453 (1974) ........................................................................11

*Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002)................................12

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943)........................................................ 13-14

*Time Warner Entertainment Co., L.P. v. FCC*, 144 F.3d 75 (D.C. Cir.
  1998) .....................................................................................................................17

*U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004)...................................20

*United States v. Giordano*, 416 U.S. 505 (1974).....................................................10

*United States v. Tohono O'Odham Nation*, 563 U.S. 307 (2011) ...........................11

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*Viasat, Inc. v. FCC*, 47 F.4th 769 (D.C. Cir. 2022) .................................................. 5

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001) ................................... 7

**STATUTES**

47 U.S.C. § 301 .............................................................................................................. 6

47 U.S.C. § 303 .............................................................................................................. 6

47 U.S.C. § 305(a) ......................................................................................................... 6

47 U.S.C. § 309(j)(2) ................................................................................................... 14

47 U.S.C. § 902(b)(2)(A) .............................................................................................. 6

47 U.S.C. § 1401(2) ....................................................................................................... 6

47 U.S.C. § 1401(14) ..................................................................................................... 6

47 U.S.C. § 1402 ............................................................................................................ 6

47 U.S.C. § 1421(a) .................................................................................................... 6, 7

47 U.S.C. § 1422(b) ....................................................................................................... 9

47 U.S.C. § 1426(a)(1) ............................................................................................... 7, 8

47 U.S.C. § 1426(a)(6) ................................................................................................... 8

47 U.S.C. § 1426(b) .................................................................................................... 7, 8

47 U.S.C. § 1426(c) ....................................................................................................... 9

47 U.S.C. § 1433 ............................................................................................................ 7

Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112-96, 125 Stat. 156 (2012) ........................................................................................ 5

**OTHER AUTHORITIES**

47 C.F.R. § 2.103(b) .................................................................................................... 16

47 C.F.R. § 2.103(b)(2) ............................................................................................... 17

47 C.F.R. § 90.1217(c)..............................................................................14

47 C.F.R. § 90.1217(d) .......................................................... 6, 14, 17-18

Donny Jackson, *AT&T CEO Shares Potential 4.9 GHz Vision as FirstNet Tops 6.4 Million Connections*, Urgent Commc'ns (Oct. 25, 2024), https://urgentcomm.com/public-safety/at-t-ceo-shares-potential-4-9-ghz-vision-as-firstnet-tops-6-4-million-connections ...........................................3

Office of Inspector General, U.S. Department of Commerce, Summary of Investigation: *Investigation into Allegations that FirstNet Authority Senior Officials Interfered with OIG Audits*, Case No. 24-175 (Aug. 28, 2025), https://www.oig.doc.gov/wp-content/OIGPublications/Public_Investigative_Summary_24-0175_SECURED.pdf ...........................................23

# GLOSSARY

| | |
|---|---|
| **BART** | San Francisco Bay Area Rapid Transit District |
| **CERCI** | Coalition for Emergency Response and Critical Infrastructure |
| **CERCI Petitioners** | Coalition for Emergency Response and Critical Infrastructure; San Francisco Bay Area Rapid Transit District; National Sheriffs' Association; California State Sheriffs' Association |
| **CSSA** | California State Sheriffs' Association |
| **FCC or Commission** | Federal Communications Commission |
| **FirstNet** | First Responder Network Authority |
| **NPSBN** | Nationwide Public Safety Broadband Network |
| **NSA** | National Sheriffs' Association |
| **NTIA** | National Telecommunications and Information Administration |
| **OMB** | Office of Management and Budget |
| **OIG** | Department of Commerce's Office of Inspector General |
| **PSBTA** | Public Safety Broadband Technology Association |
| **PSSA** | Public Safety Spectrum Alliance |

# INTRODUCTION

The effect of the order under review is to unlawfully and irrationally take spectrum from state and local public-safety licensees in the 4.9 GHz band and provide it to the federal First Responder Network Authority ("FirstNet"), operated by its commercial partner, AT&T. *See In re Amendment of Part 90 of the Commission's Rules*, Eighth Report and Order, 39 FCC Rcd 12032 (2024) ("Order") (JA__). The Federal Communications Commission ("FCC" or the "Commission") fails to identify any statutory basis allowing it to authorize FirstNet to expand to the 4.9 GHz band. Congress prescribed a specific operating role for FirstNet and a circumscribed support role for the Commission. The Commission may not override Congress's statutory scheme with an unprecedented workaround in which the Commission grants an overlay license to a sham Band Manager to passthrough spectrum to FirstNet and AT&T.

