# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

PUBLIC SAFETY SPECTRUM ALLIANCE and PUBLIC BROADBAND
TECHNOLOGY ASSOCIATION,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents.*

On Petitions for Review of an Order of
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

<table>
<tr><td></td><td>D. Adam Candeub<br>*General Counsel*</td></tr>
<tr><td></td><td>Bradley Craigmyle<br>*Deputy General Counsel*</td></tr>
<tr><td></td><td>Sarah E. Citrin<br>*Deputy Associate General Counsel*</td></tr>
<tr><td>Abigail A. Slater<br>*Assistant Attorney General*</td><td>Igor Helman<br>*Counsel*</td></tr>
<tr><td>Robert B. Nicholson<br>Shana M. Wallace<br>*Attorneys*</td><td>FEDERAL COMMUNICATIONS<br>COMMISSION</td></tr>
<tr><td>U.S. DEPARTMENT OF JUSTICE<br>ANTITRUST DIVISION<br>950 Pennsylvania Ave. NW<br>Washington, DC 20530</td><td>45 L Street NE<br>Washington, DC 20554<br>(202) 418-1740<br>fcclitigation@fcc.gov</td></tr>
</table>

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

(A) **Parties and Amici.** Four related cases have been consolidated: Nos. 24-1363, 24-1364, 25-1028, and 25-1034. Petitioners in 24-1363 are the Public Safety Spectrum Alliance (PSSA) and the Public Safety Broadband Technology Association. Petitioner in No. 24-1364 is the Coalition for Emergency Response and Critical Infrastructure (CERCI). Petitioners in No. 25-1028 are the National Sheriffs' Association and the California State Sheriffs' Association. Petitioner in No. 25-1034 is the San Francisco Bay Area Rapid Transit District (BART).

Respondents are the Federal Communications Commission (FCC or Commission) and the United States of America.

The National Fraternal Order of Police has intervened in Nos. 24-1364, 25-1028, and 25-1034. PSSA and the Public Safety Broadband Technology Association have intervened in support of Respondents in No. 24-1364. CERCI and BART have intervened in support of Respondents in No. 24-1363.

(B) **Rulings Under Review.** The petitions for review challenge the following order of the Federal Communications Commission:

*Amendment of Part 90 of the Commission's Rules*, 39 FCC Rcd 12032 (2024) (*Order*), *reprinted at* JA664–714.

BART's petition for review also seeks review of a "related public notice" that two of the FCC's subordinate bureaus issued, which was published in the Federal Register on December 9, 2024. 89 Fed. Reg. 97559. Because BART did not first seek review of that public notice from the full Commission, judicial review of the public notice is not available here. *See* 47 U.S.C. § 155(c)(7) (the filing of an application for review is a "condition precedent to judicial review" of actions taken by the FCC's subordinate bureaus on delegated authority).

(C) **Related Cases.** The *Order* under review has not previously been before this Court or any other court. Respondents are aware of no other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

**TABLE OF CONTENTS**

Page

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ..................................................... i

TABLE OF AUTHORITIES ...................................................... v

GLOSSARY ...................................................................... xiii

INTRODUCTION ................................................................. 1

JURISDICTIONAL STATEMENT ........................................... 7

STATEMENT OF THE ISSUES .............................................. 9

PERTINENT STATUTES AND REGULATIONS ..................... 10

STATEMENT OF THE CASE ............................................... 10

    A.    Statutory And Regulatory Background ............... 10

    B.    FirstNet And The Nationwide Public Safety Broadband
        Network ................................................................. 12

    C.    The 4.9 GHz Band ............................................ 15

        1.    Features Of The Band ................................ 15

        2.    Underutilization Of The Band ................... 18

    D.    *Order* On Review ............................................... 24

        1.    Authorizing A Nationwide Overlay License And
            Spectrum Sharing With FirstNet ............... 24

        2.    Facilitating The Granular Data Collection ........ 29

    E.    Subsequent Developments .................................... 34

STANDARD OF REVIEW ................................................... 35

SUMMARY OF THE ARGUMENT ......................................... 37

STANDING ...................................................................... 42

    A.    The CERCI Petitioners Have Not Established Standing
        To Challenge The Overlay License And The Sharing
        Agreement .......................................................... 43

    B.    The PSSA Petitioners Have Not Established Standing
        To Assert Either Of Their Claims ......................... 46

ARGUMENT ........................................................................... 47

I.   THE COMMISSION IS AUTHORIZED TO ISSUE A LICENSE TO
     THE BAND MANAGER, AND FIRSTNET MAY USE 4.9 GHZ
     SPECTRUM UNDER A SHARING AGREEMENT .............................. 47

     A.   Allowing The Band Manager To Apply For An Overlay
          License Is Consistent With The Communications Act ........ 51

     B.   The Commission Lawfully Authorized The Band
          Manager To Pursue A Sharing Agreement With
          FirstNet ..................................................................... 60

          1.   Sharing "Overlay" Spectrum With FirstNet Does
               Not Require The Consent Of Incumbent
               Licensees ............................................................. 63

          2.   The Communications Act Does Not Prohibit The
               Contemplated Sharing Agreement With FirstNet ...... 67

          3.   The Spectrum Act Is No Obstacle To Sharing
               With FirstNet ....................................................... 70

II.  THE COMMISSION'S ORDER WAS NOT ARBITRARY AND
     CAPRICIOUS ..................................................................... 77

     A.   The Commission Adequately Considered The Reliance
          Interests Of Incumbent Licensees ................................ 78

     B.   The Commission Reasonably Decided To Cancel The
          PA Licenses As Duplicative After Issuing Licenses
          With New Service Codes ............................................. 86

     C.   The CERCI Petitioners' Additional Attacks On The
          Order Lack Merit ...................................................... 88

     D.   The Commission Reasonably Rejected PSSA's
          Proposals ................................................................. 94

CONCLUSION ......................................................................... 97

CERTIFICATE OF COMPLIANCE .............................................. 99

# TABLE OF AUTHORITIES*

## Cases

*Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1 (D.C. Cir. 2009) ................... 96

*Am. Hosp. Ass'n v. Azar*, 938 F.3d 528 (D.C. Cir. 2020) ........................ 59

*Animal Legal Def. Fund v. Vilsack*, 111 F.4th 1219
    (D.C. Cir. 2024) ..................................................................... 42

*\*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003) ........................... 75

*Biden v. Nebraska*, 600 U.S. 477 (2023) ................................................ 76

*Blanca Tel. Co. v. FCC*, 743 F.3d 860 (D.C. Cir. 2014) .......................... 82

*Burgess v. United States*, 553 U.S. 124 (2008) ...................................... 59

*Cellco P'ship v. FCC*, 357 F.3d 88 (D.C. Cir. 2004) ............................... 36

*Cellco P'ship v. FCC*, 700 F.3d 534 (D.C. Cir. 2012) ........................ 10, 48

*Chamber of Com. v. EPA*, 642 F.3d 192 (D.C. Cir. 2011) ...................... 47

*Chickasaw Nation v. United States*, 534 U.S. 84 (2001) ........................ 67

*Competitive Enter. Inst. v. FCC*, 970 F.3d 372 (D.C. Cir. 2020) ....... 43, 46

*Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121 (2025) ................... 43

*Doe v. SEC*, 28 F.4th 1306 (D.C. Cir. 2022) ......................................... 74

*Entergy Ark. LLC v. FERC*, 134 F.4th 576 (D.C. Cir. 2025) ............ 42, 44

*Ethyl Corp. v. EPA*, 51 F.3d 1053 (D.C. Cir. 1995) ............................... 74

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ........................ 78

*\*FCC v. WNCN Listeners Guild*, 450 U.S. 582 (1981) ...................... 36, 52

---

*\* Authorities upon which we chiefly rely are marked with asterisks.*

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260 (2016) ........................37

*Gettman v. DEA*, 290 F.3d 430 (D.C. Cir. 2002) ...............................46, 47

*Inner City Press v. Bd. of Govs. of Fed. Reserve Sys.*, 130 F.3d 1088
 (D.C. Cir. 1997) ...............................................................................43

*Intelligent Transp. Soc'y of Am. v. FCC*, 45 F.4th 406
 (D.C. Cir. 2022) ..............................................................10, 47, 86, 91

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)..................35, 36

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)......................................42

*Mobile Relay Assocs. v. FCC*, 457 F.3d 1 (D.C. Cir. 2006) ...............37, 45

*New World Radio, Inc. v. FCC*, 294 F.3d 164 (D.C. Cir. 2002)...............43

*Northstar Wireless, LLC v. FCC*, 38 F.4th 190 (D.C. Cir. 2022) ............48

*NTCH, Inc. v. FCC*, 950 F.3d 871 (D.C. Cir. 2020) .............36, 37, 48, 53

*P.R. Mar. Shipping Auth. v. ICC*, 645 F.2d 1102 (D.C. Cir. 1981).........59

*Reytblatt v. NRC*, 105 F.3d 715 (D.C. Cir. 1997) ...................................43

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002).................................42

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ...........................................46

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ..............................47

*Transp. Div. of Int'l Ass'n of Sheet Metal, Air, Rail & Transp.
 Workers v. Fed. R.R. Admin.*, 10 F.4th 869 (D.C. Cir. 2021) ............97

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ................................42

*Tri-Cnty. Tel. Ass'n v. FCC*, 999 F.3d 714 (D.C. Cir. 2021) .............42, 44

*Twin Rivers Paper Co. v. SEC*, 934 F.3d 607 (D.C. Cir. 2019) ............ 42

*U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004)..................... 83

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ................................. 77

*Viasat, Inc. v. FCC*, 47 F.4th 769 (D.C. Cir. 2022).................... 42, 47, 66

*West Virginia v. EPA*, 597 U.S. 697 (2022) ............................................. 75

*Zimmer Radio of Mid-Mo., Inc. v. FCC*, 145 F.4th 828 (8th Cir. 2025) ..............................................................................36, 37, 52

**Statutes**

5 U.S.C. § 706(2)(A) ................................................................................ 36

28 U.S.C. § 2342(1) .................................................................................... 7

28 U.S.C. § 2344.......................................................................................... 8

*47 U.S.C. § 151 .................................................................................. 10, 77

47 U.S.C. § 301....................................................................................... 48

*47 U.S.C. § 303.......................................................................... 10, 48, 77

47 U.S.C. § 303(c) ............................................................................. 11, 48

47 U.S.C. § 303(d) ............................................................................. 11, 49

47 U.S.C. § 303(f) ................................................................................... 49

47 U.S.C. § 303(g) ................................................................................... 53

47 U.S.C. § 303(h) ................................................................................... 11

47 U.S.C. § 303(l) .................................................................................... 48

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

47 U.S.C. § 303(r).................................................................49

47 U.S.C. § 305(a) ..........................................................11, 49

*47 U.S.C. § 309(a) .........................................................48, 52

47 U.S.C. § 309(j) ...........................................................28, 52

*47 U.S.C. § 309(j)(2)(A).............................39, 54, 58, 59, 60

*47 U.S.C. § 309(j)(6)(C) ......................................................53

47 U.S.C. § 309(j)(11) ...........................................................53

47 U.S.C. § 310 ......................................................................68

47 U.S.C. § 337(f)(1)(B) .......................................................60

47 U.S.C. § 402(a) ...................................................................7

*47 U.S.C. § 405(a) ...............................................................66

47 U.S.C. § 902(b)(2)(A) .......................................................11

47 U.S.C. § 922 ......................................................................11

47 U.S.C. § 922(2) ..................................................................11

47 U.S.C. § 922(3) ..................................................................11

47 U.S.C. § 1401(21) ..............................................................13

*47 U.S.C. § 1421 .....................................................................3

47 U.S.C. § 1422 ......................................................................3

47 U.S.C. § 1422(a) .................................................................72

*47 U.S.C. § 1422(b) .........................................13, 15, 49, 72

47 U.S.C. § 1424.................................................................. 3

*47 U.S.C. § 1426 ............................................................. 13

47 U.S.C. § 1426(a)(1) ..................................................... 73

47 U.S.C. § 1426(a)(6) ..................................................... 73

47 U.S.C. § 1426(b) ..................................................... 72, 89

47 U.S.C. § 1426(b)(4) ..................................................... 14

47 U.S.C. § 1426(c) ............................................................ 72

47 U.S.C. § 1426(c)(1) ..................................................... 14

47 U.S.C. § 1426(c)(3) ..................................................... 14

47 U.S.C. § 1426(c)(4) ..................................................... 13

47 U.S.C. § 1428.............................................................. 91

*47 U.S.C. § 1433.................................. 13, 15, 49, 71

47 U.S.C. § 1457(b)(3)....................................................... 3

Middle Class Tax Relief and Job Creation Act of 2012,
Pub. L. No. 112-96, 125 Stat. 156 (2012) ........................... 12

One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025) ..... 53

**Rules**

D.C. Cir. R. 28(a)(7) ....................................................... 42

**Regulations**

*47 C.F.R. § 1.3 ............................................................... 82

47 C.F.R. § 1.925 ................................................................. 82

*47 C.F.R. § 1.925(b)(3)(i) ................................................. 82

47 C.F.R. § 1.9035(d)(2) ..................................................... 69

47 C.F.R. § 2.103 .......................................................... 61, 77

*47 C.F.R. § 2.103(b) .......................... 9, 12, 49, 50, 52, 62, 66

47 C.F.R. § 90.7 ................................................................. 14

47 C.F.R. § 90.1203(b) ............................................. 64, 65, 69

47 C.F.R. § 90.1207(a) ....................................................... 17

47 C.F.R. § 90.1207(e)(1)(vi) ...................................... 80, 83

47 C.F.R. § 90.1207(h) ............................................. 52, 62, 65

47 C.F.R. § 90.1209(a) ....................................................... 17

47 C.F.R. § 90.1217(d) ....................................................... 64

## Administrative Materials

*4.9 GHz Band Transferred from Federal Government Use*,
17 FCC Rcd 3955 (2002) ........................................... 3, 15, 16

*Acceleration of Broadband Deployment by Improving Wireless
Facilities Siting Policies*, 28 FCC Rcd 14238 (2013) .......................... 13

*Amendment of Part 2 of the Commission's Rules to Allocate
Spectrum for the Fixed-Satellite Service in the 17.8–20.2 GHz
Band for Government Use*, 10 FCC Rcd 9931 (1995) ......................... 70

*Deadline for 4.9 GHz Public Safety Licensees to Provide Granular
Licensing Data Extended by 30 Days*, DA 25-463 (Pub. Safety
and Wireless Burs. June 2, 2025) ........................................ 35

*Development of Operational, Technical and Spectrum Requirements for Meeting Federal, State and Local Public Safety Agency Communication Requirements Through the Year 2010*, 14 FCC Rcd 152 (1998) ............................................. 61

*First Responder Network Authority Nationwide Public Safety Broadband Network Renewal of SP-700 MHz Public Safety Broadband Nationwide License Radio Service*, 38 FCC Rcd 4989 (Pub. Safety Bur. 2023) ......................................... 14

*Implementation of Sections 309(j) and 337 of the Communications Act of 1934 As Amended*, 15 FCC Rcd 22709 (2000) .............. 53, 54, 60

*Partitioning, Disaggregation, & Leasing of Spectrum*, 37 FCC Rcd 8825 (2022) ...................................................... 61

*Promoting Efficient Use of Spectrum,* 18 FCC Rcd 20604 (2003) ........... 69

*Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Establish Deadline for 4.9 GHz Public Safety Licensees to Provide Granular Licensing Data*, DA 24-1137, 2024 WL 5052941 (Pub. Safety and Wireless Burs. 2024) ......................................................................... 34, 87

**Legislative Materials**

H.R. Rep. No. 105-217 (1997) (Conf. Rep.) ............................................. 60

**Other Materials**

FirstNet Authority, *Fiscal Year 2023 Annual Report to Congress*.........15

Memorandum of Understanding Between the Federal
    Communications Commission and the National
    Telecommunications and Information Administration
    (Aug. 1, 2022) ......................................................................11

