IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

PUBLIC SAFETY SPECTRUM ALLIANCE AND PUBLIC
SAFETY BROADBAND TECHNOLOGY ASSOCIATION,

Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,

Respondents.

On Petitions For Review Of An Order
Of The Federal Communications Commission

**FINAL OPENING BRIEF OF PETITIONERS PUBLIC SAFETY
SPECTRUM ALLIANCE AND
PUBLIC SAFETY BROADBAND TECHNOLOGY ASSOCIATION**

Andrew J. Pincus
Carmen N. Longoria-Green
Wajdi C. Mallat
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006
(202) 263-3000
apincus@mayerbrown.com

*Counsel for Petitioners Public Safety Spectrum Alliance & Public Safety
Broadband Technology Association*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Petitioners Public Safety Spectrum Alliance and Public Safety Broadband Technology Association certify as follows:

## I.   Parties and *Amici*

### A.   Parties, Intervenors, and *Amici* who Appeared in the District Court

There were no proceedings in the district court, so there were no parties in the district court.

### B.   Parties to this Case

The following are the parties before this Court in these consolidated cases.

In No. 24-1363, Petitioners are the Public Safety Spectrum Alliance (PSSA) and Public Safety Broadband Technology Association (PSBTA), the Respondents are the Federal Communications Commission (FCC) and the United States, and the intervenors are the Coalition for Emergency Response and Critical Infrastructure (CERCI), the San Francisco Bay Area Rapid Transit District (BART), and the National Fraternal Order of Police (FOP).

In No. 24-1364, Petitioner is CERCI, Respondents are the FCC and the United States, and intervenors are PSSA, PSBTA, BART, and FOP.

In No. 25-1028, Petitioners are the National Sheriffs' Association and the California State Sheriffs' Association, Respondents are the FCC and the United States, and intervenors are PSSA, PSBTA, CERCI, BART, and FOP.

In No. 25-1034, Petitioner is BART, Respondents are the FCC and the United States, and intervenors are PSSA, PSBTA, CERCI, and FOP.

*Amici Curiae*: There are no *amici curiae* as of the time of this filing.

## II. Rulings Under Review

Petitioners seek review of a final order of the Federal Communication Commission, captioned Improving Public Safety Communications in the 4.9 GHz band, 89 Fed. Reg. 91,578 (Nov. 20, 2024) (the Order).

## III. Related Cases

The Order has not been previously before this Court or any other court. The Court has consolidated four petitions for review of the FCC's order. CERCI filed a petition for review of the Order, Pet. for Review, *Coalition for Emergency Response and Critical Infrastructure v. FCC*, No. 24-1364 (D.C. Cir. Nov. 27, 2024), Doc. No. 2087294, and the Court consolidated CERCI's petition for review with PSSA's petition on December 4, 2024, Order, *Public Safety Spectrum Alliance v. FCC*, No. 24-1363 (D.C. Cir. Dec. 4, 2024), Doc. No. 2087934. NSA and CSSA filed a petition for review of the Order on January 17, 2025. *See* Pet. for Review, *National Sheriffs' Association v. FCC*, No. 25-1028 (D.C. Cir. Jan. 17, 2025), Doc. No. 2095068. BART filed a petition for review of the Order the same day. *See* Pet. for Review, *San Francisco Bay Area Rapid Transit District v. FCC*, No. 25-1034 (D.C. Cir. Jan. 17, 2025), Doc. No. 2095119. The Court consolidated these actions with PSSA's

and CERCI's petitions for review on January 21, 2025. *See* Order, *Public Safety Spectrum Alliance v. FCC*, No. 24-1363 (D.C. Cir. Jan. 21, 2025), Doc. No. 2095073; Order, *Public Safety Spectrum Alliance v. FCC*, No. 24-1363 (D.C. Cir. Jan. 21, 2025), Doc. No. 2095228.

*/s/ Andrew J. Pincus*
Andrew J. Pincus
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

*Counsel for Petitioners*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Public Safety Spectrum Alliance (PSSA) states that it is an alliance of the nation's leading public safety officials and organizations that aims to ensure that first responders nationwide are able to use the most technologically advanced communications capabilities that address the difficult, life-threatening challenges they face as first responders. PSSA is an initiative of the Public Safety Broadband Technology Association (PSBTA). PSSA and PSBTA advocate for their members and operate as trade associations within the meaning of Circuit Rule 26.1(b). PSBTA is operated by Public Safety 360, LLC. Public Safety 360, LLC has no parent corporation, and no publicly held corporation has a 10% or greater ownership interest in Public Safety 360, LLC.

*/s/ Andrew J. Pincus*
Andrew J. Pincus
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

*Counsel for Petitioners*

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT...................................iv

TABLE OF CONTENTS...................................................................................v

GLOSSARY..................................................................................................xi

INTRODUCTION ..........................................................................................1

STATEMENT OF JURISDICTION................................................................4

STATEMENT OF THE ISSUES......................................................................4

STATUTES AND REGULATIONS.................................................................4

STATEMENT OF THE CASE.........................................................................5

    A.    Statutory And Regulatory Framework .................................5

        1.    The FCC's Authority ...............................................5

        2.    FirstNet.......................................................................7

    B.    Prior Commission Proceedings Regarding The 4.9 GHz Band.........10

    C.    The Order Under Review ..................................................17

    D.    Legal Challenges To The Order.........................................25

SUMMARY OF THE ARGUMENT ..............................................................26

STANDING ..................................................................................................28

ARGUMENT .................................................................................................29

THE COMMISSION'S FAILURE TO ADOPT PSSA'S PROPOSALS IS INCONSISTENT WITH ITS NEW 4.9 GHZ BAND LICENSING FRAMEWORK AND THEREFORE ARBITRARY AND CAPRICIOUS..........29

    A.    The FCC's Justifications For Its New Licensing Framework. ..........30

    B.    The Commission Acted Arbitrarily By Failing To Adopt PSSA's Proposals To Take More Expeditious Action To Reclaim Unused Spectrum. ...............................................33

        1.    The Commission Arbitrarily And Capriciously Failed To Replace Incumbent Geographic Licenses With Site-Based Licenses.......................................................34

2. The Commission Arbitrarily And Capriciously Failed To Require Incumbent Licensees To Surrender Unused Spectrum. .................................................................................37

CONCLUSION......................................................................................................41

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993)...............................................................34

*AT&T Servs., Inc. v. FCC*,
    21 F.4th 841 (D.C. Cir. 2021)........................................................5, 34

*Cellco P'ship v. FCC*,
    700 F.3d 534 (D.C. Cir. 2012)...............................................................30

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)...............................................................................28

*Huntsman Petrochemical LLC v. EPA*,
    114 F.4th 727 (D.C. Cir. 2024)......................................................35, 36

*ICORE, Inc. v. FCC*,
    985 F.2d 1075 (D.C. Cir. 1993)..............................................................34

*Intelligent Transp. Soc'y of Am. v. FCC*,
    45 F.4th 406 (D.C. Cir. 2022).........................................................5, 30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983).........................................................................37, 39

*Northstar Wireless, LLC v. FCC*,
    38 F.4th 190 (D.C. Cir. 2022)................................................................5

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015)................................................................................35

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)..............................................................................28

*Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R. Admin.*,
    10 F.4th 869 (D.C. Cir. 2021)...............................................................38

*United Keetoowah Band of Cherokee Indians in Oklahoma v. FCC*,
    933 F.3d 728 (D.C. Cir. 2019) ............................................................................... 14

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................................... 28

*Whitaker v. Dep't of Commerce*,
    970 F.3d 200 (2d Cir. 2020 ...................................................................................... 7

**Statutes**

5 U.S.C. § 706(2) ........................................................................................................ 33

28 U.S.C. § 2343 .......................................................................................................... 4

28 U.S.C. § 2344 .......................................................................................................... 4

47 U.S.C. § 151 ............................................................................................................ 5

47 U.S.C. § 301 ............................................................................................................ 5

47 U.S.C. § 302a(a) ..................................................................................................... 6

47 U.S.C. § 303(b) ....................................................................................................... 6

47 U.S.C. § 303(c) ....................................................................................................... 6

47 U.S.C. § 303(f) ........................................................................................................ 6

47 U.S.C. § 303(g) ....................................................................................................... 6

47 U.S.C. § 303(r) ........................................................................................................ 6

47 U.S.C. § 303(y) ....................................................................................................... 6

47 U.S.C. § 305 ............................................................................................................ 20

47 U.S.C. § 309(j)(1) ................................................................................................... 6

47 U.S.C. § 309(j)(2)(A) .......................................................................................... 6, 18

47 U.S.C. § 402(a) ....................................................................................................... 4

47 U.S.C. § 1401(21) ................................................................................................... 9

47 U.S.C. § 1421(a) ...............................................................................................9

47 U.S.C. § 1422.................................................................................................7

47 U.S.C. § 1422(b) .............................................................................................9

47 U.S.C. § 1424(a) .............................................................................................7

47 U.S.C. § 1424(b)(1)..........................................................................................7

47 U.S.C. § 1426(a)(1)...........................................................................................8

47 U.S.C. § 1426(a)(5)...........................................................................................8

47 U.S.C. § 1426(a)(6)...........................................................................................8

47 U.S.C. § 1426(b)(1)...........................................................................................8

47 U.S.C. § 1426(b)(4)(A)......................................................................................8

47 U.S.C. § 1426(b)(4)(D).....................................................................................8

47 U.S.C. § 1426(c)(4)...........................................................................................9

47 U.S.C. § 1428(c) .............................................................................................7

47 U.S.C. § 1429................................................................................................ 7-8

47 U.S.C. § 1430.................................................................................................8

47 U.S.C. § 1433.................................................................................................9

Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No.
112-96, 126 Stat. 156...........................................................................................7

## Regulations

47 C.F.R. § 1.925(b)(3)........................................................................................25

*Amend. of Part 90 of the Commission's Rules*,
WP Docket No. 07-100, Eighth Report and Order, FCC 24-114
(rel. Oct. 22, 2024)................................................... 4, 10, 12, 14-24, 30-33, 36-38

*In re 4.9 GHz Band Transferred from Fed. Gov't Use*,
17 F.C.C. Rcd. 3955 (2002)................................................................................10

*In re Amend. of Part 90 of the Commission's Rules*,
  No. FCC18-33, 2018 WL 1452723 (OHMSV Mar. 23, 2018) ..........................11

*In re Amend. of Part 90 of the Commission's Rules*,
  36 F.C.C. Rcd. 1958 (2020)..........................................................................11, 14

*In re Amend. of Part 90 of the Commission's Rules*,
  36 F.C.C. Rcd. 15032 (2021).............................................................................15

*In re Amend. of Part 90 of the Commission's Rules*,
  38 F.C.C. Rcd. 704 (2023)...............................................................11, 12, 15, 16

*In re First Responder Network Auth. Nationwide Pub. Safety
Broadband Network Renewal of Sp-700 MHz Pub. Safety
Broadband Nationwide License Radio Serv.*,
  38 F.C.C. Rcd. 4989 (2023)...............................................................................10

## Other Authorities

FCC, *5G FAQs* (last updated May 4, 2021) ...........................................................14

Press Release, *FCC Adopts New Rules to Increase Use of 4.9 GHz
Spectrum Band*, 2020 WL 5876789 (OHMSV Sept. 30, 2020) .........................11

# GLOSSARY

| | |
|---|---|
| 4.9 GHz Band | 4940-4990 MHz spectrum band |
| APA | Administrative Procedure Act |
| BART | San Francisco Bay Area Rapid Transit District |
| CSSA | California State Sheriffs' Association |
| CERCI | Coalition for Emergency Response and Critical Infrastructure |
| FirstNet | First Responder Network Authority |
| FCC | Federal Communications Commission |
| NSA | National Sheriffs' Association |
| NTIA | National Telecommunications and Information Administration |
| PSBTA | Public Safety Broadband Technology Association |
| PSSA | Public Safety Spectrum Alliance |

**INTRODUCTION**

This case concerns the decade-long effort by the Federal Communications Commission (FCC or Commission) to increase utilization of the 4940-4990 MHz spectrum band (4.9 GHz band) in order to better enhance public safety communications. The Commission in 2002 designated that band to be used exclusively for public safety purposes; it authorized public safety entities to obtain geographic licenses that granted usage rights to all frequencies across the entire band.

