# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 24, 2025          Decided July 21, 2026

No. 24-1363

PUBLIC SAFETY SPECTRUM ALLIANCE AND PUBLIC SAFETY
BROADBAND TECHNOLOGY ASSOCIATION,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

COALITION FOR EMERGENCY RESPONSE AND CRITICAL
INFRASTRUCTURE AND SAN FRANCISCO BAY AREA RAPID
TRANSIT DISTRICT,
INTERVENORS

———

Consolidated with 24-1364, 25-1028, 25-1034

———

On Petitions for Review of a Final Order
of the Federal Communications Commission

———

*Jessica R. Amunson* argued the cause for petitioners
Coalition for Emergency Response and Critical Infrastructure,
et al.  With her on the briefs were *Arjun R. Ramamurti, James*

2

*M. Smith*, *Hyland Hunt*, *Ruthanne M. Deutsch*, and *Phyllis A. Whitten*. *Elizabeth B. Deutsch* entered an appearance.

*Leif E. Overvold* argued the cause for petitioners Public Safety Spectrum Alliance and Public Safety Broadband Technology Association. With him on the briefs were *Andrew J. Pincus* and *Carmen Longoria-Green*.

*D. Adam Candeub*, General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Robert B. Nicholson* and *Shana M. Wallace*, Attorneys, U.S. Department of Justice, *Bradley Craigmyle*, Deputy General Counsel, Federal Communications Commission, *Sarah E. Citrin*, Deputy Associate General Counsel, and *Igor Helman*, Counsel. *Shana M. Wallace*, Attorney, U.S. Department of Justice, and *Jacob M. Lewis*, Associate General Counsel, Federal Communications Commission, entered appearances.

*Joshua Turner* argued the cause for respondent-intervenors Public Safety Spectrum Alliance, et al. With him on the brief were *Sara Baxenberg*, *Andrew J. Pincus*, and *Carmen Longoria-Green*.

*Hyland Hunt*, *Ruthanne M. Deutsch*, *Phyllis A. Whitten*, *Jessica Ring Amunson*, and *Arjun R. Ramamurti* were on the brief for respondent-intervenors Coalition for Emergency Response and Critical Infrastructure, et al. *Boyd Garriott* entered an appearance.

Before: WILKINS, KATSAS, and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

3

KATSAS, *Circuit Judge*: This case involves communications within a band of electromagnetic spectrum that is reserved for public-safety organizations and persistently underutilized. The Federal Communications Commission has determined to select a "Band Manager" to better manage these communications. In the order under review, the FCC has prospectively authorized the Band Manager, as yet unselected, to transfer unused spectrum within the band to FirstNet, a federal entity that has successfully built a public-safety communications network in a different frequency band. Some petitioners argue that the FCC went too far in restricting the rights of incumbent licensees, while others fault the agency for not going far enough. We hold that the latter group of petitioners lacks Article III standing and that the claims of the former group either fail on the merits or are unripe.

I

The Communications Act of 1934 authorizes the FCC to regulate radio and wire communications through the electromagnetic spectrum. 47 U.S.C. § 151. The agency may designate bands of spectrum for particular kinds of communications and then license companies to operate within each band. *Id.* §§ 303(c), 307; *see PSSI Glob. Servs., LLC v. FCC*, 983 F.3d 1, 4 (D.C. Cir. 2020). In 2002, the FCC reserved what it calls the 4.9 gigahertz (GHz) band of spectrum, which encompasses a range of spectrum around that frequency, for use by public-safety organizations like state or local police and fire departments. *In the Matter of the 4.9 GHz Band Transferred from Federal Government Use*, 17 FCC Rcd. 3,955, 3,956 (2002).

A different regulatory system governs use of spectrum on radio stations "belonging to and operated by the United States." 47 U.S.C. § 305(a). The Communications Act bars the FCC

4

from licensing or assigning frequency to such federal entities, instead reserving that power for the President. *Id.* And the Telecommunications Authorization Act of 1992 authorizes the National Telecommunications and Information Administration (NTIA), a component of the Department of Commerce, to exercise the President's regulatory authority over such federal entities. *Id.* § 902(b)(2)(A). The FCC and NTIA have issued a memorandum of understanding to coordinate their respective regulatory responsibilities. *Memorandum of Understanding Between the Federal Communications Commission and the National Telecommunications and Information Administration* (Aug. 1, 2022), https://perma.cc/NT3Q-2RMB (FCC/NTIA Memorandum).