Moreover, the Order does not reflect reasoned decisionmaking. It fails to account for incumbents' reliance interests in their prior, flexible geographic licenses, and requires them to obtain new licenses that are concededly narrower in geographic scope and frequency. The Commission arbitrarily cancelled incumbents' existing licenses before even considering the data regarding their usage. Finally, the Order ignored numerous issues with FirstNet, including its poor management, imminent sunset date, and relationship with AT&T. The Court should vacate the Order.

# ARGUMENT

## I.  CERCI PETITIONERS HAVE STANDING TO CHALLENGE THE OVERLAY LICENSE AND SPECTRUM SHARING AGREEMENT.

The Commission incorrectly argues that CERCI Petitioners have not "shown an injury" to challenge the overlay license and spectrum sharing agreement. FCC Br. 44. The Commission concedes that CERCI Petitioners include members who hold 4.9 GHz licenses and face injury from "the Commission's decisions to freeze incumbent license applications and to change license codes," *id.*, but argues that CERCI Petitioners are somehow barred from challenging the overlay license and the sharing agreement because those will purportedly "cover[] only spectrum that was 'unassigned' *when the Order was adopted,* to which the CERCI Petitioners have no rights," *id.* (emphasis added). This argument fails.

*First*, the Order does not say what the Commission now claims. The Commission primarily relies on a footnote explaining only that "American Samoa, Georgia, Iowa, Kansas, the Northern Mariana Islands, and South Dakota" are "not covered by a statewide license." Order ¶ 5 n.18 (JA__)). That footnote does not even appear in the Band Manager section of the Order and nowhere suggests that the Band Manager's overlay license is limited to jurisdictions without current statewide licenses.[1] The Commission's only other citation for its newfound interpretation

---

[1] The Commission's new and limited interpretation will no doubt surprise AT&T's Chief Executive Officer, who "applaud[ed] the FCC's recent decision to make

explains that the Band Manager "will obtain the rights to a *nationwide* geographic area license"; that this "nationwide" license will "*include*[] areas where spectrum is unassigned"; and that the license encompasses "*all* unassigned spectrum *subject to* the exclusion of licensed geographic areas and frequencies held by an incumbent licensee." *Id.* ¶ 23 & n.94 (JA__) (emphases added). That language, if anything, only confirms the breadth of the license. *Cf. id.* ¶¶ 1, 20-23 (JA __, __-__) (noting the "nationwide" license).

In fact, the Order makes clear that the overlay license is not limited to spectrum that was "unassigned" at the time of the Order's adoption, but instead will include all newly "unassigned" spectrum previously held under geographic licenses by incumbent licensees, such as CERCI Petitioners and their members. The Commission concedes that after the current license cancellation process, incumbents' new licenses could cover a "smaller" geographic area and a "narrower" range of frequencies, thereby creating additional unassigned spectrum that will be available to the Band Manager for sharing with FirstNet. FCC Br. 31.

If the Order actually were limited to "two U.S. territories and portions of four states," FCC Br. 57, it makes no sense to define "unassigned" spectrum in open-

---

available 50 MHz of spectrum to the FirstNet Authority to facilitate *nationwide* deployment of 5G services…" Donny Jackson, *AT&T CEO Shares Potential 4.9 GHz Vision as FirstNet Tops 6.4 Million Connections*, Urgent Commc's (Oct. 25, 2024), https://urgentcomm.com/public-safety/at-t-ceo-shares-potential-4-9-ghz-vision-as-firstnet-tops-6-4-million-connections (emphasis added).

ended and present-tense terms to encompass wherever "white spaces *exist*" and "spectrum *is* unassigned," *id.* ¶ 23 (JA__) (emphasis added). Nor would it make sense to describe the sharing agreement as providing FirstNet with "*any* unassigned spectrum," *id.* ¶ 22 (JA__); *id.* ¶ 42 (JA__) (similar), with no temporal limitation. Moreover, silently tying the overlay license and sharing agreement to the time the Order was adopted and ignoring newly created "unassigned spectrum" thereafter would be incongruent given that the Band Manager only applies for a license in the future. *See, e.g.*, *id.* ¶ 24 n.100 (JA__); *id.* ¶ 21 (JA__).

*Second*, the incumbent freeze and narrower-license substitution cannot be divorced from the overlay license and spectrum sharing agreement, such that CERCI Petitioners have standing with respect to the former but not the latter. *Cf.* FCC Br. 44. The Order operates as a unified whole, with the narrower-license substitution generating additional "unassigned" spectrum for the Band Manager to share with FirstNet. Indeed, the Order explicitly contemplates that the sharing agreement will expand as incumbents' licenses are cancelled, stating that when a license is "terminated," the Band Manager may "amend its sharing agreement with FirstNet" to "include the rights to operate in the geographic (or site-based) area and on the channel(s) of the cancelled license." Order ¶ 24 (JA__). The Commission's argument that the overlay license and sharing agreement "'ha[ve] no effect on'" CERCI Petitioners and cause them "'no injury'" because they stem from a "different

part of the order" is meritless. FCC Br. 44 (quoting *Tri-Cnty. Tel. Ass'n v. FCC*, 999 F.3d 714, 719 (D.C. Cir. 2021)).