National Commission on Terrorist Attacks upon the United
    States, *9/11 Commission Report* (2004) ........................2, 12

R. H. Coase, *The Nature of the Firm*, 4 Economica 386 (1937) ..............20

# GLOSSARY

| | |
|---|---|
| **4.9 GHz band** | The portion of the electromagnetic spectrum ranging from 4940–4990 MHz |
| **BART** | Petitioner San Francisco Bay Area Rapid Transit |
| **CERCI** | Petitioner Coalition for Emergency Response and Critical Infrastructure |
| **CERCI Petitioners** | Petitioners BART, CERCI, and Sheriffs' Associations |
| **FCC** or **Commission** | Respondent Federal Communications Commission |
| **FirstNet** | First Responder Network Authority |
| **GHz** | Gigahertz |
| **MHz** | Megahertz |
| **NTIA** | National Telecommunications and Information Administration |
| **PA** | Service code under which licenses in the 4.9 GHz band were registered at the time of the order on review |
| **PB** | New service code under which "base/mobile," "mobile-only," or "temporary fixed" operations will be licensed in the 4.9 GHz band |
| **PF** | New service code under which "fixed" operations will be licensed in the 4.9 GHz band |

| | |
|---|---|
| **PSSA** | Petitioner Public Safety Spectrum Alliance |
| **PSSA Petitioners** | Petitioners Public Safety Spectrum Alliance and Public Safety Broadband Technology Association |
| **Public Safety Broadband Network** | A high-speed, nationwide wireless broadband network dedicated to supporting public safety communications, which FirstNet is statutorily responsible for overseeing and operating |
| **Sheriffs' Associations** | Petitioners National Sheriffs' Association and California State Sheriffs' Association |

**Nos. 24-1363 (lead), 24-1364, 25-1028, 25-1034**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

PUBLIC SAFETY SPECTRUM ALLIANCE and PUBLIC BROADBAND
TECHNOLOGY ASSOCIATION,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

---

On Petitions for Review of an Order of
the Federal Communications Commission

---

## BRIEF FOR RESPONDENTS

---

## INTRODUCTION

After the terrorist attacks of September 11, 2001, Congress

created the "9/11 Commission" to investigate the circumstances of those

attacks and recommend future safeguards. The resulting investigation

identified two significant problems with public safety communications

networks. Police, fire, and ambulance services, and other first

responders, could not communicate at all on 9/11 because networks

provided by commercial carriers were overwhelmed. National Commission on Terrorist Attacks upon the United States, *9/11 Commission Report* 293 (2004), *available at* https://perma.cc/XKZ8-Y8DU. And even those first responders with uninterrupted access to their own, exclusive, dedicated communications networks lacked interoperability and so could not communicate and coordinate with other first responders. *Id.* at 397.

To solve these problems, the 9/11 Commission recommended that Congress create a communications network that enjoys dedicated spectrum and is interoperable, so as to promote access for all public safety entities and first responders. Such a network would allow public safety entities to talk to each other during times of crisis—even during days of record use, as on 9/11.

In legislation adopted in 2012, Congress took a number of steps to respond to the 9/11 Commission's recommendations: it mandated a nationwide public safety broadband network (the Public Safety Broadband Network), operated by the First Responder Network Authority (FirstNet); authorized $7 billion from spectrum auction revenues to deploy the network; and reallocated 20 MHz of the 700

MHz band of spectrum for FirstNet's use. *See* 47 U.S.C. §§ 1421, 1422, 1424, 1457(b)(3).

Congress was not alone in responding to the communications issues raised by 9/11. In 2002, the Federal Communications Commission (FCC or Commission), listening to public safety groups that sought to improve their response capabilities after that tragic day, designated 50 MHz of the 4.9 GHz spectrum band for use in support of public safety. *See 4.9 GHz Band Transferred from Federal Government Use*, 17 FCC Rcd 3955, 3967 ¶ 23 (2002) (*Second Report & Order*). The FCC expected development in the 4.9 GHz band to support "short range" uses that, although not interoperable, would "complement" public safety operations in the 700 MHz band. *Id*. at 3967–68, 3970 ¶¶ 24, 26, 30.

Fast forward twenty years, and while both allocation of the 700 MHz band for FirstNet's Public Safety Broadband Network and the designation for public safety of the 4.9 GHz band shared a common origin in the response to 9/11, the subsequent history of the two spectrum bands could not be more different.

In the 700 MHz band, FirstNet now provides services to over 26,000 public safety agencies and organizations and supports

interoperability among disparate agencies with modern, reliable communication tools and increased coverage for first responders. FirstNet's success is a direct reflection of the regulatory framework governing the spectrum over which Congress has given FirstNet sole oversight and control. Use of this spectrum does not depend on ad hoc negotiations among the numerous public safety entities that purchase FirstNet's services. Because responsibility for the Public Safety Broadband Network is consolidated in FirstNet, coordination functions occur efficiently, in a hierarchical fashion, through FirstNet's statutorily authorized contract with its commercial partner and operational manager of the network, AT&T. (AT&T may also use the 700 MHz spectrum for its own commercial purposes, so long as it does not cause interference to public safety operations, which remain "primary" and need not protect AT&T from interference.)

By contrast, usage in the 4.9 GHz band continues to be sparse: the number of licensees has stalled at fewer than 4,000, and the band has seen minimal innovation over the years in terms of available applications. The 4.9 GHz band's persistent underutilization results in large part from its character as shared spectrum. In this band, the Commission does not assign licensees slices of the spectrum for their

exclusive use—as, for instance, commercial cell phone providers enjoy in other bands. Rather, the Commission allows licensees to operate in all parts of the band, requiring that they resolve any interference problems between and among themselves, informally, on a consensus-driven, ad hoc basis; the FCC plays a role of final arbiter in theory, but there is no clear dispute resolution process in place. The Commission has recognized that the lack of a formal frequency coordination process in the 4.9 GHz band creates business uncertainty, raises deployment costs, and chills entrance and innovation.

After over a decade of failed efforts to spur usage, the Commission adopted a new regulatory framework to address the coordination problem that has been hindering utilization of the 4.9 GHz band: it determined that a third-party Band Manager, which the Commission first provided for in an earlier order, will now be eligible to apply for a nationwide license that will be layered over existing licenses in the band (and is thus called an "overlay" license) and will cover spectrum not included within any existing license. The Band Manager will have the power to resolve frequency disputes, ensure that users do not create harmful interference, and work with incumbent licensees to facilitate the deployment of advanced wireless technologies in the band.

Following a data collection process that the FCC has initiated to gain a full understanding of current operations in the band, the Band Manager will also identify specific areas where spectrum is unused and might present opportunities for increased access.

The Commission further authorized the Band Manager to enter into a sharing agreement with FirstNet for use of the unassigned spectrum covered by the Band Manager's overlay license. FirstNet is not, the Commission recognized, limited by statute to operating only in the band where it was initially licensed (the 700 MHz band). Nor is FirstNet prohibited from sharing spectrum with a Commission licensee. To be sure, the Commission generally does not license federal entities, because the National Telecommunications and Information Administration (NTIA) oversees federal spectrum use. But federal entities regularly share spectrum with Commission licensees. Indeed, the FCC's rules expressly allow this, without need for a license. And because FirstNet is an established entity and already successfully operates the Public Safety Broadband Network, the Commission regarded FirstNet as uniquely well positioned to promote "robust deployment in the [4.9 GHz] band in the near term." *Amendment of*

*Part 90 of the Commission's Rules*, 39 FCC Rcd 12032, 12048 ¶ 27 (JA680) (2024) (*Order*).

The regulatory framework adopted in the *Order* will allow for a comprehensive, considered solution to the persistent problem of underutilization of the 4.9 GHz band for public safety purposes. By making a single Band Manager responsible for frequency coordination in the band, and also for facilitating FirstNet's access to unassigned spectrum, the Commission expects to see development and deployment of "new technologies" for the public safety community, including advanced "5G" wireless applications. *Order* ¶ 27 (JA680). At the same time, the *Order* preserves the rights of incumbent licensees to "operate their existing networks." *Id.* ¶ 58 (JA700). As we show, the Commission's approach is a reasonable exercise of the agency's broad authority to manage electromagnetic spectrum and should be upheld.

## JURISDICTIONAL STATEMENT

The Court's jurisdiction to review the *Order* rests on 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1). A summary of the *Order* was published in the Federal Register on November 20, 2024. *See* 89 Fed. Reg. 91578. All five petitioners timely petitioned this Court for review within 60 days of that public notice: Petitioners Public Safety Spectrum

Alliance (PSSA) and the Public Safety Broadband Technology Association (collectively, PSSA Petitioners) on November 26, 2024; Petitioner Coalition for Emergency Response and Critical Infrastructure (CERCI) on November 27, 2024; Petitioner San Francisco Bay Area Rapid Transit (BART) on January 21, 2024; and Petitioners the National Sheriffs' Association and the California State Sheriffs' Association (collectively, Sheriffs' Associations) on January 21, 2024. *See* 28 U.S.C. § 2344.

As we explain, however, the PSSA Petitioners have not met their burden to show Article III standing. *See infra* Standing, Part B. The other petitioners (collectively, the CERCI Petitioners) have established standing to challenge portions of the *Order* that affect their existing licenses. *See infra* Part II. They have not, however, shown any injury from the Commission's decision to allow the Band Manager to apply for an overlay license and negotiate a sharing agreement with FirstNet; neither the overlay license nor the sharing agreement affects spectrum licensed to any incumbent licensee. Accordingly, the CERCI Petitioners have not established Article III standing to challenge the Commission's statutory and regulatory authority to take those actions. *See infra* Standing, Part A.

## STATEMENT OF THE ISSUES

1.     Whether the petitioners have met their burden to establish Article III standing.

2.     If the Court reaches the merits of the CERCI Petitioners' challenges to the Commission's statutory and regulatory authority, whether

(a) allowing the Band Manager to apply for an overlay license, without conducting a spectrum auction, was a lawful exercise of the Commission's authority under the Communications Act; and

(b) authorizing the Band Manager to negotiate a sharing agreement with FirstNet was consistent with (i) the Commission's rule governing spectrum sharing with federal entities in the 4.9 GHz band, 47 C.F.R. § 2.103(b); (ii) the agency's statutory authority under the Communications Act and the Spectrum Act; and (iii) the powers granted to FirstNet under the Spectrum Act.

3.     Whether the Commission's other actions in the *Order* were reasonable, including its decisions to

(a) freeze expansions and other modifications to incumbent operations in the 4.9 GHz band while the agency inventories existing operations in the band;

(b) cancel duplicative or obsolete licenses in its Universal Licensing System, once incumbent licensees obtain new licenses under the *Order*'s updated service codes;

(c) not convert geographic licenses into site-based licenses; and

(d) defer consideration of whether to require incumbent licensees to surrender—for the benefit of the Band Manager and FirstNet— spectrum that was licensed to them but that they were not using at the time of the *Order*.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in a separately bound statutory addendum.

## STATEMENT OF THE CASE

### A.  Statutory And Regulatory Background

"The FCC has 'broad authority to oversee wire and radio communication in the United States' and must promote 'effective use of radio in the public interest.'" *Intelligent Transp. Soc'y of Am. v. FCC*, 45 F.4th 406, 411 (D.C. Cir. 2022) (quoting *Cellco P'ship v. FCC*, 700 F.3d 534, 537 (D.C. Cir. 2012)); *see* 47 U.S.C. §§ 151, 303. "Part of that task is assigning 'bands of frequencies to the various classes of stations' that will make use of spectrum." *Intelligent Transp. Soc'y*, 45 F.4th at 411

(citing 47 U.S.C. § 303(c)); *see also* 47 U.S.C. § 303(d) (determine location of stations); *id.* § 303(h) (establish areas or zones to be served).

The only exception to the Commission's broad radio spectrum licensing and frequency assignment powers concerns "[r]adio stations belonging to and operated by the United States." 47 U.S.C. § 305(a). Such federal stations are administered by and operated on frequencies allocated by NTIA, a component of the Department of Commerce, which exercises authority delegated from the President. *See id.* § 902(b)(2)(A).

The two agencies collaborate closely. *See* Memorandum of Understanding Between the Federal Communications Commission and the National Telecommunications and Information Administration (Aug. 1, 2022) (2022 MOU), *available at* https://perma.cc/4L5K-GD27. Their leaders and staff "meet[] at least biannually" (and in practice more regularly, *see* 2022 MOU at 2–3) "to conduct joint spectrum planning" on various issues. *Id.* at 1; *see* 47 U.S.C. § 922. Among other things, they coordinate on "future spectrum requirements for public and private uses, including State and local government public safety." 47 U.S.C. § 922(2). And they jointly plan "the spectrum allocation actions necessary to accommodate those uses." *Id.* § 922(3).

In addition, FCC rules have for more than two decades permitted federal radio stations to use non-federal frequencies dedicated to public safety pursuant to sharing agreements and in accordance with relevant Commission rules. This is permitted where the stations are "used for interoperability or [as] part of a Federal/non-Federal shared or joint-use system," and where the "Federal entity obtains the approval of the non-Federal (State/local government) licensee(s) or applicant(s) involved." 47 C.F.R. § 2.103(b).

## B. FirstNet And The Nationwide Public Safety Broadband Network

The 9/11 attacks laid bare the importance of resilience in the communications networks available to first responders during a public safety crisis. *See 9/11 Commission Report* 293. Congress addressed this concern in Title VI of the Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112-96, §§ 6001–6703, 125 Stat. 156, 201–56 (codified in scattered sections of 47 U.S.C.) (Spectrum Act).

The Spectrum Act established FirstNet as an independent authority within NTIA, and made FirstNet responsible for overseeing the construction and operation of the Public Safety Broadband Network—a high-speed nationwide wireless broadband network

dedicated to supporting public safety communications. *See* 47 U.S.C.

§ 1426; *Acceleration of Broadband Deployment by Improving Wireless*

*Facilities Siting Policies*, 28 FCC Rcd 14238, 14272 ¶ 91 (2013).

The Public Safety Broadband Network is an "interoperable"

network, 47 U.S.C. § 1401(21), "based on a single, national network

architecture," *id.* § 1422(b). Congress specified that the network would

"initially consist[] of" specified components. *Id.* It also contemplated,

however, that the network would "evolve[] with technological

advancements." *Id.*

In establishing FirstNet, Congress directed the FCC to grant it a

license for a 20 MHz portion of the 700 MHz band of spectrum. *See*

*Order* ¶¶ 13–14 (JA670–671). Congress also directed the FCC to

support the Public Safety Broadband Network going forward. The

Commission is empowered to "provide technical assistance" to FirstNet.

47 U.S.C. § 1433. It also is authorized to "take any action necessary to

assist [FirstNet] in effectuating its duties and responsibilities" under

Sections 1421 through 1433 of U.S. Code Title 47. *Id.* Those duties

include, among others, a duty to "ensure . . . improvement of the

. . . network" with policies that "take into account new and evolving

technologies." *Id.* § 1426(c)(4).

To maximize use of the spectrum allotted to FirstNet, Congress authorized FirstNet to leverage "existing" infrastructure, including "commercial" infrastructure, 47 U.S.C. § 1426(c)(3), and to "contract with . . . private companies" in carrying out its duties, *id.* § 1426(b)(4); *see id.* § 1426(c)(1). Exercising these powers, FirstNet conducted a competitive procurement process through which it selected AT&T to build and operate the Public Safety Broadband Network under FirstNet's oversight. *See First Responder Network Authority Nationwide Public Safety Broadband Network Renewal of SP-700 MHz Public Safety Broadband Nationwide License Radio Service*, 38 FCC Rcd 4989, 4995–96 ¶¶ 16–17 (Pub. Safety Bur. 2023) (*Renewal Order*). AT&T is authorized under its contract with FirstNet to use FirstNet's 700 MHz spectrum on a secondary, interruptible basis. *See Order* n.154 (JA687).[1]

When the FCC renewed FirstNet's license in 2023, it recognized that the Public Safety Broadband Network already "serv[ed] over 3.7 million public safety device connections." *Renewal Order*, 38 FCC Rcd at 4994 n.52. FirstNet subsequently reported that it serves "more than

---

[1] "Secondary" operations may not cause interference to "primary" operations and are not protected from interference caused by primary operations. 47 C.F.R. § 90.7.