But, over time, that licensing approach has left the 4.9 GHz band severely underutilized—a study in the administrative record found it more than 90% unused. One reason for this underutilization is the Commission's issuance of non-exclusive geographic licenses conferring the right to use the entire 4.9 GHz band across a broad geographic area, without any mechanism for coordination with other overlapping licensees. Moreover, geographic licensees rarely ever use the 4.9 GHz band throughout the entirety of their jurisdictions and typically do not even possess the technology needed to make use of the whole band throughout the entire area covered by the license. That problem is exacerbated by retention of unused spectrum by incumbent licensees.

In the order under review, which is the culmination of multiple notices, proposed rules, and opportunities for public comment, the Commission—

unanimously—took important steps to address these flaws and improve utilization of the 4.9 GHz band. The Commission assigned a nationwide overlay license to a third-party Band Manager to increase utilization of the 4.9 GHz band in areas where the 4.9 GHz band is not being used by incumbent licensees. And the Commission authorized the Band Manager to enter into a spectrum sharing agreement with the First Responder Network Authority (FirstNet), an independent authority created by Congress in 2012 to establish and operate a nationwide public safety interoperable broadband network.

Under the spectrum sharing agreement, FirstNet could incorporate unused 4.9 GHz spectrum into the FirstNet public safety broadband network. Access to this mid-band spectrum will enable FirstNet's rollout of 5G services and other vital cutting-edge communications technologies that first responders need.

Finally, the Commission maintained the freeze on new license applications that has been in place since 2020 and reinstated a freeze on modifications of existing licenses to ensure that its changes to the 4.9 GHz band would be implemented as seamlessly as possible.

Petitioners the Public Safety Spectrum Alliance (PSSA) and the Public Safety Broadband Technology Association (PSBTA) believe these steps are essential to increase utilization of the 4.9 GHz band and improve the ability of police, fire, and other public safety entities to communicate efficiently and effectively. The

Commission's determinations are well-founded in the administrative record and fall squarely within its broad authority to regulate spectrum.

But Petitioners urged the Commission to take two additional, related steps to remedy the problems caused by the underutilization of the band by geographic licensees. First, PSSA proposed that the Commission convert all incumbent geographic licenses into site-based licenses. Virtually all usage of the 4.9 GHz band is site-based—*i.e.*, between fixed points such as antennas at base stations—and it therefore makes sense to shift the licensing framework to a site-based one. Second, PSSA proposed that licensees surrender any unused spectrum. That would speed the process of identifying the spectrum available for deployment and enable more rapid availability of 5G services for first responders.

The Commission did not adopt either of these proposals. While it acknowledged PSSA's proposal to convert geographic licenses into site-based licenses, the Commission never responded substantively to the proposal or explained why it did not adopt it. And the Commission deferred consideration of PSSA's recommendation that it compel licensees to surrender unused spectrum even though it conceded that adopting PSSA's proposal would likely increase utilization of the 4.9 GHz band.

Given the Commission's policy rationale for its new licensing framework— the importance of addressing the underutilization of the band and improving the

communications technologies available to first responders, and the need to avoid further delays in the creation of a network capable of using those state-of-the-art technologies—its refusal to take these additional steps necessary to implement that policy is arbitrary and capricious.

The Court accordingly should remand these two discrete aspects of the Order for further consideration by the Commission.

## STATEMENT OF JURISDICTION

The Commission published the Order, *Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Eighth Report and Order, FCC 24-114 (rel. Oct. 22, 2024), JA664-JA714, in the Federal Register on November 20, 2024. *See* Improving Public Safety Communications in the 4.9 GHz Band, 89 Fed. Reg. 91,578 (Nov. 20, 2024). On November 26, PSSA and PSBTA petitioned this Court for review. This Court has jurisdiction pursuant to 28 U.S.C. § 2344. *See also* 47 U.S.C. § 402(a). Venue is proper in this Court. *See* 28 U.S.C. § 2343.

## STATEMENT OF THE ISSUES

Whether the Commission's Order is arbitrary and capricious to the extent it fails to convert geographic-based licenses into site-based licenses and fails to require incumbent licensees to surrender unused spectrum.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Statutory And Regulatory Framework

#### 1.     The FCC's Authority

Congress created the FCC "for the purpose of promoting safety of life and property through the use of wire and radio communications." 47 U.S.C. § 151. The Commission "has 'broad authority to oversee wire and radio communication in the United States' and must promote 'effective use of radio in the public interest.'" *Intelligent Transp. Soc'y of Am. v. FCC*, 45 F.4th 406, 411 (D.C. Cir. 2022) (quoting *Cellco P'ship v. FCC*, 700 F.3d 534, 537, 542 (D.C. Cir. 2012)); *see also AT&T Servs., Inc. v. FCC*, 21 F.4th 841, 843 (D.C. Cir. 2021) (referring to the "Commission's . . . highly technical [policy] determination to which [courts] owe considerable deference").

"The Communications Act of 1934 tasks the Commission with regulating 'all the channels of radio transmission'—that is, the electromagnetic spectrum used to send and receive wireless data." *Northstar Wireless, LLC v. FCC*, 38 F.4th 190, 197 (D.C. Cir. 2022) (quoting 47 U.S.C. § 301). Congress directed the Commission "to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels . . . under licenses granted by Federal authority." 47 U.S.C. § 301. It vested the Commission with the authority to issue

radio licenses upon its determination that doing so will serve the "public interest, convenience, and necessity." *Id.* § 309(a).

Congress gave the Commission significant and clearly described powers to fulfill its mandate. Under the Communications Act, the Commission has the power to:

- "[p]rescribe the nature of the services to be rendered by each class of licensed stations and each station within any class," 47 U.S.C. § 303(b);

- "[a]ssign bands of frequencies to the various classes of stations, and assign frequencies for each individual station and determine the power which each station shall use and the time during which it may operate," *id*. § 303(c);

- "encourage the larger and more effective use of radio in the public interest," *id.* § 303(f)-(g);

- "make reasonable regulations governing the interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications," *id.* § 302a(a);

- "grant [a] license or permit to a qualified applicant through a system of competitive bidding" or waive the competitive bidding process "for public safety radio services," *id.* § 309(j)(1)-(2)(A);

- "[h]ave authority to allocate electromagnetic spectrum so as to provide flexibility of use, if— . . . (2) the Commission finds, after notice and an opportunity for public comment, that—(A) such an allocation would be in the public interest; (B) such use would not deter investment in communications services and systems, or technology development; and (C) such use would not result in harmful interference among users," *id.* § 303(y); and

- "[m]ake such rules and regulations and prescribe such restrictions and conditions" as it deems necessary, *id.* § 303(r).

### 2. FirstNet

Responding to concerns about communications availability and interoperability that hampered first responders on September 11, 2001, and in subsequent emergencies, Congress in 2012 enacted the Spectrum Act to establish a "nationwide interoperable public safety broadband network." 47 U.S.C. § 1422; *see* Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112-96, §§ 6001-6303, 6413, 126 Stat. 156, 201-22, 235-36 (codified at 47 U.S.C. §§ 1401-1443, 1457).

To perform that mission, the Spectrum Act created FirstNet as an independent authority within the National Telecommunications and Information Administration (NTIA). 47 U.S.C. § 1424(a); *see also Whitaker v. Dep't of Commerce*, 970 F.3d 200, 202 (2d Cir. 2020) ("FirstNet was created . . . at the recommendation of the 9/11 Commission to oversee the development of a National Public Safety Broadband Network . . . for first responders.").

FirstNet is headed by a Board that includes the Secretary of Homeland Security, the Attorney General, the Director of the Office of Management and Budget, and twelve individuals appointed by the Secretary of Commerce. 47 U.S.C. § 1424(b)(1). In addition, FirstNet is subject to substantial government oversight. The NTIA reviews and approves any fees assessed by FirstNet, *id.* § 1428(c); the Secretary of Commerce must retain an independent auditor to annually audit

FirstNet, *id.* § 1429; and FirstNet must present an annual report to Congress, *id.* § 1430.

Congress specifically authorized FirstNet to:

- "take all actions necessary to ensure the building, deployment, and operation of the nationwide public safety broadband network," 47 U.S.C. § 1426(b)(1);

- "make contracts with individuals, private companies, and Federal, State, regional, and local agencies," *id.* § 1426(b)(4)(A); and

- "spend funds [in furtherance of making contracts] in a manner authorized by the Board, but only for purposes that will advance or enhance public safety communications," *id.* § 1426(a)(5).

And Congress gave FirstNet the authority "[t]o exercise, through the actions of its Board, all powers specifically granted by the provisions of this subtitle, and such incidental powers as shall be necessary" to fulfill its mandate. 47 U.S.C. § 1426(a)(1); *see also id.* § 1426(a)(6) (authorizing FirstNet "[t]o take such other actions as the First Responder Network Authority (through the Board) may from time to time determine necessary, appropriate, or advisable to accomplish the purposes of this chapter"); *id.* § 1426(b)(4)(D) (authorizing FirstNet to "take such other actions as may be necessary to accomplish the purposes set forth in this subsection").