The Spectrum Act of 2012, enacted a decade after the FCC designated the 4.9 GHz band for public-safety uses, undertook to bolster the infrastructure for such communications. That statute created an entity called the First Responder Network Authority or FirstNet, an independent authority within the NTIA. 47 U.S.C. § 1424(a). Congress charged FirstNet with building and operating a nationwide public-safety broadband network. *Id.* §§ 1422(a), 1426(b)(1). And despite the FCC's general lack of licensing authority over federal entities, Congress required the FCC to license FirstNet to use spectrum within the 700 megahertz (MHz) band. *Id.* § 1421(a).

To fulfill its statutory responsibilities, FirstNet contracted with AT&T to build and operate the public-safety network mandated by Congress. The contract authorizes AT&T to use FirstNet's spectrum in the 700 MHz band for AT&T's own commercial purposes, but only on a secondary, interruptible basis. That means AT&T's use of this spectrum may not interfere with primary public-safety operations, and AT&T's communications are not protected from any interference by those operations. *See* 47 C.F.R. § 90.7. This partnership has

5

achieved success: The national public-safety broadband network supports some 26,000 public-safety organizations and five million connections in the 700 MHz frequency band. *See* FirstNet, *Fiscal Year 2023 Annual Report to Congress* 7 (2024), https://perma.cc/HK5Q-LEUN.

In contrast to the 700 MHz band, however, the 4.9 GHz band has been persistently underutilized. As of October 2024, the FCC had issued just 3,676 licenses in the band, which amounts to a small fraction of the tens of thousands of organizations that are eligible to use the band. In March 2018, the FCC reported that just 3.5 percent of potential licensees were using the band, which caused the agency to "remain concerned" that the band had "fallen short of its potential." *In the Matter of Amendment of Part 90 of the Commission's Rules*, 33 FCC Rcd. 3,261, 3,262 (2018).

One source of this problem has been the FCC's use of broad geographic licenses within the 4.9 GHz band. Such a license allows its holder to set up stations—physical structures that connect individual devices to the broader communications network—anywhere within the jurisdiction of the public-safety organization. 47 C.F.R. § 90.1207(a). In addition, the license authorizes communications on a range of individual frequency channels within the band. *Id.* Given these license characteristics, no licensee in the 4.9 GHz band has an exclusive right to use any given portion of the spectrum without interference from other users. *Id.* § 90.1209(a). Furthermore, no regulator seeks to coordinate communications to minimize interference. Concern about interference has suppressed use of the band. And low usage has made it difficult for licensees to acquire necessary technology at reasonable prices.

6

II

A

To address these problems within the 4.9 GHz band, the FCC has undertaken to change its current regulatory approach. In 2007, the agency initiated a rulemaking to consider possible changes. *Amendment of Part 90 of the Commission's Rules*, 72 Fed. Reg. 32,582 (2007). In 2023, as part of that rulemaking, the FCC promulgated an order laying the groundwork for a more coordinated regulatory framework. *In the Matter of Amendment of Part 90 of the Commission's Rules*, 38 FCC Rcd. 704 (2023) (*Seventh Report and Order*). That order provides for the appointment of a "Band Manager" to establish "consistent, nationwide rules" governing use of the 4.9 GHz band. *Id.* at 705. The order also prospectively allows the Band Manager to allow uses unrelated to public safety. *Id.* The FCC has yet to select the Band Manager.