*Third*, at minimum, CERCI Petitioners have met their burden to show that there is a "substantial probability" of "harm [to] the concrete and particularized interests of at least one of their members." *Am. Lib. Ass'n v. FCC*, 401 F.3d 489, 493 (D.C. Cir. 2005); *see also Viasat, Inc. v. FCC*, 47 F.4th 769, 779 (D.C. Cir. 2022). Given the Order's categorical statements that the Band Manager's license covers "any" unassigned spectrum, and the Commission's explicit concession that the narrower-license substitution will result in new unassigned spectrum (both in terms of geography and frequency), the nationwide overlay license and sharing agreement are substantially likely to harm incumbents' existing licenses. *See* FCC Br. 31, 84.[2]

## II.  THE ORDER EXCEEDS THE COMMISSION'S AUTHORITY.

### A.  The Commission Cannot Authorize FirstNet to Operate Beyond the Spectrum Specifically Dedicated by Congress.

Neither the Communications Act nor the Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112-96, 125 Stat. 156 ("Spectrum Act") authorize

---

[2] CERCI Petitioners' opening brief clearly established standing. The Commission's citation (at 44) to *Entergy Arkansas, LLC v. FERC*, 134 F.4th 576, 581 (D.C. Cir. 2025), where the petitioner "provided neither argument, nor analysis, nor evidence to support its standing," and the word "standing" did not even "appear in the document," is inapposite.

the Commission to expand FirstNet's spectrum beyond the 700 MHz band Congress directed the Commission to allocate to FirstNet. The Commission does not dispute that both the Commission and FirstNet are federal entities that "literally ha[ve] no power to act[] … unless and until Congress confers power upon [them]." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Nor does the Commission dispute that it generally lacks authority under the Communications Act to assign a license directly to a federal entity like FirstNet. *See* FCC Br. 49; *see generally* 47 U.S.C. §§ 301, 303, 305(a), 902(b)(2)(A). Instead, the Commission argues that it can achieve the same practical result by first granting a license to a Band Manager whose "primary responsibilities" include "[m]anaging a sharing agreement with [FirstNet]." 47 C.F.R. § 90.1217(d). But the Commission still has not identified any statutory authorization to expand FirstNet's ambit in this manner.

### 1. There Is No Statutory Authority for the Commission's Authorization of FirstNet.

FirstNet is a creature of statute. The Commission entirely ignores the numerous Spectrum Act provisions clearly limiting FirstNet's operations only to the 700 MHz band, including: (1) Congress expressly allocating to FirstNet the "700 MHz D block spectrum" and "existing public safety broadband spectrum," which Congress explicitly defined, 47 U.S.C. §§ 1421(a), 1401(2), (14); (2) Congress's adoption of a "[r]ule of construction" to remove any doubt about the meaning of the enumerated frequency ranges, *id.* § 1402; (3) Congress's specification that FirstNet

6

would hold only "*the single* public safety wireless license granted" in the Spectrum Act, *i.e.*, the license to the specified portions of the 700 MHz band, *id.* §§ 1426(b)(1), 1421(a); and (4) Congress's instruction that FirstNet must require equipment that is "capable of being used by any public safety entity … operating *in the 700 MHz band*," *id.* § 1426(b). All of these provisions, combined with (1) the lack of *any* reference to the possibility of FirstNet and its Nationwide Public Safety Broadband Network ("NPSBN") operating in some other band, and (2) the undisputed backdrop of the Commission lacking *any* authority to grant a federal entity like FirstNet any license absent congressional authorization like the Spectrum Act, powerfully support the conclusion that the Commission acted contrary to law in granting FirstNet access to the 4.9 GHz band.