26,000 public safety agencies and organizations nationwide, with a total of 5 million connections on the network." FirstNet Authority, *Fiscal Year 2023 Annual Report to Congress* 7, *available at* https://perma.cc/HK5Q-LEUN; *see also Order* n.149 (JA686) (citing more recent evidence that FirstNet serves "more than 6 million users").

### C. The 4.9 GHz Band

This case concerns the Commission's ongoing efforts both to support FirstNet in developing a "technological[ly] advance[d]" Public Safety Broadband Network, 47 U.S.C. § 1422(b); *see id.* § 1433, and to leverage FirstNet's capabilities as part of a plan to maximize use of another band of spectrum that supports public safety—the 4.9 GHz band (4940–4990 MHz).

#### 1. Features Of The Band

In 2002, acting on recommendations from public safety groups that sought to improve response capabilities after the failures of 9/11, the FCC allocated the 4.9 GHz band exclusively for public safety use. *See Second Report & Order*, 17 FCC Rcd at 3966–67 ¶ 23. Whereas the 700 MHz band supports a national, interoperable, dedicated network for public safety, the FCC expected the 4.9 GHz band to support the development of "short-range" uses that would "complement" public

safety operations in the 700 MHz band. *Id.* at 3968, 3970 ¶¶ 26, 30. The

4.9 GHz band uses were not anticipated to be interoperable but rather

were intended to support public safety activities that use "emerging

broadband technologies," including "devices such as headsets, portable

computing devices, video cameras, thermal imagers, and 3D locators."

*Id.* at 3967 ¶ 24.

The Commission's approach to regulating the 4.9 GHz band has

evolved over time. For much of the past two decades, however, the

governing regulatory framework has included several distinctive

features.

First, the Commission has restricted eligibility for licenses in the

band to entities that provide public safety services. *See Amendment of

Part 90 of the Commission's Rules*, 38 FCC Rcd 704, 705–06 ¶ 3 & nn.3–

5 (JA387–388) (2023) (*Seventh Report & Order*). When adopting this

restriction in 2003, the Commission anticipated that there would "be

considerable activity in the band, even with a user pool primarily

limited to . . . public safety entities." *The 4.9 GHz Band Transferred

from Federal Government Use*, 18 FCC Rcd 9152, 9160 ¶ 19 (JA60)

(2003) (*Third Report & Order*).

A second distinctive feature is that access to 4.9 GHz spectrum has been "shared amongst eligible licensees." *Order* ¶ 3 (JA665). Unlike commercial licensees in other bands, the public safety entities that use the 4.9 GHz band have no "right to exclusive, or interference free, access to" their licensed spectrum. *Id.* (citing 47 C.F.R. § 90.1209(a)).

Third, shared licenses in the band "often overlap." *Order* ¶ 4 (JA666). In other spectrum bands—as, for instance, where commercial cell phone providers operate—licensees are authorized to operate only on specific frequencies. In the 4.9 GHz band, by contrast, the Commission has authorized licensees to operate certain kinds of equipment "on any channel [of frequencies] over the entire 50 megahertz of the band." *Id.* ¶ 3 (JA665). And whereas in other bands licensees are limited to operating in specially delineated locations or areas, licensees in the 4.9 GHz band have historically been authorized to operate anywhere within "the geographic area encompassing the legal jurisdiction of the licensee." *Id.* (citing 47 C.F.R. § 90.1207(a)).

Finally, the FCC has not historically specified formal coordination requirements in the 4.9 GHz band—despite the overlapping nature of 4.9 GHz licenses. *Order* ¶ 4 (JA666). It has instead relied on informal cooperation among public safety agencies to facilitate spectrum sharing.

*E.g.*, *Third Report & Order*, 18 FCC Rcd at 9164 ¶ 28 (JA64). A "common scenario might involve a statewide license held by the state police, a county-wide license held by the sheriff's department, and fixed-site licenses operating in the same area by various public safety entities." *Order* n.13 (JA666). These entities must informally coordinate interference issues, which include myriad technical matters such as antenna height and polarization, effective radiated power, and emission type. *Cf. Seventh Report & Order* ¶ 34 (JA399) (reflecting the relevance of these considerations for coordination). In contrast, cell phone companies hold exclusive-use licenses in the spectrum bands where they operate, thereby avoiding the coordination problems that have led to underuse in the 4.9 GHz band.

## 2. Underutilization Of The Band

Under this distinctive regulatory framework, utilization of the band has been less robust than the Commission initially anticipated— with fewer than 4,000 licensees at any point since the band was set aside for public safety. *See, e.g., Order* ¶ 5 (JA666) (citing "3,676 licenses currently issued in the band"); *Amendment of Part 90 of the Commission's Rules*, 27 FCC Rcd 6577, 6584 ¶ 17 & n.49 (JA109) (2012) (*Fifth Further Notice*) (citing fewer than 2,442 entities holding licenses

in the band, out of more than 89,000 local governmental jurisdictions eligible). The Commission has worked to address this problem for many years.

In the *Fifth Further Notice,* the Commission recognized the fundamental problem that the 4.9 GHz band's spectrum regime presents. On the one hand, voluntary coordination increases costs, creating inefficiencies that discourage use and innovation; on the other hand, centralized coordination comes at a cost—which also could discourage use and innovation. "Although quantifying the benefits of coordination . . . may be difficult," the Commission explained, "it is important to determine whether adopting a coordination procedure will significantly benefit the public." *Fifth Further Notice* ¶ 20 (JA110). "This is due to the apparent benefits of coordination: (i) reduced risk of interference, which translates into clearer communications, which in turn may mean the difference of life or death in an emergency situation, and (ii) improved spectrum efficiency, which would allow more entities to use the 4.9 GHz band for wireless broadband communications." *Id.*; *see also Amendment of Part 90 of the Commission's Rules*, 33 FCC Rcd 3261, 3264 ¶ 6 (JA180) (2018) (*Sixth Further Notice*).

The question of which coordination costs are efficiently internalized within one (larger) entity—and which costs should be coordinated through voluntary negotiations with other (smaller) firms—is a pivotal question that drives a firm's size and structure. *See* R.H. Coase, *The Nature of the Firm*, 4 Economica 386 (1937) (explaining that, in a free market, entities can decide efficiently which functions to internalize and which to obtain from others through market transactions). This question also drives whether one entity should mandate interference coordination or whether these matters can be negotiated voluntarily by multiple licensees. It is this question that dominated the Commission's regulatory efforts for a decade.

In its efforts to induce growth in the 4.9 GHz band, the Commission has contemplated two broad approaches for reducing the costs and difficulties of coordination: (i) requiring licensees to provide more information about their activities to make voluntary coordination easier and less costly *or* (ii) empowering a third party to resolve interference or coordination issues, eliminating the ad hoc negotiations among licensees.

As to the first approach, the *Fifth Further Notice* contemplated using databases and registration requirements to provide more accurate

information that would facilitate more effective voluntary interference coordination among licensees. *See Fifth Further Notice* ¶¶ 26–28, 30, 34 (JA112–113, 114, 115). The Commission continued to explore the use of databases in subsequent orders, concluding that making information more easily available would reduce the cost and difficulty of coordination decisions. *See Sixth Further Notice* ¶¶ 32, 34 (JA189).

At the same time, the *Fifth Further Notice* also pursued a second approach, "ask[ing] whether [regional planning committees] could manage coordination in each region by submitting regional plans to the Commission rather than having licensees register technical parameters in a database." *Fifth Further Notice* ¶ 40 (JA116). The Commission examined whether these plans should be mandatory as a way of establishing better coordination. *See id.* ¶ 41 (JA117). The *Sixth Further Notice* examined a similar approach, proposing "frequency coordinators," entities that would "coordinate applications in the 4.9 GHz band." *Sixth Further Notice* ¶ 28 (JA187). The Commission sought "comment on the relative costs and benefits of frequency coordination." *Id.*

In later orders, the Commission relied on the second approach of creating an overarching authority to coordinate interference issues. In

2020, the Commission granted statewide incumbent licensees the option to grant spectrum access leases to their spectrum through a single statewide entity designated as the "State Lessor." *Amendment of Part 90 of the Commission's Rules*, 36 FCC Rcd 1958, 1966 ¶ 20 (2020) (*Sixth Report & Order*), *repealed (before taking effect) on reconsideration in Amendment of Part 90 of the Commission's Rules*, 36 FCC Rcd 15032, 15033 ¶ 2 (JA323) (2021) (*Order on Reconsideration*). The Commission reasoned that "[t]his approach" would "ensur[e] that leasing [would] be coordinated by a single state entity . . . able to work with county and local public safety entities, as well as lessees, to avoid harmful interference." *Id.* ¶ 13 (JA327).

In 2023, having reconsidered the "State Lessor" concept in 2021, the Commission determined that a *national* band coordinator would most efficiently manage the 4.9 GHz band. *See Seventh Report & Order* ¶ 1 (JA387). It concluded that a further "centralized coordination strategy will provide better information and certainty about existing users and public safety deployments, which in turn will help leverage new technologies, lower equipment costs, attract new users, facilitate effective frequency coordination and interference protection, and promote interoperability." *Id.* ¶ 17 (JA392); *see also Order* ¶ 19 (JA 675)

(describing "a comprehensive and coordinated nationwide approach to the 4.9 GHz band, centralizing management in a single Band Manager"). In this sense, the *Seventh Report & Order* put in place what later became the foundation of the regulatory framework adopted in the *Order* here.

First, the Commission "adopt[ed] a single, nationwide framework for the 4.9 GHz band, . . . centered around a new Band Manager." *Seventh Report & Order* ¶ 20 (JA393). The Band Manager would be responsible for "frequency coordination" and "incentivizing the use of the latest commercially available technologies, including 5G." *Id.* ¶ 23 (JA395).

Second, to "help the Band Manager perform its duties" and improve utilization of the band, the Commission elected to collect granular data regarding incumbent licensees' existing operations. *Seventh Report & Order* ¶ 33 (JA399). And as part of this effort, the Commission required incumbent licensees and future applicants to obtain site-based, instead of geographic, licenses for base stations. *Id.* ¶ 34 (JA399). The Commission directed the Public Safety and Wireless Bureaus to prepare the FCC's Universal Licensing System and handle

any other necessary logistical steps to support the granular data collection. *Id.*

### D. *Order* On Review

In the *Order* on review, the Commission "bolster[ed]" its initial efforts in the *Seventh Report & Order* "to coordinate operations in the 4.9 GHz band, optimize public safety use, and facilitate the integration of the latest commercially available technologies, including 5G, for the benefit of public safety users." *Order* ¶ 1 (JA664–665). As we describe below, the framework adopted by the Commission, including the Band Manager, allows for something closer to the kind of hierarchical, lower-cost coordination that commercial cell phone companies are able to employ in other bands, and that FirstNet employs in the 700 MHz band. The Commission stated that a primary purpose of the "Band Manager . . . [is] working with public safety licensees to coordinate and rationalize their use of the band." *Order* ¶ 20 (JA675).

#### 1. Authorizing A Nationwide Overlay License And Spectrum Sharing With FirstNet

Building on the Band Manager framework adopted in the *Seventh Report & Order*, the Commission took two new significant steps. First, the *Order* provides that, once a Band Manager is selected, it will be

authorized to apply for "a nationwide overlay license" covering as-of-yet "unassigned spectrum in the band." *Order* ¶ 21 & n.100 (JA675, 678). Second, the *Order* permits the Band Manager to "enter into a spectrum sharing agreement with FirstNet to allow FirstNet to operate in [the] unassigned portions of the band" covered by the overlay license. *Id.* ¶ 21 (JA675).

In adopting this approach, the Commission credited comments that doing so would foster better utilization of the band—which, as of the *Order*'s adoption, still had only 3,676 licensees. *See Order* ¶¶ 5, 22 (JA666, 676). Granting a nationwide overlay license and allowing sharing with FirstNet, the Commission believed, will "lower costs" of deployment in the band and ensure that individual public safety users can access it "without bearing the cost of deployment and operations" individually. *Id.* n.90 (JA676); *see id.* n.149 (JA686). The Commission also agreed with commenters that this new framework will promote "the integration of the latest commercially available technologies" into the band, including by fostering the deployment of advanced "5G" wireless services. *Id.* ¶ 22 & n.90 (JA676). And the Commission cited evidence that granting access to FirstNet will allow "first responders in

emergency situations to access capabilities on the 4.9 GHz and 700 MHz bands on one device." *Id.* n.150 (JA687).

At the same time, the Commission was sensitive to concerns that "a nationwide licensee [could] force incumbents out of the band." *Order* ¶ 22 (JA676). It expressly sought to "preserv[e] . . . incumbent licensee use" of the band, *id.* ¶ 21 (JA675), emphasizing that no part of the *Order* should be understood to undermine existing operations, *e.g.*, *id.* ¶ 35 (JA687).

To the contrary, the Commission concluded that the Band Manager's functions—including certain expanded and clarified responsibilities that the Commission adopted, *see Order* ¶¶ 38–49 (JA689–690)—will help incumbent licensees "optimize and coordinate their spectrum use," *id.* ¶ 41 (JA692). In addition to "performing . . . frequency coordination" for "applicants seeking to license new or modify existing facilities in the band," as required under the *Seventh Report & Order*, *see id.* ¶ 39 (JA690), the Commission made the Band Manager responsible for "frequency coordination and interference protection for incumbent public safety licensees," *id.* ¶ 41 (JA691). Taken together with the Band Manager's obligation to monitor FirstNet's operations for compliance with the Commission's rules, *see*

*id.* ¶ 43 (JA693), the Commission concluded that its new framework will protect incumbents as well as "maximiz[e] the overall use of [the] band," *id.* ¶ 34 (JA686); *see id.* ¶ 35 (JA687).

Importantly, when deciding to grant the Band Manager—and, by extension, FirstNet—access to "unassigned" portions of the 4.9 GHz band, *Order* ¶ 21 (JA675), the Commission did "not otherwise confer authority on the Band Manager or FirstNet to modify or alter the existing license rights of incumbent[]" licensees, *id.* n.100 (JA678). In particular, the Commission "defer[red] any consideration of . . . proposals" to grant access to incumbents' "unused" spectrum—i.e., spectrum that their existing licenses authorize them to access, but that they are not currently using. *Id.* ¶ 59 (JA701); *see also id.* n.94 (JA677) (overlay license "exclu[des] . . . licensed geographic areas and frequencies held by an incumbent licensee").

The Commission accounted for other commenter concerns as well. Some commenters urged the Commission not to "directly assign[]" a license to FirstNet. *Order* ¶ 30 (JA682). Among other things, they argued that the Commission lacks statutory authority to grant FirstNet, and FirstNet lacks authority to hold, a license in the 4.9 GHz band. *See id.* & n.124 (JA682).

In response, the Commission explained that it was "not directly assigning a nationwide license to FirstNet." *Order* ¶ 30 (JA682). And "[u]pon review of FirstNet's analysis of its authorizing statute," the Commission determined that there is no "restriction on FirstNet's authority to operate in bands other than the 700 MHz band." *Id.* ¶ 31 (JA684).