This broad statutory authority enables FirstNet to fulfill its congressional mandate, which includes making available to first responders an up-to-date network so that they may utilize state-of-the-art communications tools. Congress understood

that it was establishing a statutory framework that would "ensure the maintenance, operation, and improvement of the nationwide public safety broadband network," including by "tak[ing] into account new and evolving technologies." 47 U.S.C. § 1426(c)(4). And Congress specified that the Commission could "take any action necessary to assist [FirstNet] in effectuating its duties and responsibilities" and "provide technical assistance to [FirstNet]." *Id.* § 1433.

As part of its efforts to ensure the establishment of a nationwide network, Congress specifically directed an initial grant of spectrum: "the Commission shall reallocate and grant a license to [FirstNet] for the use of the 700 MHz D block spectrum." 47 U.S.C. § 1421(a). But nothing in the statute restricts FirstNet's operations to only the 700 MHz band. Rather, the Spectrum Act broadly defines the "nationwide public safety broadband network" to mean "the nationwide, interoperable public safety broadband network" that is "based on a single, national network architecture that evolves with technological advancements." *Id.* §§ 1401(21), 1422(b).

Since the FCC first issued FirstNet the license for the 700 MHz band, FirstNet has successfully advanced its mission to establish a nationwide interoperable public safety broadband network. In renewing FirstNet's license in 2023, the Commission's Public Safety and Homeland Security Bureau concluded that FirstNet had (1) successfully begun deploying and operating "a single, national network

architecture, based on open, commercial standards"; (2) "promote[d] competition in the equipment market, including devices for public safety communications"; and (3) "update[d] and revise[d] any policies . . . to take into account new and evolving technologies." Order, *In re First Responder Network Auth. Nationwide Pub. Safety Broadband Network Renewal of Sp-700 MHz Pub. Safety Broadband Nationwide License Radio Serv.*, 38 F.C.C. Rcd. 4989 ¶¶10-38 (2023).

## B. Prior Commission Proceedings Regarding The 4.9 GHz Band

In the wake of September 11, 2001, and the communication challenges faced by first responders during and after the terrorist attacks, the Commission designated the 4.9 GHz band for public safety use. *In re 4.9 GHz Band Transferred from Fed. Gov't Use*, 17 F.C.C. Rcd. 3955 ¶¶1, 23 (2002). That decision, the Commission explained, "aligns with new national priorities focusing on homeland security, and will ensure that agencies involved in the protection of life and property possess the communications resources needed to successfully carry out their mission." *Id.* ¶1. The Commission limited "[o]perations in the band . . . to those in support of public safety operations" and restricted licenses to "public safety entities or those operating in support of public safety." Order ¶6, *Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Eighth Report and Order, FCC 24-114 (rel. Oct. 22, 2024), JA667 (Order).[1]

---

[1] The Order is attached to PSSA's Petition for Review as Exhibit A.

Since its 2002 action, however, the Commission has repeatedly recognized that the 4.9 GHz band is "underutilized." Seventh Report and Order and Ninth Further Notice of Proposed Rulemaking, *In re Amend. of Part 90 of the Commission's Rules*, 38 F.C.C. Rcd. 704 ¶17 (2023) (Seventh Report and Order), JA392-JA393; *see also In re Amend. of Part 90 of the Commission's Rules*, 36 F.C.C. Rcd. 1958 ¶35 (2020), JA277-JA278 (recognizing that "4.9 GHz spectrum has been underutilized"); *In re Amend. of Part 90 of the Commission's Rules*, No. FCC18-33, 2018 WL 1452723, at *10 (OHMSV Mar. 23, 2018), JA189-JA190 (seeking to "promot[e] more efficient use of [4.9 GHz] spectrum that has long been underutilized"); Press Release, *FCC Adopts New Rules to Increase Use of 4.9 GHz Spectrum Band*, 2020 WL 5876789, at *2 (OHMSV Sept. 30, 2020) (quoting report that "[t]he 4.9 GHz band represents a valuable, though currently underutilized, resource" (alteration in original)).

A 2024 report by Roberson and Associates, included in the record before the Commission, assessed the 4.9 GHz band's utilization. Roberson & Assocs. LLC, *Utilization Analysis of 4.9 GHz Spectrum* (Jan. 2024), https://perma.cc/EG3L-LTTV (Roberson Report), JA566-JA573. The Roberson Report used "publicly available FCC licenses" to "draw . . . inferences on overall utilization of the spectrum across the United States." *Id.* at 1, JA568. It concluded that between 92% and 95% of the spectrum was unused. *Id.* at 3-4, JA570-JA571.

Over more than a decade—through multiple notices of proposed rulemakings and reports and orders—the Commission has examined the reasons for this underutilization and attempted to remedy it. *See* Order ¶6 & nn.22-25, JA667.

The principal sources of the problem, the Commission found, were the Commission's original decisions to issue non-exclusive geographic licenses without any coordination mechanism. In contrast to other public safety bands, the "4.9 GHz band licenses authorize operation on any channel over the entire 50 megahertz of the band," and "a 4.9 GHz licensee has blanket authority to operate base stations and mobile units . . . and/or temporary . . . fixed stations anywhere within its authorized area." Seventh Report and Order, 38 F.C.C. Rcd. at 706 ¶4, JA388. Also, because none of these licenses is exclusive, no licensee may exclude other licensees from using the same frequencies in the geographic area in its own license—but the Commission's "4.9 GHz rules . . . historically have not specified a formal coordination requirement." *Id.* ¶5, JA388. These geographic licenses therefore severely restrict any other entity's use of the entire 4.9 GHz band in the geographic area that is subject to that license. *See* Order ¶3, JA665.

Moreover, substantial record evidence developed over the course of the Commission's review demonstrated that the available technology does not allow a licensee to make effective use of its entire geographic license. APCO Int'l, *4.9 GHz Task Force Report* 12 (Sept. 28, 2015), https://perma.cc/CU2D-K3E5 (APCO

Report), JA172 (noting "limited vendor ecosystem, specialized devices, and higher costs"). That is because there is "a lack of available equipment for mobile applications," which means that even if a licensee could in theory use the 4.9 GHz band anywhere within its allotted area, it rarely has the necessary technology to actually do so. Proposed Rule: 4.9 GHz Band, 83 Fed. Reg. 20,011, 20,012 (May 7, 2018), JA238. As then-Commissioner Jessica Rosenworcel recognized, "there is a limited vendor ecosystem supporting this band, so it is hard to acquire equipment and costly to deploy it." *Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Dissenting Statement of Commissioner Rosenworcel (Sept. 30, 2020), JA260.

For this reason, one study concluded that "over 90% of the utilization [of the 4.9 GHz band] is for point-to-point applications"—*i.e.*, use of the band between fixed points such as two antennas at base sites. APCO Report 3, JA163. Thus, even though geographic licenses permit the use of mobile units anywhere in the authorized area, virtually all usage of the 4.9 GHz band consists of communications between fixed locations—an additional reason why the band is grossly underutilized within the area covered by broad geographic licenses.

The underutilization of the 4.9 GHz band is especially problematic because of the spectrum's potential for use by innovative equipment employing advanced

communications technologies such as 5G and other technological innovations.[2] The technological characteristics of the 4.9 GHz band combine relatively fast through-put speeds while still permitting signals to travel longer distances, which makes it ideally suited for 5G deployment. *See* PSSA *Ex Parte* 1, WP Docket No. 07-100 (Apr. 23, 2024), https://perma.cc/52SM-TX3D, JA594. Increasing usage of the 4.9 GHz band could expand deployment of "robotics and airborne operations, . . . the Internet of Things," and "the latest commercially available technologies, including 5G, for the benefit of public safety users." Order ¶¶5, 1, JA666, JA664-JA665. The Commission recognized that lack of demand was an obstacle to development and deployment of these technologies. *See id.* ¶44, JA693-JA694 (acknowledging its request for comments "on how to encourage the widespread deployment of the latest commercially available technologies in a way that would promote interoperability while also lowering equipment costs").

In 2020, the Commission issued a freeze on applications for the 4.9 GHz band so that it could better study how to improve utilization of the band. Sixth Report and Order and Seventh Further Notice of Proposed Rulemaking, *In re Amend. of Part 90 of the Commission's Rules*, 36 F.C.C. Rcd. 1958 ¶11 (2020), JA268.

---

[2] "5G" is the fifth "generation of wireless service," *United Keetoowah Band of Cherokee Indians in Oklahoma v. FCC*, 933 F.3d 728, 732 (D.C. Cir. 2019), which provides users "faster data rates with lower latency, or delays, in transmitting data," FCC, *5G FAQs* (last updated May 4, 2021), https://perma.cc/A47Y-9DAH.

In 2021, the Commission sought public input on "how to maximize the use of the band to support public safety, leverage technological advancements (such as 5G), foster a robust equipment market, and address non-public safety use of the band on a nationwide basis." Order ¶8, JA668 (citing prior order). It also "sought comment on implementation of a single, nationwide framework." *Id.* The Commission in addition "lift[ed] the licensing freeze . . . as it applies to incumbent[ license holders] wishing to modify their existing licenses or license new permanent fixed sites." Order on Reconsideration and Eighth Further Notice of Proposed Rulemaking, *In re Amend. of Part 90 of the Commission's Rules*, 36 F.C.C. Rcd. 15032 ¶25 (2021), JA331-JA332.

The Seventh Report and Order, issued in January 2023, established a "comprehensive and coordinated nationwide approach to managing the 4.9 GHz band." Order ¶10, JA669; *see also* Seventh Report and Order, 38 F.C.C. Rcd. at 704 ¶1, JA387. It adopted a nationwide Band Manager framework under which the Band Manager would "be selected based on its expertise and connections to the public safety community." Order ¶10, JA669. The Band Manager would be responsible "for coordinating all operations in the band." *Id.*

As the Commission explained, "[i]mplementing a centralized coordination strategy will . . . help leverage new technologies, lower equipment costs, attract new users, facilitate effective frequency coordination and interference protection, and

15

promote interoperability." Seventh Report and Order, 38 F.C.C. Rcd. at 710 ¶17, JA392-JA393; *see also* PSSA Comments 8, WP Docket No. 07-100 (filed Apr. 12, 2023), https://perma.cc/WL7V-FPTF, JA489 (advocating that a nationwide license would "accelerat[e] the availability of the 4.9 GHz Band for 5G services and reduc[e] equipment costs through economies of scale"); APCO Int'l Reply Comments 3, WP Docket No. 07-100 (filed May 15, 2023), https://perma.cc/3T66-A9HV, JA552 (warning that a fragmented approach to the Band Manager framework "would . . . reduce the band manager's ability to act quickly, efficiently, and decisively" and "would result in higher costs" and undermine "service to public safety [and] its ability to drive innovation and use of the band").