The order under review here, issued in October 2024, elaborates on this new regulatory framework. *In the Matter of Amendment of Part 90 of the Commission's Rules*, 39 FCC Rcd. 12,032 (2024) (*Eighth Report and Order*). This order contemplates that the FCC will take unused spectrum from incumbent licensees in the 4.9 GHz band and assign it to the Band Manager, which will then transfer the spectrum to FirstNet. *Id.* at 12,033. To accomplish that goal, the order prospectively authorizes the Band Manager to apply for a nationwide license to use unassigned spectrum in the band. *Id.* But instead of using this spectrum itself, the Band Manager will contract to transfer the spectrum to FirstNet. *See id.*

To create more spectrum for FirstNet, the order also provides for narrowing the terms of existing licenses in the 4.9 GHz band. The FCC will require incumbent licensees to apply for new site-specific licenses, which will cover only the

7

specific areas and frequency channels currently used by each incumbent. *Eighth Report and Order*, 39 FCC Rcd. at 12,067. When the incumbents receive these new licenses, their existing licenses "will be cancelled." *Id.* at 12,068. And while the FCC gathers more detailed data about current use of the 4.9 GHz Band, the order prevents incumbent licensees from expanding their current operations within it. *Id.* at 12,067.

B

Six organizations have filed a total of four petitions for review of the *Eighth Report and Order*. The petitioners fall into two groups. One group argues that the order exceeds the FCC's statutory authority and arbitrarily impairs the rights of incumbent licensees. These petitioners are the Coalition for Emergency Response and Critical Infrastructure (CERCI), the San Francisco Bay Area Rapid Transit (BART), the National Sheriffs' Association, and the California State Sheriffs' Association. We refer collectively to these four entities as the CERCI petitioners. The second group argues that the order arbitrarily failed to impose further restrictions on the terms of existing licenses. These petitioners are the Public Safety Spectrum Alliance (PSSA) and the Public Safety Broadband Technology Association (PSBTA), which we group together as the PSSA petitioners.

III

We first consider our subject-matter jurisdiction to entertain these various challenges.

A

Our statutory jurisdiction is secure. The Hobbs Act grants this Court jurisdiction to review all final FCC orders that are "made reviewable by section 402(a) of title 47" of the United

8

States Code. 28 U.S.C. § 2342(1). Section 402(a), in turn, makes reviewable all FCC orders "except those appealable under subsection (b)" of section 402. Because the Order at issue here is not among the categories of orders described in section 402(b), we have statutory authority to review it under the Hobbs Act. *See Viasat, Inc. v. FCC*, 47 F.4th 769, 776 n.1 (D.C. Cir. 2022).

B

Our constitutional jurisdiction, however, is less clear. Under Article III of the Constitution, the "judicial Power" of the federal courts extends only to resolving "Cases" or "Controversies." U.S. Const. Art. III §§ 1–2. To create a case or controversy, a plaintiff or petitioner must demonstrate its standing to sue. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Because the PSSA petitioners have not done so, we dismiss their petition for lack of jurisdiction. But we reach the merits of the CERCI petitioners' arguments, since one of the entities in that group has established its standing.

1

The PSSA petitioners assert associational standing. Each association must show, among other things, that its members would have standing to sue individually. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). That means that the member has suffered an injury that is fairly traceable to the *Eighth Report and Order* and likely to be redressed by a favorable judicial decision. *See Defs. of Wildlife*, 504 U.S. at 560–61. Each petitioner must point to evidence—not allegations—proving the elements of standing. *Viasat*, 47 F.4th at 781. So, entities claiming associational standing must submit "individual affidavits" or declarations from identified members who have suffered the requisite harm. *Summers v. Earth Island Inst.*, 555

9

U.S. 488, 499 (2009).  It is "not enough to aver that unidentified members have been injured."  *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019).  Moreover, to ensure that standing questions may be aired out in the ordinary course, the petitioner must submit the necessary affidavits or declarations no later than when it files its opening brief.  *See* D.C. Cir. R. 28(a)(7); *Twin Rivers Paper Co.*, 934 F.3d at 613; *Sierra Club v. EPA*, 292 F.3d 895, 900–01 (D.C. Cir. 2002).

The PSSA petitioners failed to prove their Article III standing under these standards.  In their opening brief, they offered only a conclusory assertion that their members "include public safety officials and organizations that are subject to the Order."  PSSA Br. at 28.  That assertion, which fails to establish specific injuries suffered by identified members, does not suffice.  *See Earth Island Inst*., 555 U.S. at 499; *Twin Rivers Paper Co.*, 934 F.3d at 613.