The Commission attempts to locate its new and capacious authority to expand FirstNet in various words and phrases plucked out of context from the Spectrum Act. *See* FCC Br. 70-77; *but see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). *First*, it relies on the word "and" in 47 U.S.C. § 1433, which authorizes the Commission to "provide technical assistance to [FirstNet] *and* [to] take any action necessary to assist [FirstNet] in effectuating its duties and responsibilities under" the Spectrum Act. 47 U.S.C. § 1433 (emphasis added). But the statute's pairing of "technical assistance" with other "action … to *assist*" FirstNet only provides limited authority to aid FirstNet in a manner analogous to technical assistance. *See, e.g.*,

*Fischer v. United States*, 603 U.S. 480, 487 (2024) (explaining that to "discern the reach of an 'otherwise' clause is to look for guidance from whatever examples come before it," because "Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it"). And that is especially so given that Congress further limited the second clause by requiring that any such assistance must be "necessary" and must "effectuat[e]" FirstNet's duties and responsibilities set forth in the Act—none of which contemplates expanding FirstNet to an entirely different band of spectrum.[3]

*Second* and similarly, the Commission emphasizes the word "and" in § 1426(b), which empowers FirstNet to hold the "single public safety wireless license [in the 700 MHz band] … *and* take all actions necessary to ensure the building, deployment, and operation of the [NPSBN]." 47 U.S.C. § 1426(b) (emphasis added). But again, that pairing simply confirms that Congress was conferring only a "single" license to a particular band of spectrum—portions of the 700 MHz band—for the NPSBN and then directing FirstNet to take particular steps

---

[3] Indeed, the Commission barely attempts to justify its authority in any subsection of § 1426, which lists FirstNet's "[p]owers, duties, and responsibilities." The Commission references § 1426(a)(1) and 1426(a)(6), *see* FCC Br. 73, but the former provision again limits FirstNet to powers "specifically granted" by the Act or that are "incidental" and "necessary," 47 U.S.C. § 1426(a)(1), and the latter provision is a catch-all merely allowing "such other actions" that "may" "from time to time" be "necessary, appropriate, or advisable to accomplish the purposes" of the Act, *id.* § 1426(a)(6).

(build, deploy, and operate the NPSBN) *within* that band.

The Commission's other asserted grounds of statutory authority are even further afield. The Commission emphasizes that Congress directed that the NPSBN should "evolve[] with technological advancements" and that FirstNet's policies should "account [for] new and evolving technologies." FCC Br. 72 (quoting 47 U.S.C. §§ 1422(b), 1426(c)); *see also* PSSA Intervenor Br. 5-6 (relying on these provisions). But the Commission nowhere explains why access to an entirely different band of spectrum can plausibly be understood as a "technological advancement[]" or an "evolving technolog[y]." And both provisions read in context refute any such notion. The former provision states that the NPSBN "shall be based on a *single, national network architecture* that evolves with technological advancements," 47 U.S.C. § 1422(b) (emphasis added), which makes clear that the contemplated advancements are at most technical hardware and software improvements for broadcasting signals within the 700 MHz band. And the latter provision is simply meant to ensure that FirstNet "updates and revises" its *policies* to account for "new and evolving technologies." *Id.* § 1426(c).

### 2. The Commission's Resort to Non-Textual Arguments Fails.

The lack of any textual basis for the Order's authorization to FirstNet resolves this case. But the Commission's additional, non-textual arguments also fail. The Commission suggests that the Spectrum Act's references to the 700 MHz band are

irrelevant because "no context suggests congressional intent to make this list of one exclusive."[4] FCC Br. 74. But CERCI Petitioners referenced the *expressio unius* canon to support an entirely different point: namely, that the Commission cannot rely on some residual source of authority in the Communications Act where Congress specifically legislated the Commission's authority over FirstNet in the Spectrum Act. In that circumstance, mere "statutory silence" will not suffice because it is "less likely that there is a 'gap' for the Commission to fill." *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1136-37 (D.C. Cir. 2022) (alteration and citation omitted); *see also Halverson v. Slater*, 129 F.3d 180, 186 (D.C. Cir. 1997) (rejecting appeal to an agency's general statutory authority to override Congress' more specific treatment of the issue because the "more specific provision controls"); *United States v. Giordano*, 416 U.S. 505, 513-14 (1974) (similar).

The statutory context overwhelmingly supports that Congress intended to limit FirstNet to the 700 MHz band: Congress repeatedly referenced only that band, in the context of a one-time carve-out from the ordinary statutory prohibition against the Commission granting licenses to federal entities. In such circumstances, the repeated references to the 700 MHz band "evinces exclusivity that[] … forecloses

---

[4] The Commission's suggestion that the canon does not apply because it always requires an exclusive list, FCC Br. 74, is contradicted by the basic premise of the *expressio unius* canon itself. *See, e.g.*, *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1061 (D.C. Cir. 1995). The fact that Congress specified only one band creates a *stronger* inference than if Congress had included a list.

the Commission's desired interpretation." *Nasdaq*, 38 F.4th at 1137; *see also, e.g.*, *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) ("When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." (quotation marks omitted)).