Moreover, the Commission explained, allowing the Band Manager to enter into a sharing agreement with FirstNet "pursuant to section 2.103(b) of the Commission's rules," *Order* n.132 (JA684), *see id.* ¶¶ 36–37 (JA688–689), is consistent with sharing arrangements that the Commission has authorized in related contexts, *id.* ¶ 37 (JA689). The Commission observed, too, that allowing sharing with FirstNet furthers "the Spectrum Act's goal[]" of ensuring that the Public Safety Broadband Network "advances and evolves." *Id.* ¶ 31 (JA684).

The Commission also rejected claims that, under Section 309(j) of the Act, issuing an overlay license to the Band Manager demands the "use of competitive bidding." *Order* ¶ 25 (JA679). Although acknowledging that Section 309(j) "generally requires that the Commission assign initial licenses" by auction, the Commission explained that an "exemption applies to [public safety] radio services."

*Id.* That exemption applies here, the Commission reasoned, because the 4.9 GHz band is "specifically designated . . . for services intended to protect the safety of life, health, or property." *Id.* ¶ 26 (JA679). Even if the "overlay license could be seen as a new service," moreover, the Commission concluded that the exemption for public safety radio services would still apply because the license will "enable FirstNet's public safety operations." *Id.*

### 2. Facilitating The Granular Data Collection

Also building on the *Seventh Report & Order*, the Commission took further steps to facilitate the granular data collection it had previously prescribed.

To start, the Commission directed the Public Safety and Wireless Bureaus to issue a public notice giving "incumbent licensees 6 months to make . . . filings" that would describe their existing applications in the agency's Universal Licensing System. *Order* ¶ 56 (JA699). The Commission also specified the format for submitting the required data. *See id.* ¶ 58 (JA700).

Incumbents' existing licenses were registered in the Universal Licensing System under the service code "PA." *See Order* ¶ 58 (JA700). The Commission required incumbent licensees to apply for new licenses

under one of two new service codes, to cover their existing operations and to provide more granular data about those deployments. *See id.* Incumbents will use the "PB" service code to create new licenses for existing "base/mobile, mobile-only or temporary fixed" operations—operations that are dynamic and allow a licensee to move or relocate some or all components of its radio system. *Id.*[2] To license existing "fixed" operations—static operations in which stationary base stations communicate only with other stationary base stations for point-to-point (or point-to-multipoint) operations—incumbents will use the "PF" service code. *See id.*

Once incumbents "apply for [and receive new licenses] under the newly created radio service codes," their licenses under the PA service code "will be cancelled." *Order* ¶ 58 (JA700). As the Commission explained, however, cancellation is designed "to ensure that [the Universal Licensing System] does not contain duplicative or inaccurate

---

[2] For example, the PB service code might cover a base station on a college campus that exchanges data with mobile patrol units (base/mobile), transmitters on a firefighter's protective gear sending video back to a fire truck (mobile-only), or a network of deployable base stations at a search-and-rescue scene that transmits data between the stations to help first responders communicate (temporary fixed).

licenses once the incumbents have received their new radio service codes." *Id.* (JA701). Cancellation "does not modify or alter incumbents' rights to operate their existing networks." *Id.* (JA700).

To be sure, if an incumbent's old license covers a geographic area that extends beyond the footprint of the incumbent's existing operations, the geographic area covered under its new PB license will be smaller (mapping onto the area in which the incumbent licensee currently operates). The same goes for the licensed frequency range. If an incumbent has not actually used the full range of frequencies authorized under its old PA license, the new PB license will reflect the scope of actual use (authorizing a narrower frequency range than the PA license covered). In this way, the new service codes will marry the licenses of incumbents to the spectrum they are actually using.

But notably, the Commission did not require incumbent licensees to "surrender to the Band Manager or share with FirstNet any unused spectrum" not encompassed within their new PB/PF licenses. *Order* ¶ 59 (JA701). Instead—as we have explained, *see supra* p. 27—the Commission "defer[red]" consideration of what to do with unused spectrum "until after" the granular data collection. *Order* ¶ 59 (JA701).

In anticipation of the data collection and ongoing regulatory reforms, the Commission considered whether to lift the freeze (in effect since 2020, and modified in 2021) on applications for new licenses in the 4.9 GHz band. *Order* ¶ 53 (JA698). It declined to do so. *See id.* Rather, it concluded that "issuing licenses to new entrants before the Commission has collected granular data from incumbent licensees would further complicate the spectrum environment." *Id.*

The Commission reached the same conclusion—based on the same spectrum-stability concerns—for incumbent licensees. *Order* ¶ 54 (JA699). After the 2021 *Order on Reconsideration*, incumbent licensees had been allowed to add new fixed base stations to their networks (or move existing ones) without needing the Commission's approval first.[3] But the Commission determined in the *Order* that allowing incumbent licensees to expand and modify their existing networks, unilaterally, during the granular data collection would compromise the "stable spectrum landscape" needed to obtain accurate data. *Order* ¶ 54 (JA 699). The agency therefore re-imposed the original freeze parameters

---

[3] As we have noted, however, they were required to obtain site-based licenses for such base stations. *See supra* p. 23 (citing *Seventh Report & Order* ¶ 34 (JA399)).

from 2020, extending the freeze (as before) to incumbent licensees. *See id.* ¶ 55 (JA699). As a result—"until further notice" from the Public Safety and Wireless Telecommunications Bureaus (to which the Commission delegated authority to "manage and implement the freeze in the future")—incumbent licensees may no longer, after the data collection deadline, unilaterally expand or modify the spectral or geographic footprint of their networks by deploying new (or repositioned) fixed base stations, increasing the operating power of their facilities, or expanding the reach of their mobile or temporary fixed units. *Id.*

In taking this approach, the Commission acknowledged "that some incumbent licensees, in reliance on the existing state of the freeze prior to [the *Order*], may have invested in systems that they hoped to use to modify or expand current operations." *Order* ¶ 54 (JA699). In recognition of this possibility, the Commission emphasized that, should the modified freeze present special hardships for certain licensees, those licensees may seek a waiver. *Id.*

The Commission thus recognized that the *Order*—while preserving the full scope of incumbent licensees' existing operations—may nonetheless affect incumbent licensees in some ways. Through the

expanded freeze, the *Order* imposes new procedural requirements that incumbents must satisfy before adding new fixed base stations to their networks (or moving existing fixed base stations). And some incumbent licensees may not, under their new PB licenses, retain the same authority to access the identical spectrum (in terms of geographic area and frequency range) that their PA licenses formerly covered. But the Commission considered the benefits of the *Order*'s approach to outweigh these possible effects on incumbent licensees—particularly when the waiver process allows an avenue for incumbent licensees to modify or expand their existing operations going forward, *see Order* ¶ 54 (JA699), and when the *Order* defers consideration of proposals to grant the Band Manager and FirstNet access to incumbent licensees' as-of-yet "unused" spectrum, *see id.* ¶ 59 (JA701).

## E.    Subsequent Developments

On December 9, 2024, the Commission's Public Safety and Wireless Bureaus released a public notice setting June 9, 2025, as the deadline for incumbent licensees to submit the granular data required under the *Seventh Report & Order*. *Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Establish Deadline for 4.9 GHz Public Safety Licensees to Provide Granular*

*Licensing Data*, DA 24-1137, 2024 WL 5052941, at *1 (Pub. Safety and Wireless Burs. 2024) (*2024 Public Notice*). Two sets of petitioners here—BART and the Sheriffs' Associations—sought a stay of the *Order* pending judicial review. This Court denied the requested stay.

The Commission subsequently extended the deadline for the granular data collection through July 9, 2025. *Deadline for 4.9 GHz Public Safety Licensees to Provide Granular Licensing Data Extended by 30 Days*, DA 25-463 (Pub. Safety and Wireless Burs. June 2, 2025), *available at* https://docs.fcc.gov/public/attachments/DA-25-463A1.pdf. The Commission is now reviewing and analyzing the data collected.

## STANDARD OF REVIEW

"[C]ourts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). "In a case involving an agency, of course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* "When the best reading of a statute is that it delegates discretionary authority to an agency"—as, for example, by using "a term or phrase that 'leaves [the agency] with flexibility'"—a "court fulfills [its] role by recognizing constitutional delegations" and ensuring that the agency has acted reasonably "within [the]

boundaries" of its delegated authority. *Id.* at 395; *see, e.g.*, *Zimmer Radio of Mid-Mo., Inc. v. FCC*, 145 F.4th 828, 844 (8th Cir. 2025) (recognizing that the "public interest" standard "provides significant discretion to the Commission," such that "the Commission may 'implement its view of the . . . standard . . . so long as that view is based on consideration of permissible factors and is otherwise reasonable'" (quoting *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 593 (1981) (internal quotation marks omitted))).

Under the Administrative Procedure Act, a court may not overturn agency action unless the challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Applying "this 'highly deferential' standard of review, [a] court presumes the validity of agency action . . . and must affirm unless the [agency] failed to consider relevant factors or made a clear error in judgment." *Cellco P'ship v. FCC*, 357 F.3d 88, 93–94 (D.C. Cir. 2004).

"[W]hen the [FCC] acts to foster 'innovative methods of exploiting the spectrum,' it 'functions as a policymaker' to which [this Court will] afford 'the greatest deference.'" *NTCH, Inc. v. FCC*, 950 F.3d 871, 879–80 (D.C. Cir. 2020) (quoting *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 8

(D.C. Cir. 2006)). The Court "will accept the Commission's 'technical judgment[s]' when supported 'with even a modicum of reasoned analysis, absent highly persuasive evidence to the contrary.'" *Id.* at 880 (alteration in original); *see also Zimmer*, 145 F.4th at 853 (a "'question [that] involves both technical understanding and policy judgment' . . . [is] better left to the FCC" (quoting *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 295 (2016))). "And the Commission's predictive judgments within its field of discretion and expertise are entitled to particularly deferential review, as long as they are reasonable." *NTCH*, 950 F.3d at 880 (alteration and internal quotation marks omitted).

## SUMMARY OF THE ARGUMENT

The FCC has broad authority to oversee wire and radio communications in the United States. This includes the power to manage non-federal spectrum in the public interest. The agency relied on this sweeping authority—and its extensive technical expertise—to address a decades-long problem: the underutilization of the 4.9 GHz band. In doing so, it relied on two familiar devices—a license (to the Band Manager) and a sharing agreement with a third party (FirstNet) that is not licensed in the 4.9 GHz band but has extensive experience in public safety operations. A critical piece of this solution is the Band

Manager's centralized role in coordinating interference issues among the various licensees, as well as with FirstNet.

**Petitioners' Failure To Establish Standing.** The CERCI Petitioners' primary claim (at 24) is that—by allowing the Band Manager to apply for an overlay license and negotiate a spectrum sharing agreement with FirstNet—the Commission has "achieve[d]" a "practical result" that the Communications Act forbids: authorizing a federal entity to use spectrum that the FCC manages, even though the FCC does not typically license federal entities. They lack standing to bring this claim. The overlay license and sharing agreement will cover only spectrum that was "unassigned" when the Commission adopted the *Order*. By definition, this unassigned spectrum is not licensed to BART or to any of CERCI's members. Nor has the Commission "effectively created" new unassigned spectrum for the overlay license authorized in the *Order*. *Contra* CERCI Br. 2. Accordingly, neither BART nor any of CERCI's members are injured by the overlay license and sharing agreement. (This claim also fails on the merits, as we explain below; the Commission has long allowed federal entities to use Commission-

managed spectrum, and FirstNet is not frozen in a different spectrum band.)

The same goes for the PSSA Petitioners. Their claimed interest in supporting public safety technology does not amount to an Article III injury. Nor have they asserted an Article III injury by claiming that the Commission's actions will unnecessarily delay the provision of 4.9 GHz services; they have not claimed to either provide or receive such services.

**Commission's Authority To Adopt The Overlay License And Sharing Agreement.** The Commission was free to invite the Band Manager to apply for the overlay license without conducting competitive bidding. The Commission's duty to conduct spectrum auctions is never absolute, and the 4.9 GHz band is subject to an exemption for "public safety radio services." 47 U.S.C. § 309(j)(2)(A).

There is no textual support for the CERCI Petitioners' central objection (at 24) to the sharing agreement: that in allowing a federal entity to use Commission-managed spectrum, the Commission is doing indirectly what it lacks authority to do directly. The Communications Act nowhere prevents the Commission from allowing its licensees to share spectrum, and the Commission has long allowed federal entities

(which the FCC does not license) to access the 4.9 GHz band through sharing agreements. Doing so would not, as the CERCI Petitioners argue, allow foreign governments to access the band. FirstNet is allowed to use spectrum in the United States. Foreign governments generally are not. That difference means that FirstNet may share spectrum, while foreign governments may not.

The CERCI Petitioners' attempt to freeze FirstNet in the 700 MHz spectrum initially designated for the Public Safety Broadband Network fares no better. This argument does at least purport to be based on statutory text (the Spectrum Act), but it relies heavily on a canon of construction (*expressio unius est exclusio alterius*) that does not apply when a statute is clear. And here, the statute makes clear that the Public Safety Broadband Network was meant to evolve with technological advancements. The spectrum that Congress initially earmarked for FirstNet in the 700 MHz band was intended to jumpstart the Public Safety Broadband Network—not handcuff FirstNet.

### Reasonableness Of The FCC's Technical Policy Decisions.

**1.** The CERCI Petitioners' arguments that the *Order* is arbitrary and capricious are unavailing. The Commission reasonably concluded that incumbent licensees should not modify or expand their existing

operations in the 4.9 GHz band while the agency collects granular data about spectrum use. After all, undertaking a spectrum inventory would be meaningless if operations in the band were a moving target. This need—paired with the incumbents' ability to ask the Commission for a waiver—properly accounts for any reliance interests.

Canceling the incumbents' old licenses after they are issued new ones also makes good sense. Doing so avoids having duplicative or obsolete license codes in the agency's records. At the same time, the incumbents will still be able to operate their existing networks.

**2.** The PSSA Petitioners' arguments are likewise unavailing. The Commission's decision not to convert all incumbent geographic licenses into site-based ones was a reasonable measure to avoid interfering with incumbents' ability to operate their existing networks. And agencies may adopt regulatory reforms incrementally. Here, the Commission reasonably deferred a decision on whether to reassign incumbent licensees' unused spectrum until after the agency collects granular data, which will allow it to make an informed decision based on spectrum usage.

## STANDING

Those seeking direct review of agency action in this Court "bear[] the burden" of establishing their standing. *Entergy Ark. LLC v. FERC*, 134 F.4th 576, 580 (D.C. Cir. 2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 431–32 (2021); D.C. Cir. R. 28(a)(7). And "'barebones' statements do not suffice." *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) (quoting *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613–14 (D.C. Cir. 2019)). Rather, unless standing is clear from the administrative record, the party must submit evidence to prove it. *Id.* (citing D.C. Cir. R. 28(a)(7) and *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002)).

Standing also "is not dispensed in gross"; instead, petitioners "must demonstrate standing for each claim that they press." *TransUnion*, 594 U.S. at 431; *Animal Legal Def. Fund v. Vilsack*, 111 F.4th 1219, 1225 (D.C. Cir. 2024); *see Tri-Cnty. Tel. Ass'n v. FCC*, 999 F.3d 714, 719 (D.C. Cir. 2021) (petitioner with standing to challenge one aspect of FCC order did not have standing to challenge another aspect that caused it no injury). Thus, for each claim, petitioners "must show that they possess a personal stake in the dispute and are not

bystanders." *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2133 (2025) (cleaned up).

Finally, with respect to agency proceedings, participation in the proceeding is not "sufficient by itself to sustain Article III standing." *New World Radio, Inc. v. FCC*, 294 F.3d 164, 170 n.5 (D.C. Cir. 2002); *accord Inner City Press v. Bd. of Govs. of Fed. Reserve Sys.*, 130 F.3d 1088, 1089 (D.C. Cir. 1997). For a party to be "aggrieved," it still must "satisf[y] both the constitutional and prudential requirements for standing." *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 380 (D.C. Cir. 2020) (quoting *New World Radio*, 294 F.3d at 169); *see Reytblatt v. NRC*, 105 F.3d 715, 720 (D.C. Cir. 1997) (explaining that "the Hobbs Act requires (1) 'party' status (i.e., that petitioners participated in the proceeding before the agency), and (2) aggrievement (i.e., that they meet the requirements of constitutional and prudential standing)" (citation omitted)).