The Commission concurrently adopted "new licensing rules" under which "public safety licensees may be issued site-based licenses for all operations which currently are authorized under their geographic area licenses." Seventh Report and Order, 38 F.C.C. Rcd. at 742 ¶117, JA424. The Commission also required "incumbent licensees . . . to obtain a license for base stations (currently authorized under the geographic license scheme) on a site-by-site basis." *Id.* at 717 ¶34, JA399-JA400.

Consistent with this change in structure, the Seventh Report and Order authorized "the collection [from licensees] of granular data on public safety operations in the 4.9 GHz band." Order ¶11, JA669. As the Commission explained,

16

"this data combined with a formal coordination structure performed by the Band Manager will improve interference mitigation efforts, bolster public safety confidence in the band, and play a crucial role in the Band Manager's ability to find opportunities for increasing access into the band." *Id.*

The Commission sought comment on how to implement the nationwide Band Manager framework and how to choose the Band Manager. Order ¶15, JA671.

### C.  The Order Under Review

In October 2024, the Commission issued the Eighth Report and Order. The Order advances the Commission's efforts to enhance the use of the band to protect public safety. Specifically, the Order assigns a nationwide overlay license to a Band Manager, which in turn is authorized to enter into a sharing agreement with FirstNet. The Order also imposes other duties and obligations on the Band Manager to ensure adequate oversight of the 4.9 GHz band and to protect incumbent licensees. And the Order begins the process of collecting data that would facilitate the conversion of all licenses into usage-based licenses. Finally, the Order maintains the freeze on new license applications and reinstitutes the freeze on modifications to incumbent licenses. However, the Commission did not adopt PSSA's proposals to replace all geographic licenses with site-based licenses and compel licensees to give up unused spectrum.

*Nationwide Overlay License Assigned to Band Manager.* The Commission previously had "sought comment on the best ways to increase utilization in areas where there are no operations in the band." Order ¶21, JA675-676. In particular, the Commission "sought comment on establishing a national license for the band." *Id.* Based on the record before it, the Commission reaffirmed its conclusion in the Seventh Report and Order "that the best mechanism for putting unassigned spectrum to use as quickly and efficiently as possible is to assign a nationwide overlay license to the Band Manager." *Id.*

Under this framework, the Band Manager would "obtain the rights to a nationwide geographic area license across the entire 50 megahertz of the band that is 'overlaid' on top of the existing incumbent licenses and includes areas where spectrum is unassigned." Order ¶23, JA677-678. In support of its conclusion, the Commission cited comments stating "that assigning a nationwide overlay license to the Band Manager" was "the most efficient and cost-effective way" to "increase the band's usage, preserve incumbent operations, maximize the benefit of the band for the greatest number of America's first responders, and meet public safety's growing need for advanced and dedicated 5G-enabled communications." *Id.* ¶22, JA676-677 (quotation marks and alterations omitted).

The Commission explained that its issuance of the overlay license to the Band Manager was within its statutory authority. It referenced Section 309(j)(2)(A), which

18

permits the Commission to issue a license without a competitive bidding process if the license is "for public safety radio services." Order ¶25, JA678-JA679 (citing 47 U.S.C. § 309(j)(2)(A)). The Commission concluded that "this exemption applies to the 4.9 GHz band because the Commission specifically designated this band for services intended to protect the safety of life, health or property." *Id.* ¶26, JA679-JA680. Since "a majority of users licensed in the 4.9 GHz band are qualified to obtain auction-exempt spectrum," the Commission reasoned that "assigning a nationwide overlay license to the Band Manager is also exempt from auction" because it, too, would be "protecting the safety of life, health, or property." *Id.*

*Band Manager Authorized to Share Spectrum with FirstNet.* The Commission next authorized the Band Manager "to enter into a spectrum sharing agreement with FirstNet to allow FirstNet to operate in unassigned portions of the band." Order ¶21, JA675-JA676. The sharing agreement could allow "FirstNet to operate anywhere within the geographic area of the overlay license, subject to the parameters of the sharing agreement and protection of incumbent licensees." *Id.* ¶24, JA678. And if a licensee's license were terminated, the Band Manager could amend the sharing agreement with FirstNet "to include the rights to operate in the geographic (or site-based) area and on the channel(s) of the cancelled license." *Id.*

The Commission concluded "that this mechanism is the best method to make certain that the 4.9 GHz band remains a public safety band which is more fully

utilized." Order ¶24, JA678. As it explained, "this decision and the Band Manager's oversight role . . . will increase overall utilization of the band, enhance public safety coordination, and allow incorporation of the latest commercially available technologies into the band." *Id.* ¶35 & n.156, JA687-JA688 (collecting comments supporting findings).

The Commission determined that its statutory powers encompass authorizing a Band Manager-FirstNet sharing agreement. The Commission noted that, "[a]lthough [47 U.S.C. § 305] precludes the Commission from licensing stations belonging to and operated by the federal Government, NTIA . . . agrees that such restrictions do not bar federal entities from use of spectrum managed by the Commission." Order ¶36 n.159, JA689 (quoting Third Report and Order, *In re the 4.9 GHz Band Transferred from Federal Government Use*, 18 F.C.C. Rcd. 9152 ¶25 n.76 (2003), JA63). And since the Commission's licensing assignment was to the third-party Band Manager, not to FirstNet, Order ¶30, JA682-JA683, and its rules would enable FirstNet to operate in the band pursuant to such a sharing agreement, *id*. ¶¶36-37, JA688-JA689 (citing 47 C.F.R. § 90.1203(b)), the assignment was permissible under 47 U.S.C. § 305.

The Commission also rejected the argument that permitting FirstNet to operate in the band was impermissible. The Commission refused to "read[] a restriction on FirstNet's authority to operate in bands other than the 700 MHz band"

and instead concluded "that one of the Spectrum Act's goals is to ensure that FirstNet's" nationwide public safety broadband network "advances and evolves and that restricting [it] to the 700 MHz band would not be in line with this goal." Order ¶31, JA683-JA684.

*Additional Band Manager Responsibilities.* The Order also assigns responsibilities to the Band Manager to ensure that the modified framework is effectively implemented. Specifically, the Order directs the Band Manager to (1) "protect[] incumbent public safety licensees from harmful interference," Order ¶41, JA691-JA692; (2) ensure that its sharing agreement with FirstNet will comply with the Commission's rules and "will not cause harmful interference to incumbent licensees," including by requiring that "[i]f such interference occurs, the Band Manager must require FirstNet to immediately cease operations," *id.* ¶¶42-43, JA692-JA693; and (3) "work with incumbent licensees to facilitate the deployment of advanced wireless technologies in a manner that supports and protects public safety users," including by "leveraging" FirstNet's nationwide public safety broadband network, *id.* ¶44, JA693-JA694. Moreover, to "facilitate Commission oversight, improve transparency, and help to ensure that the 4.9 GHz band is put to its highest and best use," the Order provides for annual reporting by the Band Manager. *Id.* ¶49, JA696.

*Treatment of Incumbent Licensees.* The Commission ordered the collection of granular data regarding incumbent licensees' use of the band, which would be used to replace all licenses, whether geographic or site-based, with usage-based licenses. Order ¶58, JA700-JA701. The Commission gave "incumbent licensees 6 months to make the appropriate filings" concerning their use of the 4.9 GHz band. *Id.* ¶56, JA699-JA700. Once that data is collected, "incumbent licensees' current . . . licenses will be cancelled once the incumbents apply for and are" granted new licenses, which may be geographic or site-based. *Id.* ¶58, JA700-JA701. In an effort to address concerns that the shift could "disrupt the serious reliance interests of existing state and local 4.9 GHz public-safety licensees," *id.* ¶57, JA700 (quoting CERCI May 10, 2024, *Ex Parte* at 2, JA602), the Commission stressed that the new regime "does not modify or alter incumbents' rights to operate their existing networks," *id.* ¶58, JA700-JA701.

The Commission declined *sub silentio* to replace all geographic area licenses with site-based licenses. PSSA had proposed "that the Commission convert all current public safety licenses to site-based authorizations to operate." PSSA Comments 16, WP Docket No. 07-100 (filed Apr. 12, 2023), https://perma.cc/WL7V-FPTF, JA497. It explained that, in conjunction with the nationwide overlay license, a switch to site-based licensing would make it easier and more efficient to identify and make use of unused spectrum. The Utilities

Technology Council echoed this recommendation, stating that switching immediately to a site-based licensing regime will "ensure that licenses are tailored to the needs of public safety" and "discourage warehousing of spectrum and speculation by licensees, which also would result in wasteful use of the spectrum." Utilities Technology Council Comment 8, WP Docket No. 07-100 (filed Apr. 13, 2023), https://perma.cc/75HD-T6BR, JA539. While others opposed the proposal, asserting that certain operations "are not well-suited for site-based licensing," *see* APCO Int'l Comments 19-20, WP Docket No. 07-100 (filed Apr. 13, 2023), https://perma.cc/3NUQ-N6AN, JA519-JA520, the Commission did not explain its decision not to take this step.

The Commission also declined to compel all incumbent licensees to surrender any unused spectrum. To further improve utilization of the 4.9 GHz band and provide greater clarity about the scope of available spectrum, PSSA proposed that the Commission "require incumbent licensees to surrender spectrum they are not using." PSSA *Ex Parte* 4, WP Docket No. 07-100 (Apr. 23, 2024), https://perma.cc/52SM-TX3D, JA597. The Commission recognized that surrendering unused spectrum could help "increase overall spectrum efficiency in the band." Order ¶59, JA701. But it nonetheless declined to act, deferring any decision pending further data collection. *Id.* Again, the Commission did not explain why it elected to defer this decision.

*Freeze on New or Modified Licenses.* To ensure an effective transition to the modified framework, the Commission addressed the pre-existing freeze on new licenses for the 4.9 GHz band that had persisted through the Seventh Report and Order. It concluded that lifting the freeze "would further complicate the spectrum environment and undermine the Band Manager's flexibility to provide for efficient use of this spectrum." Order ¶53, JA698. It further concluded "that freezing expansions, additions to, or modification of other technical parameters applicable to incumbent licensees is also necessary . . . to enable expanded public safety access to the band through the Band Manager's nationwide overlay license and sharing agreement with FirstNet." *Id.* ¶54, JA699. It therefore "retain[ed] the freeze for all applicants who are not already 4.9 GHz licensees, and . . . reinstate[d] the freeze as it applies to incumbent licensees . . . . adding new licenses or modifying existing licenses." *Id.* ¶55, JA699.