Nor do the declarations attached to the PSSA petitioners' reply brief.  We have sometimes permitted petitioners to prove standing in a reply brief, if they can show "good cause" for failing to do so sooner.  *See Twin Rivers Paper Co.*, 934 F.3d at 614.  Here, there is no such good cause because the PSSA petitioners could not have reasonably believed either that (1) their opening brief proved standing under *Earth Island* or (2) their standing was self-evident from the administrative record, which contains no facts about the members or their alleged injuries.  *See id.* at 613–14.[1]  In any event, the

---

[1] The PSSA petitioners filed their opening brief on June 3, 2025, some two months before amendments to D.C. Circuit Rule 28(a)(7) took effect.  *See SSM Litig. Grp. v. EPA*, 150 F.4th 593, 596 n.1 (D.C. Cir. 2025).  The amended Rule 28(a)(7) requires petitioners to include arguments and evidence establishing standing in their opening briefs "regardless of whether standing is apparent from the administrative record."  *Id.*  We have indicated that this amendment,

10

declarations are also deficient because none of the declarants asserts that he (or his organization) is a member of either PSSA or PSBTA. *See Viasat*, 47 F.3d at 781–82.

Because the PSSA petitioners failed to prove Article III standing, we dismiss their petitions for lack of jurisdiction.

2

At least one of the CERCI petitioners—BART—has proven its Article III standing. One of its managers submitted a timely declaration explaining that BART holds a license to operate in the 4.9 GHz band. Because the *Eighth Report and Order* restricts BART's rights under its existing license, Bart has suffered a qualifying Article III injury.

Our conclusion that BART has standing tees up the challenges collectively pressed by the CERCI petitioners, regardless of whether the other CERCI petitioners also have standing. *See Biden v. Nebraska*, 600 U.S. 477, 489 (2023). We thus proceed to resolve these challenges.

IV

The Administrative Procedure Act requires us to set aside FCC action that is contrary to law or arbitrary. 5 U.S.C. § 706(2)(A). The CERCI petitioners argue that the *Eighth Report and Order* violates several statutory provisions, violates an FCC regulation, and is arbitrary. We construe statutes *de*

---

upon taking effect, "eliminate[d] the exception" for reasonable reliance on the administrative record. *Entergy Ark., LLC v. FERC*, 134 F.4th 576, 582 n.3 (D.C. Cir. 2025). Because the PSSA petitioners filed their opening brief before the amendment became effective, we have assessed whether they demonstrated good cause under that exception.

11

*novo*, with no deference to the views of the agency. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). An agency's interpretation of its own regulation may sometimes be entitled to deference. *See Kisor v. Wilkie*, 588 U.S. 558, 574–79 (2019). But because we uphold the FCC's interpretation under *de novo* review, we need not consider any question about such deference. As for the claim of arbitrariness, we review an agency's discretionary judgments deferentially, considering only whether they are "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

A

The CERCI petitioners argue that the Order contravenes Spectrum Act limitations on FirstNet's authority, Communications Act requirements of competitive bidding, statutory provisions barring the FCC from exercising control over FirstNet, and an FCC rule restricting federal licensees' use of the 4.9 GHz band. We reject these contentions.

1

The Spectrum Act requires FirstNet to "ensure the establishment of a nationwide, interoperable public safety broadband network" and, to that end, it requires the FCC to "grant a license to" FirstNet "for the use of the 700 MHz" band of spectrum. 47 U.S.C. §§ 1421(a), 1422(a). Likewise, the statute requires FirstNet to develop network equipment "capable of being used … in the 700 MHz band." *Id.* § 1426(b)(2)(B)(ii). Invoking the *expressio unius* canon, the CERCI petitioners argue that these provisions, which require various FirstNet activity in the 700 MHz band, implicitly forbid FirstNet from using spectrum in other bands.