Resorting to policy arguments, the Commission argues that the statute intends FirstNet to create a "dynamic, evolving network" so Congress would not have wanted to foreclose access to other bands. FCC Br. 74-75. But the Commission cannot rely on "considerations of policy divorced from the statute's text and purpose" to "override its meaning." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 317 (2011). And, in any case, the context shows that Congress repeatedly hesitated to provide FirstNet with the open-ended authority the Commission imagines. Indeed, Congress included an automatic 2027 sunset provision for FirstNet, provided detailed prescriptions for its funding, finances, expenses, and Board structure, and subjected it to annual audit and reporting requirements. *See* CERCI Br. 11-12.[5]

The Commission also argues that the clear limitations in the Spectrum Act and on the Commission's federal-entity licensing authority are irrelevant because the Commission has chosen to proceed via a sharing agreement. The Commission

---

[5] Nor would Congress have left unspoken something so significant as an open door for adding new spectrum bands—a highly relevant consideration for attracting bidders to partner with FirstNet in the first place.

cites a long-standing practice of "spectrum sharing between Commission licensees and federal entities" endorsed by the NTIA—which ordinarily handles the assignment of federal spectrum. FCC Br. 67-68; *cf.* PSSA Intervention Br. 7-8. But that general agency practice carries little weight here, where the Commission—for the first time ever—is seeking to enter into a spectrum "sharing" arrangement with a federal entity that Congress has expressly limited to a different spectrum band.

The Commission has no limiting principle for the "sharing" authority it claims. The Commission attempts to rebut CERCI Petitioners' hypothetical illustrating how a similar pass-through could circumvent the Communications Act's foreign-government licensing bar by arguing that *other* statutory prohibitions would preclude that result. FCC Br. 69. But that is not responsive to CERCI Petitioners' overarching point that using pass-throughs in this manner is inherently unlawful because it "work[s] an end run around important [statutory] limitations" and "contravenes Congress' will." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91-92 (2002). Indeed, under the Commission's theory, nothing would stop the Commission from using the same "sharing" workaround to allow FirstNet into any public-safety band.

Finally, at a minimum, the Order violates the major questions doctrine by authorizing the reassignment of a band of spectrum worth billions of dollars to FirstNet and opening the door to the potential reassignment of billions more in the

future.  CERCI Br. 30-31.  The Commission does not contest CERCI's estimate of the spectrum's value, nor that Congress previously undertook this task itself in the Spectrum Act.  Instead, the Commission primarily relies on its newfound interpretation that the Order is limited to "six states and territories."  FCC Br. 76. As explained, the Order is not reasonably read that way.  *Supra* Part I.  Regardless, the Commission nowhere supports the notion that the *geographic* scope of an assertion of agency authority bears on whether a major question is posed.

## B.   The Commission's Workaround Is Also Contrary to Law.

Even if the Court concludes that the Spectrum Act does not bar the Order's two-step workaround, each step of that workaround is independently contrary to law.

### 1.   The "Public Safety" Exemption in Section 309(j) Does Not Apply.

With respect to the Band Manager's overlay license, § 309(j)(2)'s auction exemption for "public safety radio services" does not authorize the Commission to bypass a competitive process.  *Cf.* FCC Br. 51-60.  The Commission now suggests that it could issue an overlay license on a noncompetitive basis under its public-interest authority.  *See* FCC Br. 51-54.  But the Commission did not invoke any such authority in its discussion of the overlay license in the Order, and it cannot do so for the first time in litigation.  *See* Order ¶ 25 (JA__) (concluding only that the "future issuance of the Band Manager overlay license is consistent with our statutory authority under section 309(j)"); *cf. SEC v. Chenery Corp.*, 318 U.S. 80, 94-95

(1943).

As for whether the exemption for "public safety radio services" applies, the Commission is entitled to no deference, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395-96 (2024), and its statutory interpretation is unpersuasive. The exemption applies to "public safety radio services, including private internal radio services used by *State and local governments and non-government entities* and including emergency road services provided *by not-for-profit organizations*." 47 U.S.C. § 309(j)(2) (emphasis added).

The Commission first argues that the exemption applies under its prior determination that future licensing for an "existing service" is exempt "where the majority of users licensed … are qualified to obtain auction-exempt spectrum." FCC Br. 54-55 (quoting Order ¶ 25 (JA__)). Thus, the Commission asserts that "regardless of whether the Band Manager (or FirstNet) would qualify to obtain auction-exempt spectrum on its own account," FCC Br. 55, the exemption applies because incumbents currently use the band for public safety. But it is perverse to justify an exemption for the Band Manager based on *incumbents*' public-safety qualifications when the Band Manager is coming in explicitly to "[f]acilitate[e] *non-public safety use* of the 4.9 GHz band," and "[m]anag[e] a sharing agreement" that will displace incumbents and bring commercial service to the band. 47 C.F.R. § 90.1217(c), (d) (emphasis added). The Band Manager will provide no public

safety services itself, Order ¶ 23 (JA__), and therefore cannot qualify for the exemption.