## A. The CERCI Petitioners Have Not Established Standing To Challenge The Overlay License And The Sharing Agreement

Because the CERCI Petitioners (including BART as well as various members of CERCI) hold 4.9 GHz licenses, CERCI Br. 22, they have standing to challenge those aspects of the *Order* that affect those

licenses. Specifically, we agree that they may challenge the Commission's decisions to freeze incumbent license applications and to change license codes—actions that they contend "risk" creating new spectrum that "will be deemed 'unassigned'" at a future time, "unless" the Commission determines that the spectrum is "able to be re-licensed." *Id.* at 41; *see id.* at 38–49.

The CERCI Petitioners have not, however, shown an injury from any other part of the *Order. See Tri-Cnty. Tel. Ass'n*, 999 F.3d at 719 (concluding that a party with standing to challenge one part of an FCC order nonetheless "lack[ed] standing to challenge [a different part of the order that] had no effect on [the party] and thus caused it no injury"). That failure cannot be cured on reply. *See Entergy Ark.*, 134 F.4th at 581.

The CERCI Petitioners have not shown standing to challenge the Commission's decision to grant an overlay license to the Band Manager. As the *Order* makes clear, that license covers only spectrum that was "unassigned" when the *Order* was adopted, to which the CERCI Petitioners have no rights. *See infra* p. 51 (citing *Order* n.18, ¶ 23 & n.94 (JA666, 677)). To be sure, the Court may consider the CERCI Petitioners' claim that canceling incumbent licensees' PA licenses

"risk[s]," CERCI Br. 41, "effectively creat[ing]," *id.* at 2, *new* unassigned spectrum, and that the Commission did not reasonably consider incumbent licensees' reliance interests. *See infra* pp. 83–86 (explaining why that claim is unpersuasive). But that theory does not establish that the overlay license—which would not, without further Commission action, include any newly "unassigned" spectrum—injures any incumbent licensee.

The CERCI Petitioners likewise have not demonstrated standing to challenge the Commission's decision to authorize the Band Manager to enter into a sharing agreement with FirstNet. That agreement would encompass only the same unassigned spectrum included in the overlay license. And, again, that spectrum was never licensed to any of the CERCI Petitioners.[4]

---

[4] The CERCI Petitioners do not argue that they have competitive standing. Instead, they assert (at 48) that the *Order* will "substantially harm and distort competition in the commercial wireless marketplace." But when asserting that an agency action results in a "skewed playing field among competitors," a "party seeking to establish standing on that basis must demonstrate that it is a direct and current competitor whose bottom line may be adversely affected by the challenged government action." *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 13 (D.C. Cir. 2006) (internal quotation marks and emphasis omitted). The CERCI Petitioners have not attempted to make such a showing for the overlay license or the sharing agreement.

The CERCI Petitioners argue that they all "participated actively in the underlying proceeding and are parties aggrieved within the meaning of 28 U.S.C. § 2344." CERCI Br. 22. Mere participation in the proceeding, however, is insufficient to establish standing. *Competitive Enter. Inst.*, 970 F.3d at 380. To have standing, a party must suffer a cognizable injury, which the CERCI Petitioners have not established for either the overlay license or the sharing agreement.

## B. The PSSA Petitioners Have Not Established Standing To Assert Either Of Their Claims

The PSSA Petitioners base their claim on associational standing, but they do not assert that their members hold any 4.9 GHz licenses. *Cf*. PSSA Br. 27–28. Instead, PSSA is an "initiative" of the Public Safety Broadband Technology Association that aims to support technology for public safety officials and first responders. *Id*. at iv. But "'[a] mere interest in a problem,' no matter how longstanding the interest and . . . how qualified the organization is in evaluating the problem, is not sufficient by itself" to demonstrate injury for purposes of Article III standing. *Gettman v. DEA*, 290 F.3d 430, 434 (D.C. Cir. 2002) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).

The PSSA Petitioners contend that the Commission's actions will inject unnecessary delay into the provision of 4.9 GHz services, PSSA Br. 28, but they nowhere claim to provide or receive such services. They contend only that the Commission's actions will deprive PSSA members of "certainty to plan for the availability of such services." *Id.* Such vague and conclusory allegations are wholly insufficient to demonstrate that the PSSA Petitioners or their members will suffer injury from the *Order*. *See Viasat*, 47 F.4th at 781. And "[w]hen a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured." *Chamber of Com. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011). Rather, the petitioner must specifically "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

## ARGUMENT

## I.    THE COMMISSION IS AUTHORIZED TO ISSUE A LICENSE TO THE BAND MANAGER, AND FIRSTNET MAY USE 4.9 GHZ SPECTRUM UNDER A SHARING AGREEMENT

The FCC has "broad authority to oversee wire and radio communication in the United States," and a duty to promote "effective use of radio in the public interest." *Intelligent Transp. Soc'y*, 45 F.4th at

411–12 (quoting *Cellco P'ship v. FCC*, 700 F.3d 534, 542 (D.C. Cir. 2012)).

One of the Commission's central mandates is to license the use of spectrum. *See* 47 U.S.C. § 301 (directing the Commission to "maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels . . . under licenses"); *see also Northstar Wireless, LLC v. FCC*, 38 F.4th 190, 197 (D.C. Cir. 2022) (equating "channels of radio transmission" with "electromagnetic spectrum"). The Commission awards licenses when it determines that doing so would serve the "public interest, convenience, and necessity." 47 U.S.C. § 309(a); *see id.* § 303(l). It is not constrained to use a system of competitive bidding to do so, *see NTCH*, 950 F.3d at 879—particularly not spectrum in bands "specifically designated . . . for services intended to protect the safety of life, health, or property," *Order* ¶ 26 (JA679).

The Act enumerates a wide range of other spectrum-management powers that the Commission may exercise in the public interest as well. *See* 47 U.S.C. § 303. Among other things, the Commission may "[a]ssign bands of frequencies to the various classes of [licensed] stations," *id.* § 303(c), "assign frequencies for each individual station," *id.*,

"[d]etermine the location of . . . stations," *id.* § 303(d), and "[m]ake such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of [the Act]," *id.* § 303(f); *see id.* § 303(r).

The Commission is not ordinarily empowered to license federal entities, *see* 47 U.S.C. § 305(a), although Congress directed the FCC to license spectrum in the 700 MHz band to FirstNet, *see supra* p. 13. Nonetheless—as the FCC and NTIA have long agreed—federal entities may enter into sharing agreements with Commission licensees to share non-federal spectrum. *See infra* pp. 61–62, 67–68. The Commission's rules expressly allow for such sharing in the 4.9 GHz band. 47 C.F.R. § 2.103(b). And the CERCI Petitioners notably do not challenge the FCC's authority, as a general matter, to allow it. *See* CERCI Br. 36–37.

Under the Spectrum Act, the Commission is empowered to "take any action necessary to assist [FirstNet] in effectuating its duties and responsibilities." 47 U.S.C. § 1433. That includes supporting FirstNet's mandate to maintain a Public Safety Broadband Network that "evolves with technological advancements," *id.* § 1422(b), by ensuring that the Public Safety Broadband Network incorporates the latest technology to support public safety.

Every aspect of the *Order* as to which the CERCI Petitioners raise statutory challenges was in fact well within the Commission's authority. In particular, there is no merit to the claim that the CERCI Petitioners frame as "central" to this case: that by "channeling FirstNet's access [to the 4.9 GHz band] through a pass-through Band Manager and a spectrum sharing arrangement," the Commission improperly sought to "[d]o [i]ndirectly" something it "[l]acks [a]uthority to [d]o [d]irectly." CERCI Br. 24.

As we explain below in Part A, especially given that the 4.9 GHz band is designated for public safety, and FirstNet is statutorily required to perform a public safety function, the Commission was not required to conduct a spectrum auction before allowing the Band Manager to apply for an overlay license. *Contra* CERCI Br. 32–35. In Part B, we explain why allowing the Band Manager to negotiate a sharing agreement with FirstNet was consistent not only with the governing spectrum sharing rule, 47 C.F.R. § 2.103(b), but also with the Commission's statutory authority under both the Communications Act and the Spectrum Act. *Contra* CERCI Br. 24–28, 35–37. In doing so, we explain that FirstNet is not, as the CERCI Petitioners claim, limited to the 700 MHz band. Rather, the Spectrum Act's text shows that the Public Safety

Broadband Network is meant to evolve with technology, and that the 700 MHz band is FirstNet's starting point for establishing the evolving network.

### A. Allowing The Band Manager To Apply For An Overlay License Is Consistent With The Communications Act

**1.** In allowing the 4.9 GHz Band Manager to apply for an "overlay license," *see Order* ¶¶ 19–26 (JA675–680), the Commission acted well within its broad authority to manage the band in the public interest, *see id.* n.102 (JA678). The license for which the Band Manager is eligible will include all spectrum in the band that was "unassigned" as of the time of the *Order*—that is, the band's "white spaces," excluding any "licensed geographic areas [or] frequencies held by . . . incumbent licensee[s]." *Order* ¶ 23 & n.94 (JA677). Once licensed in the band, the Band Manager will be eligible "to enter into a sharing agreement enabling FirstNet to operate where white spaces exist." *Id.* ¶ 23 (JA677); *see also id.* n.18 (JA666) (identifying the states and territories with unassigned spectrum that the overlay license will cover).

Adopting this "licensing structure," *Order* ¶ 23 (JA677), was well within the Commission's public interest authority. Under the *Order*, the Band Manager will have responsibility both for frequency coordination

and for protecting incumbent operations from interference. *See id.*
¶¶ 23–24, 39–41 (JA677–678, 690–692). By virtue of the overlay license,
the same entity will now also be responsible for ensuring that FirstNet's
operation in the band complies with the Commission's rules. *See* 47
C.F.R. §§ 2.103(b); 90.1207(h); *Order* ¶ 43 (JA693). Consolidating those
responsibilities in a single entity—which the Commission will regulate
and oversee, *see id.* n.102 (JA678)—is reasonably understood to "serve
the public interest, convenience, and necessity." *Id.* (quoting 47 U.S.C.
§ 309(a)); *see also Zimmer*, 145 F.4th at 844 ("[T]he public-interest
standard is 'a supple instrument for the exercise of discretion by the
expert body which Congress has charged to carry out its legislative
policy.'" (quoting *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 593
(1981))).

The Commission acknowledged that it generally must award new
licenses through a system of "competitive bidding"—i.e., by auction.
*Order* ¶ 25 (JA679) (citing 47 U.S.C. § 309(j)). But it correctly
determined that there was no need to conduct an auction before
awarding the overlay license at issue here.

As a threshold matter, the Commission recognized that its
obligation to conduct competitive bidding is never absolute. *See Order*

n.107 (JA679) (citing *Implementation of Sections 309(j) and 337 of the Communications Act of 1934 As Amended*, 15 FCC Rcd 22709, 22713–14 ¶ 11 (2000) (*309(j) Implementation Order*)).[5] The Commission's overarching mandate is always to "encourage the larger and more effective use of radio in the public interest," 47 U.S.C. § 303(g), and nothing in Section 309(j) "diminish[es] [that] authority," *id.* § 309(j)(6)(C). Rather, as this Court has observed, the "duty to auction off licenses only kicks in once [the Commission] receives 'mutually exclusive applications'"; the statute "preserves the Commission's discretion to 'avoid mutual exclusivity in . . .licensing proceedings'— thus averting the need to [conduct an] auction." *NTCH*, 950 F.3d at 879; *accord 309(j) Implementation Order*, 15 FCC Rcd at 22713–14 ¶¶ 10–11.

Here, the Commission explained why selecting a Band Manager through the process set forth in the *Order* and *Seventh Report & Order* is the best way to ensure "that the entity that applies for the [overlay] license is the most qualified." *Order* n.107 (JA679). In particular, by

---

[5] In fact, the Commission did not have authority to award licenses by auction when it adopted the *Order* because the authority largely expired on March 9, 2023, *see* 47 U.S.C. § 309(j)(11), and was only recently restored, *see* One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72, § 40002 (2025).

allowing the Wireless and Public Safety Bureaus to "establish the procedures by which [the Band Manager] selection [process] will" proceed—including by "identifying [suitable] representatives to sit on the selection committee" and establishing appropriate "selection criteria," *id.* ¶ 52 (JA698)—the Commission put itself in a position to identify a qualified applicant for the overlay license "more efficient[ly]" than would have been possible using competitive bidding. *Id.* n.107 (JA679).

As a further basis for foregoing competitive bidding, the Commission invoked an exemption from its auction authority for "public safety radio services." *Order* ¶ 25 (JA679). Section 309(j) provides that the FCC's "competitive bidding authority . . . shall not apply to licenses . . . issued . . . for public safety radio services." 47 U.S.C. § 309(j)(2)(A). And the FCC has long and consistently understood this exemption to apply "to radio services, rather than specific users." *Order* ¶ 25 (JA679); *see 309(j) Implementation Order*, 15 FCC Rcd at 22741, 22744 ¶¶ 66, 73. In other words, "where the majority of users licensed in an existing service and within a given frequency band are qualified to obtain auction-exempt spectrum, future licensing for that service in

[the] band will be exempt from auction unless the spectrum is being used for new services." *Order* ¶ 25 (JA679).

The public safety "exemption applies to the 4.9 GHz band" because the band is "specifically designated . . . for services intended to protect the safety of life, health, or property." *Order* ¶ 26 (JA679). All of the over 3,000 users currently licensed in the band "operat[e] in support of public safety." *Id.* n.108 (JA679–680); *see id.* ¶ 5 (JA666). Thus, regardless of whether the Band Manager (or FirstNet) would qualify to obtain auction-exempt spectrum on its own account, or in a different band, competitive bidding is not required for the overlay license because "a majority of users licensed in the [4.9 GHz] band" do qualify for the exemption, and "the primary use of the band . . . will not change by assigning an overlay license to the Band Manager and authorizing it to enter into a sharing agreement with FirstNet." *Id.* ¶ 26 (JA679–680).

**2.** The CERCI Petitioners concede the general principle that the Commission may "assess[] auction-exempt status based on current use." CERCI Br. 34 (emphasis removed). But they contend that the Commission should not have applied that approach here because AT&T's contract with FirstNet will allow it "to use unassigned portions of the band on a secondary, interruptible basis for AT&T's commercial

subscribers." *Id.* "At minimum," they argue, the Commission could not "rely on [the public interest exemption] without explaining how FirstNet's and AT&T's use will not become *the* dominant use of the 4.9 GHz band." *Id.* at 34–35.

There are several problems with that argument. For one, it does not really concern the Band Manager's overlay license. The Band Manager, after all, has not yet been selected, and no license has been granted. And the *Order* makes clear, in any event, that "the . . . Band Manager will be prohibited from using the overlay license to provide its own services." *Order* ¶ 23 (JA677). So awarding an overlay license to the Band Manager, in and of itself, cannot change the public safety nature of the band.

The CERCI Petitioners' argument is really an objection to the prospect of the Band Manager's sharing agreement with FirstNet. *See* CERCI Br. at 33 (arguing that "the Commission must rely on FirstNet's use of the band to qualify for the [auction] exemption"). Their logic seemingly is that FirstNet will obtain access to a majority of the band, will not use this spectrum (or much of it) to support public safety operations, and will allow AT&T to use excess spectrum for its commercial operations—which then (although "secondary" to and

"interruptible" by public safety operations) will become the dominant use of the band.