In reinstituting the freeze on incumbent licensees, the Commission concluded that "a stable spectrum landscape reflecting the current state of operations in the band will better facilitate analysis . . . of licensed operations by the Commission, the Band Manager, and other interested parties." Order ¶54, JA699. But the Commission was "cognizant that some incumbent licensees . . . may have invested in systems that they hoped to use to modify or expand current operations," and "remind[ed]

applicants and current licensees facing special circumstances that they make seek a waiver of the freeze pursuant to section 1.925 of the Commission's rules." *Id.*[3]

### D. Legal Challenges To The Order

The Commission published the Order in the Federal Register on November 20, 2024. *See* Improving Public Safety Communications in the 4.9 GHz Band, 89 Fed. Reg. 91,578 (Nov. 20, 2024). On November 26, PSSA petitioned this Court for review of several discrete aspects of the Order, while supporting its principal provisions. On November 27, CERCI also filed a petition for review of the Order in this Court. *See* Pet. for Review, *Coalition for Emergency Response and Critical Infrastructure v. FCC*, No. 24-1364 (D.C. Cir. Nov. 27, 2024), Doc. No. 2087294. NSA and CSSA also filed a petition for review. *See* Pet. for Review, *National Sheriffs' Association v. FCC*, No. 25-1028 (D.C. Cir. Jan. 17, 2025), Doc. No. 2095068. And BART filed a petition for review of the Order in this Court. *See* Pet. for Review, *San Francisco Bay Area Rapid Transit District v. FCC*, No. 25-1034 (D.C. Cir. Jan. 17, 2025), Doc. No. 2095119.

---

[3] A waiver may be obtained "if it is shown that" either "[t]he underlying purpose of the rule(s) would not be served or would be frustrated by application to the instant case, and that a grant of the requested waiver would be in the public interest;" or "[i]n view of unique or unusual factual circumstances of the instant case, application of the rule(s) would be inequitable, unduly burdensome or contrary to the public interest, or the applicant has no reasonable alternative." 47 C.F.R. § 1.925(b)(3).

The Court consolidated these actions. *See* Order, *Public Safety Spectrum Alliance v. FCC*, No. 24-1363 (D.C. Cir. Jan. 21, 2025), Doc. No. 2095073; Order, *Public Safety Spectrum Alliance v. FCC*, No. 24-1363 (D.C. Cir. Jan. 21, 2025), Doc. No. 2095228; Order, *Public Safety Spectrum Alliance v. FCC*, No. 24-1363 (D.C. Cir. Dec. 4, 2024), Doc. No. 2087934.

NSA/CSSA and BART petitioned the Commission for a stay of the Order. They then moved for a stay in this Court. On March 19, the Court denied the motions, concluding that the stay applicants "have not satisfied the stringent requirements for a stay pending court review." *Public Safety Spectrum Alliance v. FCC*, No. 24-1363 (D.C. Cir. Mar. 19, 2025), Doc. No. 2106559.

## SUMMARY OF THE ARGUMENT

The Commission correctly justified its decision to adopt a new licensing framework for the 4.9 GHz band based on its conclusions that existing licenses were overbroad and resulted in gross underutilization of the band; and that making all spectrum available in a nationwide overlay license would increase band use by first responders and also promote development and deployment of new, life-saving communications technologies. But the Order is arbitrary and capricious in two specific respects, because the Commission failed to take key actions necessary to fully effectuate the policy it adopted and failed to offer any reason for stopping where it did.

First, despite ample record evidence showing that the 4.9 GHz band is severely underutilized, the Order does not adopt PSSA's proposal to convert all incumbent geographic licenses into site-based licenses that reflect licensees' actual operations. The Commission acknowledged PSSA's proposal, but it did not address it at all, instead *sub silentio* rejecting it. In so doing, it violated the Commission's obligation under the Administrative Procedure Act to respond meaningfully to comments. Moreover, the Commission's failure to grapple with this issue meant that the Commission's otherwise-laudable Order did not address the root causes of the underutilization of the 4.9 GHz band, which undermines public safety.

Second, the Order arbitrarily deferred deciding whether to compel licensees to surrender any unused spectrum. The Commission acknowledged requiring surrender of unused spectrum would increase utilization of the 4.9 GHz band, but it deferred consideration until the agency completes its data-collection process. Of course, the Commission cannot determine *which* spectrum is underutilized and should be surrendered without collecting this data, but there is no doubt that a vast catalog of spectrum *is* underutilized. The Commission has made that clear. There is thus no reason to delay making the decision that such spectrum, once identified, should be surrendered immediately.

Deferring that decision contradicts the Commission's acknowledgment that surrendering unused spectrum will improve utilization and protect public safety.

And it delays the process of identifying and freeing unused spectrum, which means less spectrum will be made available on a timely basis to the Band Manager (and, ultimately, to FirstNet's first responder network), which will harm public safety and delay the deployment of new cutting-edge communication technologies. The Commission's failure to require the surrender of unused spectrum is therefore arbitrary and capricious.

## STANDING

The members of PSSA and PSBTA include public safety officials and organizations that are subject to the Order. Petitioners have associational standing to bring this suit "as the representative of [their] members," *Warth v. Seldin*, 422 U.S. 490, 511 (1975), because those members "would otherwise have standing to sue in their own right," *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Order will (i) inject unnecessary delay into the delivery of important services that FirstNet would provide first responders using the 4.9 GHz band; and (ii) deprive Petitioners' members of certainty to plan for the availability of such services. For these reasons, the interests PSSA and PSBTA seek to protect are germane to their purpose; and neither the claims asserted nor the relief requested requires the participation of Petitioners' individual members in the lawsuit. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

Because of the importance of these issues to the organizations' members, PSSA—on its own behalf and as an initiative of PSBTA—submitted comments to the FCC in connection with the proceeding that resulted in issuance of the Order. *See* PSSA Comments, WP Docket No. 07-100 (filed Apr. 12, 2023), https://perma.cc/WL7V-FPTF, JA482-JA498; PSSA Comments, WP Docket No. 07-100 (filed Nov. 29, 2021), https://perma.cc/5P3U-2PEK, JA373-JA385; PSSA Response to CERCI Written Ex Parte, WP Docket No. 07-100 (filed May 24, 2024), https://perma.cc/WQ2J-QAPV, JA616-622.

## ARGUMENT

**THE COMMISSION'S FAILURE TO ADOPT PSSA'S PROPOSALS IS INCONSISTENT WITH ITS NEW 4.9 GHZ BAND LICENSING FRAMEWORK AND THEREFORE ARBITRARY AND CAPRICIOUS.**

The Commission properly justified its new licensing framework for the 4.9 GHz band based on its well-supported determinations that the band's gross underutilization results from the overbreadth of existing licenses and that making the unused spectrum available as part of a nationwide overlay license will increase utilization, foster the deployment of new life-saving communications technologies, and save lives. But the Commission inexplicably ignored the logical, and necessary, implications of those determinations: that it is essential to abandon the existing geographic licensing regime once and for all and, while protecting incumbent licensees' current actual usage, require licensees to surrender unused spectrum

without delay. The Commission therefore acted arbitrarily by rejecting PSSA's proposals to convert all incumbent geographic licenses into site-based licenses and require licensees to surrender unused spectrum.

### A.    The FCC's Justifications For Its New Licensing Framework.

Congress has given the Commission "broad authority to oversee wire and radio communication in the United States." *Cellco P'ship*, 700 F.3d at 537. That authority includes "assigning 'bands of frequencies to the various classes of stations' that will make use of the spectrum." *Intelligent Transp. Soc'y*, 45 F.4th at 411 (quoting 47 U.S.C. § 303(c)).

The Commission explained in detail the reasons for its decision to adopt the new licensing framework for the 4.9 GHz band.

The Commission confronted a serious problem: the band is grossly underutilized—more than 90% unused—but has the potential to support new, and more effective and efficient, means of communication by first responders. *See* pp. 11-14, *supra*. Moreover, existing licenses are overbroad: they encompass all frequencies across the entire 4.9 GHz band, but licensees generally use only a specific frequency or frequencies, and many of the licenses encompass large geographic areas, but licensees use only a small portion of the territory. Order ¶¶3, 5, JA665, JA666.

To accomplish its goal of increasing use of the band by first responders, the Commission made three interrelated determinations.

First, the FCC concluded that "assigning a nationwide overlay license to the Band Manager" was "the most efficient and cost-effective way" to "increase the band's usage, preserve incumbent operations, maximize the benefit of the band for the greatest number of America's first responders, and meet public safety's growing need for advanced and dedicated 5G-enabled communications." Order ¶22, JA676-JA677 (quotation marks and alterations omitted). The nationwide overlay license will "quickly allow for a wider variety of public safety uses in a more dynamic fashion than is currently permitted in the band, which in turn will make this spectrum more responsive to market demands and technological innovations." *Id.* ¶23, JA677-JA678.

Second, the agency authorized the Band Manager to enter into a sharing arrangement in the 4.9 GHz band with FirstNet. The Commission determined that the sharing agreement with FirstNet would "increase overall utilization of the band, enhance public safety coordination, and allow incorporation of the latest commercially available technologies into the band." Order ¶35, JA687-JA688. As the record reflected, FirstNet has already successfully deployed a nationwide public safety broadband network that accommodates the needs of first responders by deploying next-generation communications technologies.

FirstNet therefore is uniquely positioned "to leverage the 4.9 GHz band for the benefit of public safety by using it to provide enhanced and innovative broadband communications services and capabilities to first responders on a nationwide basis," because it could incorporate spectrum from the sharing agreement "into the existing FirstNet network [to] make it available to public safety users without bearing the cost of deployment and operations." Order ¶21 n.90, JA676 (quotation marks omitted). Sharing spectrum from the 4.9 GHz band—a band whose characteristics are "uniquely positioned to" facilitate 5G usage—with FirstNet on a nationwide basis, "rather than [with] multiple commercial users, would facilitate rapid and efficient nationwide deployment and stop the slow and fragmented approach that has led to prolonged underutilization of the band in the last 20 years." *Id.* (quotation marks omitted).

Third, the Commission took several steps to address the overbreadth of incumbent licensees and their consequent retention of unused spectrum. The Commission made clear that it wanted to preserve incumbents' actual use of the band for public safety purposes, but otherwise make unused spectrum available for use by FirstNet. Order ¶21, JA675-JA676 ("Pursuant to any sharing agreement executed with FirstNet, the Band Manager will be responsible for ensuring that FirstNet's operations are coordinated with, and do not cause harmful interference to, existing public safety operations in the band.").

The agency therefore continued the freeze on new licenses and reimposed the freeze on new uses by incumbent licensees, with a waiver process in the event of hardship. Order ¶¶54-55, JA699. And it began the process of converting all licenses into usage-based licenses—but did not require elimination of geographic-based licenses. *Id.* ¶¶58-59, JA700-JA701.

## B.    The Commission Acted Arbitrarily By Failing To Adopt PSSA's Proposals To Take More Expeditious Action To Reclaim Unused Spectrum.

The Commission has taken important and necessary steps toward improving utilization of the 4.9 GHz band. But while those steps are laudable, the Commission acted inconsistently and arbitrarily by failing to apply its policy determinations to two proposals advanced by PSSA.