12

The Spectrum Act does not limit FirstNet to the 700 MHz band, expressly or otherwise. To the contrary, it required FirstNet to establish "a nationwide … public safety broadband network" without specifying any specific frequency band. 47 U.S.C. § 1422(a). The Act separately required the FCC to allow FirstNet to use the 700 MHz band, thus providing for such a network to begin within that frequency band. *Id.* § 1421(a). But far from limiting the network to that band, Congress required FirstNet to develop "national network architecture that evolves with technological advancements," *id.* § 1422(b), and to "ensure the … improvement" of the network by "tak[ing] into account new and evolving technologies," *id.* § 1426(c)(4). Congress also gave FirstNet broad authority to "take all actions necessary" to build and operate the network, *id.* § 1426(b)(1), and to "take such other actions" as it thinks "advisable to accomplish the purposes of this chapter," *id.* § 1426(a)(6). Moreover, Congress established FirstNet as an "authority within the NTIA," *id.* § 1424(a), which is itself a body within the Commerce Department, *id.* § 902(a)(1). This allowed FirstNet to be assigned additional spectrum by the NTIA, exercising its authority under the Telecommunications Authorization Act. *Id.* § 902(b)(2)(A).

Finally, we note that even the CERCI petitioners do not really embrace their own position that Congress has impliedly prohibited FirstNet from using spectrum outside the 700 MHz band. An FCC regulation, which we address in more detail below, permits state and local governments licensed to broadcast in the 4.9 GHz band to share this spectrum with federal entities. *See* 47 C.F.R. § 2.103(b). At oral argument, the CERCI petitioners conceded that state and local governments could lawfully share that spectrum with FirstNet pursuant to this regulation. Oral Arg. Tr. at 25–26, 29. But such sharing—within the 4.9 GHz band—would be impossible

13

if the Spectrum Act impliedly barred FirstNet from using any spectrum outside the 700 MHz band.

Given the breadth of FirstNet's authority, the evolving nature of its communications network, and the independent statutory mechanism for FirstNet to receive additional spectrum assigned by the NTIA, we hold that the Spectrum Act does not limit FirstNet to the 700 MHz band.

2

The Communications Act requires competitive bidding whenever the FCC accepts "mutually exclusive applications" for any initial license. 47 U.S.C. § 309(j)(1). However, the statute provides an exemption for certain public safety radio services, so long as they are not made commercially available. *Id.* § 309(j)(2)(A). And it creates a rule of construction that nothing in section 309(j) shall "be construed to relieve the Commission of the obligation in the public interest to continue … to avoid mutual exclusivity in application and licensing proceedings." *Id.* § 309(j)(6)(E).

The *Eighth Report and Order* invoked the exemption and the rule of construction to conclude that the FCC need not use competitive bidding to select the Band Manager. *See* 39 FCC Rcd. at 12,046–48 & n.107. The CERCI petitioners argue that this was legal error. We hold that the FCC properly invoked the rule of construction, so we need not consider whether it also properly invoked the public-safety exemption.

By its terms, the rule of construction preserves a statutory obligation for the FCC to "avoid mutual exclusivity" in licensing, 47 U.S.C. § 309(j)(6)(E), despite a general requirement for competitive bidding whenever the agency accepts "mutually exclusive" license applications, *id.* § 309(j)(1). Here, the FCC did not accept such mutually

14

exclusive applications. To the contrary, it sought to combat an extant problem of interference due to overlapping geographic licenses, which had resulted in chronic underutilization of the 4.9 GHz band. To address those problems, the FCC created a Band Manager to referee competing uses within the band. *Eighth Report and Order*, 39 FCC Rcd. at 12,058. And it then authorized the Band Manager to apply for a nationwide license for the purpose of transferring spectrum to FirstNet, a federal entity with demonstrated expertise in building up a public-safety communications network. *See id.* These structural adjustments in the governing regulatory framework bear little resemblance to the heartland application of section 309(j)(1), requiring competitive bidding for selecting which of two competing, private companies will obtain valuable use of the public airwaves for its own benefit. And the adjustments fall within the heartland of what the construction rule requires, namely regulatory efforts to avoid "mutual exclusivity" in the first place. Because the FCC reasonably concluded that avoiding mutually exclusive applications would serve the public interest, the agency permissibly exempted the Band Manager's license from competitive bidding. *See NTCH, Inc. v. FCC*, 950 F.3d 871, 881–82 (D.C. Cir. 2020) (per curiam).