Nor does FirstNet qualify for the exemption because it is not a state, local, or nonprofit public-safety entity. CERCI Br. 35. The Commission's only response is to cite ambiguous legislative history and claim that the statute's use of the term "including" suggests that the exemption applies more broadly than the text specifies. FCC Br. 59-60 (citing H.R. Rep. No. 105-217, at 572 (1999) (Conf. Rep.)). But the Commission nowhere articulates any sensible principle governing which entities are covered and which are not, and the examples the statute gives ("private internal radio services used by State and local governments and non-government entities" and "emergency road services provided by not-for-profit organizations") bear little resemblance to FirstNet. Rather, what these examples have in common—and what FirstNet lacks, given its relationship with AT&T—is their noncommercial character.

Finally, contra the Commission, there was indeed "evidentiary support" for the concerns that the Order could lead to commercial use becoming dominant in the band, in violation of § 309(j)(2)(A)(ii). *Cf.* FCC Br. 57. CERCI explained that as to the existing NPSBN, "only a fraction of the capacity of [FirstNet's] assigned spectrum is actually used for public safety; AT&T uses the rest to serve its commercial subscribers." CERCI July 10, 2024 Ex Parte Letter, at 3 (JA__). Tellingly, the Commission does not deny that most FirstNet-licensed spectrum use

is by AT&T's commercial subscribers, instead relying entirely on FirstNet's own description of how it might "leverage the 4.9 GHz band." FCC Br. 57-58. The Order nowhere concluded that "FirstNet (or by extension AT&T)" would not gain "access to a majority of the band." FCC Br. 57. Given the conceded near-certainty of commercial use, the Commission cannot rely on the "public safety radio services" exemption to authorize its workaround.

### 2. Section 2.103(b) Does Not Authorize the Commission's Contemplated Sharing Agreement.

Nor can Section 2.103(b) justify the sharing agreement with FirstNet. *Cf.* FCC Br. 60-67. Section 2.103(b) allows sharing with "[f]ederal stations" when, among other requirements, the "non-Federal (State/local government) licensee[] or applicant[]'" agrees to the sharing arrangement. *See* 47 C.F.R. § 2.103(b). The Commission *itself* obfuscates regarding whether this provision applies, stating only that the Order "*anticipate[s]* that section 2.103(b) *would* enable" the contemplated sharing arrangement, Order ¶ 37 (JA__), and that the "agency was careful … not to prejudge whether whatever actual agreement the Band Manager may negotiate with FirstNet" would satisfy Section 2.103(b), FCC Br. 62.

Section 2.103 plainly forecloses any such sharing arrangement. The Commission has no answer to the argument that Section 2.103 requires that consent for sharing must come from a state or local government licensee, which the Band Manager is not. The text is clear: The term "non-Federal" is defined by the ensuing

16

parenthetical "(State/local government)," and it does not extend to a private Band Manager. 47 C.F.R. § 2.103(b)(2); *see, e.g.*, *Hanser v. McDonough*, 56 F.4th 967, 971-74 (Fed. Cir. 2022) (collecting cases reading parentheticals as definitions). The Commission calls the parenthetical merely "illustrative," FCC Br. 66, but its only case for that proposition interpreted a disanalogous provision with a parenthetical starting with "including," *Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001); *see also Hanser*, 56 F.4th at 973 (finding parenthetical to be definitional where it "does not include the term 'e.g.' or 'for example,' or any other indication that it is merely illustrative").[6]

It would destroy Section 2.103(b)'s emphasis on ensuring the "approval of the non-Federal (State/local government) licensees" if a Band Manager—who provides no public-safety services at all—can substitute for the required consent from incumbents. The Commission responds that the Band Manager is only consenting to share "unassigned" spectrum in which no incumbents presently operate. FCC Br. 64. But even if true, the Band Manager cannot possibly offer genuine consent when it is essentially required by regulation to reach an agreement with FirstNet. *See* 47

---

[6] The Commission argues this contention is waived, FCC Br. 65-66, but CERCI Petitioners fairly raised concerns about whether Section 2.103(b) could legally ground PSSA's proposed workaround. The "formulation of the issue presented" here need not be "precisely as presented to the Commission," *Time Warner Ent. Co., L.P. v. FCC*, 144 F.3d 75, 81 (D.C. Cir. 1998), and in any case, 47 U.S.C. § 405(a)'s requirement is not jurisdictional, *see M2Z Networks, Inc. v. FCC*, 558 F.3d 554, 558 (D.C. Cir. 2009).

C.F.R. § 90.1217(d).