These concerns lack evidentiary support in the record and do not undermine the Commission's contrary, common-sense conclusion. For one, by the terms of the *Order*, the overlay license includes only "unassigned" spectrum, *see supra* p. 25, which encompasses only two U.S. territories and portions of four states, *see Order* n.18 (JA666). The Commission expressly deferred consideration of what will happen to spectrum that was assigned to incumbent licensees at the time of the *Order* but that the granular data collection may reveal is not currently in use. *See id.* ¶ 59 (JA701). So the *Order* is not reasonably construed as having given FirstNet (or by extension AT&T) access to a majority of the band.

Even assuming that FirstNet would allow AT&T secondary, interruptible access to the overlay license spectrum for commercial use, as the CERCI Petitioners contend (at 34), that would not change the public safety nature of the band. As the Commission recognized, there is no reason to doubt that FirstNet will put the 4.9 GHz band to use for its public safety operations. *See Order* ¶ 26 (JA680). After all, FirstNet already operates a successful public safety network, *see supra* pp. 14–

15, and it told the Commission that it "is in a position to leverage the 4.9 GHz band for the benefit of public safety." 4/8/2024 FirstNet Ex Parte Letter at 1 (JA574) (cited at *Order* n.112 (JA680)).

In these circumstances, the Commission reasonably concluded that the public safety exemption applies. That is so even supposing that the "overlay license could be seen as a new service" in the 4.9 GHz band. *Order* ¶ 26 (JA680). Any "new" service would itself "meet the requirements" of the public safety exemption codified in "section 309(j)(2)(A) of the Act." *Id.*

The CERCI Petitioners object that "the Commission cannot here rely on the certainty of FirstNet's public-safety use when elsewhere it claims" that determinations concerning FirstNet are "premature." CERCI Br. 35 (quoting *Order* ¶ 37 (JA689)). To be sure, the Commission did not claim to know every detail of FirstNet's not-yet-executed sharing agreement with the not-yet-selected Band Manager. *See Order* ¶ 37 (JA689). But that does not undermine the Commission's reasonable conclusion that a federal-government entity created to operate a public safety network—one on which tens of thousands of public-safety subscribers already rely, *see supra* pp. 14–15—will continue to serve a public safety function in the 4.9 GHz band.

**3.** The CERCI Petitioners raise a similarly unpersuasive claim that FirstNet "does not qualify for the statutory exemption" for public safety entities because it "is not a State, local or nonprofit public-safety entity." CERCI Br. 35. But the "public safety radio services" referenced in Section 309(j)(2)(A) are not limited to those provided by "State and local governments and non-government entities." 47 U.S.C. § 309(j)(2)(A). Rather, the statute defines public safety radio services as "*including* [certain] private internal radio services used by State and local governments and non-government entities and *including* emergency road services provided by not-for-profit organizations." *Id.* (emphasis added).

"It is hornbook law that the use of the word 'including' indicates that the specified list . . . that follows is illustrative, not exclusive." *Am. Hosp. Ass'n v. Azar*, 938 F.3d 528, 534 (D.C. Cir. 2020) (alteration in original) (quoting *P.R. Mar. Shipping Auth. v. ICC*, 645 F.2d 1102, 112 n.26 (D.C. Cir. 1981)); *see also Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008) ("[T]he word 'includes' is usually a term of enlargement and not of limitation.").

Notably, too, the Commission has long understood that the exemption is "broader than the definition of 'public safety services'" in

Section 337(f)(1) of the Act. *309(j) Implementation Order*, 15 FCC Rcd at 22742–43 ¶ 69 (citing H.R. Rep. No. 105-217, at 572 (1997) (Conf. Rep.)). The definition in Section 337(f)(1)—which was adopted at the same time as the auction exemption in Section 309(j)(2)(A)—limits the term "public safety services" to those "provided . . . by State or local government entities" or "by nongovernmental organizations." 47 U.S.C. § 337(f)(1)(B). But in adopting those two definitions, Congress expressly recognized that the auction exemption for public safety services "is much broader than the explicit definition" of the same term in "new section 337(f)(1)." H.R. Rep. No. 105-217, at 572. *Contra* CERCI Br. 33. This interpretation of the auction exemption at the time of enactment further supports the Commission's view that FirstNet qualifies as a "public safety service" within the meaning of the auction exemption. *Order* ¶ 26 (JA679–680).

### B. The Commission Lawfully Authorized The Band Manager To Pursue A Sharing Agreement With FirstNet

In addition to determining that allowing the Band Manager to apply for an overlay license would serve the public interest, the Commission recognized that there will be "multiple public interest benefits" to allowing FirstNet to pursue access to the 4.9 GHz band

through a sharing agreement with the Band Manager. *Order* ¶ 34
(JA686); *see id.* ¶¶ 34–37 (JA685–689). In particular, the Commission
concluded that allowing the Band Manager to share unassigned
spectrum with FirstNet "is the best way to preserve the public safety
nature of the 4.9 GHz band, promote robust deployment in the band in
the near term, and facilitate the development and deployment of new
technologies and services for the public safety community." *Order* ¶ 27
(JA680).

The Commission has recognized for decades that its broad
authority to manage spectrum encompasses allowing licensees to lease,
divide, or otherwise share spectrum with third parties that do not
themselves hold licenses. *See Partitioning, Disaggregation, & Leasing of
Spectrum*, 37 FCC Rcd 8825, 8827 ¶ 6 (2022). And although the
Commission does not license federal entities (because NTIA assigns
their spectrum), the Commission has allowed its licensees to share
spectrum with federal entities. *See* 47 C.F.R. § 2.103; *Development of
Operational, Technical and Spectrum Requirements for Meeting
Federal, State and Local Public Safety Agency Communication
Requirements Through the Year 2010*, 14 FCC Rcd 152, 186 ¶ 68 (1998)
("Although we conclude herein that Federal entities are ineligible for

Commission licensing in the 700 MHz band, they are eligible to receive authorization to use this spectrum in accordance with the requirements set forth in Section 2.103 of our rules for Government use of non-Government spectrum.").

Indeed, the Commission's rules expressly allow "[f]ederal stations" to use the 4.9 GHz band when "the Commission finds such use necessary," and where specified conditions are met. 47 C.F.R. § 2.103(b). To paraphrase the governing rule, sharing 4.9 GHz spectrum with federal stations is allowed when the "non-Federal (State/local government) licensee[] or applicant[]" agrees to the sharing arrangement, federal operation complies with rules governing the band, and the arrangement promotes "interoperability." *Id.*

The Commission explained in the *Order* that it "anticipate[s] that section 2.103(b) would enable" the Band Manager to agree to share the 4.9 GHz spectrum covered by its overlay license with FirstNet. *Order* ¶ 37 (JA689). The agency was careful, however, not to prejudge whether whatever actual agreement the Band Manager may negotiate with FirstNet is "[c]onsistent with . . . section 2.103(b)" or a related rule, Section 90.1207(h), that the Commission adopted as part of the *Order*. 47 C.F.R. § 90.1207(h); *see Order* ¶¶ 37, 43 (JA689, 693). Thus, the

*Order* serves to put in place a regulatory framework under which FirstNet may negotiate a sharing agreement with the Band Manager; the *Order* does not in fact authorize any specific sharing arrangement. Recognizing that FirstNet is eligible—assuming it later satisfies the conditions set forth in the Commission's rules—to share non-federal spectrum in the 4.9 GHz band was a routine use of the agency's well-established authority to promote effective use of the spectrum it regulates.

The CERCI Petitioners challenge the Commission's decision to (provisionally) authorize spectrum sharing with FirstNet on a variety of grounds—all unpersuasive.

### 1. Sharing "Overlay" Spectrum With FirstNet Does Not Require The Consent Of Incumbent Licensees

Challenging the support for spectrum sharing with FirstNet under the Commission's rules, the CERCI Petitioners contend that "Section 2.103(b) envisions genuine sharing between federal and non-federal entities," and that offering FirstNet access to the 4.9 GHz band through a sharing agreement with the Band Manager "subverts any such genuine agreement between state and local licensees and FirstNet." CERCI Br. 36–37. This argument misunderstands what spectrum

FirstNet will be sharing. As we have explained, the Band Manager's overlay license covers only unassigned spectrum—not spectrum licensed to incumbent licensees. *See supra* pp. 25, 57. So the relevant approval necessarily must come from the Band Manager, not the incumbents; it is the Band Manager's spectrum that FirstNet will be sharing.

There is likewise no merit to the CERCI Petitioners' assertion (at 37) that the Band Manager cannot give "genuine agreement" to sharing with FirstNet. Their theory goes that, because one of the Band Manager's responsibilities under the *Order* is to manage a sharing arrangement with FirstNet, "the Band Manager . . . is compelled to consent." *Id.* Not so.

To be sure, it is reasonable to anticipate that the Band Manager will agree to share its spectrum with FirstNet: there are considerable public benefits to doing so, and the Band Manager will not itself provide services in the band. *See Order* ¶¶ 23, 34–35 & n.154 (JA677–678, 685–688). But both the *Order* and the text of the rule on which the CERCI Petitioners rely (at 37) make clear that the Band Manager will only enter into a sharing agreement with FirstNet where the conditions of Section 2.103(b) are satisfied—including that the Band Manager consents to sharing. *See* 47 C.F.R. § 90.1217(d) (Band Manager's

responsibilities include "[m]anaging a sharing agreement with [FirstNet] *pursuant to §§ 90.1207(h) and 2.103(b)*" (emphasis added)); *Order* ¶ 42 (JA692–693) ("any sharing agreement entered into by FirstNet and the Band Manager should be contingent upon compliance with" the "Commission's rules governing this band, inclusion of any conditions agreed upon by the Commission and the NTIA, and prevention and mitigation of any harmful interference to incumbent licensees").

Finally, the CERCI Petitioners make an argument that, by the terms of Section 2.103(b), consent to spectrum sharing in the 4.9 GHz band may only come from "a state or local government licensee." CERCI Br. 37. So far as it appears, however, neither CERCI nor any other party raised this argument before the Commission. CERCI raised a variety of other arguments centered on Section 2.103(b), but not this one. *See, e.g.*, 9/5/2024 CERCI Ex Parte Letter at 2 (JA662) ("[W]hile Section 2.103(b) of the Commission's rules allows an incumbent licensee to enter into a *voluntary* sharing agreement with a Federal entity, any arrangement *requiring* licensees to do so would amount to assignment by fiat, which is prohibited." (citation omitted)); 5/10/2024 CERCI Ex Parte Letter at attachment 3–4 (JA607–608) (raising various objections

to the application of Section 2.103(b) to permit sharing with FirstNet, but nowhere asserting that the text of the rule restricts eligibility for sharing agreements to state and local government entities); 4/15/2024 CERCI Ex Parte Letter at attachment 6–7 (JA585–586) (referencing Section 2.103(b) in support of a different argument).

Because the Commission had no "opportunity to pass" on this argument during the administrative proceeding, 47 U.S.C. § 405(a), this Court lacks jurisdiction to consider it. A long line of precedent confirms this point. *See, e.g.*, *Viasat*, 47 F.4th at 778 (under the "exhaustion requirement" of Section 405(a), courts may not review arguments that no party has first "'flagged' or 'teed up' before the Commission").

In any event, the newly raised reading of Section 2.103(b) is unduly narrow. To be sure, the rule identifies state and local governments as examples of licensees that may agree to sharing. *See* 47 C.F.R. § 2.103(b) (making it a condition of sharing that "[t]he Federal entity obtains the approval of the non-Federal (State/local government) licensee"). But the CERCI Petitioners put too much weight on an illustrative parenthetical. The rule requires the approval of a "non-Federal . . . licensee," *id.*, and the Band Manager fits that description. Nothing suggests that the ensuing parenthetical is meant to exclude

other types of licensees; instead, the parenthetical is best read as providing the most common examples. Thus, as the Supreme Court observed in a similar circumstance, "the more plausible role for the parenthetical to play in this subsection is that of providing an illustrative list of examples." *Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001).

### 2. The Communications Act Does Not Prohibit The Contemplated Sharing Agreement With FirstNet

Nothing in the Communications Act's plain text prevents the Commission from allowing its licensees to share spectrum. And the agency has done so for decades. With no textual support, the CERCI Petitioners argue that because the Commission cannot issue a license directly to FirstNet, the Commission cannot "achieve the same practical result" through a sharing agreement. CERCI Br. 24. This objection fails.

As we have explained, *see supra* pp. 61–62, spectrum sharing between Commission licensees and federal entities is grounded in decades of Commission practice. And, notably, NTIA—which administers federal radio services and collaborates closely with the Commission on spectrum management, *see supra* p. 11—agrees that

sharing non-federal spectrum with federal entities is consistent with the Communications Act. *See, e.g.*, *Order* ¶ 36 n.159 (JA689) ("Although Section 305 of the Act precludes the Commission from licensing stations belonging to and operated by the federal Government, NTIA, the entity empowered with managing federal use of spectrum, agrees that such restrictions do not bar federal entities from use of spectrum managed by the Commission." (internal quotation marks omitted)).[6]

Exposing their lack of textual support, the CERCI Petitioners fall back on a policy objection: they claim (at 24) that the Commission's position would allow it "to circumvent the statutory prohibition on granting licenses" to foreign governments. *See* 47 U.S.C. § 310. But unlike any foreign government, FirstNet is already a Commission licensee (per Congress's directive). And stepping back, U.S. federal entities, unlike foreign governments, have wide latitude to use spectrum in the United States. The Commission's decision to allow the Band Manager to share spectrum with FirstNet, therefore, is not fairly

---

[6] The CERCI Petitioners' attempt (at 27) to repackage this argument as a failure to consider a part of the problem fails for the same reasons. The Commission concluded that its decision is consistent with the Communications Act and noted that its approach here "closely aligns" with its approach in other related contexts. *See Order* ¶¶ 31, 37 (JA683–684, 689).

construed to imply that "licensing restrictions have no bearing on" permissible sharing arrangements. *Contra* CERCI Br. 24.

Indeed, when adopting rules governing spectrum sharing or other secondary-use arrangements, the FCC limits eligibility to entities that may obtain authorization to use spectrum in the United States. This means that the FCC generally requires sharing entities to meet the same eligibility requirements as licensees. For instance, foreign-owned entities that are statutorily prohibited from being licensees cannot be lessees under the Commission's spectrum leasing rules. *Promoting Efficient Use of Spectrum,* 18 FCC Rcd 20604, 20665–66 (2003); 47 C.F.R. § 1.9035(d)(2).

But entities that share spectrum need not always have the same eligibility as licensees. That is why, for example, the Commission has long allowed licensees in the 4.9 GHz band to "enter into sharing agreements with entities not eligible for their own licenses," where a licensee determines that such entities "operate in support of public safety." *Third Report & Order*, 18 FCC Rcd at 9162 ¶ 22 (JA62); *see* 47 C.F.R. § 90.1203(b).

Notably, the CERCI Petitioners do not (and could not) contend that FirstNet is ineligible to hold a spectrum license in the United

States at all. To be sure, it is NTIA's responsibility to administer federal entities' spectrum use. But the increasingly congested spectrum environment and evolving demands of federal and non-federal entities require NTIA and the Commission to coordinate to adjust spectrum allocations when needed—as happens on a regular basis. *See, e.g.*, *Amendment of Part 2 of the Commission's Rules to Allocate Spectrum for the Fixed-Satellite Service in the 17.8–20.2 GHz Band for Government Use*, 10 FCC Rcd 9931, 9931 ¶ 1 (1995) (at NTIA's request, adding a footnote to the FCC-administered non-federal Table of Frequency Allocations to permit the use of specified frequencies for federal military systems). Allowing federal entities to share non-federal spectrum is just one additional tool that the agencies have agreed they may use to optimize access to the country's spectrum as between federal and non-federal entities.