Despite overwhelming evidence showing the harmful consequences of the existing license scheme, under which licensees retain huge quantities of unused spectrum, the Commission declined to take the required action to solve this important aspect of the problem. Its failure to do so is arbitrary, and the Court should remand this particular aspect of the Order for further proceedings.

A court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2). To "demonstrate that a regulation is arbitrary and capricious, a challenger must show that the agency 'relied on factors which Congress has not intended it to

consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *AT&T Servs.*, 21 F.4th at 845 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).

One flawed aspect of a rule or order does not necessarily require invalidation of the entire agency action. "An inadequately supported rule . . . need not necessarily be vacated" and can instead be remanded for further consideration. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993); *see also ICORE, Inc. v. FCC*, 985 F.2d 1075, 1081 (D.C. Cir. 1993) ("This and other federal circuit courts have repeatedly found it appropriate to remand an agency action without vacating it.").

The Court therefore should not vacate, but rather remand and direct the Commission to reconsider its failure to adopt PSSA's proposals.

### 1. The Commission Arbitrarily And Capriciously Failed To Replace Incumbent Geographic Licenses With Site-Based Licenses.

The Commission *sub silentio* declined to adopt PSSA's proposal that the agency convert all incumbent, geographic licenses into site-based licenses. In so doing, it violated the basic tenet of administrative law requiring an agency to respond to significant comments, and it failed—without explanation—to adopt a proposal

necessary to achieve the goals that the Commission itself adopted in issuing the Order.

It is arbitrary and capricious for an agency to "fail[] to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Huntsman Petrochemical LLC v. EPA*, 114 F.4th 727, 735 (D.C. Cir. 2024) (quoting *State Farm*, 463 U.S. at 43). What's more, "[a]n agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

The Commission did not do that here. It acknowledged that "PSSA recommend[ed] that the Commission convert all current public safety geographic-area licenses to site-based authorizations." Order ¶56, JA699-JA700. But the Commission did not respond to PSSA's recommendation. While it acknowledged opposition to this proposal, the Commission never explained why it chose not to adopt it. The failure to provide reasons for its decision is arbitrary and capricious.

This failure is especially problematic in light of the substantial record evidence showing that overlapping geographic licenses that allow the use of the entire 4.9 GHz band without any mechanism for coordination are a principal cause of underutilization of the 4.9 GHz band. Virtually all use of the 4.9 GHz band—94.5% by one study's count—is site-based. *See* APCO Report 8, JA168. That is

unsurprising given that there is a "limited vendor ecosystem" for the few "specialized devices" that currently enable a licensee to use the 4.9 GHz band in mobile locations. *Id.* at 12, JA172. And because some geographic licenses go so far as to span an entire state, Order ¶5, JA666, an incumbent license that has no coordination mechanism severely restricts the use of the 4.9 GHz band by other entities even when a large portion of the license's geographic coverage is entirely unused. Accordingly, by failing to respond to and act on PSSA's proposal, the Commission "failed to consider an important aspect of the problem." *Huntsman*, 114 F.4th at 735 (quotation marks omitted).

Moreover, the Order's refusal to convert all geographic licenses into site-based licenses will harm the very public safety interests that the Commission seeks to protect through its new licensing framework. As PSSA explained in its comments, it is essential that FirstNet be able to expeditiously and broadly enhance the nationwide public safety broadband network by facilitating the use of new technologies, such as 5G, utilizing the 4.9 GHz band's favorable propagation characteristics. PSSA Comments 8 (Apr. 12, 2023), JA489. The nationwide overlay license will help achieve that goal, by giving the Band Manager access to underutilized spectrum resources. But the Order's failure to convert incumbent licenses into site-based licenses undercuts the speed and efficiency with which this

access can take place, and will reduce "the availability of the 4.9 GHz Band for 5G services" and increase "equipment costs." *Id.*

The Commission offered no explanation for failing to take this important step. Because the Commission did not explain its non-action and, in addition, ignored the significant harm to public safety, its failure to convert geographic licenses into site-based licenses is arbitrary and capricious.

### 2. The Commission Arbitrarily And Capriciously Failed To Require Incumbent Licensees To Surrender Unused Spectrum.

The Commission compounded its failure to convert incumbent geographic licenses by also declining to require these licensees to surrender unused spectrum—even though it acknowledged that doing so would improve utilization of the 4.9 GHz band. That, too, was arbitrary and capricious.

An agency cannot ignore its own findings. As discussed, the Commission accordingly must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation marks and citation omitted).

PSSA proposed that "the Commission require incumbent licensees to surrender any 4.9 GHz spectrum that they are not using." Order ¶57, JA700. The surrender of unused spectrum is critical to increasing utilization of the band because such surrender would facilitate the use of unused spectrum. Critically, it would

37

reduce any uncertainty about the ongoing scope of existing licenses and allow the Band Manager to put such spectrum into use as expeditiously as possible.

The Commission acknowledged that this proposal would "potentially . . . increase overall spectrum efficiency in the band." Order ¶59, JA701. But it nevertheless "defer[red] any consideration of" this proposal "until after the Commission has completed its collection and analysis of granular technical data on incumbent licensed public safety operations in the band." *Id.*

An agency generally is under no obligation to "regulate a particular area all at once." *Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. Fed. R.R. Admin.*, 10 F.4th 869, 876 (D.C. Cir. 2021). But here, the Commission acted arbitrarily and capriciously by failing to require incumbent licensees to surrender unused spectrum, because its failure is starkly inconsistent with the rationale underlying the Order.

First, the Commission expressly recognized that implementing this requirement could "increase overall spectrum efficiency in the band." Order ¶59, JA701. Given the Commission's decade-long effort to increase utilization of the 4.9 GHz band, it makes no sense for the Commission to now defer taking a step that it recognized would help achieve that goal. That delays "the rapid deployment of 5G." PSSA Comments 11, WP Docket No. 07-100 (filed Apr. 12, 2023), https://perma.cc/WL7V-FPTF, JA492; *see also* FOP Comments 2, WP Docket No.

07-100 (filed Apr. 25, 2024), https://perma.cc/4Y89-28A5, JA600 ("We also urge the Commission to take swift and definitive action on this matter, so as not to further delay the ongoing evolution of dedicated public safety communications."). The Commission thus failed to "articulate a satisfactory explanation for its action." *State Farm*, 463 U.S. at 43.

Of course, the Commission cannot know which spectrum must be surrendered before it completes its analysis of existing band usage. But the record shows that there is an enormous amount of unused spectrum in the band, and that the best way to remedy this problem is to rapidly make unused spectrum available once it is identified. There is thus no reason for the Commission to defer the foundational decision of *whether* to require that identified spectrum be surrendered. Licensees can and should be required to surrender any unused spectrum as soon as it is identified; delay irrationally obstructs accomplishment of the Commission's stated policy goals.

The Commission's deferral of this decision will also directly harm public safety. As discussed, providing FirstNet access to the 4.9 GHz band will "accelerat[e] the availability of the 4.9 GHz Band for 5G services and reduc[e] equipment costs through economies of scale." PSSA Comments 8, WP Docket No. 07-100 (filed Apr. 12, 2023), https://perma.cc/WL7V-FPTF, JA489. The more unused spectrum that is allocated to the Band Manager for use by FirstNet, the more

cost-effective it will be for Petitioners' members to utilize new life-saving services. Conversely, failing to adopt PSSA's proposal will impede the availability of these services. This ultimately will harm the public: the continued underutilization of the 4.9 GHz band will mean that first responders have fewer tools to respond to emergencies, especially tools that involve advanced technologies. The Commission has recognized that forcing licensees to give up unused spectrum will improve utilization of the 4.9 GHz band and therefore help the general public. Absent any legitimate reason to adopt this proposal, the Commission should not be permitted to ignore the PSSA's proposed solution.

## CONCLUSION

The Court should remand the Order for further proceedings with respect to the Commission's failure to adequately consider whether to replace incumbent geographic licenses with site-based licenses and compel incumbent licensees to surrender unused spectrum.

> */s/ Andrew J. Pincus*
> Andrew J. Pincus
> Carmen N. Longoria-Green
> Wajdi C. Mallat
> MAYER BROWN LLP
> 1999 K Street, N.W.
> Washington, DC 20006
> (202) 263-3000
> apincus@mayerbrown.com
>
> *Counsel for Petitioners Public Safety Spectrum Alliance & Public Safety Broadband Technology Association*

Dated: September 29, 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation set forth in the Court's Order, *see* Order, *Public Safety Spectrum Alliance v. FCC*, No. 24-1363 (D.C. Cir. May 6, 2025), Doc. No. 2114559, because it contains 8,925 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f).

This motion complies with the typeface requirements of Rule 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman 14-point type.

*/s/ Andrew J. Pincus*
Andrew J. Pincus
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

*Counsel for Petitioners Public Safety Spectrum Alliance & Public Safety Broadband Technology Association*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2025, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system, which will serve all counsel of record.

*/s/ Andrew J. Pincus*
Andrew J. Pincus
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

*Counsel for Petitioners Public Safety Spectrum Alliance & Public Safety Broadband Technology Association*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

Page

47 U.S.C. § 151 ..................................................................Add.1

47 U.S.C. § 301 .................................................................Add.1

47 U.S.C. § 302a ...............................................................Add.2

47 U.S.C. § 305 .................................................................Add.2

47 U.S.C. § 309 .................................................................Add.2

47 U.S.C. § 1401 ...............................................................Add.3

47 U.S.C. § 1421 ...............................................................Add.4

47 U.S.C. § 1422 ...............................................................Add.4

47 U.S.C. § 1424 ...............................................................Add.5

47 U.S.C. § 1426 ...............................................................Add.8

47 U.S.C. § 1428 .............................................................Add.14

47 U.S.C. § 1429 .............................................................Add.14

47 U.S.C. § 1430 .............................................................Add.15

47 U.S.C. § 1433 .............................................................Add.16

47 C.F.R. § 1.925 .............................................................Add.16

47 C.F.R. § 90.1203 .........................................................Add.16

## 47 U.S.C. § 151

### § 151. Purposes of chapter; Federal Communications Commission created

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

## 47 U.S.C. § 301

### § 301. License for radio communication or transmission of energy

It is the purpose of this chapter, among other things, to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license. No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio (a) from one place in any State, Territory, or possession of the United States or in the District of Columbia to another place in the same State, Territory, possession, or District; or (b) from any State, Territory, or possession of the United States, or from the District of Columbia to any other State, Territory, or possession of the United States; or (c) from any place in any State, Territory, or possession of the United States, or in the District of Columbia, to any place in any foreign country or to any vessel; or (d) within any State when the effects of such use extend beyond the borders of said State, or when interference is caused by such use or operation with the transmission of such energy, communications, or signals from within said State to any place beyond its borders, or from any place beyond its borders to any place within said State, or with the transmission or reception of such energy, communications, or signals from and/or to places beyond the borders of said State; or (e) upon any vessel or aircraft of the United States (except as provided in section 303(t) of this title); or (f) upon any other mobile

stations within the jurisdiction of the United States, except under and in accordance with this chapter and with a license in that behalf granted under the provisions of this chapter.