The CERCI petitioners object that the FCC did not actually invoke the rule of construction. They are correct that the FCC spilled more ink on the exemption, but its reasoning rests on both. The *Eighth Report and Order* concludes that selecting the Band Manager through a process established by its wireless and public-safety bureaus "will be more efficient and effective in ensuring that the entity that applies for the license is the most qualified." 39 FCC Rcd. at 12,047 n.107. To support that conclusion, the agency cited administrative and judicial precedents broadly construing its authority to dispense with competitive bidding, including an FCC decision explaining that section 309(j)(6)(E) allows the agency to forgo

15

competitive bidding if it finds that the public interest warrants doing so. *In the Matter of Implementation of Sections 309(j) and 337 of the Communications Act of 1934 As Amended*, 15 FCC Rcd. 22,709, 22,713 ¶ 11 (2000); *see also Rainbow Broad. Co. v. FCC*, 949 F.2d 405, 410 (D.C. Cir. 1991) (similar). Given the intended purpose of the Band Manager to referee competing spectrum uses and to transfer spectrum to a federal entity, rather than to broadcast for profit, we conclude that the FCC's invocation of section 309(j)(6)(E) was neither unlawful nor arbitrary.

3

The CERCI petitioners contend that the *Eighth Report and Order* also exceeds the FCC's very limited authority over federal entities. As noted above, the Communications Act provides for the President, not the FCC, to license and assign frequencies to "[r]adio stations belonging to and operated by the United States," 47 U.S.C. § 305(a), while the Telecommunications Authorization Act vests this authority in the NTIA, *id.* § 902(b)(2)(A). As the respective agencies have recognized, the FCC is thus "the exclusive regulator of non-Federal spectrum use," whereas the NTIA is "the sole agency responsible for authorizing Federal spectrum use." FCC/NTIA Memorandum, *supra*, at 2.

As the CERCI petitioners explain, these provisions do not authorize the FCC to assign spectrum in the 4.9 GHz band to FirstNet. Moreover, they forcefully argue that the *Eighth Report and Order* simply does that indirectly, by licensing a Band Manager for the express purpose of transferring spectrum in the 4.9 GHz band to FirstNet. If the FCC cannot assign spectrum to FirstNet directly, the CERCI petitioners contend, then they cannot accomplish the same thing by creating and licensing such a pass-through entity.

16

Although this argument has some force, it is not yet ripe for our review. The FCC has long allowed its licensees to transfer or share spectrum with third parties that do not themselves hold FCC licenses, including federal entities. *See, e.g.*, *In the Matter of Partitioning, Disaggregation, and Leasing of Spectrum*, 37 FCC Rcd. 8,825, 8,827 (2022). More specifically, the FCC permits state and local governments with FCC licenses in the 4.9 GHz band to share spectrum with federal entities. 47 C.F.R. § 2.103(b). The NTIA—which licenses, regulates, and assigns spectrum to federal entities— agrees that those entities may "use … spectrum managed by the Commission." *Eighth Report and Order*, 39 FCC Rcd. at 12,057 n.159. And the FCC acknowledges that "federal entities must submit their requests to use non-government spectrum with NTIA in accordance with Section 305." *Id.* at 12,057 n.162 (cleaned up). Given all this, there would seem to be no problem if the FCC were to authorize one of its licensees to transfer spectrum to a federal entity and the NTIA were to authorize the federal entity to accept the additional spectrum.

In this matter, the NTIA has been strangely silent about a major FCC regulatory initiative proposing just such a transfer. Given the statutory scheme that the CERCI petitioners invoke, we would have substantial doubts about the lawfulness of implementing the *Eighth Report and Order* without appropriate authorization from the NTIA, which has responsibility for licensing and regulating FirstNet—the intended recipient of the spectrum transfer contemplated by the FCC. Nonetheless, the *Eighth Report and Order* does not itself purport to allow FirstNet to use spectrum in the 4.9 GHz band. To the contrary, under the framework it establishes, FirstNet cannot use that spectrum until the FCC selects a Band Manager, which then will negotiate a spectrum transfer agreement with FirstNet, which the FCC then will have to approve. *Eighth Report and Order*, 39 FCC Rcd. at 12,060–

17

61.  But none of that has occurred yet.  If the FCC, in making its necessary future authorizations, purports to unilaterally license FirstNet to use spectrum in the 4.9 GHz band without any separate approval from the NTIA, then the CERCI petitioners' argument about *ultra vires* FCC action will be ripe for review.  But until then, we decline to definitively decide what role the NTIA must play in all of this without any clear sense of how the selection, negotiation, and transfer will unfold.  Deferring review on that question will help sharpen the questions presented and will present no significant hardship for the CERCI petitioners.  *See*, *e.g.*, *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967); *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 386–87 (D.C. Cir. 2012).