In short, the Band Manager—a *non*-State/local government entity that provides *no* public-safety services and is *mandated* to reach an agreement with a federal entity—cannot possibly satisfy a regulation meant to ensure that state and local public-safety entities offer genuine "approval" before sharing public-safety spectrum with federal entities.

## III. THE ORDER IS ARBITRARY AND CAPRICIOUS.

### A. The Commission Failed to Consider Incumbents' Significant Reliance Interests.

First, the Order is arbitrary and capricious because it pays scant attention to incumbents' reliance interests. The Order freezes incumbent licensees' ability to modify or expand their existing operations and requires exchange of prior (PA) geographic licenses for narrower "PB" and "PF" licenses. For decades, incumbents relied on the flexibility of the prior licenses to use any channel in the band without Commission approval, add or move base stations and most fixed sites, and make plans and investments for future expansion. Order ¶¶ 56, 58 (JA__). The Order changed that by forcing incumbents to exchange geographic licenses for licenses based on "actual use," which the Commission now acknowledges will result in incumbents having "smaller" licensed geographic areas and "narrower" licensed frequency ranges. FCC Br. 31. The Order's imposition of these changes with barely a word regarding incumbents' reliance interests was arbitrary and capricious. *See*

CERCI Br. 38-42.

The Commission contends that the new PB and PF licenses preserve the status quo by replacing "obsolete" or "duplicative" PA licenses. FCC Br. 79-80, 86-87; PSSA Intervenor Br. 19-20. But the new licenses no more replace the original ones than a pack of paper plates replaces a set of fine china. The Commission concedes that because incumbents are now required to license base stations on a site-based rather than geographic basis, they can no longer add or move base stations without Commission approval. FCC Br. 33-34.[7] The Commission also acknowledges that even for services that can be licensed on a geographic basis (purely mobile or temporary fixed), incumbents' new licenses may not cover the same "spectrum (in terms of geographic area and frequency range)" that their original licenses did. FCC Br. 34. Maintaining local control over use of the band throughout public safety entities' jurisdictions is not "warehous[ing]" spectrum (*contra* FCC Br. 85)—it is essential to ensuring availability and flexibility to respond to local emergencies.

Otherwise, the Commission reasoned that freezing the band was necessary to "capture an accurate snapshot of frequency use" under the Order's data collection effort. FCC Br. 78; *see also* PSSA Intervention Br. 18-19. But the Commission

---

[7] The Commission incorrectly attempts to consign the base-station licensing shift to the Seventh Report and Order. FCC Br. 84. But that order's directive to collect site-based licensing information was contingent on later OMB approval, and the relevant Commission action is the cancellation of geographic licenses for base stations here.

changed the status quo by forcing incumbents to narrower PB and PF licenses, thereby creating new "unassigned" spectrum. And the Commission nowhere balanced the purported analytical benefits of the freeze against the harms to public safety. Claiming it undertook the proper weighing, the Commission cites Order ¶ 54 (JA__), but that paragraph says only that "stable" spectrum "will better facilitate analysis" of the data and does not support the Commission's gloss that the Commission somehow weighed the harm to incumbents from permanent revocation of their rights to modify and expand against the purported need for temporary stability during data collection. FCC Br. 81.

Finally, the Commission notes the availability of a waiver, but a waiver—which, historically, the Commission rarely grants—does not excuse an otherwise unjustified general rule. *See U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 571 (D.C. Cir. 2004). Moreover, the waiver process is drawn out and cumbersome, as evidenced by the current proceedings before the Commission regarding the New York Metropolitan Transit Authority's request to license fixed base stations and mobile units throughout its geographic license area to upgrade the signaling technology required for train safety—a request that has been vigorously opposed by PSSA. *See* Comments of the Public Safety Spectrum Alliance on Waiver Request of New York City Transit Authority at 4-7, ULS File Number 0011366120 (Aug. 22, 2025) (JA__). Incumbents cannot count on receiving a waiver, and the mere

possibility of a waiver cannot justify the Order where no other reasoning supports its approach.

## B. The Commission's Cancel First, Justify Later Approach Is Arbitrary and Capricious.

There was no basis to limit incumbents to actual current usage and deprive them of the flexibility associated with their original licenses until the data had been analyzed. *Cf.* FCC Br. 86-88. The Commission could not possibly know that an entirely new licensing scheme based primarily on site-based licenses is in the public interest without reviewing the data. Indeed, the Commission stated that it needed to collect the data to better understand current usage. Order ¶ 54 (JA__); *see also* FCC Br. 78. And the Commission concluded that it needed to study the data collection results before requiring surrender of unused spectrum. Order ¶ 59 (JA__). Yet inexplicably, the Order concluded that there was adequate basis to require license conversion, which results in narrower "paper plate" licenses for incumbents. *See* FCC Br. 31. This "cancel first, justify later" approach was arbitrary and capricious.