### 3. The Spectrum Act Is No Obstacle To Sharing With FirstNet

With no help from the Communications Act or the Commission's rules, the CERCI Petitioners point to the Spectrum Act (which created FirstNet) and argue (at 25–31) that because that statute only specifically authorizes the FCC to license FirstNet in the 700 MHz

band, and does not expressly authorize FirstNet to operate in any other band, the Commission may not authorize the Band Manager to share 4.9 GHz spectrum with FirstNet. The text of the statute belies that claim—as to both the Commission's authority to support FirstNet and FirstNet's authority to operate outside the 700 MHz band.

"[T]he Spectrum Act gives the Commission broad discretion to assist FirstNet in furtherance of its statutory mandate." *Order* ¶ 31 (JA683–684) (citing 47 U.S.C. § 1433). Contrary to what the CERCI Petitioners contend (at 26–27), the statute does not limit the Commission's authority to reallocating and licensing the 700 MHz band or providing only "technical" assistance. Rather, as the CERCI Petitioners acknowledge in passing (at 26), the Commission "may provide technical assistance . . . *and* may take any action necessary to assist [FirstNet] in effectuating its duties and responsibilities" under the statute. 47 U.S.C. § 1433 (emphasis added).

The Commission's authority to assist FirstNet extends to all of FirstNet's duties and responsibilities, which are not—as the CERCI Petitioners would have it—limited to "creating the [Public Safety Broadband Network] using the 700 MHz license, and that license alone." CERCI Br. 30. The text of the statute makes clear that FirstNet

is empowered to "hold the single public safety wireless license [in the 700 MHz band] . . . *and* take all actions necessary to ensure the building, deployment, and operation of the [Public Safety Broadband Network]." 47 U.S.C. § 1426(b) (emphasis added). FirstNet's authority to "take all actions necessary" in support of the Network is separate from, not limited by, the reference to its 700 MHz license. *Id.* Similarly, the statutory provision creating FirstNet directs it to "ensure the establishment of a nationwide, interoperable public safety broadband network," 47 U.S.C. § 1422(a)—not to establish a network "in the 700 MHz band."

Further illustrating that FirstNet is not limited to using the 700 MHz band, the Spectrum Act provides that the Public Safety Broadband Network should "evolve[] with technological advancements." 47 U.S.C. § 1422(b). The statute also identifies components that the network should "*initially* consist[] of." *Id.* (emphasis added). And FirstNet is charged with "ensur[ing] the maintenance . . . and improvement" of the Public Safety Broadband Network, "including by ensuring that [FirstNet] updates and revises . . . policies . . . to take into account new and evolving technologies." *Id.* § 1426(c).

Finally, the Spectrum Act grants FirstNet general authority to "exercise . . . all powers specifically granted by the provisions of [the statute], and such incidental powers as shall be necessary" in furtherance of that authority. 47 U.S.C. § 1426(a)(1). It also authorizes FirstNet "[t]o take such other actions as [it] . . . may from time to time determine necessary, appropriate, or advisable to accomplish the purposes" of the statute. *Id.* § 1426(a)(6).

The powers that the Spectrum Act grants FirstNet—and grants the FCC to assist FirstNet—easily support the *Order*'s contemplated sharing agreement. The agreement is calculated to "ensure" that the Public Safety Broadband Network "advances and evolves." *Order* ¶ 31 (JA684); *see id.* ¶ 34 & nn.148, 151, 152 (JA685–687). In particular, FirstNet explained to the Commission that "opportunities to leverage the 4.9 GHz spectrum" will allow it to "enhance the broadband tools available to" first responders and improve the "network experience" for entities that rely on the Public Safety Broadband Network. *Id.* n.151 (JA687) (quoting 4/13/23 FirstNet Comments at 2, 4 (JA526, 528)); *see also id.* n.152 (JA687) ("For the fire and emergency service, the 5G spectrum presents an opportunity to develop technology to track firefighters in buildings; support Unmanned Aerial Systems and robots;

and improve the data available to an incident commander on the scene of a major incident." (quoting 7/8/24 MFCA Ex Parte Letter at 1 (JA645)). Far from barring the spectrum sharing contemplated in the *Order*, the Spectrum Act straightforwardly promotes it.

The CERCI Petitioners' reliance (at 25) on the statutory canon of *expressio unius est exclusio alterius*—the "mention of one thing implies exclusion of another," *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1061 (D.C. Cir. 1995)—is therefore misplaced. That canon is only used as interpretive assistance in the face of ambiguity. Here, the plain meaning of the Spectrum Act permits each and every action that the *Order* contemplates.

Moreover, the *expressio unius* canon "is entirely dependent upon context." *Doe v. SEC*, 28 F.4th 1306, 1314 (D.C. Cir. 2022). "When context indicates a list is meant to be exclusive, the 'canon' applies; when context does not so indicate, [it] does not apply." *Id.* (internal quotation marks omitted). Here, there is no "list . . . meant to be exclusive," just a list of one: the 700 MHz band. And no context suggests congressional intent to make this list of one exclusive. Rather the opposite. Instead of binding FirstNet to the 700 MHz band alone, the statute directs FirstNet to create a dynamic, evolving network that will

best serve the American people. There is no reason to suppose that, when assigning FirstNet spectrum in the 700 MHz band, Congress contemplated and rejected the possibility that FirstNet might one day use other frequencies as well. In such instances, the *expressio unius* canon does not apply. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("We do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.").

The CERCI Petitioners likewise get no help from the "major questions doctrine." They invoke the doctrine on a theory that the Commission "[r]eallocat[ed] a band of spectrum worth billions of dollars," a decision that Congress would likely have intended to retain "for itself." CERCI Br. 30. But this mischaracterizes what the Commission did, and ignores the FCC's broad—and congressionally conferred—spectrum management powers.

The major-questions doctrine instructs courts, in certain "extraordinary" cases, to "hesitate" before accepting an agency's assertion of an "extravagant statutory power" based on a "novel" reading of "modest words" or "vague terms." *West Virginia v. EPA*, 597 U.S. 697, 716, 723–24 (2022) (internal quotation marks omitted). The

Supreme Court's application of the doctrine has generally reflected its concern about agency reliance on "relatively narrow statutes" to ground "broad invocations of power" or attempts to "regulate[] outside its wheelhouse." *Biden v. Nebraska*, 600 U.S. 477, 517–18 (2023) (Barrett, J., concurring) (internal quotation marks omitted).

This case involves no "novel" claim of "extravagant" power. The overlay license gives the Band Manager rights only to those portions of the band that have not been assigned to any user; it does not revoke existing licenses in the band—just provides for the licensing and use of unassigned "white spaces." *Order* ¶ 23 (JA677). There are only six states and territories that have spectrum included in the Band Manager's overlay license (those that did not previously have state- (or territory-) wide licenses). *See id.* n.18 (JA666). And the sharing agreement with FirstNet is simply the mechanism for operations under that license; it does not expand its impact. Likewise, the administrative substitution of the PA license code by the more precise PB and PF codes does not "modify or alter" the right of incumbent licensees "to operate their existing networks." *Id.* ¶ 58 (JA700).

As important, the Commission's actions in the *Order*—allowing the Band Manager to apply for an overlay license, inviting FirstNet to

enter into a sharing agreement to use that spectrum, and revising

incumbent licensees' service codes—are grounded in the agency's broad

authority to oversee wire and radio communication, *see* 47 U.S.C.

§§ 151, 303, and on longstanding Commission rules permitting federal

access to non-federal spectrum, *see* 47 C.F.R. § 2.103. Thus, far from

"claim[ing] to discover" regulatory authority for the first time, *see Util.*

*Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), the Commission has

exercised authority at the heartland of its congressionally delegated

powers.

## II.  THE COMMISSION'S ORDER WAS NOT ARBITRARY AND CAPRICIOUS

Both the CERCI Petitioners and the PSSA Petitioners contend

that the *Order* was arbitrary and capricious, but in different respects.

The CERCI Petitioners argue (in addition to a number of miscellaneous

objections), that the Commission erred in reforming the 4.9 GHz band

without considering the reliance interests of incumbent licensees, and

before completing its granular data collection showing how the band is

currently used. The PSSA Petitioners, by contrast, contend that the

Commission did not go far enough in reforming the band: the

Commission should have accepted PSSA's proposals to convert all

geographic 4.9 GHz licenses to site-based ones, and to require incumbents to surrender all of their unused 4.9 GHz spectrum.

Neither set of petitioners can demonstrate that the Commission's actions were not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

## A. The Commission Adequately Considered The Reliance Interests Of Incumbent Licensees

Uncertainty surrounding the full scope of licensed 4.9 GHz operations has impeded robust utilization of the band. *See Seventh Report & Order* ¶ 17 (JA392–393). This is why the Commission decided in the *Seventh Report & Order*—with "overwhelming[]" support from commenters, *id.* ¶ 31 (JA398)—to collect granular data from incumbent licensees on their existing operations. *See id.* ¶ 32 (JA399).

But the Commission's data-collection efforts are useful only if they capture an accurate snapshot of frequency use in the band—not a blurred image of a moving target. It was therefore reasonable for the Commission to determine in the *Order* that, absent special circumstances warranting a waiver from the Commission, incumbent licensees should not be able to modify or expand their existing operations in the band while the Commission conducts the granular

data collection. *See Order* ¶¶ 53–55 (JA698–699). It was likewise reasonable for the Commission to prescribe that incumbent licensees receive new licenses under the PB and PF service codes. Those license codes—which do not convert geographic licenses into site-based ones, *contra* CERCI Br. 39—help to reflect the full scope of existing operations in the band accurately. *See Order* ¶ 58 (JA700). Finally, the Commission's decision to defer consideration of what to do with "unused" spectrum under the incumbent licensees' historical PA licenses, *see id.* ¶ 59 (JA701), was reasonable and prudent.

**1.** The CERCI Petitioners complain that the Commission—in ordering the freeze on new or modified operations in the band and requiring incumbent licensees to convert their licenses to new service codes—failed to consider incumbent licensees' significant reliance interests. *See* CERCI Br. 38–42. That contention is belied by the terms of the *Order*.

First, the Commission made clear that the exchange of licenses with PA codes for those with PB and PF codes recognized the state of incumbents' existing operations. As explained above, *see supra* pp. 30–31, under the Commission's new license codes, facilities that involve movement, such as mobile and temporary fixed operations, will

continue to be operated on a geographic basis (as the CERCI Petitioners appear to recognize (at 39 n.17)). Facilities that do not involve movement, such as base stations in a base/mobile or point-to-point network—which already required site-specific authorizations, *see* 47 C.F.R. § 90.1207(e)(1)(vi) (effective Mar. 30, 2023); *Seventh Report & Order* ¶ 34 (JA399)—will be licensed as site-based.[7] In this way, the exchange of license codes does not "replac[e] geographic licenses with site-based ones." CERCI Br. 39. Nor does it "modify or alter incumbents' rights to operate their existing networks." *Order* ¶ 58 (JA700); *see also id.* n.100 (JA678) (Band Manager is to coordinate any sharing with FirstNet "to ensure the protection of incumbent operations," and has no authority "to modify or alter" incumbents' "existing license rights").

To be sure, the Commission not only retained the freeze on applications for new licenses but "reinstate[d] the freeze as it applies to incumbent licensees," preventing them from "adding new licenses or

---

[7] For example, a fire department that relies on mobile-to-mobile facilities for communications at the scene of a fire may still operate in all of the same places and on all of the same frequencies under the *Order* as it could before. If a fire department needs to relocate a temporary base station to respond to a wildfire, it may do so, just as it could have under its previous license.

modifying existing licenses unless otherwise excepted." *Order* ¶ 55 (JA 699); *see supra* pp. 32–34. And in doing so, the Commission recognized that extending the scope of the existing freeze to reach incumbent licensees would in some cases implicate reliance interests. *See Order* ¶ 54 (JA699) ("We are cognizant that some incumbent licensees, in reliance on the [narrower] state of the freeze prior to [the *Order*], may have invested in systems that they hoped to use to modify or expand current operations.").

But having considered the *Order*'s effects on incumbent licensees' reliance interests, the Commission explained that, nonetheless, "a stable spectrum landscape reflecting the current state of operations in the band will better facilitate analysis of the upcoming granular data collection of licensed operations." *Order* ¶ 54 (JA699). The Commission thus weighed the interests of incumbents in continuing to modify and expand their existing networks without prior authorization from the Commission against the need for stability in the band during the granular data collection. *See id.* It determined that the need for stability should win out. *Id.*

That was an entirely reasonable decision. Without a freeze on expansions or other modifications to incumbent operations, the

Commission would not be able to obtain a complete and accurate picture of the current use of the band—where it is being used, with what devices, and on which frequencies. And without that data, in turn, it would not be possible to close gaps between users to increase usage of the band. *See Order* ¶¶ 11, 41, 59 (JA669, 691–692, 701); *see also Seventh Report & Order* ¶¶ 16–17, 20, 30–35 (JA392–394, 398–400).

**2.** In any event, the Commission made clear that "licensees facing special circumstances" may "seek a waiver of the freeze pursuant to section 1.925 of the Commission's rules." *Order* ¶ 54 (JA699); *see* 47 C.F.R. § 1.925. Under that provision, the Commission may grant a waiver if a party shows that the "underlying purpose of the rule(s) would not be served or would be frustrated by application to the instant case, and that a grant of the requested waiver would be in the public interest." *Id.* § 1.925(b)(3)(i); *see, e.g.*, *Blanca Tel. Co. v. FCC*, 743 F.3d 860, 864 (D.C. Cir. 2014) (waivers granted to carriers exercising "reasonable diligence" in seeking but failing to comply with regulatory deadline); *see also* 47 C.F.R. § 1.3 (waiver of any Commission rule available "for good cause shown"). The opportunity for incumbent licensees to seek a waiver will allow them to present for the

Commission's consideration the facts—including reliance interests—of any particular situation.

The CERCI Petitioners argue that the possibility of waiver "does not cure an *irrational* rule." CERCI Br. 42 (quoting *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 571 (D.C. Cir. 2004)). But as we have explained, the freeze itself was reasonably calculated to facilitate the upcoming spectrum inventory.

**3.** Finally, the CERCI Petitioners complain of an "unacknowledged risk that geographic areas lost through the conversion to site-based licenses . . . will be deemed 'unassigned' [and] then be shifted to FirstNet . . . and, by extension, to secondary commercial use by AT&T subscribers." CERCI Br. 41. This fear is misplaced.

First, as noted above, *see supra* p. 79, the service code changes prescribed in the *Order* do not convert licenses that were previously "geographic" into site-based licenses. *Contra* CERCI Br. 2, 4, 21, 39. Where existing operations involved moving equipment—that is, mobile and temporary fixed operations—the new PB licenses for those operations will remain "geographic." *See* 47 C.F.R. § 90.1207(e)(1)(vi) (effective Mar. 30, 2023); *Seventh Report & Order* ¶ 34 (JA400); *see also* CERCI Br. n.17 (acknowledging that these licenses remain geographic).

If the CERCI Petitioners contend (at 40) that, before the *Order*, incumbent licensees were entitled to geographic licenses for "fixed" base stations, that is not correct. The Commission required such stations to obtain site-based licenses in the *Seventh Report & Order*—not the *Order* under review. *See Seventh Report & Order* ¶ 34 (JA399).

In any event, to whatever extent incumbent licensees "hoped to use or modify or expand current operations" without the Commission's prior approval, CERCI Br. 40 (internal quotation marks omitted), and can be understood to have lost the "right" to do so under the *Order*, *id.* (emphasis omitted), the Commission was not "blind[]," *id.* at 41, to that concern, *see supra* pp. 80–83 (explaining considerations that outweigh incumbent licensees' reliance interests, particularly given the availability of waivers for special circumstances). The Commission acknowledged the possibility that "unused" spectrum formerly licensed under the PA license codes—if not re-licensed under the new PB/PF service codes—"could potentially," at a later point, be made "available to FirstNet" to "increase overall spectrum efficiency in the band." *Order* ¶ 59 (JA701). But the Commission expressly deferred consideration of PSSA's proposal to require "incumbent licensees [to] surrender to the Band Manager or share with FirstNet any [such] unused spectrum." *Id.*

(Indeed, PSSA challenges this deferral. As we explain below, however, it was reasonable. *See infra* pp. 96–97.)