## 47 U.S.C. § 302a

### § 302a. Devices which interfere with radio reception

**(a) Regulations**

The Commission may, consistent with the public interest, convenience, and necessity, make reasonable regulations (1) governing the interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications; and (2) establishing minimum performance standards for home electronic equipment and systems to reduce their susceptibility to interference from radio frequency energy. Such regulations shall be applicable to the manufacture, import, sale, offer for sale, or shipment of such devices and home electronic equipment and systems, and to the use of such devices.

## 47 U.S.C. § 305

### § 305. Government owned stations
**(a) Frequencies; compliance with regulations; stations on vessels**
Radio stations belonging to and operated by the United States shall not be subject to the provisions of sections 301 and 303 of this title. All such Government stations shall use such frequencies as shall be assigned to each or to each class by the President. All such stations, except stations on board naval and other Government vessels while at sea or beyond the limits of the continental United States, when transmitting any radio communication or signal other than a communication or signal relating to Government business, shall conform to such rules and regulations designed to prevent interference with other radio stations and the rights of others as the Commission may prescribe.

## 47 U.S.C. § 309

### § 309. Application for license

**(a) Considerations in granting application**

Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 of this title applies, whether the

public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.

…

**(j) Use of competitive bidding**

**(1) General authority**

If, consistent with the obligations described in paragraph (6)(E), mutually exclusive applications are accepted for any initial license or construction permit, then, except as provided in paragraph (2), the Commission shall grant the license or permit to a qualified applicant through a system of competitive bidding that meets the requirements of this subsection.

**(2) Exemptions**

The competitive bidding authority granted by this subsection shall not apply to licenses or construction permits issued by the Commission--

**(A)** for public safety radio services, including private internal radio services used by State and local governments and non-government entities and including emergency road services provided by not-for-profit organizations, that--

**(i)** are used to protect the safety of life, health, or property; and

**(ii)** are not made commercially available to the public;

**(B)** for initial licenses or construction permits for digital television service given to existing terrestrial broadcast licensees to replace their analog television service licenses; or

**(C)** for stations described in section 397(6) of this title.


**47 U.S.C. § 1401**

**§ 1401. Definitions**

In this chapter:

…

**(21) Nationwide public safety broadband network**

The term "nationwide public safety broadband network" means the nationwide, interoperable public safety broadband network described in section 1422 of this title.

# 47 U.S.C. § 1421

## § 1421. Single public safety wireless network licensee

**(a) Reallocation and grant of license**
Notwithstanding any other provision of law, and subject to the provisions of this chapter, the Commission shall reallocate and grant a license to the First Responder Network Authority for the use of the 700 MHz D block spectrum and existing public safety broadband spectrum.

# 47 U.S.C. § 1422

## § 1422. Public safety broadband network

**(a) Establishment**
The First Responder Network Authority shall ensure the establishment of a nationwide, interoperable public safety broadband network.

**(b) Network components**
The nationwide public safety broadband network shall be based on a single, national network architecture that evolves with technological advancements and initially consists of--
**(1)** a core network that--
**(A)** consists of national and regional data centers, and other elements and functions that may be distributed geographically, all of which shall be based on commercial standards; and
**(B)** provides the connectivity between--
**(i)** the radio access network; and
**(ii)** the public Internet or the public switched network, or both; and
**(2)** a radio access network that--
**(A)** consists of all cell site equipment, antennas, and backhaul equipment, based on commercial standards, that are required to enable wireless communications with devices using the public safety broadband spectrum; and
**(B)** shall be developed, constructed, managed, maintained, and operated taking into account the plans developed in the State, local, and tribal planning and implementation grant program under section 1442(a) of this title.

# 47 U.S.C. § 1424

## § 1424. Establishment of the First Responder Network Authority

**(a) Establishment**
There is established as an independent authority within the NTIA the "First Responder Network Authority" or "FirstNet".

**(b) Board**
**(1) In general**
The First Responder Network Authority shall be headed by a Board, which shall consist of--
**(A)** the Secretary of Homeland Security;
**(B)** the Attorney General of the United States;
**(C)** the Director of the Office of Management and Budget; and
**(D)** 12 individuals appointed by the Secretary of Commerce in accordance with paragraph (2).
**(2) Appointments**
**(A) In general**
In making appointments under paragraph (1)(D), the Secretary of Commerce shall-
**(i)** appoint not fewer than 3 individuals to represent the collective interests of the States, localities, tribes, and territories;
**(ii)** seek to ensure geographic and regional representation of the United States in such appointments;
**(iii)** seek to ensure rural and urban representation in such appointments; and
**(iv)** appoint not fewer than 3 individuals who have served as public safety professionals.
**(B) Required qualifications**
**(i) In general**
Each member appointed under paragraph (1)(D) should meet not less than 1 of the following criteria:
**(I) Public safety experience**
Knowledge and experience in the use of Federal, State, local, or tribal public safety or emergency response.
**(II) Technical expertise**
Technical expertise and fluency regarding broadband communications, including public safety communications.
**(III) Network expertise**
Expertise in building, deploying, and operating commercial telecommunications networks.

**(IV) Financial expertise**
Expertise in financing and funding telecommunications networks.
**(ii) Expertise to be represented**
In making appointments under paragraph (1)(D), the Secretary of Commerce shall appoint--
**(I)** not fewer than 1 individual who satisfies the requirement under subclause (II) of clause (i);
**(II)** not fewer than 1 individual who satisfies the requirement under subclause (III) of clause (i); and
**(III)** not fewer than 1 individual who satisfies the requirement under subclause (IV) of clause (i).
**(C) Citizenship**
No individual other than a citizen of the United States may serve as a member of the Board.

**(c) Terms of appointment**
**(1) Initial appointment deadline**
Members of the Board shall be appointed not later than 180 days after February 22, 2012.
**(2) Terms**
**(A) Length**
**(i) In general**
Each member of the Board described in subparagraphs (A) through (C) of subsection (b)(1) shall serve as a member of the Board for the life of the First Responder Network Authority.
**(ii) Appointed individuals**
The term of office of each individual appointed to be a member of the Board under subsection (b)(1)(D) shall be 3 years. No member described in this clause may serve more than 2 consecutive full 3-year terms.
**(B) Expiration of term**
Any member whose term has expired may serve until such member's successor has taken office, or until the end of the calendar year in which such member's term has expired, whichever is earlier.
**(C) Appointment to fill vacancy**
Any member appointed to fill a vacancy occurring prior to the expiration of the term for which that member's predecessor was appointed shall be appointed for the remainder of the predecessor's term.
**(D) Staggered terms**
With respect to the initial members of the Board appointed under subsection (b)(1)(D)--

**(i)** 4 members shall serve for a term of 3 years;
**(ii)** 4 members shall serve for a term of 2 years; and
**(iii)** 4 members shall serve for a term of 1 year.
**(3) Vacancies**
A vacancy in the membership of the Board shall not affect the Board's powers, and shall be filled in the same manner as the original member was appointed.

**(d) Chair**
**(1) Selection**
The Secretary of Commerce shall select, from among the members of the Board appointed under subsection (b)(1)(D), an individual to serve for a 2-year term as Chair of the Board.
**(2) Consecutive terms**
An individual may not serve for more than 2 consecutive terms as Chair of the Board.

**(e) Meetings**
**(1) Frequency**
The Board shall meet--
**(A)** at the call of the Chair; and
**(B)** not less frequently than once each quarter.
**(2) Transparency**
Meetings of the Board, including any committee of the Board, shall be open to the public. The Board may, by majority vote, close any such meeting only for the time necessary to preserve the confidentiality of commercial or financial information that is privileged or confidential, to discuss personnel matters, or to discuss legal matters affecting the First Responder Network Authority, including pending or potential litigation.

**(f) Quorum**
Eight members of the Board shall constitute a quorum, including at least 6 of the members appointed under subsection (b)(1)(D).

**(g) Compensation**
**(1) In general**
The members of the Board appointed under subsection (b)(1)(D) shall be compensated at the daily rate of basic pay for level IV of the Executive Schedule for each day during which such members are engaged in performing a function of the Board.

**(2) Prohibition on compensation**

A member of the Board appointed under subparagraphs (A) through (C) of subsection (b)(1) shall serve without additional pay, and shall not otherwise benefit, directly or indirectly, as a result of their service to the First Responder Network Authority, but shall be allowed a per diem allowance for travel expenses, at rates authorized for an employee of an agency under subchapter I of chapter 57 of Title 5, while away from the home or regular place of business of the member in the performance of the duties of the First Responder Network Authority.

## 47 U.S.C. § 1426

### § 1426. Powers, duties, and responsibilities of the First Responder Network Authority

**(a) General powers**

The First Responder Network Authority shall have the authority to do the following:

**(1)** To exercise, through the actions of its Board, all powers specifically granted by the provisions of this subchapter, and such incidental powers as shall be necessary.

**(2)** To hold such hearings, sit and act at such times and places, take such testimony, and receive such evidence as the First Responder Network Authority considers necessary to carry out its responsibilities and duties.

**(3)** To obtain grants and funds from and make contracts with individuals, private companies, organizations, institutions, and Federal, State, regional, and local agencies.

**(4)** To accept, hold, administer, and utilize gifts, donations, and bequests of property, both real and personal, for the purposes of aiding or facilitating the work of the First Responder Network Authority.

**(5)** To spend funds under paragraph (3) in a manner authorized by the Board, but only for purposes that will advance or enhance public safety communications consistent with this chapter.

**(6)** To take such other actions as the First Responder Network Authority (through the Board) may from time to time determine necessary, appropriate, or advisable to accomplish the purposes of this chapter.

**(b) Duty and responsibility to deploy and operate a nationwide public safety broadband network**

**(1) In general**

The First Responder Network Authority shall hold the single public safety wireless license granted under section 1421 of this title and take all actions necessary to ensure the building, deployment, and operation of the nationwide public safety broadband network, in consultation with Federal, State, tribal, and local public safety entities, the Director of NIST, the Commission, and the public safety advisory committee established in section 1425(a) of this title, including by, at a minimum--

**(A)** ensuring nationwide standards for use and access of the network;

**(B)** issuing open, transparent, and competitive requests for proposals to private sector entities for the purposes of building, operating, and maintaining the network that use, without materially changing, the minimum technical requirements developed under section 1423 of this title;

**(C)** encouraging that such requests leverage, to the maximum extent economically desirable, existing commercial wireless infrastructure to speed deployment of the network; and

**(D)** managing and overseeing the implementation and execution of contracts or agreements with non-Federal entities to build, operate, and maintain the network.