4

The CERCI petitioners claim that the *Eighth Report and Order* violates the FCC rule permitting state and local governments to share spectrum in the 4.9 GHz band with federal licensees.  In pertinent part, the rule provides that "federal stations may … use channels in" the 4.9 GHz band if "the federal entity obtains the approval of the non-federal (State/local government) licensee(s) or applicant(s) involved." 47 C.F.R. § 2.103(b) (cleaned up).  According to the CERCI petitioners, this provision requires FirstNet, in order to use spectrum within the 4.9 GHz band, to obtain the consent of all the state and local governments already licensed to do so.

We reject this argument.  For one thing, we read the regulation to govern only inter-governmental agreements between federal-government licensees on the one hand and either state- or local-government licensees on the other.  The regulation does not address agreements between federal licensees (like FirstNet) and FCC licensees (like the Band Manager) that are not governmental entities at all.  Moreover,

18

even if the regulation did govern all use of the 4.9 GHz band by any federal station, it still applies only to agreements between the federal licensee and the other "licensee(s) or applicant(s) involved."   47 C.F.R. § 2.103(b).   Here, the licensee or licensees "involved" in the prospective agreement with FirstNet is the Band Manager—the private entity on the other side of the agreement.   And the FCC has required the Band Manager, once selected, to negotiate such an agreement with FirstNet.

In sum, we see no statute or regulation prohibiting a federal licensee like FirstNet from using spectrum assigned to a non-federal licensee like the Band Manager, at least if the NTIA and the FCC, using their respective authorities to assign spectrum to federal and non-federal entities, jointly approve the contemplated transfer of spectrum.

B

The CERCI petitioners contend that the *Eighth Report and Order* is arbitrary for multiple reasons.  To survive APA review for arbitrariness, agency action need only be "reasonable and reasonably explained."  *Prometheus Radio Project*, 592 U.S. at 423.  The order here clears that hurdle.

First, the CERCI petitioners contend that the FCC failed to adequately consider the reliance interests of incumbent licensees.  In stripping these licensees of the right to use spectrum that they were authorized to use but not already using, the order creates some hardship for incumbents who have made investments to expand operations in the 4.9 GHz band.  But since 1934, Congress has made clear that a broadcast license does not create any "ownership" interest. 47 U.S.C. § 301.  So, "no person is to have anything in the nature of a property right as a result of the granting of a license." *Am. Broad. Co. v. FCC*, 191 F.2d 492, 497 (D.C. Cir. 1951) (quoting *FCC v. Sanders*

19

*Bros. Radio Station*, 309 U.S. 470, 475 (1940)).  And the FCC "may revoke any station license" in service of the public interest.  *Id.*  The FCC thus may extinguish a licensee's investment-backed reliance on its license, so long as it has "assess[ed] whether there were reliance interests, determin[ed] whether they were significant, and weigh[ed] any such interests against competing policy concerns." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 940–41 (D.C. Cir. 2021) (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020)); *see also Affirmed Energy, LLC v. FERC*, 166 F.4th 1070, 1088 (D.C. Cir. 2026) ("It falls to the agency to decide whether any reliance interests are outweighed by other factors.").

The FCC did so here.  It acknowledged that some incumbents have "invested in systems that they hoped to use to modify or expand current operations." *Eighth Report and Order*, 39 FCC Rcd. at 12,067.  But the agency concluded that the project's public-safety benefits outweighed these reliance interests.  *Id.*  And it noted that applicants who face special hardship because of the freeze on expanding operations may seek a waiver under FCC regulations.  *Id.* (citing 47 C.F.R. § 1.925).  Moreover, incumbents should have readily appreciated the heightened risks of seeking to expand their operations within the 4.9 GHz band.  For more than a decade, the FCC has been actively contemplating, in the same open rulemaking, significant changes to the management of the 4.9 GHz band.  *See*, *e.g.*, *In the Matter of Amendment of Part 90 of the Commission's Rules*, 27 FCC Rcd. 6,577, 6,578 (2012) (proposing to "establish appropriate frequency coordination procedures" for the band).  Additionally, the agency had prevented incumbent licensees from modifying or expanding their operations in the 4.9 GHz band from September 2020 through October 2021. *See In the Matter of Amendment of Part 90 of the Commission's Rules*, 36 FCC Rcd. 15,032, 15,041 (2021).  And the Order simply reimposes the freeze on