## C. The Order Is Internally Inconsistent and Contradictory.

The Commission offers barely any response to CERCI's remaining challenges regarding FirstNet.

*First*, it was arbitrary to unravel the status quo in the 4.9 GHz band based on FirstNet's supposed public-safety benefits without actually concluding that FirstNet is legally entitled to enter into a sharing agreement with the Band Manager. *See*

Order ¶ 37 (JA__) ("anticipat[ing]" that FirstNet could do so). The Commission now asserts that "there are no statutory or regulatory obstacles to FirstNet's use," FCC Br. 88, but it is internally inconsistent for the Commission to sometimes state such an agreement will certainly occur, and other times claim it is tentative in an effort to avoid legal objections.

*Second*, the Commission remarkably asserts that it "defies logic" for CERCI Petitioners to question whether FirstNet's role should be expanded when the entire agency is due to expire in 2027. FCC Br. 89. But the Order's licensing scheme did not adequately account for that possibility, and designing an entirely new licensing scheme around an entity that is currently set to sunset in two years certainly ignores an important part of the problem.

*Third*, the Order fails to establish why FirstNet needs additional spectrum or how it would fund any buildout. CERCI Br. 45-46. Congress specified financing and funding matters in detail in the context of the 700 MHz band, but there are no such details here. The regurgitation of a few sentences from FirstNet's comments does not constitute a "highly technical" judgment to which this Court owes the Commission any deference. FCC Br. 91. Similarly, simply quoting the Spectrum Act's provision governing the collection of fees for the existing NPSBN is no response to whether FirstNet will be able to fund any buildout of the 4.9 GHz band. *Id.*

*Fourth*, the Commission continues to brush aside FirstNet's poor management. *Id.* But crediting NTIA's response to one report is hardly adequate in light of nearly twenty governmental reports criticizing FirstNet's performance.[8] The Commission largely ignored FirstNet's record of performance while fundamentally altering the 4.9 GHz band licensing scheme for FirstNet's benefit.

*Finally*, the Commission does not deny that AT&T gains a commercial windfall due to the Order. *See id.* at 4, 14, 94. Rather, it defends the windfall on the grounds that the "primary benefit" of the new licensing scheme is that FirstNet can "support upgrades" to the NPSBN. *Id.* at 94. But the Commission nowhere assesses whether FirstNet's usage of the band will be predominantly public-safety or commercial use, and fails to assess the effects on the commercial wireless marketplace stemming from the Commission's multi-billion-dollar gift to AT&T. Disrupting public safety incumbents' geographic licenses on such a tenuous basis was arbitrary and capricious.

---

[8] Indeed, the issues persist. A recent report found that FirstNet officials worked to obstruct OIG audits by seeking compromising information about the Inspector General and retaliating against staff who shared information with OIG. *See* Off. of Inspector Gen., U.S. Dep't of Com., Summary of Investigation: *Investigation into Allegations that FirstNet Authority Senior Officials Interfered with OIG Audits*, Case No. 24-175 (Aug. 28, 2025), https://www.oig.doc.gov/wp-content/OIGPublications/Public_Investigative_Summary_24-0175_SECURED.pdf.

## CONCLUSION

For the foregoing reasons, the Court should grant the petitions for review of

CERCI, BART, and NSA/CSSA and vacate the Order.

Dated:  September 15, 2025

/s/ *James M. Smith*
James M. Smith
Law Office of James M. Smith
4069 27th Road North
Arlington, VA 22207
(703) 855-4183
jamesmsmith8980@gmail.com

*Counsel for National Sheriffs'
Association and California State
Sheriffs' Association*

Respectfully submitted,

/s/ *Jessica Ring Amunson*
Jessica Ring Amunson
Arjun R. Ramamurti
Joshua J.W. Armstrong
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com

*Counsel for Coalition for
Emergency Response and Critical
Infrastructure*

/s/ *Hyland Hunt*
Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite
300 Washington, DC 20001
(202) 868-6915
hhunt@deutschhunt.com

Phyllis A. Whitten
SAN FRANCISCO BAY AREA RAPID
   TRANSIT DISTRICT
2150 Webster St, 10th Floor
Oakland, CA 94612
(510) 464-5000
pwhitte@bart.gov

*Counsel for San Francisco Bay
Area Rapid Transit District*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit approved by this Court in its Order of May 6, 2025, because this brief contains 5,498 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14 point Times New Roman font for the main text and 14 point Times New Roman font for footnotes.

/s/ *Jessica Ring Amunson*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2025, I caused to be electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Jessica Ring Amunson*