In the meantime, the consequences of the *Order* for such spectrum remain to be seen. Some of CERCI's members may keep all of the spectrum they want or need under the new PB/PF service codes. Others, if they do not, may seek waivers and apply to expand or modify their existing operations. Should the Commission ultimately require incumbent licensees to surrender unused spectrum, and CERCI's members (or other licensees) object to that decision, they may challenge the decision at that time.

In all events, the CERCI Petitioners fail to explain why, if the Commission should one day require them to surrender their unused spectrum—or if the Court should accept their mistaken theory that such spectrum, as a result of the *Order*, is now "effectively" unassigned, CERCI Br. 2—they should be allowed to continue to warehouse that spectrum. The point of the *Order* was, among other things, to "*increase overall utilization*" of the band. *Order* ¶ 35 (JA688) (emphasis added). And as this Court has previously held, it is within the FCC's broad "discretion" to decide that "the potential deployment of future . . . services that may or may not develop years into the future" do not

"warrant the further reservation of spectrum" for incumbent licensees.

*Intelligent Transp. Soc'y*, 45 F.4th at 414 (internal quotation marks

omitted; alteration in original).

**B.    The Commission Reasonably Decided To Cancel The PA Licenses As Duplicative After Issuing Licenses With New Service Codes**

The CERCI Petitioners next contend that it is arbitrary and

capricious for the Commission to cancel the incumbents' PA licenses

after they receive licenses with new PB/PF codes, but before the agency

collects and analyzes granular data on band usage. CERCI Br. 42–44.[8]

As an initial matter, as we have explained, the FCC decided to

cancel the PA licenses upon incumbents' receipt of PB/PF licenses

because the PA licenses will then be obsolete. *See Order* ¶ 58 (JA701).

The new license codes—which incumbents will get after they "complete

a thorough review of their current operations"—will more precisely

describe incumbent operations; they will "not modify or alter

incumbents' rights to operate their existing networks." *Id.* ¶ 58 (JA700)

---

[8] The CERCI Petitioners refer to incumbents' previous PA licenses as "geographic," *e.g.*, CERCI Br. 43, but not all PA licenses were geographic. Even before the *Order*, there were "permanent fixed" stations whose licenses were "site-based." *See supra* p. 80 (citing *Seventh Report & Order* ¶ 34 (JA399)).

And it would lead to unnecessary confusion for a single licensee to have two licenses with different service codes for the same operations in the Commission's Universal Licensing System. Cancellation of the prior licenses thus "is the best approach to ensure that [the Universal Licensing System] does not contain duplicative or inaccurate licenses." *Id.*; *2024 Public Notice*, 2024 WL 5052941, at *1.

Nor was there any reason to delay this decision until after the granular data collection was complete and the Commission had independently analyzed it. To be sure, that data will be incorporated into the PB and PF licenses. *Order* ¶ 58 (JA700). But the Commission did not have to await the results of that collection to determine that the process of thoroughly reviewing incumbent operations would render the prior PA licenses "duplicative and obsolete." *2024 Public Notice*, 2024 WL 5052941, at *1. And the revision of the license codes to more accurately reflect incumbent operations will, the Commission determined, "improve interference mitigation efforts and bolster public safety confidence in the band." *Order* ¶ 58 (JA700–701).

Finally, the CERCI Petitioners contend that the Commission failed to "adequately consider less harmful alternatives, such as allowing continued 4.9 GHz licensing by state and local public safety

entities." CERCI Br. 43. But the Commission explained that its approach would ensure a "stable spectrum landscape" for evaluating analysis of the data it ordered collected on current band operations. *Order* ¶ 54 (JA699). By contrast, to permit continued licensing while data was being collected would blur the Commission's snapshot of operations in the band and undermine the utility of the data collection.[9]

## C. The CERCI Petitioners' Additional Attacks On The Order Lack Merit

The CERCI Petitioners also raise several additional challenges to the *Order*. None is persuasive.

**1.** The CERCI Petitioners first argue that it is irrational to create a nationwide overlay license that can be shared with FirstNet without "ensuring that FirstNet is legally able to access the band." CERCI Br. 44. This objection simply rehashes earlier arguments regarding the Commission's statutory authority. But as we have explained, *see supra* Part I.B, there are no statutory or regulatory obstacles to FirstNet's use

---

[9] The CERCI Petitioners argue that "widespread underutilization of the band" does not "justif[y] cancellation of all geographic licenses," because usage of the band in some areas is greater than in others. CERCI Br. 43. But, as we have explained, the Commission's action "does not modify or alter incumbents' rights to operate their existing networks." *Order* ¶ 58 (JA700). Intensively used portions of the band will thus remain so.

of the 4.9 GHz band. The only reason the Commission stated that it "anticipate[d]" that FirstNet would be able to "access the 4.9 GHz band" and did not make a final "determination" that all of the regulatory requirements associated with the sharing agreement were met is because "the Band Manager," which has not yet been selected, has necessarily not "yet . . . enter[ed] into a sharing agreement" with FirstNet. *Order* ¶ 37 (JA689).

**2.** The CERCI Petitioners next contend that the Commission ignored the fact that FirstNet is scheduled to sunset in 2027 unless Congress reauthorizes it. CERCI Br. 45. It was, however, entirely reasonable for the Commission to assume that FirstNet would be reauthorized; FirstNet's continued existence is critical to the operation of the Public Safety Broadband Network that Congress established in the Spectrum Act. 47 U.S.C. § 1426(b). The CERCI Petitioners' speculation that Congress would not reauthorize an entity that it seeded with billions of dollars and valuable spectrum—and whose nationwide network is now up and running—defies logic.

**3.** The CERCI Petitioners next assert (at 45–46) that the Commission failed to explain why FirstNet needs any additional spectrum, or how it would fund any buildout.

But as the Commission explained, "multiple public interest benefits . . . will flow from FirstNet's future access" to the 4.9 GHz band, "including furtherance of FirstNet's statutory mission, providing additional support and services to its public safety subscribers, and maximizing the overall use of [the] 4.9 GHz band." *Order* ¶ 34 (JA686). Allowing FirstNet to share the 4.9 GHz spectrum would "enable greater public safety use, including for 5G, and has the potential to free up new opportunities for expanded use in the band in the near term." *Id.* ¶ 20 (JA675). FirstNet itself viewed "the 4.9 GHz spectrum as a potential avenue to provide enhanced broadband communications services, features, and capabilities—including 5G services—for public safety." *Id.* n.111 (JA680) (quoting 4/13/23 FirstNet Comments at 2 (JA526)).

The 4.9 GHz band's suitability for 5G services lends itself particularly well to FirstNet's mission: the spectrum will allow FirstNet to upgrade the Public Safety Broadband Network "so that first responders can harness the life-saving capabilities of 5G." *Id.* n.112 (JA680) (quoting 6/20/24 AT&T Ex Parte Letter at 1–3 (JA630–632)); *id.* n.90 (JA676) (citing 2/13/24 Fraternal Order of Police Ex Parte Letter at 2–3 (JA564–565) (noting "a real need for a dedicated 5G spectrum, and [stating that] the 4.9 GHz band is uniquely positioned to

meet this need both today and into the future")). As this Court has often recognized, "fostering innovative methods of exploiting the spectrum" is a "difficult, highly technical task," dependent on policy judgments that warrant the Court's "greatest deference." *Intelligent Transp. Soc'y*, 45 F.4th at 411. This Court should reject the CERCI Petitioners' attempt to second-guess the Commission's technical policy judgments here.

Nor was there any reason for the Commission to question FirstNet's financial ability to carry out its obligations to conduct operations on the Band Manager's overlay license. FirstNet is self-funding. Under 47 U.S.C. § 1428, FirstNet is authorized to assess fees, including on any public safety entity or secondary user that seeks access to its Public Safety Broadband Network, to "recoup [its] total expenses . . . in carrying out its duties and responsibilities" under the Spectrum Act.

**4.** The CERCI Petitioners next assail "FirstNet's poor management," noting criticism contained in reports by the Commerce Department's Office of Inspector General. CERCI Br. 47. The Commission did not turn a blind eye to these concerns. Rather, it considered NTIA's response, which represented that NTIA concurred

with the Inspector General's recommendations and would prepare a formal action plan. *Order* n.145 (JA686).[10]

The Commission found NTIA's response "sufficient to show that the NTIA will ensure that FirstNet satisfies the [Inspector General's] recommendations." *Order* n.145 (JA686). As a result, the Commission concluded that the reports should not affect its "decision to allow FirstNet to integrate the 4.9 GHz band into its [Public Safety Broadband Network] at this time." *Id.* Additionally, the Commission indicated that it would "continue to monitor AT&T's performance under the contract and FirstNet's oversight of AT&T under FirstNet's license." *Id.* The FCC's acknowledgement of these concerns and its insistence on monitoring FirstNet's performance is a reasonable response to the concerns raised in the Inspector General's reports.

**5.** Finally, the CERCI Petitioners charge that the *Order* creates a "commercial windfall to AT&T," which may use FirstNet's excess network capacity on a secondary basis "to serve commercial subscribers

---

[10] As of July 2025, the Commerce Department's Office of Inspector General has formally accepted NTIA's action plans responding to each of the relevant audits. There are not currently any audits that require additional action plans.

while its competitors that also provide services to public safety entities must pay for their spectrum." CERCI Br. 48–49.

The Commission considered all comments regarding FirstNet and its "network partner AT&T," however, including those of AT&T's competitors. *Order* ¶ 35 & n.154 (JA687). It explained at length how FirstNet's agreement to share the Band Manager's nationwide overlay license was "the best way to preserve the public safety nature of the 4.9 GHz band, promote robust deployment in the band in the near term, and facilitate the development and deployment of new technologies and services for the public safety community." *Id.* ¶ 27 (JA680). Allowing FirstNet access to the band "can eliminate the burden [on] local communities" that would otherwise have "to build out their own public safety communications network[s]," and might not have funding to do so. *Id.* n.149 (JA686) (quoting 4/11/24 International Association of Fire Chiefs Ex Parte Letter at 1 (JA576)). It also promises to offer "first responders in emergency situations [the ability] to access capabilities on the 4.9 GHz and 700 MHz bands on one device." *Id.* n.150 (JA687) (quoting 4/11/24 International Association of Fire Chiefs Ex Parte Letter at 2 (JA577)). And significantly, access to the 4.9 GHz "mid-band spectrum . . . can be used to support FirstNet 5G services[,] while

protecting incumbent uses." *Id.* n.152 (JA687) (quoting 7/8/24

Metropolitan Fire Chiefs Association Ex Parte at 1 (JA645)).

The Commission did not ignore that AT&T has "secondary,

interruptible . . . rights" to use excess capacity on FirstNet's existing

Public Safety Broadband Network, *Order* n.154 (JA687), or that

FirstNet might give AT&T similar rights in the 4.9 GHz band.

Nonetheless, the Commission explained, "the primary benefit of the

Band Manager sharing model" adopted in the *Order* "is that 'the Band

Manager would allow [FirstNet] to use the 4.9 GHz band to support

upgrades'" to the Public Safety Broadband Network. *Id.* (quoting

6/20/24 AT&T Ex Parte Letter at 13–14 (JA642–643)). Any benefit to

AT&T from this approach cannot negate the "multiple public interest

benefits that will flow from FirstNet's future access" to the 4.9 GHz

band. *Id.* ¶ 34 (JA686).

### D. The Commission Reasonably Rejected PSSA's Proposals

In contrast to the CERCI Petitioners, who contend that the *Order*

went too far, the PSSA Petitioners contend that the *Order* did not go far

enough. Specifically, they complain that the Commission arbitrarily

rejected PSSA's proposal to convert all of the 4.9 GHz band geographic

licenses to site-based ones, PSSA Br. 34–36, as well as to require 4.9 GHz licensees to surrender all of their unused spectrum to be made available to FirstNet, *id.* at 36–39.

**1.** The PSSA Petitioners first fault the Commission for failing to respond to its comment that suggested converting "all incumbent, geographic licenses into site-based" ones. PSSA Br. 34. They concede that the Commission "acknowledged" PSSA's recommendation, as well as "opposition to [the] proposal," but insist that the Commission "fail[ed] to respond to and act on [the] proposal." *Id.* at 35.

The Commission explained the benefits of its own approach at length, however. By aligning license codes more precisely with 4.9 GHz operations, the approach ensured that "incumbents' rights to operate their existing networks" are not "modifi[ed] or alter[ed]," would "improve interference mitigation efforts," "bolster public safety confidence in the band," and "ensure that [the Universal Licensing System] does not contain duplicative or inaccurate licenses once the incumbents have received their new radio service codes." *Order* ¶ 58 (JA700–701). Moreover, the granular data on band usage to be collected "will help the Band Manager identify specific frequency usage across all deployments in the band." *Id.* ¶ 59 (JA701). That the PSSA Petitioners

would have adopted a different approach does not render the Commission's approach unreasonable, or permit PSSA to "second-guess the Commission's choice when it lies within the range of reasonable alternatives." *Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1, 10 (D.C. Cir. 2009).

**2.** The PSSA Petitioners also contend that the FCC acted arbitrarily and capriciously when it rejected PSSA's proposal to require incumbent licensees to surrender all of their unused spectrum. PSSA Br. 36–39. Contrary to this characterization, the Commission did not "ignore PSSA's proposed solution." *Id.* at 39. Instead, the agency considered whether to "surrender to the Band Manager or share with FirstNet any unused spectrum," and acknowledged that the proposal "could potentially make more spectrum available to FirstNet and increase overall spectrum efficiency in the band." *Order* ¶ 59 (JA701). But the Commission decided to "defer any consideration of those proposals until after" it had "completed its collection and analysis of granular technical data on incumbent licensed public safety operations in the band." *Id.*

As the PSSA Petitioners acknowledge (at 37), agencies need not act "all at once" and may reasonably take "a first step toward a

complete solution." *Transp. Div. of Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R. Admin.*, 10 F.4th 869, 875 (D.C. Cir. 2021). Here, it was sensible for the Commission to forgo a decision on whether to require incumbents to surrender any unused spectrum before it had obtained the relevant usage data. As the Commission explained, the granular data collection "will help the Band Manager identify specific frequency usage across all deployments in the band," and thus potentially pinpoint "unused channels within areas covered by certain geographic licenses." *Order* ¶ 59 (JA701). As the PSSA Petitioners themselves acknowledge, "the Commission cannot know which spectrum must be surrendered before it completes its analysis of existing band usage." PSSA Br. 38.

## CONCLUSION

The petitions for review should be dismissed to the extent Petitioners lack standing, and otherwise denied.

Dated: September 29, 2025

Respectfully submitted,

/s/ *D. Adam Candeub*

D. Adam Candeub
   *General Counsel*

Bradley Craigmyle
   *Deputy General Counsel*

Sarah E. Citrin
   *Deputy Associate General Counsel*

Igor Helman
   *Counsel*

Abigail A. Slater
   *Assistant Attorney General*

Robert B. Nicholson
Shana M. Wallace
   *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent*
   *United States of America*[11]

FEDERAL COMMUNICATIONS
   COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal*
   *Communications Commission*

---

[11]   Filed with consent pursuant to D.C. Circuit Rule 32(a)(2).

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the Court's order, issued May 6, 2025, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1):

    ☒  this document contains <u>19,243</u> words, *or*

    ☐  this document uses a monospaced typeface and contains ____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒  this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word for Office 365</u> in <u>14-point Century Schoolbook</u>, *or*

    ☐  this document has been prepared in a monospaced spaced typeface using _____ with _____.

*/s/  D. Adam Candeub*
D. Adam Candeub
*Counsel for Respondents*