**(2) Requirements**

In carrying out the duties and responsibilities of this subsection, including issuing requests for proposals, the First Responder Network Authority shall--

**(A)** ensure the safety, security, and resiliency of the network, including requirements for protecting and monitoring the network to protect against cyberattack;

**(B)** promote competition in the equipment market, including devices for public safety communications, by requiring that equipment for use on the network be--

**(i)** built to open, non-proprietary, commercially available standards;

**(ii)** capable of being used by any public safety entity and by multiple vendors across all public safety broadband networks operating in the 700 MHz band; and

**(iii)** backward-compatible with existing commercial networks to the extent that such capabilities are necessary and technically and economically reasonable;

**(C)** promote integration of the network with public safety answering points or their equivalent; and

**(D)** address special considerations for areas or regions with unique homeland security or national security needs.

### (3) Rural coverage

In carrying out the duties and responsibilities of this subsection, including issuing requests for proposals, the nationwide, interoperable public safety broadband network, consistent with the license granted under section 1421 of this title, shall require deployment phases with substantial rural coverage milestones as part of each phase of the construction and deployment of the network. To the maximum extent economically desirable, such proposals shall include partnerships with existing commercial mobile providers to utilize cost-effective opportunities to speed deployment in rural areas.

### (4) Execution of authority

In carrying out the duties and responsibilities of this subsection, the First Responder Network Authority may--

**(A)** obtain grants from and make contracts with individuals, private companies, and Federal, State, regional, and local agencies;

**(B)** hire or accept voluntary services of consultants, experts, advisory boards, and panels to aid the First Responder Network Authority in carrying out such duties and responsibilities;

**(C)** receive payment for use of--

**(i)** network capacity licensed to the First Responder Network Authority; and

**(ii)** network infrastructure constructed, owned, or operated by the First Responder Network Authority; and

**(D)** take such other actions as may be necessary to accomplish the purposes set forth in this subsection.


### (c) Other specific duties and responsibilities

### (1) Establishment of network policies

In carrying out the requirements under subsection (b), the First Responder Network Authority shall develop--

**(A)** requests for proposals with appropriate--

**(i)** timetables for construction, including by taking into consideration the time needed to build out to rural areas and the advantages offered through partnerships with existing commercial providers under paragraph (3);

**(ii)** coverage areas, including coverage in rural and nonurban areas;

**(iii)** service levels;

**(iv)** performance criteria; and

**(v)** other similar matters for the construction and deployment of such network;

**(B)** the technical and operational requirements of the network;

**(C)** practices, procedures, and standards for the management and operation of such network;

**(D)** terms of service for the use of such network, including billing practices; and

**(E)** ongoing compliance review and monitoring of the--

**(i)** management and operation of such network;

**(ii)** practices and procedures of the entities operating on and the personnel using such network; and

**(iii)** necessary training needs of network operators and users.

**(2)** State and local planning

**(A)** Required consultation

In developing requests for proposals and otherwise carrying out its responsibilities under this chapter, the First Responder Network Authority shall consult with regional, State, tribal, and local jurisdictions regarding the distribution and expenditure of any amounts required to carry out the policies established under paragraph (1), including with regard to the--

**(i)** construction of a core network and any radio access network build out;

**(ii)** placement of towers;

**(iii)** coverage areas of the network, whether at the regional, State, tribal, or local level;

**(iv)** adequacy of hardening, security, reliability, and resiliency requirements;

**(v)** assignment of priority to local users;

**(vi)** assignment of priority and selection of entities seeking access to or use of the nationwide public safety interoperable broadband network established under subsection (b); and

**(vii)** training needs of local users.

**(B) Method of consultation**

The consultation required under subparagraph (A) shall occur between the First Responder Network Authority and the single officer or governmental body designated under section 1442(d) of this title.

**(3) Leveraging existing infrastructure**

In carrying out the requirement under subsection (b), the First Responder Network Authority shall enter into agreements to utilize, to the maximum extent economically desirable, existing--

**(A)** commercial or other communications infrastructure; and

**(B)** Federal, State, tribal, or local infrastructure.

**(4) Maintenance and upgrades**

The First Responder Network Authority shall ensure the maintenance, operation, and improvement of the nationwide public safety broadband network, including by ensuring that the First Responder Network Authority updates and revises any policies established under paragraph (1) to take into account new and evolving technologies.

**(5) Roaming agreements**

The First Responder Network Authority shall negotiate and enter into, as it determines appropriate, roaming agreements with commercial network providers to allow the nationwide public safety broadband network to roam onto commercial networks and gain prioritization of public safety communications over such networks in times of an emergency.

**(6) Network infrastructure and device criteria**

The Director of NIST, in consultation with the First Responder Network Authority and the Commission, shall ensure the development of a list of certified devices and components meeting appropriate protocols and standards for public safety entities and commercial vendors to adhere to, if such entities or vendors seek to have access to, use of, or compatibility with the nationwide public safety broadband network.

**(7) Representation before standard setting entities**

The First Responder Network Authority, in consultation with the Director of NIST, the Commission, and the public safety advisory committee established under section 1425(a) of this title, shall represent the interests of public safety users of the nationwide public safety broadband network before any proceeding, negotiation, or other matter in which a standards organization, standards body, standards

development organization, or any other recognized standards-setting entity addresses the development of standards relating to interoperability.

**(8) Prohibition on negotiation with foreign governments**

The First Responder Network Authority shall not have the authority to negotiate or enter into any agreements with a foreign government on behalf of the United States.

**(d) Exemption from certain laws**

Any action taken or decisions made by the First Responder Network Authority shall be exempt from the requirements of--

**(1)** section 3506 of Title 44 (commonly referred to as the Paperwork Reduction Act);

**(2)** chapter 5 of Title 5 (commonly referred to as the Administrative Procedures Act); and

**(3)** chapter 6 of Title 5 (commonly referred to as the Regulatory Flexibility Act).

**(e) Network Construction Fund**

**(1) Establishment**

There is established in the Treasury of the United States a fund to be known as the "Network Construction Fund".

**(2) Use of Fund**

Amounts deposited into the Network Construction Fund shall be used by the--

**(A)** First Responder Network Authority to carry out this section, except for administrative expenses; and

**(B)** NTIA to make grants to States under section 1442(e)(3)(C)(iii)(I) of this title.

**(f) Termination of authority**

The authority of the First Responder Network Authority shall terminate on the date that is 15 years after February 22, 2012.

**(g) GAO report**

Not later than 10 years after February 22, 2012, the Comptroller General of the United States shall submit to Congress a report on what action Congress should take regarding the 15-year sunset of authority under subsection (f).

# 47 U.S.C. § 1428

## § 1428. Permanent self-funding; duty to assess and collect fees for network use

…

### (c) Annual approval

The NTIA shall review the fees assessed under this section on an annual basis, and such fees may only be assessed if approved by the NTIA.

# 47 U.S.C. § 1429

## § 1429. Audit and report

### (a) Audit

### (1) In general

The Secretary of Commerce shall enter into a contract with an independent auditor to conduct an audit, on an annual basis, of the First Responder Network Authority in accordance with general accounting principles and procedures applicable to commercial corporate transactions. Each audit conducted under this paragraph shall be made available to the appropriate committees of Congress.

### (2) Location

Any audit conducted under paragraph (1) shall be conducted at the place or places where accounts of the First Responder Network Authority are normally kept.

### (3) Access to First Responder Network Authority books and documents

### (A) In general

For purposes of an audit conducted under paragraph (1), the representatives of the independent auditor shall--

**(i)** have access to all books, accounts, records, reports, files, and all other papers, things, or property belonging to or in use by the First Responder Network Authority that pertain to the financial transactions of the First Responder Network Authority and are necessary to facilitate the audit; and

**(ii)** be afforded full facilities for verifying transactions with the balances or securities held by depositories, fiscal agents, and custodians.

### (B) Requirement

All books, accounts, records, reports, files, papers, and property of the First Responder Network Authority shall remain in the possession and custody of the First Responder Network Authority.

### (b) Report

### (1) In general

The independent auditor selected to conduct an audit under this section shall submit

a report of each audit conducted under subsection (a) to--
**(A)** the appropriate committees of Congress;
**(B)** the President; and
**(C)** the First Responder Network Authority.
**(2) Contents**
Each report submitted under paragraph (1) shall contain--
**(A)** such comments and information as the independent auditor determines necessary to inform Congress of the financial operations and condition of the First Responder Network Authority;
**(B)** any recommendations of the independent auditor relating to the financial operations and condition of the First Responder Network Authority; and
**(C)** a description of any program, expenditure, or other financial transaction or undertaking of the First Responder Network Authority that was observed during the course of the audit, which, in the opinion of the independent auditor, has been carried on or made without the authority of law.

## 47 U.S.C. § 1430

### § 1430. Annual report to Congress

**(a) In general**
Not later than 1 year after February 22, 2012, and each year thereafter, the First Responder Network Authority shall submit an annual report covering the preceding fiscal year to the appropriate committees of Congress.

**(b) Required content**
The report required under subsection (a) shall include--
**(1)** a comprehensive and detailed report of the operations, activities, financial condition, and accomplishments of the First Responder Network Authority under this section; and
**(2)** such recommendations or proposals for legislative or administrative action as the First Responder Network Authority deems appropriate.

**(c) Availability to testify**
The members of the Board and employees of the First Responder Network Authority shall be available to testify before the appropriate committees of the Congress with respect to--
**(1)** the report required under subsection (a);
**(2)** the report of any audit conducted under section 1429 of this title; or
**(3)** any other matter which such committees may determine appropriate.

**47 U.S.C. § 1433**

**§ 1433. Provision of technical assistance**

The Commission may provide technical assistance to the First Responder Network Authority and may take any action necessary to assist the First Responder Network Authority in effectuating its duties and responsibilities under this subchapter.

**47 C.F.R. § 1.925**

**§ 1.925 Waivers.**

…

(b) Procedure and format for filing waiver requests.

(3) The Commission may grant a request for waiver if it is shown that:

(i) The underlying purpose of the rule(s) would not be served or would be frustrated by application to the instant case, and that a grant of the requested waiver would be in the public interest; or

(ii) In view of unique or unusual factual circumstances of the instant case, application of the rule(s) would be inequitable, unduly burdensome or contrary to the public interest, or the applicant has no reasonable alternative.

**47 C.F.R. § 90.1203**

**§ 90.1203 Eligibility.**

…

(b) 4.9 GHz band licensees eligible pursuant to paragraph (a) of this section may enter into sharing agreements or other arrangements for use of the spectrum with entities that do not meet the eligibility requirements in this section. However, all applications in the band are limited to operations in support of public safety.