20

essentially the same terms.  *See Eighth Report and Order*, 39 FCC Rcd. at 12,067.  All of this surely alerted the incumbents to the hazards of seeking to expand operations within the band.

Second, the CERCI petitioners contend that the FCC arbitrarily decided to cancel the incumbents' current licenses before collecting "granular data" showing the precise extent of any underutilization.  *Eighth Report and Order*, 39 FCC Rcd. at 12,067–68.  But even before determining exactly which spectrum remained unused, the FCC had ample support for its longstanding conclusion that regulatory reform was necessary to ensure that the band is "efficiently and intensely utilized." *Id.* at 12,032; *see*, *e.g.*, *Seventh Report and Order*, 38 FCC Rcd. at 711 (reform necessary to "move the band away from being underutilized").  The FCC could reasonably conclude that chronic underutilization was a significant problem before ascertaining its exact extent.

Third, the CERCI petitioners contend that it was arbitrary for the FCC to defer deciding what procedures it will use to select the Band Manager and whether the Band Manager's eventual agreement with FirstNet will satisfy regulatory requirements.  But agencies may address problems incrementally.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 522 (2009).  And because "an agency would be paralyzed if all the necessary answers had to be in before any action at all could be taken," it may reasonably "defer resolution of issues raised in a rulemaking." *Nat'l Ass'n of Broads. v. FCC*, 740 F.2d 1190, 1210 (D.C. Cir. 1984).  The FCC permissibly left to its wireless and public-safety bureaus the task of specifying the exact procedures for selecting the Band Manager.  And it was not compelled to somehow evaluate possible terms of the anticipated contract between FirstNet and the Band Manager before the contract was even negotiated.

21

Fourth, the CERCI petitioners say that the FCC arbitrarily ignored concerns about FirstNet's supposedly poor management. But as the FCC noted, the NTIA has committed to ensuring that FirstNet complies with certain recommendations of an inspector general. *Eighth Report and Order*, 39 FCC Rcd. at 12,053 n.145. And under the longstanding presumption of regularity, the FCC could reasonably conclude that its sister agency will adequately discharge its legal responsibility to regulate FirstNet appropriately. *See United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926).

Finally, the CERCI petitioners argue that the Order will eventually allow AT&T—a commercial rival of CERCI members Verizon and T-Mobile—to access the 4.9 GHz band for AT&T's commercial use. FirstNet has a contract with AT&T that allows AT&T to use any "excess network capacity" on FirstNet's national public-safety broadband network on a "secondary, interruptible basis." *Eighth Report and Order*, 39 FCC Rcd. at 12,055 n.154. The CERCI petitioners object that allowing AT&T to access the 4.9 GHz band does not advance public safety. But neither does it advance public safety for incumbent licensees to hoard spectrum that they are not using. And, as the FCC explained, it does advance public safety for FirstNet to "use the 4.9 GHz band to support upgrades" to FirstNet's national public-safety network. *Id.* Moreover, the FCC reasonably predicted that FirstNet's use of this spectrum would incentivize providers to develop new commercial technologies that will benefit public-safety organizations. *See id.* at 12,054–55. The fact that FirstNet will share spectrum with its commercial partner, as consideration for AT&T's services to FirstNet, does not outweigh what the FCC reasonably saw as the "multiple public interest benefits that will flow from FirstNet's future access" and the resulting maximization of the 4.9 GHz band's potential, including the

22

provision of top-class internet services to public-safety entities. *Id.* at 12,054–55 & n.154.

V

The petition for review filed by PSSA and PSBTA in No. 24-1363 is dismissed for lack of Article III standing. The remaining petitions for review are denied on the merits in part and dismissed in part as unripe, as discussed above.

*So ordered.*